1

**WERGE & CORBIN LAW GROUP**
Thomas E.M. Werge (State Bar # 362485)
2
*tom@werge.law*
3
1736 Race Street
Denver, CO 80206
4
Telephone: (303) 586-4900
Facsimile: (720) 554-8042
5

6

**FROST, LLP**
7
Christopher Frost (State Bar No. 200336)
*chris@frostllp.com*
8
Paul Ghazaryan (State Bar No. 317876)
9
*paul@frostllp.com*
Nico Brancolini (State Bar No. 318237)
10
*nico@frosllp.com*
11
10960 Wilshire Blvd., Suite 2100
Los Angeles, CA 90024
12
Telephone: (424) 254-0441
Facsimile: (424) 600-8504
13

14
*Attorneys for Plaintiff*
15
MATTHEW SPATOLA p/k/a
MATTY SPATS
16

17
UNITED STATES DISTRICT COURT
18
**CENTRAL DISTRICT OF CALIFORNIA**

19
MATTHEW SPATOLA p/k/a MATTY SPATS,
20
       Plaintiff,
21
       v.
22
JASON DESROULEAUX p/k/a JASON
23
DERULO; and SONY MUSIC
ENTERTAINMENT d/b/a COLUMBIA
24
RECORDS,
25
       Defendants.
26

27

28

CASE NO. 2:23-CV-06191-MWF-E

**PLAINTIFF MATTHEW SPATOLA'S NOTICE OF MOTION TO AMEND SCHEDULING ORDER AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT**

Action Filed: July 31, 2023
Final Pretrial Conf.: March 30, 2026
Trial Date: April 21, 2026

---

NOTICE OF MOTION TO AMEND SCHEDULING ORDER AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT
-1-

# **NOTICE OF MOTION AND MOTION**

TO THE COURT, THE PARTIES, AND THEIR COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on March 2, 2026, or as soon thereafter as the matter may be heard in Courtroom 5A of Honorable Michael W. Fitzgerald, United States District Court, Central District of California, Western Division located at 350 W First Street, Los Angeles, California, Plaintiff Matthew Spatola p/k/a Matty Spats, will, and hereby does, move this Court for an order amending the scheduling order to allow Plaintiff to file a Second Amended Complaint, adding negligence and unjust enrichment causes of action against Defendant Jason Derulo.

This Motion is based on the Notice of Motion, the following Memorandum of Points and Authorities, any accompanying declarations and exhibits filed concurrently herewith, any further briefing in connection with this Motion, all pleadings and other records on file in this action, and upon such further evidence and arguments as may be presented to the Court at the time of the hearing, and any and all other materials the Court deems proper.

This Motion made is made following the conference of counsel pursuant to Central District Local Rule 7-3, which occurred on January 12, 2026.

NOTICE OF MOTION TO AMEND SCHEDULING ORDER AND
MOTION FOR LEAVE TO FILE SECOND
AMENDED COMPLAINT

1 | Dated: February 2, 2026

Respectfully submitted,

2

*/s/ Thomas E.M. Werge*

3

4 | **WERGE & CORBIN LAW GROUP**
Thomas E.M. Werge

5

6 | **FROST, LLP**
Christopher Frost

7

8 | *Attorneys for Plaintiff*
MATTHEW SPATOLA p/k/a MATTY

9 | SPATS

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

NOTICE OF MOTION TO AMEND SCHEDULING ORDER AND
MOTION FOR LEAVE TO FILE SECOND
AMENDED COMPLAINT

1

# TABLE OF CONTENTS

2    I.    INTRODUCTION .............................................................................................5

3    II.   LEGAL STANDARD ......................................................................................7

4    III.  ARGUMENT ...................................................................................................9

5
6            A.    Good Cause Exists Because the Proposed Amendment
7                  Responds to Newly Asserted Defenses That Directly
                   Implicate Plaintiff's Available Relief.............................................9

8            B.    The Existing Constructive Trust Allegations Encompass
9                  Defendants' Negligent Conduct and Unjust Retention of
                   Benefits. ........................................................................................10

10
11           C.    Plaintiff's Allegations of Lost Opportunities and
                   Reputational Harm Are Embedded in the Constructive
12                 Trust Claim. ...................................................................................11

13           D.    Diligence in Seeking Leave to Amend. ..........................................13

14           E.    The Amendment Will Not Prejudice Defendants.........................15

15
16           F.    Denying Amendment Would Substantially Prejudice
                   Plaintiff. ........................................................................................16

17
18           G.    The Amendment Preserves Triability Without Expanding
                   the Case..........................................................................................16

19
20           H.    Plaintiff's Request Is Made in Good Faith and Advances
                   Judicial Economy...........................................................................17

21           I.    Not Allowing Modification Would Be Unjust to Plaintiff.........17

22           J.    Amendment Should Be Permitted Under Rule 15's Liberal
23                 Standard. ........................................................................................17

24                 1.    The Timing of the Amendment Is Reasonable Under
                         the Circumstances..............................................................18

25
26                 2.    Justice Strongly Favors Resolving the Case on the
                         Merits..................................................................................18

27                 3.    The Proposed Amendment Is Not Futile...........................19

28           K.    Plaintiff's Negligence Claim is Properly Pleaded in the

Alternative to the Joint Authorship–based Constructive Trust Claim. ...............................................................19

    1.    The Constructive Trust Claim Depends on Joint Authorship; Negligence Does Not. ..................................20

    2.    The Negligence Claim Is Not a Repackaged Ownership Dispute. ...........................................................21

    3.    Disallowing the Negligence Claim Now Would Improperly Force an Election of Remedies. ....................21

    4.    Alternative Pleading Promotes Judicial Economy and Fairness. ...........................................................21

  L.    Plaintiff's Unjust Enrichment Claim is Properly Pled in the Alternative to Joint Authorship. ...........................................22

    1.    Unjust Enrichment Is Properly Pleaded in the Alternative Under  Rule 8(d). ............................................22

    2.    The Unjust Enrichment Claim Does Not Depend on Copyright Ownership. ...........................................22

    3.    The Unjust Enrichment Claim Is Not Preempted by the Copyright Act. ...............................................23

    4.    Dismissing the Unjust Enrichment Claim Now Would Be Premature. ...........................................................24

    5.    Alternative Pleading Promotes Fairness and Judicial Economy. ...........................................................24

IV.    CONCLUSION ...................................................24

<u>Cases</u>

*Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999)..................................................9

*Del Madera Properties v. Rhodes and Gardner, Inc.,* 820 F. 2d 973 (9th Cir. 1987) ............................................................................................................................23

*DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1202 (3d Cir. 1978) ........8

*Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) ....9, 15

*Foman v. Davis*, 371 U.S. 178, 182 (1962) ................................................................18

*Globe Indemnity Co. v. Capital Ins. & Surety Co.,* 352 F.2d 236, 239 (9th Cir. 1965) ......................................................................................................................8, 9, 17

*Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999) ............................9

*Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004) ...................21, 23

*Hernandez v. Creative Concepts, Inc.*, 295 F.R.D. 500 (D. Nev. 2013)....................8

*Howey v. U.S.*, 481 F.2d 1187, 1190 (9th Cir. 1973) ................................................18

*Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992).....7, 8

*Kuschner v. Nationwide Credit, Inc.*, 256 F.R.D. 684 (E.D. Cal. 2009)....................8

*Learjet, Inc. v. Oneok, Inc.* (*In re W. States Wholesale Natural Gas Antitrust Litig.*), 715 F.3d 716 (9th Cir. 2013)................................................................................17

*Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988).............................19

*Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003)...................19

*Roth v. Garcia Marquez*, 942 F.2d 617, 628 (9th Cir. 1991) ....................................9

*Sherman v. United States,* 462 F.2d 577, 579 (5th Cir. 1972) ................................9

*U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 887 (9th Cir.1981) .............8, 15, 16

*U.S. v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981) .....................................................18

<u>Rules</u>

Fed. R. Civ. P. 8.................................................................................................13, 20

Fed. R. Civ. P. 15...................................................................................5, 9, 17, 18

Fed. R. Civ. P. 16.........................................................................................5, 15

COMES NOW, Plaintiff Matthew Spatola, by and through counsel, pursuant to Rule 16 and 15 of the Federal Rules of Civil Procedure, and hereby respectfully moves this Court to amend the scheduling order and grant Plaintiff leave to file a Second Amended Complaint in this joint authorship action. Fed. R. Civ. P. 15 & 16.

## I.   **INTRODUCTION**

Plaintiff seeks modification of the scheduling order under Rule 16(b)(4) to permit a limited amendment to Plaintiff's First Amended Complaint under Rule 15(a)(2) in response to newly articulated defenses raised by Defendants that challenge the availability of the relief sought by Plaintiff as has been pled from the outset of this matter.

Defendants have recently asserted that Plaintiff's claimed damages for lost opportunities in advancing his career for Mr. Derulo's failure to credit Mr. Spatola are not recoverable under Plaintiff's currently pleaded claims and that additional parties are required for adjudication. These positions place Plaintiff's rights at risk on technical pleading grounds rather than the merits. The assertions ignore the consistent posture of this case. From the outset, Plaintiff has sought damages and equitable relief solely from Defendants Jason Derulo and Sony arising from their respective shares of the composition and sound recording, and has never sought to recover or disturb the interests of any non-party joint authors or rights holders. Moreover, Plaintiff has sought recovery of monies for lost opportunities to be part of the constructive trust that exists to hold the revenues recovered from the joint work by Mr. Derulo.

To eliminate any possible ambiguity about the non-necessity of any additional parties, Plaintiff has expressly disclaimed any claim to the shares, damages, or interests of non-parties that hold portions of the relevant copyrights and has filed a formal notice of disclaimer confirming that Plaintiff seeks recovery only from Defendants' portions of the work. *See* Notice of Disclaimer, Doc. 158. As a result, Plaintiff's claims can be fully adjudicated without the presence of any additional parties, and Defendants' newly raised indispensable-party argument is rendered moot.

Defendants' attempt to inject this issue at this late stage does not reflect a genuine defect in the pleadings, but a belated effort to foreclose Plaintiff's recovery through alleged pleading technicalities. The proposed amendment clarifies this long-standing limitation on the relief sought and ensures that Plaintiff's claims against Defendants Derulo and Sony may proceed to trial on the merits.

Further, Defendants now contend—on the eve of trial—that Plaintiff cannot recover damages for lost professional opportunities and reputational harm because, in their view, no theory supporting such damages appears in the operative complaint. Although that contention is incorrect and untimely, Plaintiff now seeks to amend to ensure that the full scope of his claims are heard at trial.

Plaintiff has consistently alleged that Defendants' refusal to credit Plaintiff for his substantial creative contributions to *Savage Love* deprived him of the recognition, compensation, and professional opportunities that flow from authorship and production credits on a globally successful work. Those allegations have been part of this case from its inception, were disclosed in discovery, and have been incorporated into all of the materials that remain prepared for trial . *See, e.g.,* Expert Report of Jeff Rougvie and Supplemental Expert Report.  Defendants could have raised any purported legal defect in Plaintiff's damages theories through a motion for summary judgment or other dispositive motion. They did not do so, and should not now be allowed to toss out Plaintiff's ability to be made whole at trial.

Instead, Defendants have asserted—at the last minute—that reputational harm and lost future opportunities are categorically unrecoverable. Plaintiff disputes that assertion and maintains that such damages are recoverable under Plaintiff's existing constructive trust theory based on Defendants' wrongful deprivation and unjust retention of benefits. However, in light of Defendants' newly articulated position, Plaintiff seeks leave to amend out of an abundance of caution to expressly plead negligence and unjust enrichment, thereby ensuring that Plaintiff's damages theories are fully triable and not foreclosed by a belated procedural argument.

Importantly, this amendment does not introduce any new damages nor any new factual theories. It clarifies the legal bases under which damages that have long been sought and litigated—including reputational harm and lost professional opportunities—may be awarded. Defendants' attempt to exclude those damages at this stage is precisely the type of tactical maneuver that Rule 16's good-cause standard is designed to prevent another from unfairly impairing a party's substantive rights.

Granting leave to amend will ensure that Plaintiff may present the full scope of damages arising from Defendants' conduct and that the case is resolved on its merits, rather than constrained by late-breaking, technical arguments that could have been raised earlier.

The proposed amendment does not introduce new facts or expand the case; it clarifies the claims and pleads alternative theories arising from the same conduct long at issue. As such, no change to the trial, as set to commence on April 21, 2026 will be necessary. Good cause exists to allow amendment now so the case proceeds to trial and that the trial includes a full adjudication of the issues at the heart of this lawsuit.

Accordingly, leave should be granted to ensure that the case is resolved on its merits, with the pleadings aligned to the issues Defendants now place in dispute, and without risking the impairment of Plaintiff's claims based on avoidable pleading technicalities.

## II.    **LEGAL STANDARD**

If the Court has established a scheduling order with a deadline for amending pleadings pursuant to Rule 16, a party seeking to amend after that deadline must show "good cause" for the modification of the scheduling order. When a court has entered a case scheduling order under Rule 16 of the Federal Rules of Civil Procedure and a party requests to amend a pleading after the expiration of the deadline set by the court, the party's request is controlled by Rule 16(b), not by Rule 15(a). *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 607-08 (9th Cir. 1992). Thus, the party requesting an amendment must first show "good cause" under Rule 16(b) and then

show that its proposed amendment is proper under Rule 15(a). *Johnson*, 975 F.2d at 608.

Rule 16(b)'s "good cause' standard primarily considers the diligence of the party seeking the amendment." *Id.* at 609. "Although the existence or degree of prejudice to the party opposing the modification might supply additional reasons to deny a motion, the focus of the inquiry is upon the moving party's reasons for seeking modification." *Id.*

The moving party must show that it diligently assisted the court in creating a workable scheduling order and that it could not comply with the deadlines due to unforeseen circumstances that were beyond its control at the time the scheduling order was issued. *Kuschner v. Nationwide Credit, Inc.*, 256 F.R.D. 684 (E.D. Cal. 2009).

A party demonstrates good cause by showing that, despite exercising due diligence, it was unable to meet the deadlines set forth in the scheduling order.

The party must also demonstrate that it promptly sought an amendment once it became apparent that compliance with the scheduling order was not feasible. *Id.*, *Hernandez v. Creative Concepts, Inc.*, 295 F.R.D. 500 (D. Nev. 2013).

Although the focus of the "good cause" inquiry is on the diligence of the party seeking the modification of the scheduling order, other considerations include: (1) the degree of prejudice to the moving party resulting from failure to modify; (2) the degree of prejudice to the nonmoving party from a modification; (3) the impact of a modification at that stage of the litigation on the orderly and efficient conduct of the case; and (4) the degree of willfulness, bad faith, or inexcusable neglect on the part of the moving party. *U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 887 (9th Cir.1981). When refusal to allow modification might result in injustice, while allowing the modification would cause no substantial injury to the opponent and no more than slight inconvenience to the court, modification should be allowed. *Id.*; *Globe Indemnity Co. v. Capital Ins. & Surety Co.,* 352 F.2d 236, 239 (9th Cir. 1965); *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1202 (3d Cir. 1978);

*Sherman v. United States,* 462 F.2d 577, 579 (5th Cir. 1972).  A pre-trial order should not lightly be modified, nevertheless a court should be liberal in allowing amendments where no substantial injury will be done the opposing party, the failure to allow the amendment might result in a grave injustice to the moving party, and the inconvenience to the court is relatively slight.  *Globe Indem. Co.*, 352 F.2d at 239.

Rule 15(a) provides that "[t]he court should freely give leave [to amend] when justice so requires," and there is a strong public policy in favor of permitting amendment. *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir. 1999). The Ninth Circuit has made clear that Rule 15(a) is to be applied with "extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (per curiam). Under Rule 15(a), courts consider various factors, including: (1) bad faith; (2) undue delay; (3) prejudice to the opposing party; (4) futility of the amendment; and (5) whether the plaintiff has previously amended the complaint. *See id*. at 1052. Not all of these factors carry equal weight and prejudice is the "touchstone." *Id*. Absent a showing of prejudice or a strong showing of any of the remaining factors, there is a presumption that leave to amend should be granted. *Id*. "In exercising this discretion, a court must be guided by the underlying purpose of Rule 15—to facilitate decision on the merits, rather than on the pleadings or technicalities." *Roth v. Garcia Marquez*, 942 F.2d 617, 628 (9th Cir. 1991) (quoting *United States v. Webb*, 655 F.2d 977, 979 (9th Cir. 1981)). Generally, the analysis "should be performed with all inferences in favor of granting the motion." *Griggs v. Pace Am. Grp., Inc.*, 170 F.3d 877, 880 (9th Cir. 1999).

### III.  ARGUMENT

**A. Good Cause Exists Because the Proposed Amendment Responds to Newly Asserted Defenses That Directly Implicate Plaintiff's Available Relief.**

Plaintiff's request to amend is grounded in diligence and good faith. The proposed amendment is not based on newly discovered facts, but only on addressing

newly raised defenses and legal positions belatedly advanced by Defendants—positions that directly challenge the availability of Plaintiff's remedies and the structure of the case as pled.

During recent meet-and-confer communications related to the respective motions the parties will be filing on February 2, 2026 (the date of this filing), Defendants asserted for the first time that Plaintiff's claimed damages for lost opportunities, lost reputational damages, and lost profits are not recoverable under the causes of action presently pleaded. Defendants have further asserted, again for the first time, that additional holders of interests in the musical composition are indispensable parties whose absence purportedly precludes full adjudication of this matter.

Plaintiff disputes both contentions. However, Defendants' newly articulated positions create a pleading dispute that did not previously exist in this form and that, if left unaddressed, could impair Plaintiff's substantive rights based on technical pleading arguments rather than the merits.

In response, Plaintiff seeks leave to amend to clarify the scope of relief sought and to plead alternative theories of recovery—including unjust enrichment and negligence against Defendant Jason Derulo—arising from the same conduct that has been at issue throughout this litigation. These alternative claims ensure that the full nature of the dispute, as Defendants have long understood it, will be properly presented to the jury regardless of how the Court ultimately resolves Defendants' newly asserted legal theories.

## B. The Existing Constructive Trust Allegations Encompass Defendants' Negligent Conduct and Unjust Retention of Benefits.

Plaintiff's proposed damages theories are not new or foreign to the operative pleading. The First Amended Complaint already alleges conduct that sounds in both negligence and unjust enrichment and seeks relief that necessarily depends on those principles.

Specifically, Plaintiff alleges that Defendants "wrongfully deprived Spatola from his share of the profits that they have enjoyed from the exploitation of *Savage Love*" and that, "[b]y virtue of the Defendants' deprivation," Defendants hold all profits derived from exploitation of the work as constructive trustees for Plaintiff's benefit. (FAC ¶¶ 90–92.) These allegations necessarily rest on Defendants' wrongful conduct in exploiting Plaintiff's contributions and retaining benefits to which Plaintiff is equitably entitled. A constructive trust is not a standalone cause of action, but a remedy imposed to address wrongful conduct resulting in unjust retention of property. The operative pleading therefore already places at issue whether Defendants acted improperly in handling, exploiting, and profiting from Plaintiff's creative contributions, and whether equity requires disgorgement of those profits. That inquiry inherently overlaps with principles of unjust enrichment and, where the deprivation results from Defendants' failure to exercise reasonable care in disclosures, credits, and exploitation, negligence.

Accordingly, Plaintiff's primary position is that legal damages flowing from Defendants' wrongful deprivation of profits are recoverable under the existing constructive trust claim. The factual allegations supporting that claim encompass Defendants' inequitable retention of benefits and their mishandling of Plaintiff's interests—conduct that forms the basis for unjust enrichment and negligence.

### C. Plaintiff's Allegations of Lost Opportunities and Reputational Harm Are Embedded in the Constructive Trust Claim.

Plaintiff's allegations regarding lost professional opportunities and reputational harm were not pleaded as free-floating damages untethered to any claim. Rather, they were expressly incorporated into Plaintiff's constructive trust claim and form part of the wrongful conduct giving rise to equitable relief.

This claim was indeed pled in the First Amended Complaint. Specifically, paragraphs 62 through 64 allege that Defendants' failure to properly credit Plaintiff as a co-author and co-producer deprived Plaintiff of industry recognition and caused

him to lose concrete professional opportunities, including opportunities to work with other high-profile artists and to further advance his career. Those allegations describe the consequences of Defendants' wrongful conduct—namely, their deprivation of Plaintiff's rightful interest and recognition in *Savage Love*.

The constructive trust claim expressly relies on that same wrongful conduct. In pleading that Defendants "wrongfully deprived Spatola from his share of the profits" and now hold the proceeds of *Savage Love* as constructive trustees, Plaintiff incorporated the factual allegations set forth earlier in the complaint, including the allegations of lost opportunities and reputational harm. Those harms explain why Defendants' retention of profits is inequitable and why equity requires disgorgement.

In other words, the lost-opportunity allegations are not separate or novel theories; they are part of this action as has been pled for the last two years. Moreover, these allegations are a factual predicate establishing inequity and unjust retention—core elements of a constructive trust. They demonstrate that Defendants' conduct caused harm beyond mere nonpayment and underscore why relief is warranted.

Accordingly, Plaintiff's constructive trust claim has always encompassed Defendants' conduct in denying credit, the resulting loss of professional opportunities, and the inequitable benefits Defendants retained as a result. Defendants' assertion that such damages were never pleaded mischaracterizes the complaint and ignores the manner in which constructive trust claims operate under federal pleading rules.

Nevertheless, to the extent the Court were to agree with Defendants and conclude that the recovery for reputational damages sought by Plaintiff are not available under a constructive trust theory as pleaded, Plaintiff seeks leave to amend to expressly plead negligence and unjust enrichment arising from the same conduct already alleged. As such, the amendment would not inject new facts or theories into the case, but would merely clarify the legal vehicles through which relief may be awarded for conduct that has been at issue since the outset of the litigation.

The parties' Joint Rule 26(f) Report confirms that Defendants have been on notice from the outset that this case concerns Defendants' exploitation of Mr. Spatola's creative contributions to *Savage Love* and their refusal to provide recognition and compensation for those contributions. *See* Joint Rule 26(f) Report, Doc. 22.  The factual narrative set forth in that report—describing Mr. Spatola's substantial creative labor, Defendants' commercial exploitation of the work, and Mr. Spatola's exclusion from credit and profits—forms the same factual basis for the negligence and unjust enrichment claims now pleaded. The proposed amendment does not introduce new facts or disputes; it clarifies the legal frameworks under which the same conduct may be adjudicated. Accordingly, Defendants cannot plausibly claim surprise or prejudice, and good cause exists to permit amendment under Rule 16(b).

Defendants may argue that if negligence and unjust enrichment were always "in the case," they should have been pleaded earlier as separate causes of action. That argument mischaracterizes both the operative pleading and federal pleading requirements.

Plaintiff's First Amended Complaint already pleads the operative conduct and seeks relief based on Defendants' wrongful deprivation and unjust retention of profits through a constructive trust. *See* First Amended Complaint (FAC)*, ¶ 62-65, 88-92.  At the pleading stage, a Plaintiff is not required to enumerate every potential legal theory arising from that conduct so long as the facts and requested relief were adequately alleged in "a short and plain statement." *See* Fed. R. Civ. P. 8(a)(2).

### D. Diligence in Seeking Leave to Amend.

Plaintiff acted diligently and in good faith once Defendants first raised the contention that additional holders of interests in the composition are indispensable parties and that Plaintiff's lost reputational damages and lost opportunities are not recoverable under Plaintiff's First Amended Complaint. Prior to these assertions, Defendants had not taken the position that the absence of other rights holders

1    precluded adjudication of Plaintiff's claims or recovery of damages and that
2    Plaintiff's lost reputational damages and lost opportunities are not recoverable under
3    Plaintiff's First Amended Complaint, and Plaintiff therefore had no reason to believe
4    the existing pleading framework was inadequate. Once Defendants articulated these
5    arguments—placing Plaintiff's ability to obtain relief at risk based on pleading
6    structure rather than the merits—Plaintiff has promptly sought leave to amend to
7    clarify the claims and remedies arising from the same conduct long at issue. Plaintiff's
8    response was measured and timely and reflects reasonable diligence under Rule
9    16(b)(4), not delay.

10        It was only after Defendants newly asserted that Plaintiff's lost reputational
11   damages and lost opportunities are not recoverable under Plaintiff's First Amended
12   Complaint are unavailable under Plaintiff's constructive trust theory and that
13   additional parties are required for adjudication, that the need to expressly plead
14   negligence and unjust enrichment became concrete. Until Defendants took that
15   position, there was no basis to believe that the existing equitable framework would be
16   challenged as insufficient to support Plaintiff's damages.

17        Rule 16 does not require parties to anticipate and preempt every future remedial
18   argument, nor does it penalize a plaintiff for relying on equitable remedies until the
19   opposing party seeks to foreclose them. Once Defendants raised those challenges,
20   Plaintiff acted promptly to clarify the legal bases for relief arising from the same
21   conduct already pleaded. That sequence reflects diligence and good faith, not waiver
22   or delay.

23        Plaintiff could not reasonably have complied with the scheduling order's
24   deadline to amend pleadings because Plaintiff was not aware of any need for the
25   proposed amendment at that time. Defendants did not previously assert that additional
26   rights holders were indispensable parties or that Plaintiff's pleaded claims foreclosed
27   recovery of legal damages. Those positions were articulated for the first time only
28   recently, after the trial of this matter was continued two different times, after summary

judgment was adjudicated in favor of Plaintiff, and after the amendment deadline had passed. This assertion by Defendants, if adopted by the Court, fundamentally alters the remedial posture of the case.

Rule 16(b) does not require a party to anticipate and preempt defenses that have not yet been raised, particularly where the operative complaint already pleads the relevant conduct and seeks appropriate relief. Once Defendants advanced these new theories—placing Plaintiff's ability to obtain relief at risk based on pleading structure rather than the merits—Plaintiff acted promptly to seek leave to amend. Under these circumstances, modification of the scheduling order is warranted because Plaintiff could not have complied with the amendment deadline despite diligent prosecution of the case.

Plaintiff should not be required to proceed to trial under a pleading framework that Defendants now contend forecloses recovery, particularly where amendment clarifies—rather than expands—the claims and remedies at issue. Authorizing this amendment now ensures that the trial, as set to commence on April 21, 2026, will remain, allowing this matter to finally and permanently adjudicated.

### E. The Amendment Will Not Prejudice Defendants.

Prejudice is the "touchstone of the inquiry" under Rule 15. *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003). The degree of prejudice to the nonmoving party from a modification of the scheduling order is an additional factor to assess when granting a motion to modify the scheduling order. *U.S. v. First Nat. Bank of Circle*, 652 F.2d 882, 887 (9th Cir.1981).   Defendants cannot plausibly claim prejudice here.

The proposed amendment: does not add new parties; does not introduce new works, transactions, or time periods; does not alter the factual nucleus of the case; and does not require Defendants to defend against previously unknown conduct. Bottom line – the case remains exactly the same. The only change is to the addition of claims under the same set of facts and circumstances.

The negligence and unjust enrichment claims arise from the same facts, witnesses, and discovery already at issue. Defendants have long been on notice of Plaintiff's contentions regarding Defendants' conduct, industry practices, disclosures, and exploitation of Plaintiff's contributions. Indeed, Defendants' own anticipated motion practice confirms their awareness of these issues. Any additional discovery, if required at all, would be limited and narrowly tailored, and does not outweigh the substantial prejudice to Plaintiff if amendment were denied.

### F. Denying Amendment Would Substantially Prejudice Plaintiff.

By contrast, denying leave to amend would materially prejudice Plaintiff. If the Court were to deny amendment now, Plaintiff would be forced to proceed to trial on claims that Defendants themselves contend are deficiently pleaded—creating an unnecessary risk that Plaintiff's rights could be impaired or foreclosed on purely procedural grounds.  The degree of prejudice to Plaintiff resulting from failure to modify weighs in favor of granting the amendment. *U.S. v. First Nat. Bank of Circle*, 652 F.2d at 887.

Moreover, absent amendment, Plaintiff would be compelled to seek leave to amend after the presentation of evidence at trial under Rule 15(b), a far less efficient and more disruptive posture for both the Court and the parties. Rule 15 is intended to avoid precisely that result.  Granting leave now promotes judicial economy, ensures that the pleadings accurately reflect the claims actually being litigated, and allows the case to proceed to trial on its merits rather than precluding claims on technical pleading bases.

### G. The Amendment Preserves Triability Without Expanding the Case.

Importantly, the proposed amendment does not introduce new facts, new conduct, or new disputes. Instead, it aligns the pleadings with the theories Plaintiff has consistently advanced and with the issues Defendants now claim are dispositive.

Defendants have been on notice for years that Plaintiff's claims are premised on Defendants' conduct in exploiting the musical work, controlling disclosures, and

excluding Plaintiff from credit, profits, and downstream opportunities. The amendment simply ensures that those issues are fully triable and not artificially constrained by Defendants' late-stage legal characterizations.  Denying amendment under these circumstances would elevate form over substance and risk foreclosing Plaintiff's claims based on pleading technicalities rather than the evidence.

### H. Plaintiff's Request Is Made in Good Faith and Advances Judicial Economy.

Plaintiff does not seek amendment to gain a tactical advantage, surprise Defendants, or expand the scope of the case. To the contrary, Plaintiff seeks to cure alleged pleading defects identified by Defendants, clarify the relief sought, preserve Plaintiff's substantive rights, and streamline the issues for trial.  These are hallmarks of good faith under Rule 16(b)(4). *Learjet, Inc. v. Oneok, Inc.* (*In re W. States Wholesale Natural Gas Antitrust Litig.*), 715 F.3d 716 (9th Cir. 2013).

### I.  Not Allowing Modification Would Be Unjust to Plaintiff.

The failure to allow the amendment might result in a grave injustice to Plaintiff, and the inconvenience to the Court is relatively slight.  *Globe Indem. Co.*, 352. F.2d at 239.  Denying leave to modify the scheduling order in order to amend the complaint would effectively penalize Plaintiff for promptly curing the very deficiencies Defendants identify, foreclose adjudication of Plaintiff's claims on their merits, and needlessly inject procedural gamesmanship into the case. That outcome would work a serious and unwarranted injustice on Plaintiff.

### J.  Amendment Should Be Permitted Under Rule 15's Liberal Standard.

Under Rule 15(a), leave to amend should be "freely given when justice so requires." Fed. R. Civ. P. 15. This liberal policy favoring amendments is designed to facilitate a determination of actions on their merits. In this case, justice requires that Plaintiff be permitted to amend the Complaint for the following reasons.

1.  *The Timing of the Amendment Is Reasonable Under the Circumstances.*

While this action has been pending for a significant period and trial is approximately three months away, timing alone is not a basis to deny leave to amend. *U.S. v. Webb*, 655 F.2d 977, 980 (9th Cir. 1981) ("Delay alone, no matter how lengthy, is an insufficient ground for denial of leave to amend.").Here, the proposed amendment does not reflect a shift in litigation strategy or an effort to inject new factual disputes on the eve of trial. To the contrary, the Second Amended Complaint conforms the pleadings to the legal theories and factual positions Plaintiff has consistently advanced throughout this case, and to the issues Defendants themselves have placed squarely in dispute. *See also* Fed. R. Civ. P. 15(b) (allowing for amendments to conform to the evidence presented at trial).

Defendants have expressly stated their intent to file a motion to dismiss asserting, among other things, that: indispensable parties are absent; and the relief Plaintiff seeks cannot be granted based on the manner in which the claims are pleaded. The proposed amendment directly addresses these alleged pleading defects, clarifies the scope of relief sought, and adds alternative theories of recovery grounded in Defendants' conduct. Allowing amendment now ensures that the case proceeds to trial on properly framed claims, rather than on technical pleading disputes that could otherwise undermine Plaintiff's rights.

Courts routinely permit amendment under Rule 15 where, as here, amendment serves to refine and clarify claims in response to issues raised by the opposing party. *See Howey v. U.S.*, 481 F.2d 1187, 1190 (9th Cir. 1973).

2.  *Justice Strongly Favors Resolving the Case on the Merits.*

The U.S. Supreme Court has emphasized that Rule 15 embodies a strong policy favoring decisions on the merits. *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("It is too late in the day and entirely contrary to the spirit of the Federal Rules of Civil

Procedure for decisions on the merits to be avoided on the basis of such mere technicalities.").

Here, the proposed amendment: cures alleged pleading deficiencies identified by Defendants; clarifies the theories of relief sought; preserves Plaintiff's substantive rights; and avoids unnecessary post-trial motion practice. Under these circumstances, justice plainly requires granting leave to amend.

### 3. The Proposed Amendment Is Not Futile.

Defendants cannot meet their burden to show that the proposed amendment is futile. An amendment is futile only if it would fail to state a claim under Rule 12(b)(6), assuming the truth of the pleaded facts. *See Miller v. Rykoff-Sexton, Inc.*, 845 F.2d 209, 214 (9th Cir. 1988). That is a demanding standard, and Defendants cannot satisfy it here.

The proposed Second Amended Complaint pleads detailed factual allegations establishing Defendants' conduct, the benefits conferred upon Defendants, Defendants' retention of those benefits, Plaintiff's lost opportunities and reputational damages for failing to receive credit at the time *Savage Love* and the BTS Remix of *Savage Love* was released, and the resulting harm to Plaintiff. Those allegations are more than sufficient to state plausible claims for negligence and unjust enrichment under applicable law.

Nor is futility established merely because Defendants dispute the legal viability of those claims. At the amendment stage, the Court does not resolve contested legal theories or weigh competing interpretations of the law. *See Netbula, LLC v. Distinct Corp.*, 212 F.R.D. 534, 539 (N.D. Cal. 2003). The question is only whether the proposed claims are facially plausible—not whether Defendants believe they will ultimately prevail.

### K. Plaintiff's Negligence Claim is Properly Pleaded in the Alternative to the Joint Authorship–based Constructive Trust Claim.

Defendants may contend that Plaintiff's negligence claim is duplicative of, or subsumed by, Plaintiff's constructive trust claim arising from alleged joint authorship of the musical work at issue. That contention fails as a matter of federal pleading law and misunderstands the distinct legal predicates of the claims.

Under Federal Rule of Civil Procedure 8(d)(2)–(3), a plaintiff may plead alternative and even inconsistent theories of liability. This is particularly appropriate in joint authorship cases, where authorship status, ownership interests, and equitable remedies turn on fact-intensive inquiries not suitable for resolution at the pleading stage.

Here, Plaintiff alleges joint authorship and seeks a constructive trust over proceeds derived from exploitation of the musical work. In the alternative, Plaintiff pleads negligence in the event the Court determines that Plaintiff does not qualify as a joint author under the Copyright Act or that equitable relief tied to copyright ownership is unavailable.  This form of pleading is expressly contemplated by Rule 8 and routinely permitted in copyright cases involving disputed authorship and allocation of rights.

1.  *The Constructive Trust Claim Depends on Joint Authorship; Negligence Does Not.*

Plaintiff's constructive trust claim is predicated on a finding that Plaintiff is a joint author of the musical work and therefore holds an equitable ownership interest in the copyright and its proceeds.

By contrast, Plaintiff's negligence claim does not require a finding of joint authorship. It arises from Defendant Derulo's breach of independent duties owed to Plaintiff in connection with: Defendant's control over disclosures to record labels, publishers, and other industry decision-makers; Defendant's handling of credits, registrations, and exploitation of the musical work; Defendant's failure to disclose Plaintiff's collaboration and involvement once known, in accordance with industry standards and practices.  Defendant Derulo owed Plaintiff a duty of reasonable care

arising from his affirmative conduct in the creation, marketing, commercialization, and public representation of the musical composition and sound recording *Savage Love.*

Thus, even if the Court concludes that Plaintiff does not meet the legal standard for joint authorship, Defendant Derulo may still be liable for negligence based on his conduct and the foreseeable harm that conduct caused to Plaintiff's professional reputation, career trajectory, and commercial opportunities.

### 2. The Negligence Claim Is Not a Repackaged Ownership Dispute.

Importantly, Plaintiff does not assert negligence as a substitute means of establishing copyright ownership. The negligence claim does not seek a declaration of authorship, does not depend on the exclusive rights enumerated in 17 U.S.C. § 106, and does not seek to impose a constructive trust over copyright proceeds. Instead, negligence is pleaded as a fallback theory addressing a different wrong: Defendant Derulo's failure to exercise reasonable care in handling disclosures, credits, and industry communications relating to Plaintiff's collaboration, resulting in damages independent of copyright ownership. These elements are qualitatively different from the exclusive rights protected by copyright and are not pre-empted by the Copyright Act. *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004).

This distinction underscores why the negligence claim remains viable even if the joint authorship–based constructive trust claim fails.

### 3. Disallowing the Negligence Claim Now Would Improperly Force an Election of Remedies.

Whether Plaintiff is entitled to equitable relief based on joint authorship, legal damages based on negligence, or both depends on factual determinations that cannot be resolved on the pleadings. Allowing Plaintiff to proceed on alternative theories ensures that the Court and jury can award the appropriate relief based on the evidence, rather than prematurely foreclosing viable claims tied to Defendants' conduct.

### 4. Alternative Pleading Promotes Judicial Economy and Fairness.

Pleading negligence in the alternative avoids the risk that Plaintiff's claims could fail on technical grounds tied to the strict requirements of joint authorship, despite evidence of Defendants' wrongful conduct.

This approach promotes efficiency, provides Defendants with clear notice of the claims at issue, and aligns with the Federal Rules' preference for resolving cases on their merits rather than through procedural traps.

## L. Plaintiff's Unjust Enrichment Claim is Properly Pled in the Alternative to Joint Authorship.

Defendants may argue that Plaintiff's unjust enrichment claim is barred or duplicative if the Court rejects Plaintiff's joint authorship theory. That argument misunderstands both the nature of the claim and the Federal Rules' express authorization of alternative pleading.

### 1. Unjust Enrichment Is Properly Pleaded in the Alternative Under Rule 8(d).

Federal Rule of Civil Procedure 8(d)(2)–(3) permits a plaintiff to plead alternative and inconsistent theories of recovery. This principle has particular force in joint authorship cases, where entitlement to copyright-based remedies depends on fact-intensive determinations that cannot be resolved at the pleading stage.

Here, Plaintiff pleads unjust enrichment in the alternative in the event the Court determines that Plaintiff does not qualify as a joint author of the musical work or otherwise lacks an ownership interest in the copyright.

This alternative pleading is not an attempt to circumvent copyright law, but a recognition that Defendant Derulo's conduct may be wrongful even if Plaintiff is ultimately found not to be a joint author.

### 2. The Unjust Enrichment Claim Does Not Depend on Copyright Ownership.

Plaintiff's unjust enrichment claim does not require a finding of joint authorship, ownership, or infringement. Instead, it is premised on Defendant Derulo's

knowing acceptance and retention of benefits conferred by Plaintiff, including Plaintiff's creative labor, services, and collaboration; and Plaintiff's industry expertise and contributions that enhanced the commercial value of the musical work.

Defendant Derulo knowingly accepted these benefits and exploited them commercially while excluding Plaintiff from credit, recognition, and participation in downstream opportunities. The inequity arises from Defendant Derulo's conduct, not from the mere existence of a copyrighted work.

Thus, even if the Court concludes that Plaintiff is not a joint author, Defendant Derulo's retention of these benefits without compensation or acknowledgment may still be unjust.

### 3. The Unjust Enrichment Claim Is Not Preempted by the Copyright Act.

The unjust enrichment claim is not equivalent to a claim under 17 U.S.C. § 106 and therefore is not preempted by 17 U.S.C. § 301. Unlike a copyright claim, Plaintiff must prove: a benefit conferred through services and collaboration; Defendant Derulo's knowing acceptance and retention of that benefit; and inequity arising from Defendant Derulo's conduct in retaining the benefit without compensation or recognition. Plaintiff's contributions did not merely add notes or beats to a song. They materially enhanced *Savage Love's* market appeal, including: sonic structure and production choices that increased replay value; commercial viability aligned with contemporary market trends; creative elements that made the work more attractive to labels, distributors, radio, playlists, and licensing partners.

These elements are qualitatively different from the exclusive rights protected by copyright. *Grosso*, 383 F.3d at 968.

Courts recognize that unjust enrichment claims survive preemption where they are based on the wrongful retention of benefits conferred by the plaintiff's services or conduct, rather than on copying or ownership alone. *Id.; Del Madera Properties v. Rhodes and Gardner, Inc.,* 820 F. 2d 973 (9th Cir. 1987).

Here, Plaintiff does not seek to use unjust enrichment to establish authorship, to control exploitation of the work, or to recover statutory copyright remedies. Plaintiff played the bass, acoustic guitar, and electric guitar on *Savage Love,* with the reasonable expectation — grounded in industry custom and Defendant's conduct — that he would be properly acknowledged, credited, and treated equitably for his contributions.    Accordingly, Plaintiff seeks damages for unjust enrichment as an alternative remedy addressing Defendant Derulo's inequitable conduct if copyright ownership relief is unavailable.

### 4. *Dismissing the Unjust Enrichment Claim Now Would Be Premature.*

Whether Defendant Derulo's retention of benefits is unjust depends on factual questions concerning the parties' conduct, expectations, and industry practices. These issues cannot be resolved on the pleadings.

Forcing Plaintiff to elect between joint authorship and unjust enrichment would improperly foreclose a viable theory of recovery and risk insulating Defendant Derulo from liability for conduct that may be inequitable even absent joint authorship.

### 5. *Alternative Pleading Promotes Fairness and Judicial Economy.*

Pleading unjust enrichment in the alternative avoids the inefficiency of post-trial amendments and ensures that the Court has the flexibility to award appropriate relief based on the facts established at trial.

This approach provides Defendants with clear notice of the claims at issue (which they already have notice of), eliminates surprise, and aligns with the Federal Rules' preference for resolving cases on their merits rather than on rigid pleading technicalities.

## IV.    <u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's request to modify the scheduling order and grant Plaintiff leave to file the

proposed Amended Complaint attached hereto as Exhibit A.[1]

WHEREFORE, Plaintiff respectfully requests that this Court:

Grant this Motion to Modify the Scheduling Order;

Grant Plaintiff Leave to his Second Amended Complaint;

Direct the Clerk to file the proposed Second Amended Complaint attached as Exhibit A; and

Grant such other and further relief as the Court deems just and proper.

Date: February 2, 2026                    Respectfully submitted,

**WERGE & CORBIN LAW GROUP**
Thomas E.M. Werge (SBN 3624585)

**FROST, LLP**
Christopher Frost
 (SBN 200336)

*/s/ Thomas E.M. Werge*
Thomas E.M. Werge

*Attorneys for Plaintiff*
MATTHEW SPATOLA p/k/a MATTY SPATS

---

[1] Please note that the proposed amendment, as set forth, does not include the addition of any additional parties, as such an amendment would only be necessary in the event that the Court were to entertain Defendants' asserted bases for dismissal pursuant to Fed. R. Civ. P. 12(b)(7).

NOTICE OF MOTION TO AMEND SCHEDULING ORDER AND MOTION FOR LEAVE TO FILE SECOND AMENDED COMPLAINT

-25-

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-------------------------------------------------------X

Matthew Spatola p/k/a Matty Spats,    Plaintiff,    :

    :    Case No. 2:23-cv-06191-MWF-E

    v.    :

    :

Jason Desrouleaux p/k/a Jason Derulo;

and

Sony Music Entertainment

d/b/a Columbia Records    :

    Defendants.    :

-------------------------------------------------------X

## EXPERT REPORT OF JEFF ROUGVIE

## INTRODUCTION

I have been retained by counsel for plaintiff Matthew Spatola ("Matty Spats") to provide expert opinion testimony in connection with the above-referenced proceeding.

## EXPERIENCE

I have 40+ years of experience in the music business, including retail, publishing, booking, promotion, and distribution, including more than 15 years as a senior executive at Rykodisc (the largest independent record label in the USA in the late 80s and early 90s) and the major label EMI. In the latter two roles, it was my responsibility to evaluate potential signings (both new and catalog artists), create sales projections, estimate marketing expenses necessary to reach those goals and to decide advance offers for these deals. I would also help artists work on and select material and producers. I initiated negotiations, though deals were ultimately closed by the Business Affairs departments. At Rykodisc, I regularly worked on securing publishing rights for our in-house publishing company, Rykomusic. I started a new company in 2008, largely for obscure CD reissues, but also working with new artists and collectibles.

1

**EXHIBIT 3**

A complete, current copy of my resume is attached as Exhibit A.

## LIST OF MATERIALS CONSIDERED

A list of materials that I considered in forming my opinions in this matter appears in Exhibit B. I have also relied on the foregoing experience in formulating my opinions in this matter.

## SUMMARY OF ASSIGNMENT

I have been asked to offer my opinions concerning the industry standards of production and songwriting credits and compensation thereof related to *Savage Love (Laxed – Siren Beat)*.

## SUMMARY OF OPINION

Due to changes in how songs are created, particularly in the genre of modern pop (the space Mr. Derulo operates in) the lines between production and songwriting have become blurred so much over the last 25 years. We are now at the point where that they are virtually indistinguishable. Matthew Spatola made unique contributions in both production and writing the record released by Jawsh 685 and Jason Derulo, *Savage Love (Laxed - Siren Beat)*. The elements Mr. Spatola created were then carried over to the BTS remix version of the song. The song went on to be Mr. Derulo's first number one single in 12 years, his first top ten in five years, and his first top 40 hit in three years. However, Mr. Derulo failed to present, request, or negotiate any contract with Mr. Spatola to compensate him for his contributions to *Savage Love (Laxed – Siren Beat)*. Reporting Mr. Spatola's credits to the record label and publishing company was Mr. Derulo's responsibility – to be done before the song is released. And only after Mr. Spatola tried for months and months to get any credit at all, did he get credited for playing additional guitars, but he has never been credited appropriately as co-producer and co-songwriter. By denying Mr. Spatola credit for his contributions, Mr. Derulo deprived Mr. Spatola of the financial benefits of his work on *Savage Love (Laxed – Siren Beat)*. By denying him public credit on an international number one song, Mr. Derulo also prevented Mr. Spatola from generating more work opportunities that were likely to have significantly contributed to his income, reputation and career trajectory.

2

**EXHIBIT 3**

## OPINION

The music business is a fast-moving and ever-evolving enterprise. It has gone through a tremendous amount of disruption over the last 25 years.

To understand the current environment, it is important to follow the massive changes that have occurred. These transformations have affected both the business and consumption of music, but also the world of artists, writers and producers who make the music.

**Changes In the Industry**

Until the late '90s there were arguably seven major record labels. They distributed many sub-labels. Throughout this era and to today, there were also non-major-label-affiliated independent labels, which at any time cumulatively represented approximately 1/3rd of the business.

Labels had been consolidating throughout the '80s and '90s, but the arrival of Napster, a file-sharing service that allowed fans to easily download MP3s of their favorite songs for free, escalated the situation. With high-speed internet more widely available than ever before, fans began downloading no-cost music at astounding rates, making Napster one of the most successful websites at the time, with 80 million users.

Even though Napster was only active for approximately two years, it devastated the music business. With Napster out of the picture, other bad actors filled the void, hosting free downloadable music files that anyone could access. What had been a 40-billion-dollar business in 1999 now faced significant year over year declines throughout the '00s.

Labels reduced overhead, combined back-door services and shed tens of thousands of employees trying to remain profitable. Today there are only three major labels and income, while growing, is only at about half of the 1999 peak, not adjusted for inflation.

This matters because there are fewer major labels, and they have less staff to run the business. As a result, important legal responsibilities have shifted from the label to the artist.

**Songs**

Every recorded song legally consists of two parts or "sides."

The first part is the copyright in the recording of the song, i.e., the version of the song we hear, via streaming platforms, radio, on vinyl, tapes and CDs, in film, TV, advertising, and on social media. The sound recording of the artist performance will henceforth be referred to as the artist recording (the "Recording").

3

**EXHIBIT 3**

The second copyright is song's publishing (the "Publishing"). This is the composition of the song, *i.e.,* the work of the songwriter(s), includes the musical notes and lyrics that make up the song structure used to make the Recording. Some songs are written by a single writer, but these days (especially in Pop music) it is far more likely one song will have many writers. In a situation where many writers have contributed to the writing of the song, this component of the work is split into multiple copyrights (the "splits").

**The End of the Album Era & Rise of Modern Pop & Hip Hop**

The album era (also sometimes referred to as the "rock" era) was largely over by end of the '90s, giving way to the growth of hip-hop and modern pop as the dominant styles of music. Rock and pop music of this era had its own set of loosely defined "rules", in that bands or solo artists were generally self-contained, meaning they usually wrote, played, sang, and recorded their own songs, often with the help of a producer. The final product was usually an album made up of multiple recordings, produced by one producer (or producer team).

In the early days, hip-hop and modern pop releases largely followed the "one producer, one album" rule. But over the course of time, hip-hop and pop albums took a different route. They used multiple producers, which not only gave the albums variety, but theoretically, at least, increased chances of generating hit songs.

Each producer would be paid a royalty for the song(s) they worked on for each album.

Throughout the late '90s as modern pop became increasingly more important to the bottom line, the rise of the writer / producer happened, arguably led by Max Martin. Martin wrote and produced huge hits for artists such as Britney Spears, Backstreet Boys, Ariana Grande, Jessie J, *NSYNC, Katy Perry, P!nk, Taylor Swift, The Weeknd, and Maroon 5. As of this writing, Martin has written more #1 hits in the US than anyone except Paul McCartney.

Naturally, demand for his services increased and he built out a team to work under him. Some of these writer/producers went on to have successful careers themselves (like Shellback and Dr Luke, who in turn mentored Benny Blanco). There are newer writer / producers like Jack Antonoff, who put their own spin on Martin's approach. Now, more than ever, successful artists are looking to collaborate with established hit-making writer / producers. In other words, they are more and more looking for a single person to serve in both capacities (writer and producer) to varying degrees.

**Producing / Recording Evolution**

4

**EXHIBIT 3**

In the album era, a traditional record producer took an album's song from the original concept to an exploitable format, the final recording. The best producers would work in expensive rented studios. They'd work with musicians to coax and capture exceptional performances in the studio, with the end goal of achieving the most appealing recordings they could.

Some recordings include samples. A sample is a sound, or sounds, taken from one recording and used in another recording, usually by a different artist. It can also be the actual composition. While all samples must be properly licensed from the owners of those recordings, if the sample is very prominent, artists may have to surrender a correspondingly larger portion of publishing royalties and / or producer royalties to the sample's creator. Some artists were able to receive as much as 90% of a recording's publishing because the use of their song was so prominent.

As the '90s progressed and home recording technology developed in conjunction with mass acceptance of desktop computers, hip-hop artists pivoted from using expensive samples to new beats that were typically created by producers who specialized in this field. Beat creation exploded in the '00s when affordable studio programs made it possible to create beats in bedrooms, not the expensive studios that had few outside the major labels could previously afford.

Because the artist is no longer paying to rent a studio, writing contributions are more common during the recording process. Artists can take their time to experiment and finesse their recordings. It also allows songs to be recorded as quickly as the artist wants because they don't need to schedule time at a third-party studio.

In modern pop, most producers make tracks, which, unlike beats, include everything except the vocals. The producer may create these with a specific artist in mind or offer them to the highest bidder. Because tracks are so integral to modern pop, this practice has further blurred the lines between songwriter and producer. In some cases, the producer is considered as important as the artist.

In the wake of the industry disruption, the labels delegated the responsibility of securing contracts with all contributors to the final recording to the artist. It is a significant change in the way business is conducted.

Now, the artist or their representatives typically have sole responsibility of negotiating the terms of a producer deal. The artist, or their representatives, are responsible for negotiating advances and royalty breakdowns. Importantly, artists must get these deals "papered", or signed as legally binding contracts that they can deliver to the record company to prove clean chain of title as either a work for hire or a royalty-bearing contribution.

5

**EXHIBIT 3**

Each and every contribution must be cleared and considered in the composition (writing) and production (recording) of the track.

Producers in the US typically get paid a royalty rate of 3-4% of the recording (3-4 points). Superstar producers may be able to get as much as 6% of the proceeds from the recording (6 points).

Producers also typically get advances (i.e. money paid up front) that is recouped from income derived from the recordings until it is in a royalty-positive position.

For purposes of distinguishing different categories of producers, I'm going to use Lawyer and writer Donald Passman's generally accepted method of sorting these advances into three categories for Urban / Pop producers, as outlined in his best-selling book "Everything You Need To Know About The Music Business (11ᵗʰ Edition)":

1) New Producers (paid zero to $10,000 per recording)
2) Midlevel (paid $40-$50,000 per recording)
3) Superstar (paid $75-100,000 and up, per recording).

In addition to advances, the artist must send letters of direction to their labels and various other entities who will be making and collecting royalty payments, not only to the artist, but to all participants in the song. That's not just on the recording / production side, it's also on the songwriting / publishing side where mechanical licenses would be issued on behalf of writers & publishers who own or control a share of the underlying composition / song. This encompasses writers, producers, and any other royalty earning entities.


**The Origins of *Savage Love (Laxed - Siren Beat)***

Mr. Derulo was and remains one of the most-followed people on TikTok with millions of followers. Before Mr. Derulo initiated contact with Jawsh, Jawsh's track, *Laxed – Siren Beat*, was already viral on TikTok with over 55 million TikTok creations in just a few weeks. According to the popular music discovery app Shazam, in 2020, *Laxed – Siren Beat* was Shazam-ed so many times that it went to number two on the Shazam global chart.

The track became an anthem for cultural identity. Celebrities and influencers responded positively to the work, which led to more interest. Jawsh was approached by other artists to collaborate before Mr. Derulo reached out to him. Sony was working hard to track him down and sign him. "The label went to extreme lengths to locate the young musician including contacting his mum on Facebook and his local boxing gym."

6

**EXHIBIT 3**

*Laxed – Siren Beat* was a hit. Maybe not yet a Billboard chart hit, but a hit in the bigger world of social media, where TikTok alone has more users than all the major music streaming companies combined. A hit created by a 17-year-old Auckland, New Zealand high school student who'd made a song in his bedroom. When Jawsh's work began to attract attention from celebrities (including famous musicians), it must've been overwhelming.

Mr. Derulo wanted to create a song of his own using Jawsh's track as the basis. And he wanted to do it in a hurry, while *Laxed – Siren Beat* was still hot on TikTok.

Mr. Spatola had moved to Los Angeles to grow his career as a musician. Even without a manager, before he was invited to work on *Savage Love (Laxed – Siren Beat),* he'd built a notable reputation as a reliable and talented player, producer and songwriter. His resume was impressive; he'd worked on hit songs and played with gold and platinum artists like T.I., Mya, Ty Dolla $ign, Jessi J, Kanye West, A Boogie wit da Hoodie, Juice WRLD and others, even appearing in live television appearances with some of them. These accomplishments led to him working with Mr. Derulo.

Mr. Derulo called Mr. Spatola and said, "I want to create this song with you." This led Mr. Spatola to come to Mr. Derulo's home studio to "make a song with (Mr. Derulo)" from "a TikTok snippet". During the ensuing recording sessions, Mr. Spatola did not re-create existing parts of *Laxed – Siren Beat*, he created new, unique parts. Mr. Spatola's contributions were then carried over to the BTS remix that eventually catapulted the song to an international number one hit.

Mr. Spatola contributed his parts to *Savage Love* over two nights in the studio. The time spent writing and recording songs is not necessarily a factor in their success. Jawsh wrote and recorded *Laxed - Siren Beat* in four hours. Artists have written and recorded massive hit songs in little more than their time it takes to play them. *Wildflowers*, one of Tom Petty's most beloved songs was written quickly. Petty said, "I just took a deep breath, and it came out. The whole song. Stream of consciousness: words, music, chords. Finished it. I mean, I just played it into a tape recorder, and I played the whole song, and I never played it again. I actually only spent three and a half minutes on that whole song. So, I'd come back for days playing that tape, thinking there must be something wrong here because this just came too easy. And then I realized that there's probably nothing wrong at all."

**Unique Writer / Producer Contributions**

Patrick Leonard is a songwriter and keyboardist who has worked with Fleetwood Mac, Michael Jackson, Elton John, Madonna, Pink Floyd and many others. In 2024, he described an experience he had after jamming with Pink Floyd frontman David Gilmour. He was asked

7

**EXHIBIT 3**

to come hear tracks for the new Pink Floyd album. Leonard recalls, "...I'm sitting in this house listening to the playback, and this song goes by, and he (Gilmour) says 'do you recognize that?', and I said 'no', and he said, 'well, you wrote it.' So, what he had done is he had taken this thing that we did and made a song out of it."

Leonard got a songwriting credit - and royalties – for a song he didn't even remember he co-wrote - on an album that went on to sell over 10 million copies. This is how songwriting collaboration is supposed to work.

Creating a new part on a song is a special gift. It is a product of the unique talents of that individual playing the part, not only in how they devise the part, but how they uniquely play them.

For example, there used to be signs in music stores across the country that read, "No *Stairway to Heaven*" (Led Zeppelin) and "No *Eruption*" (Van Halen). These are both complicated works that show off a guitarists' skills. Would-be customers would play them daily to show off, driving employees crazy. There are guitarists who can play those parts perfectly, but the difference between those musicians and the original guitarists, Jimmy Page and Eddie Van Halen, is the new players never could've written those songs in the first place or have played them with the same emotional impact. These works are the musical execution of one human's unique experience expressed through an instrument.

Here's another example. A successful rock producer, Sandy Perlman, had just made an album with punk band the Clash. The new wave band Devo was considering hiring Mr. Perlman to produce their next record. Devo was interested in how certain sounds were achieved in the studio. During the courtship, Mr. Perlman took Devo to a Clash show. At the show, Devo asked how the Clash got their guitar sound.

Joe Strummer (of The Clash): "They (Devo) snuck around back and got a hold of Sandy at the mixer and said 'How do you get that sound? Tell us how it's done!' And they didn't realize it was just the way we were going like this (hunches and strums intensely) on the guitars, you know what I mean? It wasn't particularly what slave-amps you had in the P.A. or the equalizers or whatever. It was the way we were going at it."

It would be foolhardy to dispute the genius of Prince. He sold over 150 million records, won seven Grammys, an Academy Award, dozens of other notable awards and was inducted into the Rock and Roll Hall of Fame. In 1985, he wrote, produced, recorded and released a version of *Nothing Compare 2 U*.  The song did nothing on its initial release. Yet, just five years later, Sinead O'Connor's intensely personal and unique interpretation of the song became a worldwide smash hit.

8

**EXHIBIT 3**

Creation and execution of parts will obviously yield different results. Sometimes the magic is in the playing; how hard the guitar is hit or carefully finessed. Or the secret sauce can be how the song is arranged and sung. Or all of the above.

Mr. Derulo states in his deposition, "I don't play instruments." Because he does not play – at least with proficiency - he could not produce the notes that Mr. Spatola played, never mind in the style Mr. Spatola plays in, with the inflections of his distinctive playing. Mr. Spatola's style is unique. As noted in Dr. Lustig's report, Mr. Spatola's work with Jessi J is stylistically reminiscent of the work he did on Savage Love Laxed Siren Beat. In other words, Mr. Spatola developed a recognizable style, which he contributed to the record.

In his deposition, Mr. Derulo seems to agree that Mr. Spatola's contributions were unique, saying, "I definitely believe that he (Mr. Spatola) brought a feel." That's what a producer and / or songwriter does; they add something magic to the music.

It is my opinion that when Mr. Spatola created and played guitar and bass on *Savage Love*, he created unique contributions that are considered crucial parts of the production and songwriting.

## Work For Hire

Work for hire (or work made for hire) is a term that defines the ownership of certain paid creative work. Work for hire says an employer will own the creative work of a paid worker. In the music industry (and other areas of the entertainment industry), work for hire is considered a buy-out, meaning the creator signing the work for hire agreement will not receive royalties for their work, just a flat fee.

The Copyright act of 1978 defines it as:

A) "work prepared by an employee within the scope of his or her employment" or
B) "a work specially ordered or commissioned for use as a contribution to a collective work'

There's a bit more, but that's the gist. In the music industry, here's how it plays out for all practical purposes:

In A, a singular work is made by an individual during the course of their duties. In other words, they are an employee with a regular job, not an independent contractor. For the employer to claim ownership of the work, they must have made this understood by the employee via a signed employment contract, with work for hire language included. This is typical in any workplace where creative work is expected - an ad agency, for instance.

9

**EXHIBIT 3**

In B, the work is part of a larger project, like a Marvel movie. The credits of those films contain hundreds of special effects workers who contributed to the final film. Every one of these people is employed via signed work for hire agreements. Before they begin work, they know they will not be earning a royalty, they are being paid a flat fee (or salary) and that Marvel will own their work.

Mr. Derulo contends he intended Mr. Spatola's contributions to be work for hire, which was not Mr. Spatola's understanding. In his deposition, Mr. Derulo states, "I completely understand what a work-for-hire is." Frank Harris, Mr. Derulo's manager at the time also claims to understand work-for-hire.

In his deposition, Mr. Derulo says most of his work for hires are contracted "verbally or through a text". However, neither of these satisfies the government's work for hire requirement, nor does it satisfy the commonplace meaning of work for hire within the music industry. One of the absolute conditions of a work for hire is a written and signed agreement between the parties specifying the work is made for hire. For the avoidance of misunderstanding, this contract would typically be, and should indeed be, signed before work is begun. Even if it texts were considered contracts, none of the texts between Mr. Derulo and Mr. Spatola during the creation of *Savage Love* mention work for hire.

In a typical music recording situation, if someone is a work for hire, the worker is notified they are being compensated under a work-for-hire situation in advance. Mr. Derulo claims the $2000 he paid Mr. Spatola is proof of a work for hire situation and represents their mutual understanding of same. This is not true. Mr. Spatola was called to create music at Mr. Derulo's studio by Mr. Derulo himself. Mr. Spatola spent two nights in the studio while the track was being created. $2000 for Mr. Spatola's time or as a producer advance is reasonable; it is not reasonable reimbursement for his creative contributions as a writer and producer.

**Mr. Derulo's Failure To Secure Agreements & Misrepresentations**

As discussed earlier, labels expect artists to deliver finished recordings, ready for release. One major component of that responsibility is a guarantee the artist (or artists) have signed contracts with everyone who contributed to the track.

A record should not be released until everyone who participated in its creation has signed an agreement that clearly delineates what role, rights and compensation they have. Importantly, these agreements state if the contributor is going to receive royalties (or not, in the case of work-for-hire), and what percentages (splits) they will be paid in a royalty scenario.

10

**EXHIBIT 3**

Mr. Derulo says he assumed Mr. Spatola's work was work for hire. Per Mr. Spatola's deposition, when Mr. Spatola created and recorded his contributions to *Savage Love*, that was not his understanding, nor had it been communicated to him. Mr. Spatola states he wouldn't have participated if he'd been told his contributions were to be made as work for hire.

Since Mr. Derulo has a home studio and contends he contracts musicians under work for hire, it is shocking he doesn't have a simple work for hire agreement on hand for musicians to sign. This is an easy and convenient way to ensure that musicians, producers and writers understand Mr. Derulo's intentions when it comes to taking their contributions for his own. This document is not uncommon at recording studios. I have personally seen and used it many times, going back to the late '80s. Mr. Spatola further testified that had he been presented a work for hire agreement, he would never have signed it, and thius his contributions would have never been added to create *Savage Love*. Whether or not Mr. Derulo would have nevertheless worked with another producer and musician to create a different record based on Jawsh's *Laxed – Siren Beat* will never be known, nor whether such a record would have been a #1 hit.

Mr. Derulo had been in the music business for nearly 15 years by the time Savage Love was recorded. His experience far outweighed that of Mr. Spatola or Jawsh 685.Mr. Derulo and his then-manager Mr. Harris both demonstrate in their depositions that they understand the music industry and know this is not how it should be done. Both admit they knew they shouldn't have released the song.

Yet, Mr. Derulo dropped *Savage Love* on his TikTok account anyway. At that time, Mr. Derulo did not have agreements with either Jawsh 685, Jawsh's label or Mr. Spatola. Because Mr. Derulo's manager specifically warned him against releasing the song, there's no denying that Mr. Derulo knew he was in the wrong.

A Variety article cites a source close to the situation describing Mr. Derulo as going "rogue" by releasing the track before those legal matters were resolved and signed. The unnamed source also said, "Jason wanted a beat for a record. He wanted the song to be a Jason Derulo song with Jawsh as producer. But Jawsh should make decisions of what he wants to do with it, not be bullied by a bigger artist into putting it out"

To make matters even worse, Mr. Derulo did not even credit Jawsh when he first posted *Savage Love*. He mentioned himself quite a bit, though. The title was displayed as "SAVAGE LOVE: Jason Derulo – jasonderulo". The unauthorized use and cultural appropriation of Jawsh's song created a backlash online. Sony (Jawsh's label) issued a take-down notice to Mr. Derulo for the unauthorized use.

**EXHIBIT 3**

Mr. Derulo's understanding of copyright seems shaky. He claims in his book that Sony couldn't sue him for using *Siren Beat* on TikTok because he wasn't profiting from it (which is arguably untrue, since it went viral and was promoting his brand). The law doesn't require Mr. Derulo to make money off unauthorized appropriation of someone else's work for it to be wrong. By using it without a deal in place, he was hijacking and potentially devaluing the work.

In his deposition, Mr. Derulo said of releasing Savage Love without permission, "It was no harm done. It was only – like, it was just releasing a cover to a song. It was creative expression". It wasn't a cover; it was a new work utilizing Jawsh's song as the underlying track. Mr. Derulo knew *Savage Love* wasn't a cover; he had already proposed a three-way publishing split between Jawsh, J Kash and himself –he considered himself a co-author.

TikTok has been flagged as problematic by the United States Defense Department and it is prohibited on Government-owned devices. The platform thrives on user-posted content. It is not in TikTok's best interest to police infringing content for as long as they can get away with it. Sony issued a takedown request. Again, Mr. Derulo showed poor judgment, willfully ignoring their request, later writing of the demand, "I didn't try."

The legal issues with Sony were eventually resolved, and the track was released through the label, credited to Jawsh 685 and Mr. Derulo.

It was agreed Jawsh would get 50% of the publishing, leaving Mr. Derulo sole discretion to divide the publishing splits for the other 50% of the song. Mr. Derulo divvied it up as follows; 20% to J Kash, 5% to Phil Greiss, and 25% to himself. He again failed to appropriately compensate Mr. Spatola.

The Sony contract Mr. Derulo signed is dated June 4th, 2020, yet it refers to the BTS remix as already existing. But BTS didn't agree to do the remix until September 3rd and was created on approximately September 11th, 2020, per a Sony e-mail chain. As shown by the contract itself, Mr. Spatola was not compensated for the use of his creative contributions that were carried over to the remix.

Finally, the agreement Mr. Derulo signed with Sony explicitly states that "You (Derulo) represent and warrant that: a) You have all rights and power to enter into this agreement and all rights in and to the Savage Materials (referring to the recordings will be assigned to Sony as set forth above." Yet Mr. Derulo did not have Mr. Spatola's rights then and still doesn't today.

**Demand & Opportunity for Successful Writer / Producers**

**EXHIBIT 3**

Artists and labels are always on the lookout for hot new writer / producers. *Savage Love (Laxed – Siren Beat)* was hugely successful; it went to number one in 17 countries and the BTS remix took it to number one on the Billboard Hot 100 (Mr. Derulo's first US #1 since 2009) and number one on the Billboard Global 200. In its multiple versions, it has been streamed nearly 1.5 billion times since release on Spotify alone.

If Mr. Spatola had been properly credited as writer and producer on *Savage Love (Laxed Siren Beat)*, there's no doubt he would've enjoyed more opportunities to write and produce with other successful artists. Mr. Spatola certainly would have been catapulted up another level of the Producer scale based on the success of the track. Yet by denying Mr. Spatola his proper credit – he wasn't even credited for his guitar and bass performance until January of 2021 – Mr. Derulo denied Mr. Spatola the opportunities that come from contributing to a number one hit.

When asked what the difference is between a writer and a producer, Mr. DeRulo replied, "In today's day and age, it's the same thing." Although he backtracks from this idea briefly, he returns to it again saying, "So, generally, writers are people that come up with lyric and melody. And the producers are the people that come up with the track, but they're all called writers. Because a producer comes up with the production melody. So, in today's day and age, you still call them a writer, so to speak."

This may seem confusing, but he is not wrong. Mr. Derulo is keenly aware of this; he came up in the album era, but he works in the new pop style. The lines between the contributions of producer and writer are more blurred than they ever have been.

## Conclusion

It's clear Mr. Spatola made unique creative contributions to both the production and writing of *Savage Love (Laxed – Siren Beat)*. If Mr. Derulo had a specific work for hire role in mind for Mr. Spatola, it was his responsibility in the industry to make sure that was understood. He did not do so. If Mr. Spatola had been open to work for hire (the record shows he was not), Mr. Derulo should've gotten the terms of that arrangement on paper before work began. He did not abide by industry norms. In fact, throughout the creation of *Savage Love (Laxed – Siren Beat)*, Mr. Derulo failed to act as he should have, despite claiming to know the business and being warned of the potential ramifications of his actions. Mr. Spatola should be compensated for his unique production and songwriting contributions to *Savage Love (Laxed – Siren Beat)*.

Jeff Rougvie

13

**EXHIBIT 3**

**<u>EXHIBIT A</u>**

JEFF ROUGVIE

422 Lafayette Street

Salem, MA  01970

Phone: (978) 210-9567

E-mail: info@jeffrougvie.com

---

# SUMMARY

Senior entertainment industry executive with extensive experience in the evaluation, acquisition, monetization and reformatting of IP. Intimate knowledge of sales, marketing, distribution, and intellectual property law within entertainment and licensing industries.

# EXPERIENCE

<u>MUSIC EXPERT WITNESS:</u> Salem, MA                                    2008—current

Was recruited into Expert Witness work in 2008. Have provided reports and testimony for multiple cases involving IP rights, creation costs, an organization's ability to maximize assets, sales projections, and lost income scenarios involving artists including David Bowie, Interpol, Bob Marley, John Cougar Mellencamp, Iggy Pop, and the Yeah Yeah Yeahs.

<u>SUPERMEGABOT MUSIC CONCERN, LLC,</u> Salem, MA                      2008-current

Founding owner of record company, specializing in limited edition music and music-related items in a variety of mediums. Oversight of every aspect of the company (signings, packaging, marketing, hirings, budgets). Initial plan was to release licensed figures of music icons. Closed deals and created sculpts. Unfortunately manufacturing costs rose drastically due to great recession. Consequently, higher price point would've been prohibitive, and we pivoted back to music only.

<u>EMI MUSIC,</u> New York, NY                                          2006-2008

14

**EXHIBIT 3**

At EMI, spearheaded the re-launch of the Caroline Records brand, including managing catalog
assets, monetizing dormant copyrights, utilizing international assets for domestic market. Part of
the core team for Caroline Music, EMI's independent music division.

### Vice President, Repertoire

Recruited to the Caroline Group after it had been essentially dormant for ten years. 2007 was
the label's best financial year since the 90's. EMI sold in 2007 for nearly $5 billion.

- Key member of management team
- Extended the Caroline brand to include electronic and pop projects.
- Built out hugely profitable revenue stream from unexploited international repertoire via
online services

VIOLIN ROAD, Providence, RI                                                              1999-2001

Successfully managed this award-winning band and issued their album. Responsibilities included
negotiating agreements, television licenses, overseeing recording sessions, handling their
finances and coordinating live concerts and public appearances.

ATOMIK INDUSTRIES, Minneapolis, MN – Salem, MA 1988-current

Lifelong interest in comics and collectibles led to starting one of the earliest collectible toy mail
order businesses, including importing Batman '89 products directly from Japan. Still thriving
under the Supermegabot banner.

Freelance Consultant, Salem, MA                                                          2000-2002

Wrote and worked on audio & video projects for a variety of firms, including toy companies,
record companies, internet start-ups, home video companies, magazines, artists and others.
Created an extensive database of out of print music assets in preparation for digital age.

RYKODISC, Salem & Beverly, MA                                        1988-1999, 2003-2006

At Rykodisc, the world's largest independent record company, generated revenues in excess of
$100 million. Served on Executive Committee management team to provide leadership and
strategic direction to company.

### Vice President, A&R + Special Projects (2003-2006)

Recruited back to the label after they suffered a four-year slide. 2005 was the label's best
financial year since the 90's. Rykogroup sold in 2006 for nearly $80 million.

- Resumed duties as described from 1987-1999, signing artists and developing projects
- Key member of management team
- Oversaw upload of entire Rykodisc catalog to Digital Service Providers (iTunes, etc)
using a single Mac
- Extended the Rykodisc brand to include metal, punk and hard rock projects.

15

**EXHIBIT 3**

- Designed DVD projects (Monty Python's Graham Chapman, Bill Hicks, etc), including research and assembly of elements, flow charts and menu design.
- Negotiated with rights holders for commercial rights and with vendors for best rates.
- Responsible for signing, A&R and catalog work with (highlights): Big Star, Dream Syndicate, Jack Kerouac, Meat Puppets, Ministry, Misfits, Mission Of Burma, My Life With The Thrill Kill Kult, Posies, The Raspberries, Replacements, Soundtracks (of Bad News Bears, Beauty & The Beast (TV), Fever Pitch, Mad Hot Ballroom, Mean Girls, Sahara, Weeds), Wednesday 13, Kelly Willis

**Senior Director of DVD Development** (1998-1999)

Spearheaded label's venture into DVD software; including market research, acquisition, content development, technical assessments, and sales and marketing plans.

- Researched DVD format and assessed uses for existing catalog in DVD context, as well as seeking out and identifying new projects for label.
- Designed DVD projects to maximize appeal to the consumer, including research and assembly of elements and menu design.
- Negotiated with rights holders for commercial rights and with vendors for best rates.

**Senior Director of Artists & Repertoire and Special Projects, Project Manager** (1987-1998)

Overall responsibility for acquiring content within label parameters, overseeing A&R Staff, Sales and Marketing follow-through, developing new opportunities and strategies to separate Rykodisc from other record labels.

- Searched for artists and catalogs that would be successful within the context of the Rykodisc label.
- Responsible for signing, A&R and catalog work with (highlights): Badfinger & Pete Ham, Big Star/Chris Bell, Andrew Bird, David Bowie, Bruce Cockburn, Cocteau Twins, Lloyd Cole, Bootsy Collins, Elvis Costello, Dead Can Dance, Devo, Galaxie 500, Golden Smog (key members of Wilco, Jayhawks, Soul Asylum, etc), Jimi Hendrix, Bill Hicks, Nils Lofgren, MGM/United Artists Soundtrack Catalog (including Chitty Chitty Bang Bang, Great Escape, 200 Motels, Last Tango In Paris & many more), Mission Of Burma, Morphine, NRBQ, Soundtracks to Crumb and HBO's Spawn, Ringo Starr, Sugar/Bob Mould, Throwing Muses/Kristen Hersh, Pete Townshend, Undertones, Tom Verlaine, Jerry Jeff Walker, Kelly Willis, Frank Zappa.
- Assembled *Born To Choose* (Women's Rights benefit compilation featuring REM, Tom Waits, Soundgarden, etc.)
- Negotiated with managers and lawyers for recording services of their artists.
- Worked closely with Business Affairs department to insure that negotiated terms were carried through the contract stage.
- Served as liaison between the artists and the company, working with artists to choose songs, producers, studios and engineers, negotiated rates with studios and producers.

16

**EXHIBIT 3**

- Generated promotional ideas for each project.
- Conceptualized and oversaw production of music videos, including Sugar's "Gee Angel", the first video to be released on an Enhanced CD.
- Made key decisions including approving advertising, packaging, and campaigns at press, radio and retail.
- Delivered sales presentations to large audiences including retailers, distributors and members of the press.
- Put together showcases for Ryko acts at SXSW, CMJ, New Music Seminar, Sales Conferences, etc.
- Sought out new business for the company and new applications for copyrights.
- Developed new CD packages, including deluxe box sets, standardized CD single blister packs, and deluxe repackages of catalog albums.
- Produced many award-winning re-releases.
- Authored book included with the multi-platinum David Bowie album *Ziggy Stardust* throughout the world (over 3 million copies sold).
- Created a company magazine to promote Rykodisc releases.
- Conceived, designed and sourced numerous promotional items.

EAST SIDE DIGITAL, Minneapolis, MN                                1984-1987

**Vice President, Retail Development**

- Set up the first compact disc-only stores, the CD Establishment/BCD chain in Boston, Minneapolis/St. Paul and San Francisco. Directed operations from site selection through store opening.
- Managed inventory for above stores.
- Established mail order division for retail sales.

**Vice President, National Distribution**

- Produced catalogs and advertisement for retail and distribution arms.
- Inventory buyer for the warehouse, overseeing all suppliers worldwide.
- Managed warehouse, field and retail staff.

**President, ESD Label**

- Launched the in-house ESD record label.

# AFFILIATIONS AND AWARDS

Member, Recording Industry Association of America

Grammy Award for Package Design

2005 "Stoney" Award Winner for DVD of the Year

17

**EXHIBIT 3**

## EXHIBIT B

## LIST OF MATERIALS CONSIDERED IN FORMING OPINIONS IN THIS MATTER

Copyright.gov (2024) Circular 30, Works Made For Hire
https://www.copyright.gov/circs/circ30.pdf

Derulo, Jason (2023) Sing Your Name Out Loud, 15 Rules For Living Your Dream
(Harper One)

Fung, Brian (2022) Senate passes legislation to ban TikTok from US government
devices, CNN December 15 / https://edition.cnn.com/2022/12/15/tech/senate-
tiktok-ban-devices/index.html

Gabarini, Vic (1981) An Interview with Joe Strummer and Robert Fripp, Musician Magazine, June

Leonard, Patrick (2024) Bob Lefsetz Podcast August 1 /
https://open.spotify.com/episode/03ym02kkndQh9doLOMw3pS

Passman, D. S., & Glass, R. (2012), *All you need to know about the music business 8th
Edition* (Simon & Schuster)

Passman, D. S., & Glass, R. (2015), *All you need to know about the music business 9th
Edition* (Simon & Schuster)

Passman, D. S., & Glass, R. (2023), In *All You Need to Know About the Music
Business: 11th Edition* (Simon & Schuster)

Hutchinson, Lydia (2014) Tom Petty Tells The Stories Behind His Songs, Performing
Songwriter October 20

Lord, Annie (2020) Jason Derulo criticized for sampling Polynesian teenager's TikTok hit
without permission The Guardian, May 20 / https://www.independent.co.uk/arts-
entertainment/music/news/jason-derulo-tiktok-teenager-joshua-nanai-laxed-siren-
beat-a9523501.html

Rogowsky, Mark (2014) The Cruel Math Behind Why Streaming Will Never Save The Music
Industry, Forbes March 22 / https://www.forbes.com/sites/markrogowsky/2014/03/20/out-
of-tune-can-the-music-business-find-harmony-to-reverse-its-long-decline/

Rosenberg, Bill (2024) Music Industry Annual Reports Show Stable Growth And
YouTube Strength, Forbes Mar 30 /

18

**EXHIBIT 3**

https://www.forbes.com/sites/billrosenblatt/2024/03/30/music-industry-annual-reports-show-stable-growth-and-youtube-strength/

Spotify App

Tailor, Leena & Halperin, Shirley (2020) Jason Derulo sparks outrage down under for lifting Polynesian teen's TikTok hit Variety May 19 / https://variety.com/2020/music/news/jason-derulo-tiktok-controversy-savage-love-laxed-siren-beat-1234609101/

Wikipedia () Pink Floyd: Momentary Lapse of Reason, Certifications and sales / https://en.wikipedia.org/wiki/A_Momentary_Lapse_of_Reason#Certifications_and_sales

Documents Relied Upon in Connection With This Action:

Deposition transcript of Jason Desrouleaux

Deposition transcript of Frank Harris

Deposition transcript of Matthew Spatola

DESROULEAUX 8 or DERULO00179? (Sony e-mails about BTS remix)

EX 0004 DESROULEAUX, JASON (not sure if the exhibit number is right, there are other numbers like DEREULO00257? This is the texts with Jawsh)

Musicological Report of Dr. Ethan Lustig

SONY 00107-114 or DERULO00200 (not sure if this number is right either, it's the Sony agreement)

### EXHIBIT C

### PUBLICATIONS AUTHORED BY JEFF ROUGVIE IN THE LAST TEN YEARS

*Still Reads Comics*, Bowie Glamour 6 (2019)

Gunning For Hits issues 1-6, collected as *Volume 1: Slade* (Image Comics, 2019)

https://www.gunningforhits.com/

https://www.jeffrougvie.com/

https://www.musicexpertwitness.com/

19

## EXHIBIT 3

https://www.rykobook.com/

https://www.supermegabot.com/

## EXHIBIT D

## CASES IN WHICH JEFF ROUGVIE HAS TESTIFIED IN A TRIAL OR DEPOSITION IN THE LAST FOUR YEARS

Deibel V Edison (2022)
USA V Pigda (2022)
USA V Fredrick Stahmer (2023)
Ultra Records V Ultra International Music Publishing (2024)

20

**EXHIBIT 3**

# Exhibit 3 - Expert Report of Jeff Rougvie Derulo Spatola

Final Audit Report                                    2024-10-11

| | |
|---|---|
| Created: | 2024-10-11 |
| By: | shelby sokora (hayden@werge.law) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAoSEpLxvjoq29DU2UAgW__thgRaarxZ_f |

## "Exhibit 3 - Expert Report of Jeff Rougvie Derulo Spatola" History

📄 Document created by shelby sokora (hayden@werge.law)
2024-10-11 - 10:35:42 PM GMT

✉ Document emailed to Jeff Rougvie (info@jeffrougvie.com) for signature
2024-10-11 - 10:35:47 PM GMT

📄 Email viewed by Jeff Rougvie (info@jeffrougvie.com)
2024-10-11 - 10:38:36 PM GMT

✍ Document e-signed by Jeff Rougvie (info@jeffrougvie.com)
Signature Date: 2024-10-11 - 10:40:06 PM GMT - Time Source: server

✅ Agreement completed.
2024-10-11 - 10:40:06 PM GMT

**Adobe Acrobat Sign**

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

-----------------------------------------------------------------X

Matthew Spatola p/k/a Matty Spats,      Plaintiff,      :

:      Case No. 2:23-cv-06191-MWF-E

v.      :

:

Jason Desrouleaux p/k/a Jason Derulo;

and

Sony Music Entertainment

d/b/a Columbia Records      :

Defendants.      :

-----------------------------------------------------------------X

## SUPPLEMENT TO EXPERT REPORT OF JEFF ROUGVIE

This supplement provides additional context related to the opinion stated in my principal expert witness report that by denying Mr. Spatola's correct and public credit in a timely manner on an international number one song - *Savage Love (Laxed – Siren Beat)* - Mr. Derulo prevented Mr. Spatola from benefitting from that success, particularly generating more work opportunities that were likely to have significantly contributed to his income, reputation and career trajectory.

Success begets opportunity. This is true in every industry, and even more true in the music / entertainment business than in other industries. For instance, the cast of a movie has impact on its potential success. In the world of steaming music, artists who collaborate have chances to reach new audiences by working with other artists. There is cross-pollination of there collective fanbases (if everyone is properly credited). In short, successful people want to work with other successful people and their combined efforts can lift both parties.

Throughout the history of the music business, Artists, Labels, and Managers have always been looking for opportunities to work with hit-making collaborators. This includes producers, songwriters, mixers and players (and more). The theory is that hitmaking creatives can make more hits in different collaborations. Without a proper

credit, Mr. Spatola was denied these opportunities, because his name did not appear in association with the published song anywhere until well after it peaked.

For instance, in the mid-'80s Rick Rubin produced three hip hop singles which became New York area hits. His involvement in these records gave him clout and respect in the industry, which led more artists to want to work with Rubin, who was publicly credited on the physical records as producer.

As rap expanded from singles to albums and became more popular outside New York, Rubin produced three classic hip-hop albums in 1985/6, all of which went platinum or multi-platinum. LL Cool J's Radio received a Platinum certificate, RUN-DMC's Raising Hell went triple Platinum, and the Beastie Boys' License To Ill went ten times Platinum or Diamond.  In the same period, Rubin produced thrash metal band Slayer's Reign In Blood, which went Gold.

His success and musical versatility gave Rubin opportunities to produce a diverse roster of artists, including Johnny Cash, Mick Jagger, Tom Petty, Nine Inch Nails, Andrew Dice Clay, Sheryl Crow, System of a Down , Lucinda Williams, Slipknot, Weezer, Lil Jon, Shakira, Dixie Chicks, U2, Linkin Park, Neil Diamond, Kanye West, Metallica, ZZ Top, Lana Del Rey, Black Sabbath, Lady Gaga, Ed Sheeran, Cat Stevens (as Yusef), Santana, Neil Young, Kesha, Lil Uzi Vert, and Beabadoobee. Resulting in dozens of critically acclaimed Gold and Platinum records. Rick Rubin is now one of the most successful and acclaimed producers of all time.

Around the time Rubin was coming up, John "Jellybean" Benitez was also making a name for himself. Originally known as a club DJ and remixer, Benitez was brought in by Madonna to remix songs for her debut album after she wasn't satisfied with previous producers. He remixed the whole album and brought in the song "Holiday", which he produced. It became her breakthrough hit, going gold, while the album went 5x platinum.

Because his name was prominently featured on the record labels and jackets, Benitez was known to the industry. He went on to sign a deal as a solo artist. Simultaneously he produced Whitney Houston, Sheena Easton, and more Madonna material. He also became a hit-making remixer, with over 100 credits, including Bowie, ZZ Top, Fleetwood Mac, Sting, Hall & Oates, Michael Jackson, Paul McCartney and many more. These remixes are a form of production, often involving creating new parts, not just manipulating the original recordings.

These are two examples of how success and exposure beget opportunity. But these people were credited, so they benefitted. Mr. Spatola participated in the creation of a number one song, yet his involvement was not reported whatsoever until long after the song had peaked. He was accordingly unable to capitalize on the song's success.

In the current pop age - when songs routinely feature many more contributors than they had historically - credits are more important to the music eco-system than ever.

Mr. Harris, who was Mr. Derulo's manager at the time "Savage Love (Laxed Beat)" was recorded, states in his deposition; that part of his job as personal manager was "finding good people to collaborate with on records."

One of the ways the industry does this is through Jaxsta, an online database with the goal of tracking all credits for every song. Jaxsta gets their credits data directly from all the majors and many big indies, collectively representing over 80% of the industry's market share. It has been referred to as "the IMDb of the Music Industry."

Managers, publishers, labels and others looking to find artist collaborators can get contact info for anyone credited on the site, if that information is provided. A&R Managers frequently use this.

If Mr. Spatola had been credited at all - never mind for his full contributions – at the time Savage Love was released and blowing up, the music industry would have been able to see his credits on a number one song and track him down from there.

But Mr. Spatola didn't even get additional guitar and bass credits until well after the record had peaked. He didn't get the benefit of exposure that comes with the high profile of a worldwide number one song at its pinnacle.

The lack of credits is also problematic because, even if they've been updated on Jaxsta and elsewhere since, the bad data still lives online. Every song has a lot of data associated with it; artist credits, songwriting credits, producer credits, ISRC codes (used to detect plays), etc. All of this must be correct at the start, or it can cause problems later, because it is very hard to scrub bad data (or bad metadata) or bad metadata from the internet once it has been disseminated.

For instance, many online publications, including the industry bible, Billboard magazine, use Jaxsta to access credits for hit songs. That information is used in stories about those songs, even if the data is incomplete or otherwise faulty. It is unfeasible for Billboard and other users who got bad data to re-check credits and update their reporting.

As of 6/6/2025, if a Billboard reader searches the site for Savage Love, they will find an article whose headline claims it includes the "full credits" of the creative team behind Savage Love. It was posted on 10/14/2020, the week the song hit #1 – the peak of its popularity – and likely the point when industry interest in the songs creation was at its highest. Mr. Spatola's name that does not appear in that story.

Since Billboard is a trusted source, a user who saw those credits in the article had no impetus to search out Mr. Spatola as a collaborator.

Mr. Derulo's popularity on TikTok and Jawsh 685's viral success with "Laxed Beat" on TikTok are other clear examples of exposure creating opportunity, and how important it is to capitalize quickly on success.

Capitol Records sought out Mr. Derulo with the goal of spurring a collaboration between Jawsh 385 and Jason, because they were both very popular on TikTok at that moment. Expediency was key, because TikTok trends come and go so quickly – Capitol wanted the track in a week, a short amount of time to create a song.

Phil Greiss said his contributions to the final version of Savage Love were largely removed before the final version with Jawsh's sample was created. Mr. Greiss was initially credited as a performer (guitar) and producer (misc. Prod) and Composer. Mr. Greiss' contributions appear considerably less significant than those made by Mr. Spatola – yet Mr. Greiss got a 5% cut of the song's publishing, while Mr. Spatola got nothing. Mr. Greiss also got multiple credits, and all the opportunity and exposure having a number one song brings.

Here are two more recent examples of how success in the music industry begets opportunity.

Jack Antonoff started his career writing, singing and playing guitar in the early '00s in Indie rock bands before joining the pop band ".fun" in 2008. They had a number one single, co-written by Antonoff in 2012. This was before the streaming era took off. Physical copies of the music featured his credits.

That success led him to work with other popular acts, including Carly Rae Jepson, Tegan and Sara, Sara Bareilles, and, most notably, Taylor Swift. Antonoff co-wrote and co-produced a one-off song for Ms. Swift that appeared on a movie soundtrack in 2013. Because Taylor Swift is a superstar artist like Mr. Derulo, and Mr. Antonoff was properly credited, Mr. Antonoff benefitted from a boosted profile within the industry.

This led to Antonoff's producing songs on all 11 Taylor Swift studio albums since 2012 (when Ms, Swift and Mr. Antonoff first met), he's also produced and / or co-written with Sia, Zayn, Lorde, St Vincent, Pink!, Lana Del Rey, The Chicks, Olivia Rodrigo, Diana Ross, Spoon, Florence and the Machine, Brittany Howard, Phoebe Bridgers, Thundercat, Gary Clark Jr, H.E.R., R.Z.A., Maren Morris, The 1975, Beabadoobee, Paramore, Kendrick Lamar, Sabrina Carpenter, and Doja Cat, amongst many more.

Mr. Antonoff has also scored soundtracks and has his own band, Bleachers. His work has won Grammys and achieved Gold, Platinum and multi-Platinum status.

Another success story, whose career started out on a similar path to Mr. Spatola's, is Andrew Watt, originally a guitarist who grew up on Long Island. Watt graduated High

School in 2008. He dropped out of college to take his first professional gigs, playing guitar for pop artists, including Justin Bieber.

Watts' first songwriting and production credit was in 2013 on Cody Simpson's Surfers Paradise  album. He spent two years in the hard rock supergroup California Breed, for which he co-wrote all the band's songs.

California Breed broke up in 2015, and Mr. Watt began writing and producing for more acts, including Justin Bieber, Post Malone, Selina Gomez, Camila Cabello, Bebe Rexha, Hailee Steinfeld, Avicii, Rita Ora 5 Seconds of Summer, Cardi B, Florida Georgia Line, Benny Blanco (himself a successful producer), Halsey, Khalid, Lana Del Rey, Chainsmokers, Sean Mendes, Charlie Puth, Blink-182, Charli XCX, Ozzy Osbourne, Boogie With Da Hoodie (the album Artist 2.0, which Mr. Spatola also has a production credit on), Miley Cyrus, Dua Lipa, Sam Smith, Maroon 5, Elton John, Stevie Wonder, Nicki Minaj, Brandi Carlisle, Stevie Nicks, Eddie Vedder, Young Thug, Ed Sheeran, Ozzy Osbourne, Britney Spears, Iggy Pop, the Rolling Stones, Lady Gaga and Pearl Jam.

In addition to his impressive list of collaborators, much of his work became worldwide hits, achieving gold and platinum status. As Producer, Watt has won an Academy Award and a Grammy.

Mr. Spatola's career trajectory was positive when he began working with Mr. Derulo. Like Mr. Antonoff, Mr. Spatola was a respected player building his resume with writing and production credits. If Mr. Spatola had been properly credited on a number one hit, he would've been exposed to a huge number of industry people who were in positions to give him more work and therefore accumulate more opportunities and credits. In my opinion, this would've supercharged Mr. Spatola's career.

By denying Mr. Spatola any credits, Mr. Derulo prevented Mr. Spatola from having the stature in the industry and, I believe, the success that other artists on the same track were able to achieve.

Sources:

09-23-24 Harris Deposition

07-17-24 Hindlin Deposition

06-18-24 Ben Hogarth Deposition

https://en.wikipedia.org/wiki/Jacob_Kasher_Hindlin

https://en.wikipedia.org/wiki/Jack_Antonoff

https://en.wikipedia.org/wiki/Rick_Rubin

https://en.wikipedia.org/wiki/Andrew_Watt

https://splice.com/blog/phil-greiss-interview/

https://www.billboard.com/music/music-news/jawsh-685-jason-derulo-bts-savage-love-recording-credits-9465708/

https://www.digitalmusicnews.com/2022/08/09/jaxsta-official-credits-for-business-and-enterprise/

https://musically.com/2020/06/11/tools-jaxsta-the-music-industrys-official-list-of-who-did-what/#:~:text=Jaxsta's%20data%20partners%20include%20all,of%20the%20industry's%20market%20share.

https://gearspace.com/board/featured-content/1344093-inside-jaxsta-platform.html#:~:text=Charts%20and%20awards%20information%20is,and%20the%20RIAA%20(certifications).

1  **WERGE & CORBIN LAW GROUP**
2  Thomas E.M. Werge (State Bar No. 362485)
   tom@werge.law
3  Joseph A. MacHatton (*pro hac vice*)
4  joseph@werge.law
   Veronica A. Phifer *(pro hac vice)*
5  veronica@werge.law
6  1736 Race Street
   Denver, CO 80206
7  Telephone: (303) 586-4900
8  Facsimile: (720) 554-8042
9  **FROST, LLP**
   Christopher Frost (State Bar No. 200336)
10 chris@frostllp.com
   10960 Wilshire Blvd., Suite 2100
11 Los Angeles, CA 90024
   Telephone: (424) 254-0441
12 Facsimile: (424) 600-8504
13
14 *Attorneys for Plaintiff*
   MATTHEW SPATOLA p/k/a
15 MATTY SPATS
16
17                   **UNITED STATES DISTRICT COURT**
18                   **CENTRAL DISTRICT OF CALIFORNIA**
19 Matthew Spatola p/k/a Matty Spats,    | CASE NO. 2:23-CV-06191-MWF-E
20          Plaintiff,
21 v.                                    | SECOND AMENDED COMPLAINT
                                           FOR:
22 Jason Desrouleaux p/k/a Jason Derulo;
   and                                     1. DECLARATORY JUDGMENT
23 Sony Music Entertainment                2. ACCOUNTING
   d/b/a Columbia Records,                 3. CONSTRUCTIVE TRUST
24                                          4. NEGLIGENCE
25          Defendants.                     5. UNJUST ENRICHMENT
26                                         AND JURY DEMAND
27
28

SECOND AMENDED COMPLAINT                -1-                        Exhibit A

1

Plaintiff Matthew Spatola ("Plaintiff" or "Spatola") alleges as follows:

## JURISDICTION AND VENUE

1.     Spatola's first claim for relief arises under the copyright laws of the United States, as amended, 17 U.S.C. § 101, *et. seq*. Accordingly, the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

2.     The Court has supplemental jurisdiction over Spatola's second claim pursuant to 28 U.S.C. § 1367.

3.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) as Derulo and Sony have both waived service of their respective summons and are both subject to the jurisdiction of a court of general jurisdiction within the state of California.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because Defendants are residents of Los Angeles County, and a substantial part of the events occurred in this District.

## INTRODUCTION

5.     This case arises out of singer Jason Derulo's refusal to accord Matthew Spatola the credit and royalties he is due as a co-author of the number-one hit song *Savage Love (Laxed – Siren Beat)* ("*Savage Love*"). On April 23, 2020, Derulo and Spatola collaborated to create the instrumental composition and recording of what would later become *Savage Love* in Derulo's Los Angeles home studio. Derulo and Spatola went back to the studio again on April 27, 2020 whereon they completed *Savage Love*.

6.     Derulo then unilaterally released Savage Love, without providing any credit whatsoever to Spatola for the work they jointly created together. This lawsuit is filed to right that wrong, and to ensure that Spatola is properly credited as a co-writer of *Savage Love* and compensated for his contributions thereto.

Exhibit A

7.      Although Spatola had produced at Derulo's home studio before *Savage Love*, those sessions involved a larger group of contributors and were entirely unrelated to *Savage Love*. To Spatola's knowledge, none of the music created at those earlier sessions was ever released by Derulo. *Savage Love* was different – the writing and conceptualizing of the instrumental composition and the creation of the actual recording occurred when Spatola and Derulo were the only contributors present in Derulo's studio collaborating together to create *Savage Love*.

8.      *Savage Love* topped the Billboard Hot 100 on October 17, 2020, after a boost from the release of a remix version of the song by the wildly popular South Korean pop band BTS – a version which also includes all of the contributions to *Savage Love* created by Spatola. On information and belief, Defendants negotiated and released the BTS remix without acknowledging Spatola and while cutting him out completely from the writing credit and income received. *Savage Love* was an international success, reaching number one on the respective charts of over fifteen different countries and is certified multi-platinum in at least fourteen different countries. At no time did Derulo or Sony ever get permission from, account to, or even enter into any contract with, Spatola for his contributions to *Savage Love* and the BTS remix.

9.      Spatola is a Grammy-nominated professional producer, songwriter, and musician for various high-profile music artists such as Drake and DJ Khaled. Prior to working with Derulo on *Savage Love*, Spatola had worked with many different artists such as Juice WRLD, aboogiewitdahoodie, Lil Uzi Vert, and Nipsey Hussle. He has also performed on The Tonight Show Starring Jimmy Fallon, Jimmy Kimmel Live, and Saturday Night Live.

10.     Derulo has been an award-winning musician for over a decade. While Derulo has had many successful songs throughout his career, *Savage Love* was Derulo's second Billboard Hot 100 number-one hit in the United States, eleven years after his first number one song, *Whatcha Say*. Both of Derulo's number one singles

are derived from other existing works. *Whatcha Say* debuted in 2009 using the chorus and underlying composition of Imogen Heap's *Hide and Seek* from four years earlier. *Hide and Seek* had gained widespread popularity due to a its use in an episode of the television series *The O.C.*, and even more fame when *Saturday Night Live* made a parody of the episode in 2007. Heap clarified that although Derulo did not publish the song before getting her permission, she was "pretty sure they already mastered it, and it was already ready to go, and they were hoping everything would be okay in the end."[1]

11.    Derulo created *Savage Love* in a similar fashion: by finding an existing work and basing a new song around it, without first obtaining permission from the author. *Savage Love* started with a song that gained widespread fame on TikTok called *Laxed (Siren - Beat)* (the "Sample"), which was authored by a New Zealand teenager named Joshua Stylah, professionally known as Jawsh685 ("Jawsh"). *Savage Love* started by sampling a song that gained widespread fame on TikTok called *Laxed (Siren - Beat)* (the "Sample"), which was authored by a New Zealand teenager named Joshua Stylah, professionally known as Jawsh 685 ("Jawsh"). When Derulo and Spatola went into the studio to create Savage Love, Derulo started the session by loading the Sample into Pro Tools, and from which Spatola then wrote and recorded new instrumental contributions, together with Derulo, to create the instrumental version of *Savage Love*. When Derulo and Spatola went into the studio to create Savage Love, Derulo started the session by loading the Sample into Pro Tools, and from which Spatola then wrote and recorded new instrumental contributions, to create the instrumental version of *Savage Love*. When Derulo thereafter completed *Savage Love* and posted it on his personal TikTok account, he completely failed to credit Jawsh,[2] while also failing to credit Spatola in any way.

---

[1] *https://www.vulture.com/2019/04/songwriters-on-song-copying-sampling-interpolation.html*

[2] *https://variety.com/2020/music/news/jason-derulo-tiktok-controversy-savage-love-laxed-siren-*

Exhibit A

A month later, after what were likely significant negotiations between Sony, Jawsh, and Derulo, permission was obtained to release *Savage Love*, contemporaneously with Jawsh being signed to Derulo's label Columbia Records, but without involving Spatola in any way.

12.     Since the commercial release of *Savage Love*, Spatola requested that Derulo provide him with credit for his work from Derulo directly. Although Derulo originally agreed, after multiple follow-up messages, Derulo failed to follow through and rightfully credit Spatola as a co-writer.

13.     In April of 2023, Spatola was prepared to file a complaint in this Court related to the claims discussed herein. Upon discussion with counsel for Derulo and Sony, the Parties entered into a tolling agreement effective April 26, 2023, agreeing to engage in good faith settlement negotiations. After the tolling agreement was executed, however, Derulo and Sony failed to negotiate with Spatola. Derulo and Sony claimed to have an agreement, signed by Spatola, which governed the relationship between Spatola and Derulo. After numerous requests from Spatola, Derulo and Sony failed to produce any such agreement. Accordingly, on June 30, 2023, Spatola supplied Derulo and Sony with notice of termination of the tolling agreement, which terminated the agreement following the contractual 30-day period thereafter. This complaint is now filed following the expiration of the tolling agreement.

## THE PARTIES

14.     Plaintiff Spatola at all times relevant hereto was an individual residing in the County of Los Angeles, California.

15.     On information and belief, Defendant Derulo is, and at all times relevant hereto was, an individual residing and doing business in the County of Los Angeles, California.

---

*beat-1234609101/*

Exhibit A

16.    Defendant Sony Music Entertainment ("Sony"), through its record label, Columbia Records, distributed *Savage Love*, and at all times relevant hereto was a Deleware corporation that conducts business and has at least one office in the County of Los Angeles, California.

## ALLEGATIONS

17.    On April 22, 2020, just after 11:00 p.m., Spatola arrived at Derulo's home studio in Tarzana, California ("First Session").

18.    Spatola had been to Derulo's home studio about five times prior to the First Session but each time Spatola was collaborating with another producer, not Derulo individually. The First Session was the first time that Derulo had personally invited Spatola to his home studio.

19.    Spatola has a unique feel when he writes guitar or bass sections, including his strum patterns and bassline, such that it is usually identifiable by those who have worked with Spatola.

20.    Derulo had requested Spatola's phone number from a mutual friend for the purpose of collaborating together on a new song.

21.    After Spatola arrived, a sound engineer loaded the Sample from Jawsh's Siren – Beat into Pro Tools.

22.    After listening to the beat, Spatola began writing and recording the instrumental additions to the track that eventually became *Savage Love*.

23.    Through the early hours of April 23, 2020, Spatola and Derulo worked together to create on different aspects of the work, which included modifying the tempo, modifying the volume of certain instruments, adjusting the rhythm, crafting the instrumental parts for the electric and acoustic guitars and electric bass, and reimagining the overall feel of the song.

24.    Specifically, *Savage Love* includes an acoustic section, of which the instrumental portion was created from scratch by Spatola, and to which Derulo later added vocals.

Exhibit A

25.    Little to no creative elements from Jawsh's Sample are incorporated as part of the acoustic section, which distinguishes it from the rest of *Savage Love*.

26.    The instrumental feel in the acoustic section is defined by Spatola's acoustic guitar and bass elements contributed to the composition and sound recording.

27.    In addition to co-writing portions of *Savage Love* with Derulo, Spatola also performed the electric and acoustic guitars and electric bass throughout the sound recording. These parts substantially define the tone and feel of *Savage Love*.

28.    While writing and performing the acoustic section and bass, Spatola followed his own direction, made his own decisions, and ultimately wrote and recorded what he felt was right for the song.

29.    Spatola wrote and performed the electric bass and acoustic guitar sections without any instruction from Derulo on the content or feel of the parts.

30.    Spatola and Derulo wrote the electric guitar section collaboratively, with Spatola performing the electric guitars on the sound recording, and as later used on the BTS remix and other versions that Derulo later released.

31.    Other aspects of the song were discussed and decided upon collaboratively by both Derulo and Spatola, with neither party expressing dominant authority.

32.    At the end of the First Session, Derulo and Spatola had completed the instrumental composition and base recording of *Savage Love*.

33.    On April 27, 2020, Derulo sent a text message to Spatola, asking him to come back to Derulo's studio around 6:00 p.m. that day and continue working on *Savage Love* ("Second Session"). Exhibit 1.

34.    Derulo wanted to record additional lyrics in the Second Session.

35.    Spatola did not assist Derulo in authoring the lyrics of *Savage Love*, nor performing the vocals. However, Derulo specifically requested that Spatola come back into the studio to complete the song they had created together.

Exhibit A

36.     Spatola was only asked to join the Second Session because he assisted in the creation of the song and was entrusted as the producer to make the adjustments to the underlying music in order to match the lyrics.

37.     At the end of the Second Session, Derulo and Spatola had created a final version of *Savage Love*.

38.     Spatola understood that, in the event that Derulo might ever release *Savage Love*, Derulo and his record company would contact him to "clear" the work, to sign paperwork authorizing its release and fairly compensating Spatola for his co-authorship of the work.

39.     But that never happened.

40.     Following the Second Session, Derulo sent Spatola a text message asking "1k good each day?" Exhibit 2. And Derulo subsequently paid Spatola $2,000 for the two days of time in the studio.

41.     This payment was confirmed by Spatola's attempt to file Spatola's American Federation of Musicians ("AFM") report in July 2020, shortly after the commercial release of *Savage Love*. Exhibit 3.

42.     Typically, music producers who work on a song will be paid an upfront "session fee" which compensates the producer for their time in the studio. This is to protect the producer from a song not being released, and their time working on the project becoming valueless. The session fees and author's credit and royalties are not mutually exclusive.

43.     Derulo teased the song on his TikTok account on May 10, 2020. Derulo immediately received backlash for failing to credit Jawsh or get permission before sampling the song and exploiting that sample on TikTok as part of *Savage Love*.

44.     Derulo did not commercially release the song for another month, until he and Sony had negotiated a deal with Jawsh, including finally securing authority to use the Sample and to release *Savage Love*.

45.    Despite negotiating the deal with Jawsh, on information and belief, the Defendants did so without identifying to Jawsh that Spatola was a co-writer and co-producer of *Savage Love*.

46.    At the same time, Spatola has been seeking authorship credit since the release of *Savage Love*, including through e-mail with multiple employees at AFM, SAG-AFTRA, Sony, and even in direct communication with Derulo.

47.    On July 21, 2020, Spatola filed his various AFM reports to claim co-ownership and royalties for *Savage Love*. Exhibit 3.

48.    Over the next two years, Spatola was consistently redirected to other people to contact, told it was being handled in due time, and eventually outright ignored.

49.    On September 7, 2020, Spatola sent a text message to Derulo asking to "touch base about possibly getting [his] name on Savage love as addition[al] guitar and bass." Exhibit 4.

50.    Derulo replied to Spatola with "Hey bro yes. Send me your full name." Exhibit 5.

51.    When Derulo failed to credit Spatola as promised, Spatola contacted Derulo's tour manager, who also followed up with Derulo. Exhibit 6; Exhibit 7.

52.    Neither Derulo nor his tour manager ever assisted Spatola to get credited for his creative contributions to *Savage Love*.

53.    Spatola never was asked to sign a work-for-hire agreement, nor any other paperwork related to his co-authorship of *Savage Love*.

54.    Neither Derulo nor Sony ever requested or obtained any agreement from Spatola regarding *Savage Love*.

55.    During 2021 and 2022, Derulo invited Spatola to return to his home studio for other projects. At no point did Derulo state his intention to prevent Spatola from rightfully obtaining his authorship credit for *Savage Love*.

56.    Upon its release, *Savage Love* received substantial success, including over 10 weeks in the top-10 on the Billboard HOT 100.

57.    Derulo and Sony then further monetized *Savage Love* by negotiating the release of a remix of Savage Love with world-renowned K-Pop group BTS, without Spatola's permission, and without accounting to or providing any compensation whatsoever to Spatola.

58.    On October 17, 2020, the *Savage Love* remix peaked at number one.

59.    *Savage Love* has gone platinum in around fifteen countries and is RIAA certified quadruple platinum as of November 29, 2022.

60.    On April 11, 2023, Spatola received his official copyright registration from the Unites States Copyright Office for authorship and co-ownership of the sound recording and musical composition of *Savage Love*. <u>Exhibit 8</u>.

61.    *Savage Love* was Spatola's first time co-writing and producing with an artist of international notoriety.

62.    If Spatola had been properly credited as a co-author and co-producer of a hit like *Savage Love*, he would have received additional opportunities that were lost due to this lack of credit.

63.    Composers credited with co-writing hit songs as writers are invited to work with other top performers in the industry, along with other lucrative opportunities.

64.    As a direct result of Defendants' refusal to grant Spatola his rightfully earned co-writing credit, Spatola was not given the opportunity to further advance his career in the music industry as a benefit to helping Derulo create the chart-topping song.

65.    Had Derulo and Sony properly accounted to Spatola, he would have also directly generated substantial royalties.

66.    *Savage Love* is a multi-national hit that has sold millions of copies and has over a billion streams, including remixes.

67.    Defendants' refusal to credit Spatola as a co-writer and co-producer of *Savage Love* has resulted in significant harm to Spatola.

## FIRST CLAIM FOR RELIEF

### (Declaratory Judgment against all Defendants)

68.    Plaintiff repleads, realleges and incorporates by reference each allegation contained in the preceding and foregoing paragraphs.

69.    An actual and present controversy now exists between Spatola and Defendants regarding Spatola's status as a co-writer and co-producer of the musical composition of *Savage Love*.

70.    Defendants have denied recognition of Spatola's co-authorship and co-producer status, which would otherwise entitle Spatola to a writer's credit and a share of the monies generated from the exploitation of *Savage Love*.

71.    Spatola is also a co-writer and co-producer, along with Defendant Derulo, of the sound recording of *Savage Love*. *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (holding that a joint work is "(1) a copyrightable work, [with] (2) two or more 'authors,' and [where] (3) the authors intend their contributions be merged into inseparable or interdependent parts of a unitary whole").

72.    Spatola and Derulo each contributed separate and distinct copyrightable components of the song *Savage Love*.

73.    Spatola was not involved in writing the lyrics, but he was the driving force in creating the instrumental portions and rhythmic patterns, especially as to the acoustic section, with the remainder of the instrumental portions also created primarily by Spatola with influence from Jawsh's Sample.

74.    Spatola also performed all electric guitar, acoustic guitar and electric bass performances that were incorporated into the sound recording of *Savage Love*.

75.    Spatola's work on *Savage Love* qualifies him as an author, under a joint work framework *Aalmuhammed*, 202 F.3d at 1234 (holding that the factors for determining an "author" with respect to a joint work are: (1) 'superintending' the

work by exercising control, (2) make objective manifestations of shared intent to be co-authors, and (3) the 'audience appeal' of the work turns on both contributions).

76.    Each party had independent creative control over their respective contributions and exercised that control during both studio sessions.

77.    Spatola and Derulo each manifested the shared intent to co-write a song, and then worked together to jointly create *Savage Love*. Each party intended for their individual contributions to be merged into inseparable or interdependent parts of a unitary composition.

78.    Spatola contributed significantly to *Savage Love*, including by writing and recording additional guitar and bass lines and Spatola's discretion.

79.    Starting with the Sample, Spatola composed multiple additional instruments to be added into an instrumental version of *Savage Love* at the end of the First Session.

80.    By the end of the Second Session, Spatola and Derulo had recorded what would later be released as *Savage Love*. Spatola's additions helped turn a popular TikTok song into the music underlying a multi-platinum record, generating substantial audience appeal individually and jointly.

81.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Spatola is entitled to a declaration of rights as follows: (a) Spatola is a co-writer and co-producer of the sound recording for *Savage Love*, including all instrumental versions; (b) Spatola is a co-writer and co-producer of the musical composition for *Savage Love*; (c) Spatola is entitled to co-writer and co-producer credits on *Savage Love* and all variations released publicly, including remixes, instrumentals and licensed covers; and (d) Spatola is entitled to prospective and retroactive royalties and other money owed with respect to his interest in *Savage Love*.

82.    Alternatively, the First Session and the Second Session each resulted in independent sound files in a fixed medium. Spatola is a co-owner of each of those session files as independently copyrightable works. If Spatola is not an owner of the

Exhibit A

commercial release of *Savage Love*, he is at least a co-owner of the two session files, of which *Savage Love* is a derivative work. Spatola is entitled to declaratory judgment with respect to his interest in *Savage Love*.

## SECOND CLAIM FOR RELIEF

### (Accounting against all Defendants)

83.    Plaintiff repleads, realleges and incorporates by reference each allegation contained in the preceding and foregoing paragraphs.

84.    Spatola, as a joint author and co-owner of the copyright of the sound recording and composition of *Savage Love* is entitled to his *pro rata* share of the profits earned by Defendants through exploitation of Spatola's copyright. *1 Nimmer on Copyright*, § 6.12[A] ("The prevailing rule is that a joint owner is under a duty to account to the other joint owners of the work for a ratable share of the profits realized from his use of the work."); *see also Meredith v. Smith*, 145 F.2d 620, 621 (9th Cir. 1944).

85.    Spatola was wrongfully deprived of his rightful share of profits by Defendants' commercial exploitation of *Savage Love* without accounting for profits to Spatola.

86.    Defendants are in sole control of the books and records needed to determine the amounts due to Spatola pursuant to their relationship as joint authors. Spatola has no reasonable means by which he can obtain the information necessary to calculate what is owed to him by Defendants.

87.    Spatola is entitled to an order of this Court directing Defendants to render a complete and honest accounting of all revenues derived from the exploitation of *Savage Love* and all sums due to Spatola. Spatola is entitled to a judgment in the amount of the sums shown due by such accounting.

Exhibit A

## THIRD CLAIM FOR RELIEF

### (Constructive Trust against all Defendants)

88.   Plaintiff repleads, realleges and incorporates by reference each allegation contained in the preceding and foregoing paragraphs.

89.   By virtue of the foregoing, any interest that Spatola has in *Savage Love*, and any and all profits received by Defendants from the commercial exploitation of *Savage Love*, are property of Spatola and Defendants.

90.   Defendants have wrongfully deprived Spatola from his share of the profits that they have enjoyed from the exploitation of *Savage Love*.

91.   By virtue of the Defendants' deprivation of Spatola's share of profits, the Defendants hold all profits derived from the exploitation of *Savage Love* as constructive trustees for the enjoyment and benefit of Defendants and Spatola.

92.   Plaintiff is entitled to immediate possession of his *pro rata* share of profits held by Defendants as constructive trustees.

## FOURTH CLAIM FOR RELIEF

### (Negligence Against Defendant Derulo)

93.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

94.    Defendant Derulo owed Plaintiff a duty of reasonable care arising from their affirmative conduct in the creation, marketing, commercialization, and public representation of the musical composition and sound recording *Savage Love*.

95.    This duty exists independently of any copyright ownership interest and arises from Defendant Derulo's voluntary participation in a collaborative creative process and their exclusive control over how contributors were disclosed, credited, and represented to the music industry and the public.

96.   Under Ninth Circuit law, a state-law claim is not preempted by the Copyright Act where it includes an "extra element" that makes the claim

qualitatively different from a claim asserting rights equivalent to those protected by copyright. *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004).

97.    Defendant Derulo breached his duty of care by: Failing to disclose Plaintiff's role as a co-creator and co-producer to record executives, labels, collaborators, and other industry decision-makers; omitting Plaintiff from credits and acknowledgments in circumstances where Defendant Derulo knew that such credit was customary, expected, and professionally consequential; holding the work out as having been created without Plaintiff's involvement, despite that such omissions would foreseeably damage Plaintiff's career.

98.    Defendant Derulo knew, or reasonably should have known, that attribution and disclosure of creative contributors is a critical determinant of professional opportunity in the music industry, and that failure to provide such attribution would foreseeably result in lost opportunities, reputational harm, and diminished career prospects.

99.    As a direct and proximate result of Defendant Derulo's negligence, Plaintiff suffered damages separate and distinct from any alleged copyright interest, including but not limited to: Loss of professional opportunities and collaborations; Loss of industry recognition and goodwill; Diminished professional reputation; Long-term harm to Plaintiff's career trajectory.

100. Because Plaintiff's negligence claim is based on Defendant Derulo's breach of an independent duty of care and seeks recovery for reputational and professional harms — not rights equivalent to reproduction, distribution, or ownership — it is not preempted under 17 U.S.C. § 301. *See Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004).

101. Defendants' conduct was a substantial factor in causing Plaintiff's damages.

102.   Plaintiff seeks all damages recoverable at law, according to the evidence presented at trial.

Exhibit A

# FIFTH CLAIM FOR RELIEF

## (Unjust Enrichment Against Defendant Derulo)

103.   Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

104.   Defendant Derulo knowingly received and retained substantial benefits derived from Plaintiff's creative labor, industry expertise, and contributions to *Savage Love*, including but not limited to: Enhanced marketability and commercial success of the work; Increased industry credibility and goodwill; Reputational and professional advantages flowing from the song's creation and success.

105.   Plaintiff played the bass guitar, acoustic guitar, and electric guitar on *Savage Love* with the reasonable expectation — grounded in industry custom and Defendant Derulo's conduct — that he would be properly acknowledged, credited, and treated equitably for his contributions.

106.   Defendant Derulo accepted and retained the benefits of Plaintiff's contributions while deliberately failing to provide attribution, acknowledgment, or other equitable treatment customarily afforded to contributors of Plaintiff's role.

107.   Under Ninth Circuit law, unjust enrichment claims are preempted only where they assert rights equivalent to copyright and lack an extra element. *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004).

108.   Plaintiff's unjust enrichment claim includes extra elements that render it qualitatively different from a copyright claim, including: Inequitable conduct in the concealment and omission of Plaintiff's role; Retention of reputational and professional benefits unrelated to copyright ownership; An unjust windfall obtained through misrepresentation and omission, not mere copying.

109.   Unlike claims that seek compensation for unauthorized reproduction or distribution, Plaintiff does not seek recovery based on Defendant Derulo's exploitation of a copyrighted work, but rather seeks restitution for the inequitable retention of benefits obtained through Defendant Derulo's conduct toward Plaintiff.

Exhibit A

110. Allowing Defendants to retain the full reputational, professional, and commercial advantages derived from Plaintiff's contributions — while excluding Plaintiff from recognition and opportunity — would be unjust and inequitable.

111. Because Plaintiff's unjust enrichment claim is grounded in equity and focuses on Defendants' retention of non-copyright benefits obtained through inequitable conduct, it is not preempted under 17 U.S.C. § 301. *See Grosso v. Miramax Film Corp.*, 383 F.3d at 968; *Best Carpet Values, Inc. v. Google LLC*, 90 F.4th 962, 966 (9th. Cir. 2024) (distinguishing claims lacking extra elements).

112. Plaintiff seeks restitution, disgorgement, and all equitable relief necessary to prevent Defendants' unjust enrichment, in an amount according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pleads for judgment against Defendants as follows:

1.    That the Court declare that: (a) Spatola is a joint author and has ownership of the sound recording of *Savage Love*; (b) Spatola is a joint author in the composition of *Savage Love*; (c) Spatola is entitled to co-writer and co-producer credit on the copyright of the sound recording and composition of *Savage Love*, including on remixed versions of *Savage Love*; and (d) Spatola is entitled to prospective and retroactive royalties and other money owed with respect to his respective interest in the sound recording and composition of *Savage Love*, in a percentage to be proven at trial;

2.    That the Court order an accounting of all revenues derived from the exploitation of *Savage Love* by Defendants, including but not limited to earnings from licensor agreements;

3.    That the Court order turnover of the full share of profits owned by Spatola and held in constructive trust by the Defendants;

4.    That the Court enter an order for Plaintiff against Defendant Derulo for negligence and award damages in an amount to be determined at trial;

1      5.    That the Court enter an order for Plaintiff against Defendant Derulo for

2  unjust enrichment and award damages in an amount to be determined at trial;

3      6.    That Spatola be awarded his reasonable attorney's fees and costs pursuant

4  to the U.S. Copyright Act, 17 U.S.C. § 505; and

5      7.    For such other further relief as the Court deems just and proper.

6                      **DEMAND FOR TRIAL BY JURY**

7      Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues

8  so triable raised in this complaint.

9

10  Date: February 2, 2026              Respectfully submitted,

11

12                                   /s/ *Thomas E. M. Werge*
                                     Thomas E.M. Werge
13                                   WERGE & CORBIN LAW GROUP

14                                   *Attorneys for Plaintiff*
                                     *Matthew Spatola p/k/a Matty Spats*
15

16

17

18

19

20

21

22

23

24

25

26

27                      **CERTIFICATE OF SERVICE**

28

Exhibit A

1   I hereby certify that on February 2, 2026, a true and correct copy of the
2   foregoing document was filed electronically with the Clerk of the Court using the
3   Court's CM/ECF electronic filing system, which automatically generates a Notice of
4   Electronic Filing ("NEF") at the time said document is filed to all CM/ECF Users
5   and counsel of record who have appeared in this case. Service with this NEF
6   constitutes service pursuant to Federal Rule of Civil Procedure 5(b)(E).

7

8                                                   /s/ Mayte Crespo
                                                    Mayte Crespo, Legal Assistant
9                                                   WERGE & CORBIN LAW GROUP

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28



1   **WERGE & CORBIN LAW GROUP**
2   Thomas E.M. Werge (State Bar No. 362485)
    *tom@werge.law*
3   Joseph A. MacHatton (*pro hac vice*)
    *joseph@werge.law*
4   Veronica A. Phifer (*pro hac vice*)
5   *veronica@werge.law*
    1736 Race Street
6   Denver, CO 80206
7   Telephone: (303) 586-4900
8   Facsimile: (720) 554-8042
    **FROST, LLP**
9   Christopher Frost (State Bar No. 200336)
10  *chris@frostllp.com*
    10960 Wilshire Blvd., Suite 2100
11  Los Angeles, CA 90024
12  Telephone: (424) 254-0441
    Facsimile: (424) 600-8504
13                                                              ⟵ Formatted: Normal
14  *Attorneys for Plaintiff*
    MATTHEW SPATOLA p/k/a
15  MATTY SPATS

16
17              **UNITED STATES DISTRICT COURT**
18              **CENTRAL DISTRICT OF CALIFORNIA**

19  Matthew Spatola p/k/a Matty Spats,        CASE NO. 2:23-cv-06191-MWF-E    ⟵ Formatted Table

20          Plaintiff,

21  v.                                        ~~FIRST~~SECOND AMENDED
                                              COMPLAINT FOR:
22  Jason Desrouleaux p/k/a Jason Derulo;
    and                                         1.  DECLARATORY JUDGMENT
23  Sony Music Entertainment                    2.  ACCOUNTING
24  d/b/a Columbia Records,                     3.  CONSTRUCTIVE TRUST
                                                4.  NEGLIGENCE
25          Defendants.                         5.  UNJUST ENRICHMENT    ⟵ Formatted: Normal, Indent: Left:  0", Hanging:  0.5", Line spacing:  Exactly 14.5 pt
26                                            AND JURY DEMAND
27
28

SECOND AMENDED COMPLAINT          -1-

Exhibit B - Compare Report for Second Amended Complaint

Plaintiff Matthew Spatola ("Plaintiff" or "Spatola") alleges as follows:

**Formatted:** Space Before:  6 pt

## JURISDICTION AND VENUE

1.     Spatola's first claim for relief arises under the copyright laws of the United States, as amended, 17 U.S.C. § 101, *et. seq.* Accordingly, the Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338.

2.     The Court has supplemental jurisdiction over Spatola's second claim pursuant to 28 U.S.C. § 1367.

3.     This Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k)(1)(A) as Derulo and Sony have both waived service of their respective summons and are both subject to the jurisdiction of a court of general jurisdiction within the state of California.

4.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and 28 U.S.C. § 1391(b)(2) because Defendants are residents of Los Angeles County, and a substantial part of the events occurred in this District.

## INTRODUCTION

5.     This case arises out of singer Jason Derulo's refusal to accord Matthew Spatola the credit and royalties he is due as a co-author of the number-one hit song *Savage Love (Laxed – Siren Beat)* ("*Savage Love*"). On April 23, 2020, Derulo and Spatola collaborated to create the instrumental composition and recording of what would later become *Savage Love* in Derulo's Los Angeles home studio. Derulo and Spatola went back to the studio again on April 27, 2020 whereon they completed *Savage Love.*

6.     Derulo then unilaterally released Savage Love, without providing any credit whatsoever to Spatola for the work they jointly created together. This lawsuit is filed to right that wrong, and to ensure that Spatola is properly credited as a co-writer of *Savage Love* and compensated for his contributions thereto.

Exhibit B - Compare Report for Second Amended Complaint

7.      Although Spatola had produced at Derulo's home studio before *Savage Love*, those sessions involved a larger group of contributors and were entirely unrelated to *Savage Love*. To Spatola's knowledge, none of the music created at those earlier sessions was ever released by Derulo. *Savage Love* was different – the writing and conceptualizing of the instrumental composition and the creation of the actual recording occurred when Spatola and Derulo were the only contributors present in Derulo's studio collaborating together to create *Savage Love*.

8.      *Savage Love* topped the Billboard Hot 100 on October 17, 2020, after a boost from the release of a remix version of the song by the wildly popular South Korean pop band BTS – a version which also includes all of the contributions to *Savage Love* created by Spatola. On information and belief, Defendants negotiated and released the BTS remix without acknowledging Spatola and while cutting him out completely from the writing credit and income received. *Savage Love* was an international success, reaching number one on the respective charts of over fifteen different countries and is certified multi-platinum in at least fourteen different countries. At no time did Derulo or Sony ever get permission from, account to, or even enter into any contract with, Spatola for his contributions to *Savage Love* and the BTS remix.

9.      Spatola is a Grammy-nominated professional producer, songwriter, and musician for various high-profile music artists such as Drake and DJ Khaled. Prior to working with Derulo on *Savage Love*, Spatola had worked with many different artists such as Juice WRLD, aboogiewitdahoodie, Lil Uzi Vert, and Nipsey Hussle. He has also performed on The Tonight Show Starring Jimmy Fallon, Jimmy Kimmel Live, and Saturday Night Live.

10.     Derulo has been an award-winning musician for over a decade. While Derulo has had many successful songs throughout his career, *Savage Love* was Derulo's second Billboard Hot 100 number-one hit in the United States, eleven years after his first number one song, *Whatcha Say*. Both of Derulo's number one singles

Exhibit B - Compare Report for Second Amended Complaint

1    are derived from other existing works. *Whatcha Say* debuted in 2009 using the
2    chorus and underlying composition of Imogen Heap's *Hide and Seek* from four
3    years earlier. *Hide and Seek* had gained widespread popularity due to a its use in an
4    episode of the television series *The O.C.*, and even more fame when *Saturday Night*
5    *Live* made a parody of the episode in 2007. Heap clarified that although Derulo did
6    not publish the song before getting her permission, she was "pretty sure they already
7    mastered it, and it was already ready to go, and they were hoping everything would
8    be okay in the end."[1]

9       11.    Derulo created *Savage Love* in a similar fashion: by finding an existing
10   work and basing a new song around it, without first obtaining permission from the
11   author. *Savage Love* started with a song that gained widespread fame on TikTok
12   called *Laxed (Siren - Beat)* (the "Sample"), which was authored by a New Zealand
13   teenager named Joshua Stylah, professionally known as Jawsh685 ("Jawsh").
14   *Savage Love* started by sampling a song that gained widespread fame on TikTok
15   called *Laxed (Siren - Beat)* (the "Sample"), which was authored by a New Zealand
16   teenager named Joshua Stylah, professionally known as Jawsh 685 ("Jawsh"). When
17   Derulo and Spatola went into the studio to create Savage Love, Derulo started the
18   session by loading the Sample into Pro Tools, and from which Spatola then wrote
19   and recorded new instrumental contributions, together with Derulo, to create the
20   instrumental version of *Savage Love*. When Derulo and Spatola went into the studio
21   to create Savage Love, Derulo started the session by loading the Sample into Pro
22   Tools, and from which Spatola then wrote and recorded new instrumental
23   contributions, to create the instrumental version of *Savage Love*. When Derulo
24   thereafter completed *Savage Love* and posted it on his personal TikTok account, he
25   completely failed to credit Jawsh,[2] while also failing to credit Spatola in any way.

26   ─────────────
27   [1] *https://www.vulture.com/2019/04/songwriters-on-song-copying-sampling-interpolation.html*
28   [2] *https://variety.com/2020/music/news/jason-derulo-tiktok-controversy-savage-love-laxed-siren-*

SECOND AMENDED COMPLAINT                    -4-

Exhibit B - Compare Report for Second Amended Complaint

A month later, after what were likely significant negotiations between Sony, Jawsh, and Derulo, permission was obtained to release *Savage Love*, contemporaneously with Jawsh being signed to Derulo's label Columbia Records, but without involving Spatola in any way.

12.    Since the commercial release of *Savage Love*, Spatola requested that Derulo provide him with credit for his work from Derulo directly. Although Derulo originally agreed, after multiple follow-up messages, Derulo failed to follow through and rightfully credit Spatola as a co-writer.

13.    In April of 2023, Spatola was prepared to file a complaint in this Court related to the claims discussed herein. Upon discussion with counsel for Derulo and Sony, the Parties entered into a tolling agreement effective April 26, 2023, agreeing to engage in good faith settlement negotiations. After the tolling agreement was executed, however, Derulo and Sony failed to negotiate with Spatola. Derulo and Sony claimed to have an agreement, signed by Spatola, which governed the relationship between Spatola and Derulo. After numerous requests from Spatola, Derulo and Sony failed to produce any such agreement. Accordingly, on June 30, 2023, Spatola supplied Derulo and Sony with notice of termination of the tolling agreement, which terminated the agreement following the contractual 30-day period thereafter. This complaint is now filed following the expiration of the tolling agreement.

### THE PARTIES

14.    Plaintiff Spatola at all times relevant hereto was an individual residing in the County of Los Angeles, California.

15.    On information and belief, Defendant Derulo is, and at all times relevant hereto was, an individual residing and doing business in the County of Los Angeles, California.

_beat-1234609101/_

Exhibit B - Compare Report for Second Amended Complaint

1   16.    Defendant Sony Music Entertainment ("Sony"), through its record label,

2   Columbia Records, distributed *Savage Love*, and at all times relevant hereto was a

3   Deleware corporation that conducts business and has at least one office in the

4   County of Los Angeles, California.

5   <u>**ALLEGATIONS**</u>

6   17.    On April 22, 2020, just after 11:00 p.m., Spatola arrived at Derulo's home

7   studio in Tarzana, California ("First Session").

8   18.    Spatola had been to Derulo's home studio about five times prior to the

9   First Session but each time Spatola was collaborating with another producer, not

10  Derulo individually. The First Session was the first time that Derulo had personally

11  invited Spatola to his home studio.

12  19.    Spatola has a unique feel when he writes guitar or bass sections, including

13  his strum patterns and bassline, such that it is usually identifiable by those who have

14  worked with Spatola.

15  20.    Derulo had requested Spatola's phone number from a mutual friend for

16  the purpose of collaborating together on a new song.

17  21.    After Spatola arrived, a sound engineer loaded the Sample from Jawsh's

18  Siren – Beat into Pro Tools.

19  22.    After listening to the beat, Spatola began writing and recording the

20  instrumental additions to the track that eventually became *Savage Love*.

21  23.    Through the early hours of April 23, 2020, Spatola and Derulo worked

22  together to create on different aspects of the work, which included modifying the

23  tempo, modifying the volume of certain instruments, adjusting the rhythm, crafting

24  the instrumental parts for the electric and acoustic guitars and electric bass, and

25  reimagining the overall feel of the song.

26  24.    Specifically, *Savage Love* includes an acoustic section, of which the

27  instrumental portion was created from scratch by Spatola, and to which Derulo later

28  added vocals.

Exhibit B - Compare Report for Second Amended Complaint

25.   Little to no creative elements from Jawsh's Sample are incorporated as part of the acoustic section, which distinguishes it from the rest of *Savage Love*.

26.   The instrumental feel in the acoustic section is defined by Spatola's acoustic guitar and bass elements contributed to the composition and sound recording.

27.   In addition to co-writing portions of *Savage Love* with Derulo, Spatola also performed the electric and acoustic guitars and electric bass throughout the sound recording. These parts substantially define the tone and feel of *Savage Love*.

28.   While writing and performing the acoustic section and bass, Spatola followed his own direction, made his own decisions, and ultimately wrote and recorded what he felt was right for the song.

29.   Spatola wrote and performed the electric bass and acoustic guitar sections without any instruction from Derulo on the content or feel of the parts.

30.   Spatola and Derulo wrote the electric guitar section collaboratively, with Spatola performing the electric guitars on the sound recording, and as later used on the BTS remix and other versions that Derulo later released.

31.   Other aspects of the song were discussed and decided upon collaboratively by both Derulo and Spatola, with neither party expressing dominant authority.

32.   At the end of the First Session, Derulo and Spatola had completed the instrumental composition and base recording of *Savage Love*.

33.   On April 27, 2020, Derulo sent a text message to Spatola, asking him to come back to Derulo's studio around 6:00 p.m. that day and continue working on *Savage Love* ("Second Session"). Exhibit 1.

34.   Derulo wanted to record additional lyrics in the Second Session.

35.   Spatola did not assist Derulo in authoring the lyrics of *Savage Love*, nor performing the vocals. However, Derulo specifically requested that Spatola come back into the studio to complete the song they had created together.

Exhibit B - Compare Report for Second Amended Complaint

36.    Spatola was only asked to join the Second Session because he assisted in the creation of the song and was entrusted as the producer to make the adjustments to the underlying music in order to match the lyrics.

37.    At the end of the Second Session, Derulo and Spatola had created a final version of *Savage Love*.

38.    Spatola understood that, in the event that Derulo might ever release *Savage Love*, Derulo and his record company would contact him to "clear" the work, to sign paperwork authorizing its release and fairly compensating Spatola for his co-authorship of the work.

39.    But that never happened.

40.    Following the Second Session, Derulo sent Spatola a text message asking "1k good each day?" Exhibit 2. And Derulo subsequently paid Spatola $2,000 for the two days of time in the studio.

41.    This payment was confirmed by Spatola's attempt to file Spatola's American Federation of Musicians ("AFM") report in July 2020, shortly after the commercial release of *Savage Love*. Exhibit 3.

42.    Typically, music producers who work on a song will be paid an upfront "session fee" which compensates the producer for their time in the studio. This is to protect the producer from a song not being released, and their time working on the project becoming valueless. The session fees and author's credit and royalties are not mutually exclusive.

43.    Derulo teased the song on his TikTok account on May 10, 2020. Derulo immediately received backlash for failing to credit Jawsh or get permission before sampling the song and exploiting that sample on TikTok as part of *Savage Love*.

44.    Derulo did not commercially release the song for another month, until he and Sony had negotiated a deal with Jawsh, including finally securing authority to use the Sample and to release *Savage Love*.

Exhibit B - Compare Report for Second Amended Complaint

45.    Despite negotiating the deal with Jawsh, on information and belief, the Defendants did so without identifying to Jawsh that Spatola was a co-writer and co-producer of *Savage Love*.

46.    At the same time, Spatola has been seeking authorship credit since the release of *Savage Love*, including through e-mail with multiple employees at AFM, SAG-AFTRA, Sony, and even in direct communication with Derulo.

47.    On July 21, 2020, Spatola filed his various AFM reports to claim co-ownership and royalties for *Savage Love*. Exhibit 3.

48.    Over the next two years, Spatola was consistently redirected to other people to contact, told it was being handled in due time, and eventually outright ignored.

49.    On September 7, 2020, Spatola sent a text message to Derulo asking to "touch base about possibly getting [his] name on Savage love as addition[al] guitar and bass." Exhibit 4.

50.    Derulo replied to Spatola with "Hey bro yes. Send me your full name." Exhibit 5.

51.    When Derulo failed to credit Spatola as promised, Spatola contacted Derulo's tour manager, who also followed up with Derulo. Exhibit 6; Exhibit 7.

52.    Neither Derulo nor his tour manager ever assisted Spatola to get credited for his creative contributions to *Savage Love*.

53.    Spatola never was asked to sign a work-for-hire agreement, nor any other paperwork related to his co-authorship of *Savage Love*.

54.    Neither Derulo nor Sony ever requested or obtained any agreement from Spatola regarding *Savage Love*.

55.    During 2021 and 2022, Derulo invited Spatola to return to his home studio for other projects. At no point did Derulo state his intention to prevent Spatola from rightfully obtaining his authorship credit for *Savage Love*.

Exhibit B - Compare Report for Second Amended Complaint

1     56.   Upon its release, *Savage Love* received substantial success, including
2   over 10 weeks in the top-10 on the Billboard HOT 100.

3     57.   Derulo and Sony then further monetized *Savage Love* by negotiating the
4   release of a remix of Savage Love with world-renowned K-Pop group BTS, without
5   Spatola's permission, and without accounting to or providing any compensation
6   whatsoever to Spatola.

7     58.   On October 17, 2020, the *Savage Love* remix peaked at number one.

8     59.   *Savage Love* has gone platinum in around fifteen countries and is RIAA
9   certified quadruple platinum as of November 29, 2022.

10     60.   On April 11, 2023, Spatola received his official copyright registration
11   from the Unites States Copyright Office for authorship and co-ownership of the
12   sound recording and musical composition of *Savage Love*. Exhibit 8.

13     61.   *Savage Love* was Spatola's first time co-writing and producing with an
14   artist of international notoriety.

15     62.   If Spatola had been properly credited as a co-author and co-producer of a
16   hit like *Savage Love*, he would have received additional opportunities that were lost
17   due to this lack of credit.

18     63.   Composers credited with co-writing hit songs as writers are invited to
19   work with other top performers in the industry, along with other lucrative
20   opportunities.

21     64.   As a direct result of Defendants' refusal to grant Spatola his rightfully
22   earned co-writing credit, Spatola was not given the opportunity to further advance
23   his career in the music industry as a benefit to helping Derulo create the chart-
24   topping song.

25     65.   Had Derulo and Sony properly accounted to Spatola, he would have also
26   directly generated substantial royalties.

27     66.   *Savage Love* is a multi-national hit that has sold millions of copies and
28   has over a billion streams, including remixes.

Exhibit B - Compare Report for Second Amended Complaint

67.     Defendants' refusal to credit Spatola as a co-writer and co-producer of *Savage Love* has resulted in significant harm to Spatola.

## FIRST CLAIM FOR RELIEF

**(Declaratory Judgment against all Defendants)**

68.     Plaintiff repleads, realleges and incorporates by reference each allegation contained in the preceding and foregoing paragraphs.

69.     An actual and present controversy now exists between Spatola and Defendants regarding Spatola's status as a co-writer and co-producer of the musical composition of *Savage Love.*

70.     Defendants have denied recognition of Spatola's co-authorship and co-producer status, which would otherwise entitle Spatola to a writer's credit and a share of the monies generated from the exploitation of *Savage Love.*

71.     Spatola is also a co-writer and co-producer, along with Defendant Derulo, of the sound recording of *Savage Love. Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) (holding that a joint work is "(1) a copyrightable work, [with] (2) two or more 'authors,' and [where] (3) the authors intend their contributions be merged into inseparable or interdependent parts of a unitary whole").

72.     Spatola and Derulo each contributed separate and distinct copyrightable components of the song *Savage Love.*

73.     Spatola was not involved in writing the lyrics, but he was the driving force in creating the instrumental portions and rhythmic patterns, especially as to the acoustic section, with the remainder of the instrumental portions also created primarily by Spatola with influence from Jawsh's Sample.

74.     Spatola also performed all electric guitar, acoustic guitar and electric bass performances that were incorporated into the sound recording of *Savage Love.*

75.     Spatola's work on *Savage Love* qualifies him as an author, under a joint work framework *Aalmuhammed*, 202 F.3d at 1234 (holding that the factors for determining an "author" with respect to a joint work are: (1) 'superintending' the

Exhibit B - Compare Report for Second Amended Complaint

work by exercising control, (2) make objective manifestations of shared intent to be co-authors, and (3) the 'audience appeal' of the work turns on both contributions).

76.     Each party had independent creative control over their respective contributions and exercised that control during both studio sessions.

77.     Spatola and Derulo each manifested the shared intent to co-write a song, and then worked together to jointly create *Savage Love*. Each party intended for their individual contributions to be merged into inseparable or interdependent parts of a unitary composition.

78.     Spatola contributed significantly to *Savage Love*, including by writing and recording additional guitar and bass lines and Spatola's discretion.

79.     Starting with the Sample, Spatola composed multiple additional instruments to be added into an instrumental version of *Savage Love* at the end of the First Session.

80.     By the end of the Second Session, Spatola and Derulo had recorded what would later be released as *Savage Love*. Spatola's additions helped turn a popular TikTok song into the music underlying a multi-platinum record, generating substantial audience appeal individually and jointly.

81.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, Spatola is entitled to a declaration of rights as follows: (a) Spatola is a co-writer and co-producer of the sound recording for *Savage Love*, including all instrumental versions; (b) Spatola is a co-writer and co-producer of the musical composition for *Savage Love*; (c) Spatola is entitled to co-writer and co-producer credits on *Savage Love* and all variations released publicly, including remixes, instrumentals and licensed covers; and (d) Spatola is entitled to prospective and retroactive royalties and other money owed with respect to his interest in *Savage Love*.

82.     Alternatively, the First Session and the Second Session each resulted in independent sound files in a fixed medium. Spatola is a co-owner of each of those session files as independently copyrightable works. If Spatola is not an owner of the

Exhibit B - Compare Report for Second Amended Complaint

commercial release of *Savage Love*, he is at least a co-owner of the two session files, of which *Savage Love* is a derivative work. Spatola is entitled to declaratory judgment with respect to his interest in *Savage Love*.

**SECOND CLAIM FOR RELIEF**

**(Accounting against all Defendants)**

83.    Plaintiff repleads, realleges and incorporates by reference each allegation contained in the preceding and foregoing paragraphs.

84.    Spatola, as a joint author and co-owner of the copyright of the sound recording and composition of *Savage Love* is entitled to his *pro rata* share of the profits earned by Defendants through exploitation of Spatola's copyright. *1 Nimmer on Copyright*, § 6.12[A] ("The prevailing rule is that a joint owner is under a duty to account to the other joint owners of the work for a ratable share of the profits realized from his use of the work."); *see also Meredith v. Smith*, 145 F.2d 620, 621 (9th Cir. 1944).

85.    Spatola was wrongfully deprived of his rightful share of profits by Defendants' commercial exploitation of *Savage Love* without accounting for profits to Spatola.

86.    Defendants are in sole control of the books and records needed to determine the amounts due to Spatola pursuant to their relationship as joint authors. Spatola has no reasonable means by which he can obtain the information necessary to calculate what is owed to him by Defendants.

87.    Spatola is entitled to an order of this Court directing Defendants to render a complete and honest accounting of all revenues derived from the exploitation of *Savage Love* and all sums due to Spatola. Spatola is entitled to a judgment in the amount of the sums shown due by such accounting.

Exhibit B - Compare Report for Second Amended Complaint

**THIRD CLAIM FOR RELIEF**

**(Constructive Trust against all Defendants)**

88.    Plaintiff repleads, realleges and incorporates by reference each allegation contained in the preceding and foregoing paragraphs.

89.    By virtue of the foregoing, any interest that ~~Sptaola~~Spatola has in *Savage Love*, and any and all profits received by Defendants from the commercial exploitation of *Savage Love*, are property of Spatola and Defendants.

90.    Defendants have wrongfully deprived Spatola from his share of the profits that they have enjoyed from the exploitation of *Savage Love*.

91.    By virtue of the Defendants' deprivation of Spatola's share of profits, the Defendants hold all profits derived from the exploitation of *Savage Love* as constructive trustees for the enjoyment and benefit of Defendants and Spatola.

92.    Plaintiff is entitled to immediate possession of his *pro rata* share of profits held by Defendants as ~~contructive~~constructive trustees.

**FOURTH CLAIM FOR RELIEF**

**(Negligence Against Defendant Derulo)**

93.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

94.    Defendant Derulo owed Plaintiff a duty of reasonable care arising from their affirmative conduct in the creation, marketing, commercialization, and public representation of the musical composition and sound recording *Savage Love*.

95.    This duty exists independently of any copyright ownership interest and arises from Defendant Derulo's voluntary participation in a collaborative creative process and their exclusive control over how contributors were disclosed, credited, and represented to the music industry and the public.

96.    Under Ninth Circuit law, a state-law claim is not preempted by the Copyright Act where it includes an "extra element" that makes the claim

Exhibit B - Compare Report for Second Amended Complaint

1    qualitatively different from a claim asserting rights equivalent to those protected by
2    copyright. *Grosso v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004).

3    97.    Defendant Derulo breached his duty of care by: Failing to disclose
4    Plaintiff's role as a co-creator and co-producer to record executives, labels,
5    collaborators, and other industry decision-makers; omitting Plaintiff from credits
6    and acknowledgments in circumstances where Defendant Derulo knew that such
7    credit was customary, expected, and professionally consequential; holding the work
8    out as having been created without Plaintiff's involvement, despite that such
9    omissions would foreseeably damage Plaintiff's career.

10    98.    Defendant Derulo knew, or reasonably should have known, that
11    attribution and disclosure of creative contributors is a critical determinant of
12    professional opportunity in the music industry, and that failure to provide such
13    attribution would foreseeably result in lost opportunities, reputational harm, and
14    diminished career prospects.

15    99.    As a direct and proximate result of Defendant Derulo's negligence,
16    Plaintiff suffered damages separate and distinct from any alleged copyright interest,
17    including but not limited to: Loss of professional opportunities and collaborations;
18    Loss of industry recognition and goodwill; Diminished professional reputation;
19    Long-term harm to Plaintiff's career trajectory.

20    100. Because Plaintiff's negligence claim is based on Defendant Derulo's
21    breach of an independent duty of care and seeks recovery for reputational and
22    professional harms — not rights equivalent to reproduction, distribution, or
23    ownership — it is not preempted under 17 U.S.C. § 301. *See Grosso v. Miramax
24    Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004).

25    101. Defendants' conduct was a substantial factor in causing Plaintiff's
26    damages.

27    102.    Plaintiff seeks all damages recoverable at law, according to the evidence
28    presented at trial.

SECOND AMENDED COMPLAINT                    -15-

Exhibit B - Compare Report for Second Amended Complaint

| | |
|---|---|
| 1 | **FIFTH CLAIM FOR RELIEF** |
| 2 | **(Unjust Enrichment Against Defendant Derulo)** |
| 3 | 103.  Plaintiff realleges and incorporates by reference all preceding allegations |
| 4 | as though fully set forth herein. |
| 5 | 104.  Defendant Derulo knowingly received and retained substantial benefits |
| 6 | derived from Plaintiff's creative labor, industry expertise, and contributions to |
| 7 | *Savage Love*, including but not limited to: Enhanced marketability and commercial |
| 8 | success of the work; Increased industry credibility and goodwill; Reputational and |
| 9 | professional advantages flowing from the song's creation and success. |
| 10 | 105.  Plaintiff played the bass guitar, acoustic guitar, and electric guitar on |
| 11 | *Savage Love* with the reasonable expectation — grounded in industry custom and |
| 12 | Defendant Derulo's conduct — that he would be properly acknowledged, credited, |
| 13 | and treated equitably for his contributions. |
| 14 | 106.  Defendant Derulo accepted and retained the benefits of Plaintiff's |
| 15 | contributions while deliberately failing to provide attribution, acknowledgment, or |
| 16 | other equitable treatment customarily afforded to contributors of Plaintiff's role. |
| 17 | 107.  Under Ninth Circuit law, unjust enrichment claims are preempted only |
| 18 | where they assert rights equivalent to copyright and lack an extra element. *Grosso* |
| 19 | *v. Miramax Film Corp.*, 383 F.3d 965, 968 (9th Cir. 2004). |
| 20 | 108.  Plaintiff's unjust enrichment claim includes extra elements that render it |
| 21 | qualitatively different from a copyright claim, including: Inequitable conduct in the |
| 22 | concealment and omission of Plaintiff's role; Retention of reputational and |
| 23 | professional benefits unrelated to copyright ownership; An unjust windfall obtained |
| 24 | through misrepresentation and omission, not mere copying. |
| 25 | 109.  Unlike claims that seek compensation for unauthorized reproduction or |
| 26 | distribution, Plaintiff does not seek recovery based on Defendant Derulo's |
| 27 | exploitation of a copyrighted work, but rather seeks restitution for the inequitable |
| 28 | retention of benefits obtained through Defendant Derulo's conduct toward Plaintiff. |

Exhibit B - Compare Report for Second Amended Complaint

110. Allowing Defendants to retain the full reputational, professional, and commercial advantages derived from Plaintiff's contributions — while excluding Plaintiff from recognition and opportunity — would be unjust and inequitable.

111. Because Plaintiff's unjust enrichment claim is grounded in equity and focuses on Defendants' retention of non-copyright benefits obtained through inequitable conduct, it is not preempted under 17 U.S.C. § 301. *See Grosso v. Miramax Film Corp.*, 383 F.3d at 968; *Best Carpet Values, Inc. v. Google LLC*, 90 F.4th 962, 966 (9th. Cir. 2024) (distinguishing claims lacking extra elements).

112. Plaintiff seeks restitution, disgorgement, and all equitable relief necessary to prevent Defendants' unjust enrichment, in an amount according to proof.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff pleads for judgment against Defendants as follows:

1. That the Court declare that: (a) Spatola is a joint author and has ownership of the sound recording of *Savage Love*; (b) Spatola is a joint author in the composition of *Savage Love*; (c) Spatola is entitled to co-writer and co-producer credit on the copyright of the sound recording and composition of *Savage Love*, including on remixed versions of *Savage Love*; and (d) Spatola is entitled to prospective and retroactive royalties and other money owed with respect to his respective interest in the sound recording and composition of *Savage Love*, in a percentage to be proven at trial;

2. That the Court order an accounting of all revenues derived from the exploitation of *Savage Love* by Defendants, including but not limited to earnings from licensor agreements;

3. That the Court order turnover of the full share of profits owned by Spatola and held in constructive trust by the Defendants.;

4. That the Court enter an order for Plaintiff against Defendant Derulo for negligence and award damages in an amount to be determined at trial;

Exhibit B - Compare Report for Second Amended Complaint

5.    That the Court enter an order for Plaintiff against Defendant Derulo for unjust enrichment and award damages in an amount to be determined at trial;

~~4.~~6.   That Spatola be awarded his reasonable attorney's fees and costs pursuant to the U.S. Copyright Act, 17 U.S.C. § 505; and

~~5.~~7.   For such other further relief as the Court deems just and proper.

### DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all issues so triable raised in this complaint.

~~Date: February 2, 2026~~Date: February 2, 2026            Respectfully submitted,

~~/s/~~

~~Jacob A. Ayres~~
~~GUPTA EVANS & AYRES, PC~~

/s/
Thomas E.M. Werge
WERGE & CORBIN LAW GROUP

*Attorneys for Plaintiff*
*Matthew Spatola p/k/a Matty Spats*

Exhibit B - Compare Report for Second Amended Complaint

**CERTIFICATE OF SERVICE**

I hereby certify that on ~~November 1, 2023~~February 2, 2026, a true and correct copy of the foregoing document was filed electronically with the Clerk of the Court using the Court's CM/ECF electronic filing system, which automatically generates a Notice of Electronic Filing ("NEF") at the time said document is filed to all CM/ECF Users and counsel of record who have appeared in this case. Service with this NEF constitutes service pursuant to Federal Rule of Civil Procedure 5(b)(E).

*/s/ Mayte Crespo*
Mayte Crespo, Legal Assistant
WERGE & CORBIN LAW GROUP

**Formatted:** Font: Italic, Underline, Portuguese (Brazil)

**Formatted:** Portuguese (Brazil)

**Formatted:** Font: Italic, Underline, Portuguese (Brazil)

**Formatted:** Portuguese (Brazil)

Exhibit B - Compare Report for Second Amended Complaint