08:08:02

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

HONORABLE MICHAEL W. FITZGERALD, U.S. DISTRICT JUDGE

| | |
|---|---|
| MATTHEW SPATOLA, Plaintiff, vs. JASON DESROULEAUX, et al., Defendants. | 2:23-CV-6191-MWF |

REPORTER'S TRANSCRIPT OF JURY TRIAL

VOLUME V

Los Angeles, California

Tuesday, April 28, 2026

AMY DIAZ, RPR, CRR, FCRR
Federal Official Reporter
350 West 1st Street, #4455
Los Angeles, CA 90012

*Please order court transcripts here: www.amydiazfedreporter.com*

APPEARANCES OF COUNSEL:

For the Plaintiff:

WERGE LAW GROUP
By: Thomas Werge, Attorney at Law
Veronica Phifer, Attorney at Law
1736 Race Street
Denver, Colorado 80206

FROST LLP
By: Christopher Frost, Attorney at Law
Nicholas Brancolini, Attorney at Law
Rachel Duboff, Attorney at Law
10960 Wilshire Boulevard, Suite 2100
Los Angeles, California 90024

For the Defendants:

SHEPPARD MULLIN RICHTER & HAMPTON LLP
By: Joshua Rosenberg, Attorney at Law
Allison Wong, Attorney at Law
350 South Grand Avenue, 40th Floor
Los Angeles, California 90071

SHEPPARD MULLIN RICHTER & HAMPTON LLP
By: Kent Raygor, Attorney at Law
1901 Avenue of the Stars, Suite 1600
Los Angeles, California 90067

08:08:03 THE COURT: Counsel, on Friday as we broke, there was a concern raised by the defense that Mr. -- the examination of Mr. Hogarth might go into the touring issue, which was explicitly excluded in the motion in limine, and the -- that -- and I asked you to consult with each other to see if there was going to be a problem.

08:08:44 So what -- what is the situation now with Mr. Hogarth?

08:08:50 MR. WERGE: Your Honor, so this morning, just for scheduling first, we plan to call, if the Court would allow, Mr. Frank Harris, who is appearing via video. Mr. Hogarth is going to --

08:09:03 THE COURT: Do you mean by Zoom, or is there a video --

08:09:07 MR. WERGE: Sorry, yes, by Zoom, by video conference. I apologize, Your Honor. And after that, we would plan to complete the examination of Mr. Hogarth. Our subject matter will not explicitly get into any of the stuff that the Court has ruled will not come in.

08:09:34 I also left a voicemail message for Mr. Hogarth yesterday advising him that there had been a ruling on that specific issue, so that he is aware of that as well.

08:09:48 He did confirm that he received the voicemail, and so that is not going to be the subject of any of our examination today, Your Honor.

08:09:55 THE COURT: All right. Thank you.
08:09:56 Mr. Rosenberg?
08:10:00 MR. ROSENBERG: Thank you, Your Honor.
08:10:01 Tom, if you could provide us a copy of that
08:10:04 voicemail, that would -- if possible.
08:10:07 MR. WERGE: It's Mr. Hogarth's.
08:10:10 MR. ROSENBERG: Anyway, so on the Motion in Limine
08:10:12 Number 1, I just -- I don't know what the term "explicitly"
08:10:17 means in this context, but obviously Mr. Werge can't open the
08:10:23 door with Mr. Hogarth if Mr. Hogarth starts speaking for the
08:10:29 Motion in Limine Number 1 regarding the touring. So there is
08:10:34 that.
08:10:34 Secondly, frankly --
08:10:36 THE COURT: Well, I have been told that that isn't
08:10:39 where the testimony -- the examination is going to go, and in
08:10:43 the unlikely event that that turns out not to be true, then
08:10:46 I'll cut it off, so...
08:10:48 MR. ROSENBERG: Very good, Your Honor.
08:10:49 Secondly, Frank Harris, who is the first witness
08:10:52 being called, and their Motion in Limine Number 1 also has a
08:10:56 ruling excluding any testimony or questions about any kind of
08:11:01 legal disputes or anything between Jason Derulo and Frank
08:11:05 Harris. So that should be an area that should not be gone
08:11:09 into as well.
08:11:10 THE COURT: What's the -- what is the current

relationship, if any, between Mr. Harris and Mr. Derulo? And specifically, I don't know if there is the intention to treat him as a hostile witness or not, so...

MR. ROSENBERG: So they currently do not have a relationship. I forget what year they parted ways, but I don't think the reason for them parting ways is germane to this case, and I think that teeters on the motion in limine.

MR. FROST: We were going to make a request, Your Honor, that we treat him as an adverse witness. At this time we have no intention of addressing any issues precluded by the motions in limine rulings, including the dispute between them.

If on a friendly cross of the witness they raise the issue of the relationship between them two -- the two of them, and make it appear as if it has always been sort of copacetic, we may have a different issue to discuss. But in our opening discussion, we will not be delving into that.

THE COURT: Well, I think it would be one thing to just have it be neutral. And certainly, either of you can just get into the fact of what -- "When did you work for him, and when did you stop" -- or "with him, and when did you stop doing so?" without getting into the reasons for that. So...

But again, it would have to be a pretty strong inference that the defense was trying to give to the jury that everything had always been super-duper fine, or that, or

08:13:03 almost in the way of sort of a reputation witness for Mr. Derulo. And one thing you could do on that is just cut it off by objecting, and I would sustain the objection. It's just basically he worked with or for him, then he didn't, and then that is that. So -- I think as to both sides.

08:13:24 MR. ROSENBERG: And Your Honor, to that point what Mr. Frost said is pretty broad, so I just want to be clear. We obviously will be asking Mr. Harris what his duties were while representing Mr. Derulo, but that is not being offered to imply that there is some sort of copacetic relationship between them currently.

08:13:45 THE COURT: No. And I agree with that.

08:13:46 Yeah, Counsel?

08:13:47 MR. FROST: I didn't mean to interrupt you, I'm sorry. I was just going to sort of emphasize that point, that that is not what we are talking about.

08:13:53 If they were to get up, for instance -- and I don't want to run down too many sort of academic rabbit trails, but if they were to get up and talk about the fact that he's always had a very good relationship with Mr. Derulo, and inferring -- and doing things that would infer to the jury that there was never any problems between them, we would have a different issue. But we are not there, and I expect we won't get there.

08:14:15 THE COURT: And again, one way of dealing with that

08:14:17 is just to object that that sort of thing is irrelevant, or move to strike it, and I -- based on what we've discussed, I would almost certainly do that.

08:14:29 MR. FROST: Very good.

08:14:30 THE COURT: Is there -- so anything else, then, here? It sounds like we've resolved the issues that I was concerned about on Friday.

08:14:45 I notice that there is a revised deposition designation, which -- here, and then there is this issue -- when are we going to hear from Dr. Lustig?

08:15:03 MR. WERGE: Your Honor, we will hear from Dr. Lustig beginning today. The surprise motion that defendants filed this morning, we just got a copy of it. There was no conferral prior to that, even despite exchanging e-mails last night.

08:15:19 And a related issue of that, we have been asking the defendants to provide their order of witnesses since the beginning of trial. As you recall, they made a very big deal about that from our side. And just now, we have a partial list of the witnesses that they intend to call, but we would ask that they be ordered to provide that to us.

08:15:43 And as far as the motion goes, we think it's improper. I mean, this is a subject matter that has been fully disclosed, that is in the reports.

08:15:52 THE COURT: I agree. It's in the reports. I cannot

believe how much time I have spent on Dr. Lustig here. I just -- I'm surprised, I'll say that charitably, to have received this motion in limine, and it is denied.

If something is within Dr. Lustig's reports, then there will be -- that will be the testimony. Sony and Mr. Derulo have had every opportunity to point out, and often successfully, when there should be limitations on Dr. Lustig's testimony, but certainly it's -- we are past that point now, unless just on the stand, he offers some completely unexpected, unanticipated opinion, which I very much doubt given all the litigation that we have had in that regard.

So anything else?

MR. WERGE: Yeah, regarding the order of witnesses, we would ask that defendants provide the complete list of the witnesses they -- and the order of them that they intend to call.

THE COURT: All right. I think, just for purposes of trial management, I might very well be inquiring about the same thing, so I will ask the defense to do that.

Anything else?

MR. ROSENBERG: Yes, Your Honor, I have --

MR. WERGE: I have one other thing, Your Honor. The revised deposition designations, again, we would say that they are untimely. I don't know the purpose of those, and we

08:17:33 would appreciate a proffer from defendants related to them.

08:17:37 THE COURT: All right. Why are we getting these -- why am I getting these now after I have already read and marked up his deposition?

08:17:47 MR. ROSENBERG: Your Honor, at least from defendants' side, we are just trying to shorten the time because we have limited time with witnesses. So these were parts that were already designated. So we are just not using the other parts that we had previously designated. We are only using these short parts, which for our side is maybe, like, a minute and a half or less.

08:18:10 THE COURT: All right. In that case, then -- so these are things already that have been done, so what you are saying is that those portions which are designated by the defense which are not in here are -- should not be played to the jury, then?

08:18:34 MR. ROSENBERG: Correct, Your Honor.

08:18:35 THE COURT: All right. But the problem here is -- and then we've got to hear from the defense on this is - I mean, the plaintiff, is that if the plaintiff was -- the counterdesignations, in a sense, are, of course, exactly that. They were, as thought, what was necessary to balance out the defense, but there are still things that perhaps now the plaintiffs have -- plaintiff has come to rely on, so I -- what is the reaction of the defendants -- of the plaintiff to

limiting the testimony which is coming in from Mr. Akinwande?

MR. WERGE: It's our position, Your Honor, that to the extent that they want to change their counterdesignations to a smaller set of what is going on, that is absolutely fine. I think that would be upon them to provide the counterdesignations.

THE COURT: Well, they have. That is what he just said. This is.

MR. WERGE: I understand, Your Honor. I'm -- what we would anticipate is, you know, playing our designations and if they would like to follow it with their counterdesignations --

THE COURT: Well, the point is, as I've said, that is not how the jury gets it. It's all in one continuous playing on that. It's not back and forth. So it's -- to the extent that they have designated something that was not in -- maybe in your examination here, it's going to be played to the jury as it took place at the deposition.

But here, then, you've -- the two of you are going to have to cooperate on that, but here you should then take this document, which is Docket Number 248 as their existing -- of what it is that they want played, and then you will be guided on what you are playing by what my rulings were when I marked up the deposition and then just merge those two, get the video, and then we'll play it to the jury.

08:20:37 MR. WERGE: Understood, Your Honor. Thank you.

08:20:38 MR. ROSENBERG: And, Your Honor, just to that point, our -- the main reason for that is, you know, we have 14.69 hours, from what I understand, and we are doing our level best to just minimize. So the plaintiffs can play as much of his deposition as they want as long as it's not counted towards our time.

08:20:59 THE COURT: I understand that.

08:21:01 MR. ROSENBERG: I'm sorry to interrupt, Your Honor. Two more housekeeping items.

08:21:01 THE COURT: No, go ahead.

08:21:03 MR. ROSENBERG: So as Your Honor knows -- I don't see Mr. Brancolini here, but Mr. Brancolini and I have been meeting with Ms. Kajimura about the jury instructions, and Ms. Kajimura informed us that Your Honor wanted the jointly stipulated facts as an exhibit, and we received an e-mail yesterday from Mr. Werge saying, "After further consideration, in light of our previous withdrawal from the first set of stipulated facts, plaintiff will continue to object to the use of this set of facts, including the listing of these as an exhibit. Given the Court has already read the stipulated facts, we believe the jury has already been sufficiently instructed and object to providing them with the document regarding to the stipulated facts" --

08:21:46 THE COURT: I'll think about that. Well, first of

all, the plaintiff has the right to preserve and persist in the objection, so I don't have a problem with that.

You know, there are other cases in which the stipulated facts are included to the jury in that form, so that is why I was thinking of doing it this way. It's somewhat suggested in the model instructions.

On the other hand, I don't like to necessarily elevate those facts over other evidence, which if they are included in writing, it arguably does, so maybe I'll do one of two things. I'll either read them again -- and I know the two of you were going to clean them up, which as I was reading them, I realized these are kind of a mess, so I would appreciate if you did that.

But beyond that, I'll either -- I'll leave it open on whether I'm going to include them as an exhibit or whether I will just read them again, and I'll think about that. But I don't have a problem with the position that the plaintiff is taking here. If I were Mr. Werge, I would probably be saying the same thing.

MR. ROSENBERG: Your Honor, so we did submit -- as Your Honor intended, we tried to do it chronologically per the agreement with Mr. Brancolini when we were meeting with Ms. Kajimura, and so I understand that Ms. Kajimura would like that by Tuesday, today, at the end of the day. So I don't know if that is --

THE COURT: Well, we can -- we aren't instructing. If you want to do it tomorrow, then that will be fine on that, or even -- just figure out a time, just so there -- when we read -- unfortunately, it isn't as if I'll be instructing the jury Wednesday or Thursday, as much as I would like to be, so we don't have to worry about that.

MR. ROSENBERG: Very good, Your Honor. And then lastly, when I did the cross-examination of Matthew Spatola, I think Your Honor noted that I would say things like "This has already been admitted into evidence" and things like that. And that was based upon ECF 216, which is the joint stipulation to admissibility of evidence at trial.

THE COURT: Right.

MR. ROSENBERG: So one of two things that I would request: Either the evidence listed in ECF 216, that those exhibits be admitted into evidence, or in the alternative, that the exhibits that I identified and used during Mr. Spatola's cross-examination be admitted into evidence.

THE COURT: All right. They -- they are, in the sense of what -- the most technical thing of what has been admitted into evidence is, frankly, what Ms. Sanchez has annotated as being in evidence, and she did go through and admit everything which was in the joint stipulation.

So -- and I believe the jury understands. I told them that you had agreed that certain things should come in,

so if they were seeing it, then it was in evidence.

So you can use that circumlocution, if you want. But if you don't want to, and just use it, just say exhibit so and so, and then do it.

The concern I had, and it seems that we've gotten past that now, was there were certain exhibits which you felt had inherently been exhibited based on my prior rulings, and I asked for you to identify those so I could make sure that I understood that and I agreed with it, and that Ms. Sanchez and I would, therefore, mark them. But that seems that it has been -- that we have gotten past that now.

So what I also want to remind you, though, is that although those have been admitted, I don't want things going back to the jury that have not been referenced in the trial or, at a minimum, in the closing argument. So we'll pick a date, like noon before the closing argument or that.

I want -- if there is something that hasn't been referenced in trial but you are going to refer to it in closing argument, I want you to alert the other side. Because I do think it would be unfair that if these -- there is these kind of exhibits just lying around because both sides are trying to be reasonable and agree that they should be admitted and then suddenly, belatedly, you find out that they are going to be a big part of the closing argument.

In that case, there should be notice. So maybe the

08:26:29 other side decides that it wants to have -- use some additional exhibits as well.

08:26:39 So anything else?

08:26:42 MR. ROSENBERG: Your Honor, if I may just have two seconds to confer with my cocounsel, if there is anything else to raise.

08:26:48 THE COURT: You may.

08:26:51 (Pause in proceedings.)

08:26:51 MR. RAYGOR: Your Honor, if I might just interject very briefly?

08:26:53 THE COURT: Yes.

08:26:54 MR. RAYGOR: I provided the order of witnesses for defense side to Mr. Werge a few minutes ago.

08:27:00 THE COURT: Great. Thank you.

08:27:01 MR. FROST: Finally, Your Honor, I don't think we got to the point of whether or not we'll be able to treat Mr. Harris as an adverse witness. And we would make that request before the jury --

08:27:11 THE COURT: When was it that he stopped working for Mr. Derulo?

08:27:16 MR. ROSENBERG: 2022 or 2023.

08:27:24 THE COURT: Then, no. And it sounds -- I don't know what -- it sounds like it wasn't necessarily a smooth breakup, but the -- I'm not hearing any basis to think that -- I mean, he may or may not think fondly of Mr. Derulo,

08:27:43 he may or may not believe that Mr. Derulo deserves to prevail in this lawsuit, but those thoughts themselves are not a basis for saying that he's a hostile witness. There has to be some, you know, objective kind of institutional thing.

08:27:59 Other than -- and this is true of any witness. If he proved to be unbelievably difficult and refused to give up any useful information to -- under ordinary questioning, then the examiner can resort to leading questions. That is true of all witnesses. It could be -- you know, it could be Mr. Derulo's, you know, sworn enemy, and I would still make the same ruling as to that.

08:28:23 So, all right. Anything else, counsel?

08:28:28 MR. ROSENBERG: No, Your Honor. Thank you so much.

08:28:29 THE COURT: Then we'll give Ms. Diaz a bit of a break until such time as all of the jurors are here.

08:28:39 THE CLERK: We are missing one juror.

08:28:41 THE COURT: We are missing one. All right. Thank you, then, counsel.

08:28:46 (Thereupon, there was a brief recess.)

08:44:56 MR. WERGE: Your Honor, if I may? At the outset of the trial, the Court put a sequestration order. We do have a witness in the courtroom, and I just wanted to make sure that the defense witness is not in the courtroom and not provided with any of the testimony before he testifies.

08:45:13 THE COURT: All right. And which witness is this?

08:45:15 MR. WERGE: That is Mr. Leak, Wade Leak.

08:45:20 MR. ROSENBERG: Where is he?

08:45:20 No, that is not Wade Leak.

08:45:22 MR. WERGE: That is not Wade Leak?

08:45:24 MR. ROSENBERG: Yeah, you took Wade Leak's deposition. That is not Wade Leak.

08:45:27 MR. WERGE: Sorry. Who are you, sir?

08:45:29 MR. JACOBY: I'm David Jacoby. I'm head of litigation for Sony.

08:45:29 MR. WERGE: Gotcha.

08:45:33 My apologies, Your Honor. Thank you. They both have glasses, for what it's worth.

08:45:40 THE COURT: Well, I have glasses. Maybe I --

08:45:42 MR. WERGE: You could be Mr. Leak as well.

08:45:54 My apologies, Mr. Jacoby and Your Honor.

08:45:58 THE COURT: Welcome, Mr. Jacoby.

08:46:49 (Pause in proceedings.)

08:46:49 THE COURT: Counsel, Juror Number 9, for medical reasons, will be wearing her prescription sunglasses here in court. So that -- don't be surprised to see that. It will make things more comfortable for her and help her follow along more easily.

08:47:08 (Thereupon, the jury returned to the courtroom.)

08:47:32 THE COURT: Welcome back, members of the jury. All nine of you are here. I hope you enjoyed your weekend.

Before we start again, let me give you a brief refresher course on what is going on here.

As you will recall, starting a week ago when you were chosen, that this lawsuit involves a civil dispute about a musical work. It is a dispute about who should be credited as the authors of a particular song. It is therefore a dispute under copyright law, which is the area of law that defines rights in artistic works, including musical compositions and sound recordings.

As you know, this copyright dispute is about a song called, in full, *Savage Love (Laxed - Siren Beat)*. We have been referring to that song here during the trial, typically, as either "the song" or "*Savage Love*." The dispute involves both the musical composition of *Savage Love*, a derived work from *Laxed (Siren Beat)* by Jawsh 685, and then certain sound recordings.

The plaintiff, Matthew Spatola, is a musician professionally known as Matty Spats. Mr. Spatola is suing the defendants, Jason Derulo and Sony Music Entertainment, doing business as Columbia Records.

There is no dispute here that Mr. Derulo was an author of the song or that Sony Music has -- as the corporate defendant is often referred to here, has copyright interests in the composition and the recording.

The dispute is that Mr. Spatola claims that he is a

joint author of *Savage Love* based on certain contributions that he made to the song. That contention is denied by the defendants, Jason Derulo and Sony Music.

You will decide that issue of whether Mr. Spatola is a joint author, and likely, as well, answer certain questions related to the timeliness or the -- with which Mr. Spatola made his claims.

In regard to being a joint author, as I told you, I will have a number of instructions for you in writing at the end of the case. But I do think it would be useful to you to understand broadly what it is that the law views as the test for being a joint author. Here, at the -- and whether *Savage Love* is a joint work.

The law views a -- to be a joint work that a joint work must have two or more authors, and then the following four elements. The burden is on Mr. Spatola to prove these elements.

First, that each author must have made a substantial and valuable contribution to the work;

Second, each author must have intended that his contribution be merged into inseparable or interdependent parts of a unitary whole;

Third, each author must have contributed material to the joint work which could have been independently copyrighted; and

Fourth, each author must be a person to whom the work owes its origins and who superintended the whole work.

In regard to Element Number 2, the intention on whether the contribution should be merged, you may consider the following factors here, since it is acknowledged that there is no written agreement between Mr. Spatola and Mr. Derulo or Sony regarding that element.

The three factors which you may consider are:

A, whether each of the parties exercised control over the work;

B, whether each of the parties' actions showed that they shared the intent to be coauthors when they were creating the work. For instance, by publicly stating that the work was their shared project; and

C, the audience appeal of the work depends on the contribution of each party, so that the share of each party's contribution to the work's success cannot be appraised.

In making a substantial and valuable contribution to a work, each author's contribution to the joint work need not be equal.

As judges of the facts, you have heard testimony, starting on Wednesday, and seen many exhibits here in court. To refresh your recollection, the witnesses from whom you have heard were the plaintiff, Matthew Spatola; was Ghena Nasser Spatola, Mr. Spatola's ex-wife, who testified by Zoom;

and then Ben Hogarth, the sound engineer at the recording sessions for *Savage Love*, as you heard.

When we broke on Friday, Mr. Hogarth's testimony was not concluded.

Now, before we start again with Mr. Hogarth, we will once again present a witness by Zoom. And again, this is for the convenience of the witness and, frankly, to allow us to set up the Zoom so it doesn't take time away from you.

So with the understanding that Mr. Hogarth's testimony is not completed, but it will be, I now invite the plaintiff to call their witness by Zoom.

MR. FROST: Thank you, Your Honor.

At this time plaintiff calls Frank Harris.

THE CLERK: Mr. Harris, please raise your right hand.

THEREUPON:

FRANK HARRIS,

Called in these proceedings, and after having been first duly sworn, testifies as follows:

THE CLERK: Please state and spell your name for the record.

THE WITNESS: Frank Harris; F-r-a-n-k, H-a-r-r-i-s.

THE CLERK: Thank you.

THE COURT: Counsel, you may proceed.

MR. FROST: Thank you, Your Honor.

DIRECT EXAMINATION

BY MR. FROST:

Q. Thank you for being with us, Mr. Harris.

You are going to have to forgive me because, at least on my view, I can see that you get about half my head. So forgive me, I'm doing the best I can here with the technology. But thank you for being here today.

Can you tell us what it is that you do for a living?

A. Well, do you mean currently or at the time?

Q. Currently.

A. Well, I -- well, I work in the entertainment realm as a manager, as a label owner, just in general as a publisher in the music space.

Q. So you are familiar with the industry and each of those areas in terms of management and publishing and those sorts of concepts?

A. Yes, I am.

Q. When did you first become a manager in the music industry?

A. About maybe 26 years ago, approximately.

Q. And --

A. 25, 26 years ago.

Q. Okay. And who was your first artist that you managed?

A. Jason Derulo.

Q. How was it that you met and began the process of managing

08:55:34 Mr. Derulo?
08:55:35 A. You know, I was a 1L law student in Miami, met on the basketball court, and then, you know, eventually, you know, my relationship with him evolved to me being his music manager.
08:55:49 Q. And over what period of time did that occur? When did you first become his manager?
08:55:54 A. Maybe a year or so after we met. Maybe a year or so.
08:56:02 Q. Did you ever graduate law school? Do you have a law degree?
08:56:06 A. Yes, I do.
08:56:07 Q. Okay. And were you still in law school, then, when you began managing Mr. Derulo?
08:56:12 A. Yes, I was.
08:56:14 Q. Okay. And what sorts of things were you doing with Mr. Derulo as his manager?
08:56:19 A. At that time, I'm assuming you are asking?
08:56:23 Q. At the beginning.
08:56:24 A. No record deal. So setting up sessions, you know, development, developing Jason. At the time he was, I believe, 14 years old, I believe was the age. So just development. Again, making records, and, you know, getting him into talent shows and national competitions. So just, you know, doing everything that we could to work the entertainment muscle of Jason's.

08:56:49 Q. And at some point that shifted, I assume, when -- at or about the time that he was signed to a record deal?
08:56:56 A. Yes.
08:56:59 Q. And how did -- first of all, when did that happen?
08:57:03 A. I don't remember the -- I don't remember the date. Probably -- yeah, I don't remember the date, but probably -- maybe four to five -- three to four years later, approximately. But I don't remember the actual date.
08:57:16 Q. Fair enough. Just roughly three or four years after you started managing him?
08:57:20 A. Correct. Well, about four years -- three to four years, three to four years. Maybe three.
08:57:26 Q. And how did your responsibilities and duties shift once Mr. Derulo was a signed artist?
08:57:32 A. Well, I think we had a label in place, so, you know, there is a lot more interaction as it relates to releasing records. I mean, a record label, obviously, has a significant team of people who work at the label.
08:57:47 So it's just interacting now with -- you know, instead of it just being Jason and myself, right, we now had an entire record label that we had to kind of manage the relationship with, and, you know, deal with the different departments to make sure that everything was released the right way, and we had the right looks on our records, et cetera, et cetera.

Q. And I believe you had testified in your deposition that you were the person who was primarily responsible for communicating on Mr. Derulo's behalf with the record label; is that correct?
A. That's correct.
Q. Okay. And what was that label?
A. Warner Bros. At the time -- it's just Warners now, right, but at the time it was called Warner Bros.
Q. And did you ever have any opportunity to interact with Columbia Records or Sony Music during the time that you were representing or managing Mr. Derulo?
A. Yes.
Q. Okay. And in what capacity was that?
A. Well, I mean, we may have -- I may have interacted with them on multiple occasions, but are you speaking specifically about this record? Because I did interact with them about this record.
But when you manage an artist -- and we were having, fortunately, some good success -- there are times you collaborate with all labels because, you know, Jason may do a record with a particular label. You have to figure out, you know, the terms, and -- so, you know, you always are interacting consistently with various labels, et cetera.
But I was in contact with them as it relates to this song, but I was in contact with Sony before then as well, I'm

08:59:22 sure, and Columbia.
08:59:23 Q. We are going to get into the specific song shortly, but I'm just sort of talking generally for the moment.
08:59:29 Did you have an opportunity to work with Sony and/or Columbia during the time that you were working with Mr. Derulo, generally speaking?
08:59:40 A. Yes.
08:59:43 Q. Okay. And during that time, again, you were the primary interface with them relating to Mr. Derulo, his wants, needs, desires, obligations, and all of that. Is that a fair statement?
08:59:58 A. Yes.
08:59:58 Q. And were there other artists that you were working with during -- well, let me back up a step.
09:00:04 How long did you work with Mr. Derulo as his manager?
09:00:07 A. 22 or 23 years.
09:00:11 Q. And during that time, you were operating both as a professional manager and a personal manager for him, right?
09:00:19 A. I don't know that there is a differentiation.
09:00:25 Q. Okay. Just to clarify -- and I'm not trying to put words in your mouth, but I believe you testified at your deposition it was kind of a "360 responsibility in both the professional and the personal space." Does that sound accurate?
09:00:40 A. That's accurate. But as a manager, I mean, I did that

because, like I said, I started to work with Jason since he was very young, so we had, you know, a very good relationship with his family with myself, and so he trusted me in addition to the professional stuff, in general, right?

So that wasn't necessarily a job that I got a percentage for. It was something that I did because we had -- you know, we was working together for so many years, and we were very close. And so the -- that wasn't something that I was commissioned for. It was just something that I did because we had been working together for so long.

Q. So both friend and manager, confidant, all of those things?

A. Confidant. That's probably a better way to describe it. Confidant, friend, and then also professional manager as well.

Q. Okay. And did Mr. Derulo indicate to you that he trusted your advice and your opinions when it came to the music industry?

A. Yes.

Q. Okay. And did you feel like Mr. Derulo trusted you and your advice when it came to the music industry?

A. Yes.

Q. Did you ever work with any other artists during the time that you were working with Mr. Derulo?

A. Yes.

09:01:49 Q. Okay. And we don't have to get into names, but approximately how many signed artists were you working with during the life of the 22 or so years that you were working with Mr. Derulo?
09:02:02 A. So I just want to clarify, when you say -- do you mean in the -- because again, we had writers and producers, we had artists signed to our record label, and then I was a manager separately. So when you ask "artists that I was working with," are you saying as a manager or are you speaking in general?
09:02:22 Q. As a manager.
09:02:23 A. One other one that was signed to a major record label.
09:02:28 Q. Okay. Did you ever work with Mr. -- strike that.
09:02:31 When you were working with Mr. Derulo, you are aware of the fact that he would commonly work on collaboration projects with other artists, correct?
09:02:43 A. When you say "collaboration projects," can you please clarify what you mean by "collaboration"?
09:02:55 Q. Did Mr. Derulo ever release any tracks that were collaborations with other artists where other people were on the tracks with him?
09:03:02 A. Oh, yes. Um-hum, yes.
09:03:05 Q. And were you responsible for overseeing the work with Mr. Derulo as it related to those collaborations, making sure that rights were where they needed to be, making sure that

09:03:16 credit was where it needed to be, those sorts of things?
09:03:18 A. Yes.
09:03:20 Q. And are you the one who would interact with the label with respect to those issues?
09:03:25 A. Yes.
09:03:26 Q. And when the label would learn who was -- well, let me take a step back.
09:03:32 When you were working on an album or a track, the label would not be there in the recording sessions, typically speaking, right?
09:03:40 A. Yes.
09:03:42 Q. And somebody would need to communicate with the label and others relating to who credit would need to go to, who rights would be assigned to, those sorts of things. Is that a fair statement?
09:03:55 A. Well, not completely. It depends on what part -- what phase in Jason's career you are talking about because early on, there were more people involved as it related to the label, et cetera, but as, you know, he had more and more success, he had more time.
09:04:13 So when you ask that question, I think it just depends on where he was in his career because early on, the label had a lot more involvement with some of those conversations, and they were in the studio, et cetera, but again, as you have more success, you have more time.

09:04:29 Q. As he became -- as Mr. Derulo became established, if you will, was signed to the label, was recording tracks for the labels during that period of time, I would assume that the label was not normally in the room with him when he was recording; is that --
09:04:49 A. Early on they were, but as he had more success, they were not. But early on as a signed artist -- I just want to be clear --
09:04:56 Q. Understood.
09:04:56 A. Early on, as a signed artist, the label was involved in some of those conversations, but as he -- as his start continued to rise, you get more autonomy from that perspective.
09:05:09 Q. And during the time of -- you've heard the song *Savage Love (Laxed - Siren Beat)*, correct?
09:05:16 A. Correct.
09:05:16 Q. And during that period of time, how involved was the label directly in the actual recording sessions and things like that?
09:05:25 A. We didn't have a record label at that time.
09:05:31 Q. Okay. This is before the label?
09:05:32 A. Right. Because we had periods where he was not signed to a label because deals expired, et cetera. So when we did *Savage Love*, we did not have a label partner at that time.
09:05:43 Q. And during the time that Mr. Derulo was -- during the

09:05:47 time that you were managing him, he also was often using
09:05:54 samples within his tracks, right?
09:05:56 A. Well, I just want to clarify. Are you saying was he
09:06:04 using samples or are you saying -- because usually we work
09:06:11 with producers who may have used samples. So are you saying
09:06:13 was Jason using the samples or were we working in
09:06:16 collaboration with producers who used samples as well?
09:06:19 Q. Either one. Any samples that would have been applied to
09:06:22 any track that Mr. Derulo had recorded?
09:06:23 A. Correct.
09:06:25 Q. Okay. And who was responsible for communicating to the
09:06:30 record label concerning who was to get credit for the use of
09:06:38 a sample in a Jason Derulo track?
09:06:41 A. Who was -- wait. Can you ask me that again?
09:06:51 Q. Of course.
09:06:52 A. I want to give you --
09:06:53 Q. Let's talk big picture for a second and come back to the
09:06:57 specific question.
09:06:57 As a music manager, you would agree with me that it
09:07:03 is important within the industry that people are assigned the
09:07:07 credit to which they are due for the work that they would do
09:07:12 on a track or an album, correct?
09:07:16 A. Extremely important.
09:07:17 Q. You said extremely important?
09:07:19 A. Correct. Yes.

Q. And why do you say extremely important?
A. Well, I just feel like anyone who contributed to a record, it's their livelihood, and I feel like everybody should be fairly compensated for their participation, you know, as it relates to art in general.
Q. Okay. So given how extremely important you understand that to be, what steps did you take, generally speaking, to ensure that people received the proper credit they were due for the work they did on Jason Derulo tracks and/or albums?
A. Well, I think I would interface with the various managers and publishing companies to make sure that everyone who participated on a record got their proper credit and compensation.
Q. And what did you understand the consequence would be if somebody didn't get their proper credit -- this extremely important proper credit?
A. What did I think the consequences would be? Well, I mean, obviously, a person could potentially sue, one, if they felt like they were improperly credited. And it's not right. I mean, it's not right to not credit someone who participated in -- on a record. So I think it's, you know, morally not right, but outside of that, you can be sued.
Q. And so from the contributor's perspective -- I understand that from the artist's perspective and the consequence that could come to them. From the contributor's perspective, why

09:09:01 would it be important for them to be able to get the proper
09:09:03 credit for the work that they had done?
09:09:05 A. Compensation and, you know -- and you want a resume.
09:09:14 Compensation and resume are probably the two things that I
09:09:16 would point to.
09:09:17 Q. And what do you mean when you say "resume"?
09:09:19 A. Well, I mean, it's something that you can -- you know,
09:09:26 you can say, "I worked on this record." So, you know, it's a
09:09:30 resume, right? The more you build your resume, obviously,
09:09:33 the better chances you may get to get other opportunities. I
09:09:36 mean, it's not -- maybe not, right, as well. It could go
09:09:41 either way. But I think it's compensation and resume.
09:09:43 Q. One begets another, right? It's your body of work?
09:09:47 A. When you say "one begets another," what do you mean by
09:09:51 that?
09:09:51 Q. You're saying that the bigger your resume, the bigger
09:09:54 your body of work, the more of an opportunity that is going
09:09:56 to create for you for potential other future opportunities;
09:09:59 is that right? Not guaranteed, but generally so?
09:10:03 A. I want to be careful. Generally speaking, yes, but
09:10:06 definitely not guaranteed. I want to be clear. Generally
09:10:08 speaking, right, the bigger your resume, obviously the better
09:10:12 your opportunities are, but it still doesn't mean that.
09:10:16 You've still got to get in the room and you've still got to
09:10:17 make the records with other people. Who knows? But it does

create, you would hope, more of an opportunity.

Q. Right. Just because you win an academy award doesn't mean you are going to get another next movie, but it's going to increase the chances, right?

A. Correct.

Q. Okay. So do you know what a publishing copyright is?

A. I do.

Q. Okay. And what is a publishing copyright?

A. The writers, right, whoever wrote the records, they share in the publishing of the record, the splits, as it relates to who the writers are on a particular song.

Q. Okay. Understood.

And as you described in your deposition, you had said they have the copyright --

"ANSWER: If someone creates a work, they have the copyright to determine how they want that work to be disseminated and for first-use purposes."

Do you remember that testimony?

A. Right. First use, yup.

Q. Is that an accurate statement?

A. As far as I -- as far as I know, it is.

Q. From your experience?

A. Yes.

Q. And when you used that word "first use" in your deposition, what do you mean by that?

09:11:20 A. Who exploits the record first. You put out on a record label, what have you. How do you release the record? Who releases it commercially first, in a sense.
09:11:32 Q. What do you understand a sound recording copyright to be?
09:11:35 A. The master of the record. So there is a master of the song. You create the record and there is a master. So that is what I -- how I interpret the song copyright. It's the master copy of the song, the sound, the record itself.
09:11:48 Q. And -- please.
09:11:56 A. I'm sorry. The record itself, the song itself, yes.
09:11:57 Q. I'm sorry, the technology. I don't mean to keep stepping on your words.
09:12:01 But as -- based on your industry -- music industry experience, you understand that there can be ramifications for releasing a track without an agreement in place with the owner of the track or the person who created the work, correct?
09:12:16 A. Right.
09:12:27 Q. Let's talk, if we could, about that one track, *Savage Love*. Are you familiar with the song *Savage Love*?
09:12:35 A. I am.
09:12:36 Q. And do you -- are you familiar with the separate track *Laxed (Siren Beat)*?
09:12:44 A. I am.
09:12:44 Q. And do you have a recollection of who it is that created

09:12:48 that track *Laxed (Siren Beat)*?
09:12:51 A. I think -- I believe his name was Jawsh 365 [sic], I believe his name was. I'm not sure if the numbers are correct, but it's Jawsh 365. He's a young man from New Zealand, I believe.
09:13:05 Q. Jawsh 685?
09:13:07 A. Oh, I'm sorry, 685. Sorry about that, yeah.
09:13:10 Q. Of course. And did -- are you aware of whether Mr. Derulo used that track, *Laxed (Savage Beat)* [sic], to help create the song *Savage Love*?
09:13:21 A. Yes.
09:13:22 Q. And whose idea was it to use Jawsh 685's *Laxed (Savage Beat)* in terms of the beginning of the work on the song *Savage Love*?
09:13:33 A. Jason's.
09:13:36 Q. Jason Derulo?
09:13:38 A. That's correct, Jason Derulo.
09:13:39 Q. And did Mr. Derulo let you know that he was going to be using Jawsh 685's beat?
09:13:45 A. Yes.
09:13:46 Q. And did he let you know that he had reached out directly to Jawsh 685 in April of 2020?
09:13:56 A. Well, I would say yes, but I don't remember -- yes. Yes. Yes. Yup. Yup. Yes.
09:14:08 Q. And did he let you know -- did Mr. Derulo let you know

that Jawsh 685 had sent him some stems of the track?

A. Yes.

Q. And when *Savage Love* was released on TikTok, there was -- was there a formal deal in place between Jawsh 685 and Jason Derulo to give Mr. Derulo the permission to use the *Laxed (Siren Beat)* track?

A. There was not.

Q. Okay. And you actually discussed with Mr. Derulo releasing *Savage Love* on TikTok before there was any written formal agreement in place, right?

A. You said that I discussed it with him?

Q. Correct.

A. Yes.

Q. And did you advise him at the time that he needed permission from Jawsh 685 to release that track using the beat that Jawsh 685 had created?

A. Yes.

Q. And why did you do that?

A. Just ramifications. If you release a record that you don't have permission to release, there are ramifications that go along with that.

Q. Did you make that --

A. I mean, someone else's work, you can be sued, et cetera. And so just any manager, just, you know, being prudent, right, and doing your job as a manager, it's important that

you inform your client what you think is best, you know, in a situation like that.

Q. And when you say "the client," you are referring to the artist, in this case Mr. Derulo?

A. Correct.

Q. And how many times did you advise Mr. Derulo that he needed to clear the rights, if you will, before releasing that track, that -- that beat along with the track that Jawsh 685 had created?

MR. ROSENBERG: Objection, Your Honor. I just want to caution the witness not to disclose any attorney-client privilege communications that Mr. Harris may have had with Mr. Derulo's attorney.

THE COURT: Yeah. Mr. Harris, you told us that you graduated from law school. I don't know if you've -- became a member of the bar or were a lawyer at the time of these events back in 2020. To the extent that you are a member -- were a member of the bar, to the extent that a conversation was in your role as a lawyer and not your role as a manager, then of course you shouldn't discuss it.

However, to the extent that you were just giving the advice that any manager would have given, and that was understood between the two of you, then you are free to testify about that.

Do you understand that distinction?

09:16:57 THE WITNESS: Yes, Your Honor, I do.
09:16:59 THE COURT: Thank you.
09:17:00 Go ahead, Counsel.
09:17:01 MR. FROST: Thank you.
09:17:02 Q. Maybe we can clear this up this way: Mr. Harris, did you ever represent Mr. Derulo as his attorney?
09:17:08 A. Early on, yes.
09:17:13 Q. During the time -- I'm sorry. Go ahead.
09:17:15 A. Yes. Very early, before we had a record deal.
09:17:18 Q. Okay. And when you were discussing the track *Savage Love* with Mr. Derulo, were you acting as his attorney or as his manager?
09:17:27 A. As his manager.
09:17:29 Q. Okay. And during that time, relating to *Savage Love*, how many times did you advise him of the need to clear rights, whether relating to *Laxed (Siren Beat)* or otherwise?
09:17:43 A. I mean, I don't know how many times. We had the conversation, but I don't recall how many times I expressed that to him. But I did express it to him.
09:17:54 Q. Would you say numerous times?
09:17:56 MR. ROSENBERG: Just say objection, leading.
09:17:58 THE COURT: Overruled.
09:18:02 Q. Was it one or more than one?
09:18:03 A. More than one.
09:18:05 Q. Okay. And so did Mr. Derulo end up releasing *Savage Love*

without clearing the rights relating to Jawsh 685?
A. Yes.
Q. And was this after you advised him against doing that?
A. Yes, it was.
Q. Did you agree with Mr. Derulo's decision to release the track without clearing the rights?
A. I did not.
Q. Did you agree with Mr. Derulo releasing the track before getting any sort of signed, written agreement in place?
A. I did not.
Q. And did that cause you heartburn? Did you -- did that trouble you that he had chosen to do that?
A. I mean, I don't know how to answer that question. Did I have heartburn? I don't know if I felt that. I advised that he shouldn't do it. And that is how -- and that is how I felt. I don't know if I had heartburn or -- I don't know how I would describe how I felt. I just knew that he shouldn't have done it at that time without having the proper authorization.
Q. For the reasons we have discussed earlier, both the risk and the -- the moral wrong of not giving credit where credit was due?
A. Correct.
Q. Okay. Have you ever heard of the name Matthew Spatola before?

A. You mean just in general, now, or are you saying at that time?
Q. Right, as of today.
A. Yes.
Q. Okay. And how do you know that name?
A. I know it because he's suing Jason Derulo. He's currently suing him, and that's how I know it, from that perspective. And I knew it briefly at some point because, you know, one of his -- well, we can talk about it. I guess you are asking me more about it, but, yes, I do know who Matt Spatola is.
Q. Thank you. And we will get into it in just a few minutes, when that first -- name came up, I believe, and you will correct me if I'm wrong.

You were not physically present in the studio for the recording of *Savage Love*, correct?
A. Correct. I was not.
Q. Were you ever told by Mr. Derulo who all was in the studio for the recording?
A. At some point, yes, but do you mean -- I don't know, what time period are you talking about?
Q. Contemporaneous with the recording sessions.
A. No.
Q. Okay. And so how would you later have found out who was in those sessions and who was actually recording on the

track?

A. You know, Jason would tell me, you know, in the casual conversation, but especially when it became time to figure out the splits, right, who was in the room, and what were their contributions to what was going on.

Q. So am I understanding you correctly that in order to understand who needed to be credited both financially or in terms of actual credit, you were relying primarily on Mr. Derulo telling you that?

MR. ROSENBERG: Objection, leading.

THE COURT: Overruled. It's summarizing the testimony.

THE WITNESS: Well, that was a portion of it. So Jason would tell me what he felt the compensation -- the -- excuse me, what the contribution was from the other people in the room. But additionally, I would then have conversations, follow-up conversations with, you know, managers who represented the other contributors in the room, publishing companies, and they would also, you know, share what they thought their client's participation was as well.

So it would be a collaboration of me hearing from Jason and me trusting Jason, obviously, because we had worked together for so many years, juxtaposed with what the other people were saying as related to what they thought their client's contribution was.

Q. Okay. Just so I understand, in the first instance, what was the manner in which you would learn of who contributed to *Savage Love*?

A. Jason would tell me.

Q. Okay. And did you have -- if Jason didn't tell you, if Mr. Derulo did not tell you the name of somebody who worked on the track, would you have any way of knowing that the person did, that was not identified?

A. Well, I just want to be clear, if you are talking about this song because sometimes if I set up a session -- I knew there was a session going on, I would know that there were going to be people that were going to be in the session, so I would assume that they would be contributing.

So it would depend. So I can't blanketly say I never knew because there were times where I would set up sessions for Jason, and I knew who some of the other collaborators in the sessions would be --

Q. Okay. Let's break it down.

You -- did you have any other occasions other than relating to *Savage Love* to advise Mr. Derulo he needed to clear rights before he released a track other than as his legal counsel?

A. Not that I can -- not that I recall.

Q. Okay. So this was a *Savage Love*-specific issue?

A. Right. Yeah. Um-hum.

09:23:55 Q. Okay. So in -- when you were talking about there were sometimes you would know who was -- you would know who was in the session because you would arrange for them to be there, and there were other times that you would not, right?
09:24:10 A. Correct. Because Jason had his own relationships as well, so he sometimes would call a producer or other person or a writer or whatever the case may be to do a session as well. I mean, he recorded every day, right? So --
09:24:23 Q. So was it unusual, then, for Mr. Derulo to call artists or musicians directly to come into the studio and work with him?
09:24:30 A. No.
09:24:31 Q. Okay. It was pretty -- pretty common?
09:24:35 A. Yeah, relatively.
09:24:37 Q. Okay. And so with respect to *Savage Love* specifically, how did that work? Did he reach out to people or did you reach out to people?
09:24:44 A. He did.
09:24:46 Q. Okay. And you did not reach out to any of those people?
09:24:49 A. No, I did not. No.
09:24:52 Q. So for the people, then, that contributed to *Savage Love*, was there any way for you to know who actually made a contribution to the track and what it was other than, at least in the first instance, for Mr. Derulo to tell you?
09:25:10 A. That's correct. There was no way that I would know.

09:25:14 Q. Okay. And even with the follow-up, you would need to know who to follow up with, right? If you don't know the artist was in the room, you don't know to follow up with their manager, right?
09:25:24 A. Correct.
09:25:24 Q. And did Mr. Derulo tell you in your conversations about *Savage Love* that Mr. Spatola had recorded on the track?
09:25:32 A. No.
09:25:34 Q. So at the time he didn't even tell you that he had been in the sessions in whatever capacity?
09:25:41 A. Well, initially he didn't tell me anyone who was in the sessions.
09:25:46 Q. Right. Well, I guess that is the point I'm getting to, but I want to focus specifically on Mr. Spatola --
09:25:51 A. No, I didn't know. No --
09:25:52 Q. Okay.
09:25:53 A. -- I didn't.
09:25:53 Q. Okay. And so Mr. Derulo never told you that Mr. Spatola had worked on the track at all in any capacity, right?
09:26:00 A. Again, I just want to make sure in terms of timeframe, you are talking about initially, right, right when the session happened initially? I mean, you are not talking about -- because at some point he did let me know that Matthew Spatola worked on the record. So I just want to make sure I understand when you are talking about in terms of

timeframe.
Q. Yeah, of course.
So in those initial conversations, when you are talking to Mr. Derulo, and Mr. Derulo is saying, "These are the people who worked on the album" --
A. Yes.
Q. -- Mr. Spatola's name did not come up, correct?
A. Did not.
Q. Okay. And I'm sorry, you were breaking up. Can you repeat that answer?
A. Did not, no.
Q. It did not?
A. No, it did not.
Q. Okay. Sorry. Thank you for clarifying.
And in fact, the only reason you ever knew Mr. Spatola had worked on the track in any capacity is from other sources, correct?
A. Correct.
Q. Okay.
MR. FROST: Can we go to Exhibit 97, please, which I believe is already in evidence.
Permission to publish?
THE COURT: Counsel, you don't need to ask permission to publish if it's in evidence. Just go ahead and do it.

09:27:16 MR. FROST: Thank you.
09:27:29 Can we enlarge that just a little bit?
09:27:33 Q. Do you see on the top of Exhibit -- well, first of all, do you recognize Exhibit 97, what is on your screen?
09:27:43 A. I do.
09:27:44 Q. And is -- it says -- it says Exhibit 96, but just ignore that. That was a -- that was a deposition designation. So we are just -- I'll represent to you that it's 97.
09:27:57 Do you recognize that exhibit?
09:27:58 A. Correct. Yes, I do.
09:28:01 Q. And do you see there is a number in the bottom of it that says HARRIS-0001?
09:28:06 A. Yes, I do.
09:28:07 Q. And that is your last name. This is your production, correct?
09:28:12 A. Yes.
09:28:13 Q. So in connection with this litigation, you searched for and found and produced this e-mail?
09:28:21 A. Well, I don't remember how it happened, but I mean, this is an e-mail from my e-mail address. I don't recall what happened.
09:28:28 Q. Yeah. Fair enough.
09:28:29 Is this in the same or similar condition as to when you sent it and also when you produced it?
09:28:35 A. Again, that was six years ago, so -- yeah, I would assume

09:28:41 so.

09:28:42 Q. Okay. And do you see there is an e-mail in there on January 4, 2021, at 11:58 AM to benmaddahi@sonymusic?

09:28:56 A. Uh-huh. Yes.

09:28:59 MR. FROST: Actually, leave it there for a second.

09:29:01 Q. Do you see the e-mail below that from betsywhitney@columbiarecords?

09:29:08 A. Yes --

09:29:08 Q. Okay.

09:29:09 A. -- I do.

09:29:10 Q. And --

09:29:11 A. Well, I don't see Betsy's e-mail, so maybe scroll up some. I only see -- if I'm not mistaken, I think I see Ben's response. I don't see an e-mail from Betsy, I don't think.

09:29:24 Q. Right. I understand.

09:29:24 So do you see in the e-mail where it says it's from Ben Maddahi on January 4, 2021?

09:29:30 A. I do.

09:29:33 Q. And below that, Mr. Maddahi is forwarding an e-mail from Betsy Whitney, right?

09:29:38 A. Yes, I believe so.

09:29:39 Q. Okay. And did you understand that Ben Maddahi -- in fact, he says to you, "Happy New Year, Frank. Please see below. Is this accurate? Want to make sure we are not crediting anyone incorrectly. Thank you."

Do you see that?

A. Yes.

MR. FROST: And can we scroll down to the next page, please.

Q. And do you -- did you then, when you received that, see this e-mail that had been forwarded from Ghena Spatola to Betsy Whitney -- or Ghena Nasser to Betsy Whitney?

A. Yes.

Q. And did you understand this to be a request from Ghena Nasser that somebody look into the issue of Mr. Spatola's credit relating to his work on the track *Savage Love*?

A. Yes.

Q. Okay. And so why -- and what was your response to receiving that e-mail from Ben Maddahi?

MR. FROST: We can go back to the first page.

A. What was my response to him? That Jason informed me that that was correct.

Q. Okay. And so that was -- you responded to him later that day, approximately an hour and a half later?

A. Well, I'm looking at the timing, but, sure, around that time, yes. But my response was that Jason informed me that that was correct.

Q. And when did Mr. Derulo inform you that that was correct?

A. I mean, again, I asked him -- because, again, I wasn't in a session, so I don't know who was in the session, as I

stated earlier. I asked him at some point after I got that e-mail, and he responded and told me that that was the case, and then I relayed the message to the team at Columbia.
Q. Okay. So I just want to make sure we are very clear on the timeline.
A. Uh-huh.
Q. You receive an e-mail from Ben Maddahi asking you if the request for credit from Mr. Spatola's then wife was accurate, correct?
A. Yes.
Q. And then only after you received that e-mail, is that when you then asked Mr. Derulo if that was accurate?
A. Yes.
Q. Okay. So within that hour and a half window?
A. Like I said, I mean, I don't know what the timing was, but I asked him the question.
Q. Okay. I'm just trying to clarify that it was after you received Ben Maddahi's e-mail and before you responded to Ben Maddahi, it was in that window that you asked Mr. Derulo whether Mr. Spatola was involved and whether that was accurate, correct?
A. Correct. Yeah.
Q. Okay. Prior to receiving this e-mail on January 4, 2021, had Mr. Derulo ever told you the name Matty Spatola, Matthew Spatola, let alone that he had worked on *Savage Love* in any

09:32:46 way?

09:32:46 A. I don't -- I don't recall him telling me. I don't think he did. I don't remember. I mean, like I said, it was sometime ago. But assuming by my response, right, I wasn't sure about it, so I had to ask him. So I don't remember him telling me that.

09:33:03 Q. As we sit here today, do you have a recollection of Mr. Derulo ever having told you the name Matthew Spatola prior to January 4, 2021, when you asked him?

09:33:12 A. I don't -- I don't have a recollection of that, no.

09:33:19 Q. Okay.

09:33:21 MR. FROST: May I have just one moment, Your Honor?

09:33:23 THE COURT: You may.

09:33:23 (Pause in proceedings.)

09:33:34 MR. FROST: We have no further questions at this time subject to redirect.

09:33:37 THE COURT: Ladies and gentlemen, you may stand and stretch if you like.

09:33:42 The defense may cross-examine.

09:33:59 If you want to stand and stretch, Mr. Harris, for a moment as well, you are certainly free to do so.

09:34:03 THE WITNESS: I'm okay. Thank you, Your Honor. I'm fine. Thank you very much.

09:34:11 THE COURT: Please be seated.

09:34:12 Mr. Rosenberg, you may begin when you are ready.

MR. ROSENBERG: Thank you very much, Your Honor.

CROSS-EXAMINATION

BY MR. ROSENBERG:

Q. Mr. Harris, can you hear me okay?

A. Yes, I can.

Q. Thank you, sir. And good morning to you.

A. Good morning. How are you today?

Q. I'm good. Thank you. How are you?

A. Great. Thank you.

Q. So just the year, when was the last time you spoke with Jason Derulo?

A. I don't know, maybe about three years ago, maybe. I don't remember. It's been a few years. I don't know what the exact time was. Maybe three years ago or something like that.

Q. And Mr. Harris, in connection with this case, are you represented by counsel?

A. Yes.

Q. Is that the law firm Blank Rome?

A. Yes. Correct.

Q. So am I representing you in any capacity?

A. No.

Q. Okay. Mr. Frost was asking you questions about how you advised Mr. Derulo against releasing *Savage Love*. Do you remember those questions?

09:35:27 A. Yes.
09:35:28 Q. Now, that was in connection with Mr. Derulo releasing a snippet of the song on TikTok on May 11, 2020; is that correct?
09:35:39 A. I don't remember the timing, but that sounds relatively correct, yes.
09:35:45 Q. When *Savage Love* was commercially released on June 11th -- June 11, 2020, did Jason Derulo have permission from Sony Music and Jawsh 685?
09:35:59 A. Yes.
09:36:00 Q. Mr. Harris, in all your time working with Jason Derulo, have you ever known him to purposefully discredit writers or producers that he worked with?
09:36:24 A. No.
09:36:26 Q. And Mr. Harris, to your knowledge, does releasing a snippet on TikTok in May 11, 2020, did that provide any monetary gain to Jason Derulo?
09:36:45 A. That is a tricky question. Are you saying do you make money off of releasing songs on TikTok from a royalty perspective? The answer to that question is no.
09:37:01 But I don't know, you know -- but anyway, okay.
09:37:05 Q. Thank you.
09:37:06 Mr. Frost was asking you questions about credits. Do you remember those questions?
09:37:11 A. Yes.

09:37:12 Q. Does -- based on your knowledge and experience in the music industry, does having a credit equate to ownership of the copyright in the sound recording or composition of a song?

09:37:30 A. No.

09:37:33 Q. And does having a credit in and of itself equate to entitlement to receiving royalty payments, like from publishing or from the master?

09:37:49 A. No.

09:37:50 Q. Are you familiar with the term "session musician"?

09:37:59 A. I am.

09:37:59 Q. What is your understanding of the term "session musician"?

09:38:04 A. Quite often, artists have musicians who play different instruments. A guy -- a person may play the keys, a person may play a horn, a person may play a guitar. They have instrumentalists come in to work on a track.

09:38:20 Q. And how, based on your experience, are session musicians compensated?

09:38:26 A. Work-for-hire, normally.

09:38:31 Q. Do you mean work-for-hire as you understand it under the United States Copyright Act Sections 101, 201?

09:38:38 A. Well, I mean, I don't -- no, I just mean that you pay somebody a fee for doing the work. I don't know -- I don't know that specific code, but, you know, someone comes in,

09:38:50 they play, you pay, and that is the quid pro quo.
09:38:54 Q. So when you use the phrase "work-for-hire," are you using that just as a layperson, common parlance in the music industry as opposed to someone knowledgeable about copyright law?
09:39:08 A. Someone who is knowledgeable about copyright law.
09:39:12 Q. Okay.
09:39:13 A. Not knowledgeable to know what the exact statutes are, but knowledgeable, relatively knowledgeable.
09:39:20 Q. Okay. Mr. Harris, for *Savage Love* -- and Mr. Frost covered this, but I just want to make it clear -- were you ever physically present for any of the recording sessions on *Savage Love*?
09:39:37 A. None of them.
09:39:37 Q. But did you release -- receive by e-mail from Ben Hogarth the bounces from each recording session?
09:39:47 A. Yes. Yes, bounce after every session, correct.
09:39:52 Q. So while you were not there physically, you were receiving the recordings from each session; is that a fair statement?
09:40:01 A. Right. Fair statement. Correct.
09:40:03 Q. Aside from those recordings, do you have any personal knowledge about what occurred during the *Savage Love* recording sessions?
09:40:12 A. I do not.

Q. Can you please explain for the jury, in the music and entertainment industry, your role as a personal manager, as opposed to, like, a business manager or those other roles?

A. Well, I think a person -- a personal manager, I guess the best way to kind of describe it is the personal manager is kind of the CEO, I believe, of an artist's business, right? So you interface with every element of what the artist is doing.

So you interface with the record label. You also interface with the business manager. You also interface with the agents. And so you become, in essence, the person who is the key person, in a sense, to all things that relate to the artist.

Whereas, a business manager speaks specifically to the economics, the finances, the taxes, creating commission sheets, paying out people, making sure insurances are taken care of. So it has more of an economic twist.

Whereas, the personal manager is involved with all elements of what is happening in the artist's ecosystem, as well as interfacing with the business manager.

Q. And was that your role for Jason Derulo in 2020 and 2021, including the time period of *Savage Love*?

A. Yes. Correct.

Q. What did you do, Mr. Harris, on *Savage Love* pertaining to things like communicating on behalf of Jason Derulo?

A. I'm not sure I understand. What did I do? What do you mean? Can you be more specific?
Q. Yes, of course.
Was part of your job as Jason Derulo's personal manager handling business matters on his behalf, so he could focus on writing, recording, touring, and other creative projects?
A. Correct. Yes.
Q. And that was for not just *Savage Love*, but all of Mr. Derulo's career that you served as his personal manager; is that correct?
A. Correct.
MR. ROSENBERG: If we could please bring back up Trial Exhibit 97, which Mr. Frost went over with you, please.
And as the Court noted, this has been admitted into evidence, and I ask to be admitted into evidence, Your Honor.
Q. So Mr. Harris, do you have Exhibit 97 in front of you?
A. I do.
Q. And is this an e-mail exchange involving Sony Music, yourself, and then at the very bottom of page 2 an e-mail from Ghena Nasser?
A. Yes.
Q. Okay. And looking at page 1 and going over to page 2, is it correct that the e-mail at the top of page 1 is the most recent in time, and the e-mails beneath it are descending in

09:43:40 order of time?
09:43:40 A. Correct.
09:43:41 Q. And just for clarity of the record, was your e-mail address on January 4, 2021, frank@23-management.com?
09:43:54 A. Yes.
09:43:55 Q. So if we look at the e-mail at the top of page 1 from Ben Maddahi to you, so that's on January 4, 2021, at approximately 1:30 PM Pacific Time, do you see that?
09:44:13 A. Yes.
09:44:14 Q. And was that e-mail from Ben Maddahi at Sony in response to an e-mail from you, Frank Harris, sent on Monday, January 4, 2021, to Ben Maddahi, copying Juba Lee, with a Subject line "Matthew Spatola *Savage Love* song credits and session reports"?
09:44:39 A. Yes.
09:44:39 Q. Why don't we go to page 2, and let's start with the initial e-mail from Ghena Nasser on December 19, 2020.
09:45:00 This is the request -- this December 19, 2020, e-mail, Mr. Harris, was this the request you were ultimately responding to?
09:45:10 A. Yes.
09:45:10 Q. And I'll read the e-mail, and you let me know if I have misstated anything.
09:45:17 Ms. Nasser writes to Betsy Whitney, "Hi, Betsy. My name is Ghena Nasser, and I represent producer musician --

excuse me, producer/musician Matthew Spatola. Matthew got your contact information from Henry Dessources, who is part of Jason Derulo's management team. Matthew worked with Jason Derulo on the record *Savage Love* by artist Jawsh 685, and we have been trying to process his two session reports, benefits only, through AFM since mid-August in order for Matthew to receive his residuals and benefits on time."

I'll pause right there, Mr. Harris.

When you read this and you saw the words "residuals and benefits," is that like royalty payments from a record label or publishing company?

A. I did not interpret it as that.

Q. Okay. The second paragraph reads, "Erick Cruz, our contact at AFM, has on different occasions reached out to both Lindy Sevier (Columbia Records) and Brittany Kinsella (Sony Music), but the union has still not received any confirmation that the session reports have been processed by the label."

And then the third paragraph. "In addition to the session reports, we have also been in communication with Mr. Dessources to get Matthew's name on official song credits as additional guitar and additional bass for *Savage Love*, so that Matthew can present necessary proof of affiliation when needed."

Do you see that?

09:47:00 A. Yes.
09:47:01 Q. Then the last paragraph. "Mr. Dessources informed Matthew that he got in touch with you with regards to this, and that we should absolutely reach out to you again in order to follow up. Can you please assist in these matters? I have CC'd Erick Cruz as well as attached the two session reports, in case they were never priorly received by the label."
09:47:32 MR. FROST: Objection, Your Honor. Just for the record, I think it says "personally" not "absolutely."
09:47:35 MR. ROSENBERG: Did I --
09:47:37 THE COURT: Yes.
09:47:38 MR. ROSENBERG: Did I say "absolutely?" I apologize if I misread. "Personally." "That we should personally reach out," is that what the objection is about? I'm sorry if I --
09:47:49 MR. WERGE: I wanted to make sure the record was clear.
09:47:51 MR. ROSENBERG: Yeah. "Personally." I apologize.
09:47:54 Q. Mr. Harris, do you know who Ghena Nasser is?
09:47:57 A. I do not.
09:47:59 Q. Does this e-mail from Ghena Nasser look like she's requesting credit for someone who was a producer on the song?
09:48:12 MR. FROST: Objection, speculation.
09:48:13 THE COURT: Overruled.

09:48:16 THE WITNESS: It does not.
09:48:19 Q. Do you know who Henry Dessources is?
09:48:21 A. Yes.
09:48:23 Q. Who is Henry Dessources?
09:48:25 A. He, at the time, was Jason's tour manager, and he's a family member.
09:48:32 Q. So looking back at Exhibit 97, if we can -- yeah. Do you see that there is an e-mail from Betsy Whitney at Columbia Records in response to Ghena Nasser's e-mail, then copying Ben Maddahi, Juba Lee, and then on copy is Erick Cruz and Lindy Sevier?
09:48:59 And then going back to page 2, because it starts on page 1 and goes over to page 2, do you see also Brittany Kinsella is copied?
09:49:08 A. Yes.
09:49:08 Q. And the Subject line is "Matthew Spatola *Savage Love* song credits and session reports."
09:49:13 And do you see Betsy Whitney writes back -- I'll try to get the words right. Let me know if I don't. "Hi, Ghena. I unfortunately don't have any oversight of these issues, but I'm adding Ben Maddahi and Juba Lee from the A&R department, hoping they can assist. Columbia Records is closed until January 4th, so we may not be able to address until then. Have a nice holiday."
09:49:41 Do you see that response message?

09:49:43 A. Yes.
09:49:43 Q. What does "A&R" mean?
09:49:46 A. Artists and repertoire.
09:49:49 Q. And what is artists and repertoire?
09:49:53 A. Normally that is the person at a record label who is in charge of, sometimes, setting up sessions. They normally are the people who sign artists initially to record labels.
09:50:05 So you sign an artist, and then it's your responsibility to create sessions with the artist, hook him up with writers and producers. And then you are in charge of -- after those collaborative sessions, after those creative sessions, figuring out the credits, who wrote on records, who engineered records, you know, just every element of the creative and the crediting of the creative.
09:50:29 Q. Thank you, Mr. Harris.
09:50:31 MR. ROSENBERG: So if we go back to page 1 of Exhibit 97, if we can focus on that, please. Thank you.
09:50:40 A. Um-hum.
09:50:41 Q. Do you see --
09:50:42 MR. ROSENBERG: And can you blow it up, please, for the witness.
09:50:49 Q. Do you see, Mr. Harris, that there is an e-mail following the one we just went over, where it says on January 4, 2021, at 11:58 AM, Ben Maddahi from Sony Music wrote, "Happy New Year, Frank. Please see below. Is this accurate? Want to

09:51:10 make sure we are not crediting anyone incorrectly. Thank you."
09:51:15 Did you receive that e-mail?
09:51:16 A. Yes.
09:51:17 Q. And did you understand what Ben Maddahi was asking you?
09:51:23 A. I did.
09:51:24 Q. I couldn't hear you, I'm sorry.
09:51:26 A. Yes, I did, yes.
09:51:28 Q. Thank you.
09:51:30 And you received that e-mail from Ben Maddahi; is that correct?
09:51:32 A. Yes.
09:51:33 Q. And that refers to the other e-mails in this chain that we have gone over in Exhibit 97; is that right?
09:51:43 A. Yes.
09:51:44 Q. So in response to Ben Maddahi's e-mail, did you send an e-mail on Monday, January 4, 2021, to Ben Maddahi, copying Juba Lee, Subject line, "Matthew Spatola *Savage Love* song credits and session reports." "Happy holidays to you as well, and Jason just informed me that this is correct. Thanks."
09:52:10 Did I read that right?
09:52:10 A. Yeah. Yes.
09:52:13 Q. Did you send that e-mail?
09:52:14 A. I did.

Q. When you wrote, "Jason just informed me that this is correct," what were you saying was correct?
A. That the credit that they were asking for was correct. The credit that they asked for in the previous e-mail that was forwarded to me was correct.
Q. Are you referring to the December 19, 2020, e-mail from Ghena Nasser where she makes the request to, "get Matthew's name on official song credits as additional guitar and additional bass"?
A. Yes.
Q. So is that the credit that you were confirming as correct on behalf of Jason Derulo in this e-mail that you sent to Ben Maddahi on January 4, 2021?
A. Yes.
Q. So when you got the e-mail from Ben Maddahi where he forwards it to you on page 1 of Exhibit 97, did you reach out to Jason Derulo and say something to the effect of, "Hey, Jason. Did somebody named Matthew Spatola play additional guitar and bass on *Savage Love*?"
A. Yes.
Q. Do you remember if it was a phone call or an e-mail or a text?
A. I don't. But I mean, we spoke so often, right? So, I mean, you know, I don't remember what it was exactly. I don't remember what it was.

Q. Thank you.

So you had some form of communication with Jason Derulo about Mr. Spatola's requested credit for additional guitar and bass; is that correct?

A. Correct.

Q. I'm sorry?

A. Yes. Correct.

Q. Thank you.

A. Correct.

Q. I'm sorry about the feed and the audio.

A. No problem. Um-hum.

Q. And Mr. Derulo responded to you in a way that caused you to send this e-mail to Ben Maddahi at Sony Music, which you sent on January 4, 2021, on the first page of Trial Exhibit 97; is that correct?

A. Correct.

Q. And you were informing Sony Music of Jason Derulo's approval of Matthew Spatola's request to receive the specific credit of additional guitar and bass on *Savage Love*; is that correct?

MR. FROST: Objection, leading.

THE COURT: Overruled. It's cross-examination.

Q. I'll re-read the question.

And you were informing Sony Music of Jason Derulo's approval of Matthew Spatola's request to receive the specific

credit of additional guitar and bass on *Savage Love*; is that correct?

A. Correct.

Q. Mr. Harris, you testified when Mr. Frost was asking you questions about your experience in the music industry. Do you remember that?

A. Yes.

Q. Do you consider yourself someone as knowledgeable about how credits work in the music industry?

A. Yes.

Q. Do you understand what the credit means "additional guitar and bass"?

A. Yes, I do.

Q. What is that credit, to your knowledge and understanding?

A. Well, you get credit on the song as an additional guitarist or an additional bass player, whatever that is. I mean, you get credit -- because, you know, when you -- there is credits on every song, right, the A&R on the song, the instrumentalists on the song, the producer of the song, et cetera.

So that is a credit that is on the jacket or the sleeve of -- or whatever you want to call it of a song that comes out.

Q. Can you explain what you mean by that, "the jacket or the sleeve"?

A. Well, I mean -- you know, I guess maybe it's not the jacket or the sleeve anymore, right, because we live in a new era. But, you know, whenever a record comes out, there is a list of contributors, right? So there is an executive producer, usually. It talks about, you know, what label the record comes out on. It talks -- it lists quite often the A&Rs involved. The manager could potentially be on it. Produced by is normally on it.

And then also people who played, you know, getting -- additional keyboardist, additional -- whatever it may be, right? So it just kind of outlines all the people and what their contributions were to the record.

Q. Would you agree that those credits were, in the days of CDs and vinyl records, more accurate than they are today in the digital age?

A. I don't know that the accuracy of the credits is different. I mean, the way it's printed is different, but I don't know that the accuracy changes. I mean, I think the accuracy is probably still the same.

Q. Based on your experience, are session musicians sometimes inadvertently omitted from sending information to the record label?

A. I don't know about that. I don't -- I don't know. I don't know.

Q. And if that were to happen, does that indicate to you to

be something nefarious?

A. No.

Q. Mr. Harris, based on all your years of experience in the music industry and your understanding of credits, is the credit of additional guitar and bass the same credit as writing a song?

A. No.

Q. Mr. Harris, based on all of your knowledge and experience in the music industry, is the credit of additional guitar and bass the same credit as producing a song?

A. No.

Q. To your knowledge and understanding, is the credit of additional guitar and bass what is referred to as an instrumentalist credit?

A. Yes.

Q. And is the instrumentalist credit often used for the session musicians on the song?

A. Is the instrumental -- yes.

Q. Other than this e-mail marked as Trial Exhibit 97, do you, Frank Harris -- and other than the e-mails that Ben Hogarth sent with the bounces of each recording session, do you have any personal knowledge of any contributions that Matthew Spatola may have had on *Savage Love*?

A. None.

MR. ROSENBERG: Thank you.

THE COURT: Redirect, Mr. Frost.

REDIRECT EXAMINATION

BY MR. FROST:

Q. Mr. Harris, is it true that the reason you don't have any other information concerning any other contributions from Mr. Spatola is because Mr. Derulo's team never told you of any other contributions?

A. Correct.

Q. And if you -- if he were -- if you were to be provided that information, then that would be something that in the first instance, you would -- would have been in the control of Mr. Derulo, nobody else, right?

A. I'm sorry, I didn't -- can you please ask the question again?

Q. In order for --

THE COURT: Counsel, it's also quite compound, so break it up.

MR. FROST: Okay.

Q. The only -- is it true that the only way you would have known, in the first instance, of the scope and breadth of Mr. Spatola's involvement in *Savage Love* would have been something you would have learned from Mr. Derulo?

A. Correct.

Q. Okay. And so Mr. Derulo was the one who was in control of the flow of that information?

A. Correct.
Q. And when you got -- and when we've looked -- and let's see if I can do it, just for brevity purposes, without pulling it up.
On Exhibit 97, when you got the e-mail, you understood that that was a request, "Please assist in these matters," correct?
A. I'm not sure I understand that question. What do you mean? I'm sorry.
Q. Well, when you -- when Mr. Rosenberg was asking you questions, he was focused on this -- this additional guitar and additional bass credit?
A. Correct.
Q. I'm trying to talk about the body of the rest of the e-mail and the other things that are covered by that.
When you went to Mr. Derulo and you asked him, "Is this accurate" --
A. Um-hum.
Q. -- did you forward him the e-mail? Did you just paraphrase it? What did you tell him you were looking for?
MR. ROSENBERG: Objection, compound.
THE COURT: Sustained.
Q. Let me try it this way: Did you forward him the e-mail?
A. I mean, I guess I did. I mean, I'm sure I did. But I don't remember that I forwarded him the e-mail. I maybe

10:01:56 communicated about it. But I would think that I would have forwarded that e-mail to him.

10:01:59 Q. Okay. So Mr. Derulo saw, as best as you can recall, the entire e-mail, right?

10:02:04 MR. ROSENBERG: Objection, lacks foundation and calls for speculation.

10:02:08 THE COURT: Sustained.

10:02:09 MR. ROSENBERG: Thank you.

10:02:10 Q. Is it your best recollection that you forwarded him the entire e-mail?

10:02:16 A. I mean, you know, I don't have a recollection on if I forwarded him the e-mail or not, right? My guess is that I probably would have, given the circumstance, but I -- I don't -- I assume that I did. Let me say I assume that I did.

10:02:36 Q. Okay. And so I want to --

10:02:38 MR. ROSENBERG: Your Honor -- I'm sorry, Mr. Frost.

10:02:40 Your Honor, I would just move to strike the assumptions and guesses --

10:02:43 THE COURT: Well, the witness clarified. The motion is denied.

10:02:47 MR. ROSENBERG: Thank you.

10:02:48 Q. So I want to be very precise. To the best of your recollection, what did Mr. Derulo tell you was correct?

10:02:59 A. The asks that were in the body of the e-mail.

10:03:02 Q. Okay. And did he specifically say his "this is correct" is limited to additional guitar and additional bass?
10:03:12 A. Well, at the -- well, at that moment, that was the only thing that was on the table in terms of the conversation, so I think he was responding to what was in the e-mail and what the ask was at that moment.
10:03:28 Q. Okay. So just to be clear -- because we can agree or disagree as to what is in the body of the e-mail. I'm just trying to focus on the words that he used.
10:03:38 When he said "this is correct," did he differentiate between additional guitar and additional bass or anything else in the body of the e-mail?
10:03:49 A. I -- I don't remember. I don't remember.
10:03:55 Q. Okay. So do you have a recollection of him saying, "The only thing that is correct is the additional bass and additional guitar"?
10:04:02 A. I don't remember what -- what -- I mean...
10:04:09 Q. Okay.
10:04:09 A. Again, I forwarded the body of the e-mail probably, and then he responded that, and then hence my response. But I don't remember what exactly he was -- you know, what his response was. I don't remember what it exactly was.
10:04:22 Q. Okay. And have you given us, today, your best recollection of the universe of what it is that he said to you in saying "this is correct," or are there other details

you remember we haven't talked about?
A. Are you asking me -- let me just be clear. Are you asking me that recollection-wise, do I only remember what he responded to as it related to the ask in the body of the e-mail? Is that correct?
Q. Correct. Have you told us everything today that you remember about that exchange?
A. Yes.
Q. Okay. And so we talked about -- you talked with Mr. Rosenberg about the difference between an instrumentalist credit and a producer or a writer credit. Do you remember that?
A. Yes.
Q. And those are not mutually exclusive, right? You can be entitled to both in the right situations, right?
A. Correct.
Q. Somebody can be a writer, a producer, an additional instrumentalist. You can -- you can wear all those hats, right?
A. That's correct.
Q. Okay. And when -- you mentioned during your conversation with Mr. Rosenberg that Ben Hogarth had sent the bounces to you after the sessions. Do you remember that testimony?
A. Yes. Yes.
Q. And during the -- when Ben Hogarth was sending you those

10:05:56 bounces, did Ben Hogarth ever mention the name Matthew Spatola as having worked on those portions of the tracks?

10:06:03 MR. ROSENBERG: I would just object under the best evidence rule.

10:06:05 THE COURT: Overruled.

10:06:06 MR. ROSENBERG: Okay.

10:06:08 THE WITNESS: I don't remember him mentioning -- I mean, I don't recall if he had mentioned that or not. But that normally wasn't what Ben would do, right? Ben would just send me the bounces of the record. He didn't really do -- he was an engineer, so he didn't really talk about who was in the sessions, et cetera.

10:06:25 Q. Okay. Understood. But I guess my point is: Outside of Mr. Derulo, nobody else in those sessions told you the name Matthew Spatola either, even though he was there?

10:06:34 A. Correct.

10:06:34 Q. Okay. And at the time you did the deal with Columbia Records, did you have a written agreement for the use of Jawsh 685's track, beat?

10:06:49 A. Before we did a deal with Columbia?

10:06:53 Q. Before.

10:06:54 A. No.

10:06:55 Q. Okay. Was that a "no"?

10:06:57 A. No. No.

10:06:58 Q. Okay. And now I've made the record a mess. Let me try

again because I don't know what the "no" is to. So let me try it again.

At the time that you did the deal with Columbia Records --

A. Um-hum.

Q. -- did you have cleared rights to Jawsh 685's beat?

A. We did not have those rights.

Q. Okay. And that also caused you concern, for the reasons we've already discussed. Is that a fair assumption?

A. It didn't cause me concern when we were entering into a deal with Columbia, it did not.

Q. Why not?

A. So previous to that --

Q. Go ahead.

A. Why not? Because at that point Columbia had acquired the rights. So when Columbia wanted to make a deal with us, Columbia had the rights to make the deal.

Q. Okay. And so we talked about your work generally with, and your knowledge of, issues like session musicians and work-for-hires and things like that. If somebody were doing a work-for-hire with respect to an artist that you had represented, would you advise that artist to get a written work-for-hire agreement?

MR. ROSENBERG: Objection, calls for legal conclusion.

10:08:21 THE COURT: Now he's asking him in his role as a manager on whether he thinks it would be advisable. He's not asking for a legal opinion.

10:08:27 The objection is overruled.

10:08:29 Mr. Harris, you may answer the question.

10:08:32 THE WITNESS: Well, I think, yes, at some point in the process I would. The timing of it, I think, is what may be up for conversation. But at some point, absolutely, you should have deals in place for work-for-hire as well.

10:08:46 Q. All right. Are you aware of whether anybody ever offered Mr. Spatola a work-for-hire agreement or presented one for him to sign at any point in the process relating to *Savage Love*?

10:08:58 A. I'm not aware of that.

10:09:01 MR. ROSENBERG: I'm sorry, Your Honor, I would just object that under the stipulated facts that --

10:09:08 THE COURT: Counsel, this is a speaking --

10:09:10 MR. ROSENBERG: I'm sorry.

10:09:12 THE COURT: In one word, give me your objection, and I'll rule on it.

10:09:15 MR. ROSENBERG: Objection, relevance.

10:09:16 THE COURT: Overruled.

10:09:18 MR. ROSENBERG: Okay.

10:09:19 THE WITNESS: Can you repeat the question, please?

10:09:21 Q. Sure, if I can remember it. Let me see.

At any point, to the best of your knowledge, did anybody present Mr. Spatola with a written work-for-hire agreement?

A. Not to my knowledge.

Q. Okay. And would you consider that prudent to do so, as a manager?

MR. ROSENBERG: Objection. I would just -- this exceeds the scope of the cross.

THE COURT: Overruled.

THE WITNESS: You know, practicality versus prudence. I always feel like anytime you -- you should always dot your I's and cross your T's and do deals to consummate whatever the working relationship is.

Q. And the reason you want to do that is because it is helpful to have clarity as to what people's roles are, and that is how you can clarify to reduce risk, right?

A. Correct.

Q. And you had mentioned that you are aware of the term "session musician"?

A. Correct.

Q. As we sit here today, do you have any independent knowledge as to whether the role Mr. Spatola played with respect to *Savage Love* was merely as a session musician?

A. I have no idea. I have no -- no. I don't know.

MR. FROST: Thank you. I have no further questions.

10:10:55 THE COURT: All right.
10:10:57 MR. ROSENBERG: No further questions, Your Honor.
10:10:57 THE COURT: Mr. Harris, you are excused. Thank you
10:11:00 for joining us.
10:11:02 THE WITNESS: Okay.
10:11:02 THE COURT: All right. Let's -- so we can
10:11:06 disconnect from the Zoom, let's take our first break now.
10:11:09 We'll start again at 10:30.
10:11:11 Members of the jury, remember what I have told you.
10:11:13 Don't discuss the case with anyone, even amongst yourselves.
10:11:22 You are free to discuss anything else, how the Dodgers did
10:11:25 over the weekend or anything else. And don't investigate the
10:11:27 case. Thank you.
10:11:27 (Thereupon, the jury retired from the courtroom.)
10:11:50 THE COURT: Mr. Hogarth is ready, Mr. Werge?
10:11:53 MR. WERGE: I imagine he probably recently arrived.
10:11:56 I will go check.
10:11:58 THE COURT: All right. Anything else before we
10:11:59 break?
10:12:01 MR. WERGE: No, Your Honor.
10:12:02 MR. ROSENBERG: No, Your Honor.
10:12:03 (Thereupon, there was a brief recess.)
10:34:06 (Thereupon, the jury returned to the courtroom.)
10:34:29 THE COURT: Welcome back. All nine of you are here.
10:34:33 Mr. Hogarth is again on the stand. He is still under oath.

Mr. Werge, you may proceed.

MR. WERGE: Thank you, Your Honor.

(CONTINUED) DIRECT EXAMINATION

BY MR. WERGE:

Q. And good morning, Mr. Hogarth.

A. Good morning.

Q. You were Jason Derulo's full-time engineer for five years. You testified about that on Friday, right?

A. Correct.

Q. And did he have any other full-time engineers at this time?

A. Recording, no, it was just me that took care of that. He had other audio engineers for his live shows.

Q. But you also did both recording and live engineering for him, correct?

A. I did. I did help out with the playback engineering. I was in charge of playing songs and also the video formats of shows.

Q. And on tour, in the studio, you were wherever Jason Derulo asked you to be, right?

A. Correct.

Q. Now, you said you worked for him for five years. We are going to play Mr. Derulo's deposition clip. This is page 295, lines 19 through 22.

(Thereupon, the video was played.)

Q. Did Mr. Derulo -- did you only work with Mr. Derulo for a couple of years?

A. No, I worked with him for five years.

Q. Now, you testified on Friday that you didn't remember a number of the sessions. You said you didn't recall a lot of what happened during the *Savage Love* sessions. But you do agree that Jawsh 685 was not a session producer for any of the *Savage Love* sessions, correct?

A. Jawsh 685, he was the original producer of the instrumental that was used for *Savage Love*.

Q. Right. And he wasn't a session producer for any of the *Savage Love* sessions, right?

A. He wasn't at any sessions, no.

Q. So fair to say he wasn't a session producer?

A. Correct.

Q. Okay. Because he wasn't -- he wasn't there at all, right?

A. Correct.

Q. Okay. And I'm not sure if it was when you were on the stand or not, but defendants -- or Mr. Derulo's lawyers have suggested that you were at approximately 60 hours of session time related to *Savage Love*. Do you recall that from your deposition?

A. I don't know the full amount of hours, but if -- I provided all the log sheets that I worked on for the song.

10:37:36 So however many hours it was.
10:37:39 Q. Right. And counsel for defendants have suggested that Mr. Derulo was present for all of those -- all of those hours that you were there?
10:37:50 THE COURT: Counsel, how would the witness know what the lawyers are suggesting? Just ask him the question.
10:37:58 Q. How -- for how much of the hours that you were present in the studio was Mr. Derulo present?
10:38:03 A. From what I remember, he was there for most of the hours. I do remember an afternoon of when they were finishing writing the song, he asked me if I could work on the overall mix of the song, and I was left alone to work on the song one afternoon.
10:38:23 Q. Could you please turn to your deposition. It's in the binder up there. Page 188, lines 8 through 17. You were asked the question, when you were under oath:
10:38:48 "QUESTION: Of those -- of these nine recording sessions, to the best of your knowledge or recollection, Derulo attended each and every one of those nine sessions?
10:38:57 ANSWER: Yes.
10:38:59 QUESTION: And of the 58.5 hours you spent at Derulo's home studio, how many hours would you estimate that Derulo was present?"
10:39:06 And your answer was:
10:39:07 "ANSWER: Probably 50 percent" --

Well, it says:

"ANSWER: Probably 50. He was known for being an hour or two late to every session."

He was only there for half the time you were, right?

MR. ROSENBERG: Objection.

THE COURT: Counsel, the "Probably 50" would appear to be referring -- in reference to your question of 58.5 hours, not 50 percent. There is no percent suggested by this transcript.

Again, this is not related to the testimony he gave. Just please ask the witness directly how -- of the total number of hours of -- at the studio in regard to this song, how many hours would you estimate -- does he estimate that Mr. Derulo was present? And if he gives an answer that you believe is inconsistent, then you may draw the jury's attention to that. That is not what is going on here.

MR. WERGE: My apologies, Your Honor.

Q. So Mr. Derulo wasn't present for all the time, but you testified he was there for most of the time?

A. Correct.

Q. Okay. Now, as to your departure from Mr. Derulo's employment, without telling me what it was, can you please say whether anything ever came to a head or caused friction between you and Jason Derulo?

MR. ROSENBERG: Objection.

THE COURT: As just this one question, and as limited as it was, it's overruled. The jury has some right to know what the relationship is between a witness and a party.

But do you understand how narrow the question is, Mr. Hogarth?

THE WITNESS: Yes.

THE COURT: All right. Then you may answer it.

THE WITNESS: It was for personal reasons. I just didn't want to be on the road anymore, and -- yeah. Just personally, I wanted to be more in the studio and didn't want to be on the road anymore.

Q. But there was friction between you and Mr. Derulo, wasn't there?

MR. ROSENBERG: Objection.

THE COURT: All right. That is -- you may answer this question and only this question.

THE WITNESS: During that time, there was things I didn't agree with, and that led me to the decision of wanting to not be on the road anymore.

Q. And when you were talking about departing, isn't it true that Mr. Derulo berated you over text message?

MR. ROSENBERG: Objection.

THE COURT: Sustained.

MR. ROSENBERG: Your Honor, we would like to play

Mr. Derulo's deposition clip, 296-23 through 297-01. This does not include any objections.

THE COURT: Still, let me look at it.

Now, this -- we have explored this subject to the extent it deserves to be explored. That is -- your request to play this is denied.

Q. During Mr. Derulo's deposition, he identified that he didn't do any business with you, but you did business with him, including signing agreements with him, right?

A. The only document I signed was a nondisclosure agreement.

Q. And did he make everyone on his team sign a nondisclosure agreement, to the best of your knowledge?

A. From what I recall, there was one show that we did at his house, and they were forcing everyone to sign the NDA before they worked on the show.

Q. To the best of your knowledge, are you still subject to that today?

A. Yes.

Q. You testified a lot at your deposition about -- and maybe some on Friday too -- about Jason Derulo being in control of your work. Do you recall that?

A. Yes.

Q. You even testified that Jason Derulo was in charge of a six-hour mixing session that you did by yourself on April 24, 2020, for which he was not even there; isn't that true?

10:43:43 A. I don't recall that time.
10:43:46 Q. Didn't you do certain mixing sessions?
10:43:49 A. There were some moments where he trusted me to be left alone in the room, and I continued to work on the song as I was getting paid during that time.
10:43:59 Q. You made a rough mix probably after -- after the first couple of sessions?
10:44:05 A. Correct.
10:44:05 Q. But to you, even when Mr. Derulo's not there, he's always in charge of what you are doing; isn't that right?
10:44:14 A. Correct. Because I'm getting paid for that time to be there. And as I said before, I'm a service to whatever needs done during the session.
10:44:24 Q. And in your mind, just as Jason Derulo was always in control of you during those sessions, is he still in control of you today?
10:44:35 MR. ROSENBERG: Objection, relevance.
10:44:37 THE WITNESS: No, he's not.
10:44:39 THE COURT: The objection is overruled. The witness -- the answer will stand.
10:44:47 MR. WERGE: All right. Those are all of my direct questions, Your Honor.
10:44:49 THE COURT: All right. Thank you.
10:44:51 MR. WERGE: Thank you, Mr. Hogarth.
10:44:52 THE COURT: Cross-examination.

MR. ROSENBERG: Thank you.

Bear with me a moment, Your Honor and Mr. Hogarth.

Your Honor, may I approach the witness with his deposition transcripts?

THE COURT: You may.

CROSS-EXAMINATION

BY MR. ROSENBERG:

Q. Good morning, Mr. Hogarth.

A. Good morning.

Q. Do you remember the following questions that Matthew Spatola's attorney, Tom Werge, asked you on Friday afternoon, April 24, 2026, when you started your testimony in this case?

A. Yes.

Q. Specifically, Mr. Werge asked you:

"QUESTION: Question for you, Mr. Hogarth. When is the last time you spoke with Mr. Derulo or anyone on his team?

ANSWER: I haven't spoken to any of them. The last time I spoke to Mr. Derulo was 2022.

QUESTION: Has anyone tried to influence your testimony here today, sir?

ANSWER: No."

Do you remember those questions?

A. Yes.

THE COURT: Just a moment, Mr. Rosenberg.

Ladies and gentlemen, despite what might have just been suggested, there is going to be no transcript for your use in this case. The lawyers have a very rough sense of what was asked because of Ms. Diaz's computer, but it's not something you are going to have in the jury room. It's not something that is going to be -- you would have access to.

In your deliberations, if you feel it is very important that you know precisely what a witness said, what the law requires is that you let me know that, you come out here, and Ms. Diaz will read it to you from her computerized notes.

However, there are two big problems with that, bluntly. The first is that the law requires that very large amounts of the testimony of a witness be read. I mean, you might be interested in three questions and three answers, but I'm not allowed to just let those three questions and answers be read to you.

The second thing, of course, is that you aren't seeing the witness testify. One of the reasons that we have trials the way we do is not just so you can find out what a witness previously said, but rather, see and hear the witness testify, and if you are focused on Ms. Diaz's notes, then that -- you don't get the benefit of that.

So therefore, I am telling you now what I will tell you then, which is that I will strongly urge you not to

request that testimony be read. But I -- the reason I'm saying this now is I don't want you to mistakenly think that I'm going to hand you some transcript of what has happened here. That is just not the way the trials work.

All right. Thank you.

Go ahead, Mr. Rosenberg. And in the future, yes, you may -- it exists. I'm not pretending otherwise. But please don't directly quote from the extremely rough version of Ms. Diaz's notes that you have. If you wish to say, "I believe that you were asked" or phrase it in that way, that would be more accurate going forward.

Thank you.

MR. ROSENBERG: Thank you, Your Honor.

Q. Mr. Hogarth, did you appear for a deposition in this case?

A. Yes.

Q. And you have a hard copy of your deposition transcript in front of you in case you need to refresh your recollection in response to the questions that I'm going to ask you. Are you okay with that?

A. Yes.

Q. If there is anything else you need to refresh your recollection in response to my questions, like documents or audio files, will you please let me know?

A. Yes.

Q. Was Plaintiff Matthew Spatola physically present at your deposition in this case?
A. Yes.
Q. Was Plaintiff Spatola's attorney, Tom Werge, at your deposition in this case?
A. Yes.
Q. Was I at your deposition in this case?
A. Yes.
Q. Was Jason Derulo present in any way at your deposition in this case?
A. No.
Q. Were any members of Mr. Derulo's "team" present at any time during your deposition in this case?
A. No.
Q. Did your deposition in this case occur on June 18, 2024?
A. Yes.
Q. Did you ever communicate with me before June -- your June 18, 2024, deposition?
A. I don't recall, besides the subpoenas I received.
MR. ROSENBERG: Your Honor, if I may approach?
THE COURT: You may.
Q. Mr. Hogarth -- I'll say it when I get over there.
A. Okay.
Q. So --
MR. WERGE: I'm just going to object as far as is

10:50:50 this an exhibit?

10:50:51 MR. ROSENBERG: This is to refresh the witness's recollection.

10:50:53 THE COURT: The witness hasn't indicated a need to have his recollection refreshed.

10:50:58 Again, Mr. Rosenberg, please just ask directly the questions. If we need to get into the deposition or how it came -- or what is underlying Mr. Hogarth's presence here today, then of course we will. But for now, just focus on the historical events, which are the basis for Mr. Hogarth being called as a witness.

10:51:24 MR. ROSENBERG: Yes, Your Honor.

10:51:24 Q. And Mr. Hogarth, with respect to whether you and I communicated before your deposition, can you look at page 17, line 3 -- starting at line 3 of your deposition, not -- to refresh your recollection?

10:51:44 MR. WERGE: Objection. The witness does not need his recollection refreshed.

10:51:48 THE COURT: Again, if you believe that he has said something inconsistent with his deposition, then you may point that out, but the question has to come before you do that, and I -- again, I -- the witness isn't requesting to look at his deposition or anything else.

10:52:07 So ask a question. If you believe he testified inconsistently with that, then you can go ahead and read that

snippet to the jury, and the jury will make up its own mind.

Again, I say this to both sides here. You've had a lot of leeway with Mr. Spatola's deposition and Mr. Derulo's deposition because they are the parties, and if they, in this case, testified under oath subject to cross-examine, then you get to use a lot of that, but that doesn't -- that does not extend to these other witnesses.

So please, just use the deposition if you believe that there has been an inconsistent statement made, but otherwise, forget about it. Focus on ask him directly what happened, and if you don't believe the answer is accurate based on the prior testimony, then point that out.

But we are not -- I do not want to hear more questions about, "What did you say at your deposition?" I don't care what he said at his deposition. The jury doesn't care what he said at his deposition. What we care about is what he is saying here live from the stand when the jury can see and hear him.

The only reason to go into his deposition is for the jury to know, as is their right, whether he may or may not, as they decide, have said something inconsistent on the prior occasion.

BY MR. ROSENBERG:

Q. Mr. Hogarth, did you and I ever communicate before your June 18, 2024, deposition?

A. Yes.
Q. And when you and I communicated before your deposition, did we communicate by text message?
A. Yes.
Q. Does this -- did you and I communicate both before and after your deposition in June 2024 about matters that were purely logistical, like how to access documents you produced pursuant to your subpoena, notifying me when you had arrived for your deposition, the scheduling of your testimony for this trial?
A. Can you repeat the first part?
MR. WERGE: Objection, compound.
Q. Yeah. Were our communications purely logistical?
A. Yes.
Q. And in our text messages after June 18, 2024, do I remind you that we have to coordinate with Plaintiff Spatola's attorneys about scheduling your testimony?
A. Yes.
Q. And both Tom Werge and I have also e-mailed you about your availability to testify, correct?
A. Correct. Yes.
Q. The text messages and e-mails that you and I have exchanged are purely logistical, and not about the substance of the case, like your recollection of events regarding *Savage Love*; is that correct?

A. Correct.

Q. Before your June 18, 2024, deposition, sometime in late 2023 or early 2024, did I ever do something, like, for example, have a phone call with you and ask you a bunch of questions for 15 to 20 minutes about your recollection of what Matthew Spatola did during the *Savage Love* recording sessions and the only reason you took the call was because you did not want to get subpoenaed?

MR. WERGE: Objection.

THE COURT: All right. The question is compound, and on that basis, the objection will be sustained.

Q. Mr. Hogarth, in late 2023 or early 2024, did I ever call you and ask you about the substance of your recollection of events from the recording sessions?

A. No.

Q. Did I ever do something like that to you?

A. No.

Q. But there is an attorney in this courtroom who did do something like that to you; is that correct?

MR. WERGE: I'm going to object to the characterization.

THE COURT: All right. The objection is sustained.

I will allow you to ask that question in a less accusatory form, Mr. Rosenberg.

But let me just share something here with you,

ladies and gentlemen. American lawyers talk to witnesses. It is one of the biggest distinctions between the way things are done in England, where the trial lawyers are not expected to talk to witnesses or to their own -- really, to a large degree, their own clients. That is not what American lawyers do.

There is nothing suspect, in and of itself, for an American lawyer to talk to a witness, to prepare a witness to testify, to spend time with a witness, to show the witness documents. And that much more so for the lawyer's own client.

Of course, if the insinuation is being made that those things were done to shape the testimony of the witness, or to have the witness misrecollect something, or God forbid to have the witness lie, then that would be improper, and the other side has the right to point it out.

But there is absolutely nothing wrong with a lawyer calling up a potential witness for a few minutes to find out whether it makes sense to depose that witness, or to call that witness, or frankly, to decide whether the testimony of the witness would be helpful or harmful to one's client. That is just what American lawyers do.

Mr. Rosenberg, you may proceed.

Q. Did an attorney call you in late 2023 or early 2024 before your deposition? Yes or no.

A. Yes.
Q. And this attorney spoke to you for about 15 to 20 minutes; is that right?
A. I don't recall how long the conversation was, but yes, I do remember receiving a phone call.
Q. So page 20 of your deposition, lines 13 through 15.
MR. WERGE: I'm going to object for the purpose of reading the deposition.
MR. ROSENBERG: Your Honor, he said he didn't recall the amount of time.
THE COURT: You may go ahead, Mr. Rosenberg.
Q. Mr. Hogarth, I'll read lines 13 through 15.
"QUESTION: How long was the conversation with Tom Werge?"
That was the question.
"ANSWER: I think 15 to 20 minutes total."
Does that refresh your memory?
A. Yes.
Q. Did Tom Werge question you about the lawsuit that Matthew Spatola had filed in this case against Jason Derulo and Sony Music?
A. I don't recall.
Q. If you go to page 17, lines 17 through 18. Do you see that?
A. Yes.

10:59:23 THE COURT: You may read that, Counsel.

10:59:26 Q. "ANSWER: He initially contacted me about the lawsuit and wanted to question me about it."

10:59:33 That was your testimony?

10:59:34 MR. WERGE: Objection, that is not the complete answer.

10:59:36 THE COURT: Please read the complete answer, Mr. Rosenberg. And this -- I have said this to both of you. It applies to both of you.

10:59:43 Q. "ANSWER: And that was my only time I talked to Tom."

10:59:47 MR. WERGE: That also does not include the middle response.

10:59:52 THE COURT: Mr. Rosenberg, please read the entire answer.

10:59:57 MR. ROSENBERG: Okay. The question was, starting on line 12:

11:00:00 "QUESTION: Tell me about your communications with Tom. And that is Tom Werge, correct?

11:00:05 ANSWER: Yes, Thomas Werge.

11:00:07 QUESTION: Okay.

11:00:08 ANSWER: He initially contacted me about the lawsuit and wanted to question me about it. The only reason why I responded was try -- was to try not to get subpoenaed. And that was the only time I talked to Tom."

11:00:19 THE COURT: "That was my only time that I" --

MR. ROSENBERG: "ANSWER: That was my only time I talked to Tom."

Q. Does that refresh your memory?

A. Yes.

Q. Did I ever have a call with you and talk to you about your recollection of events about *Savage Love*?

MR. WERGE: Objection, asked and answered.

THE COURT: Overruled.

THE WITNESS: No, not a phone call.

Q. Okay. Was there any other form?

A. From what -- I can't remember if it was over text or e-mail, but there were documents that you were requesting for the lawsuit, and I had texted you the -- e-mailed you the link, texted you the password for that link.

Q. Right. So it was a logistical question about how to access documents you produced pursuant to a subpoena?

A. Yes.

Q. Not a conversation that you and I had outside the scope of a deposition or subpoena?

A. Correct.

Q. Okay. Mr. Hogarth, how many years of experience do you have working in the music industry as an audio engineer?

A. Went to college from 2011, 2015, and moved to Los Angeles in June of 2015. So almost 11 years.

Q. Is it fair to say you have significant professional

experience in the music industry?
A. Yes.
Q. As an audio engineer, do you view your work as creative?
A. Yes.
Q. So as the audio engineer on *Savage Love*, did you add creative parts to the song?
A. Yes.
Q. Can you please describe for the jury the creative value that you brought to *Savage Love*?
A. Obviously my job is to record the music, but for me to like have clients want me to call back, I add extra features, like delay throws, different types of -- I don't know how to explain it -- audio that I then record but added to the song. And to me, I see that as creative.
Q. If I may read from your deposition --
THE COURT: Page and line, Counsel?
MR. ROSENBERG: Yes, of course. From page 131, line -- let's start at line 11, to line 21.
THE COURT: You may.
MR. WERGE: I'm going to object to the -- to the scope of this question beyond -- it doesn't pertain to what he did.
THE COURT: Overruled.
Q. "QUESTION: Okay. Did you come up with the ideas for what you did in your work on *Savage Love* or did Jason Derulo?

11:03:21 ANSWER: Jason. For the melody, lyrics, and direction of the song, it was with Jason. As an engineer, I'm able to add different effects from my personal taste, which then Jason will say he likes or does not like. So that is where the creative part comes in under my -- my end, is I add certain effects to the song, and it's usually up to the artist whether they want to keep them or not."

11:03:48 That was your testimony, right?

11:03:50 A. Yes.

11:03:50 Q. So as an audio engineer with 11 years of experience in the creative and collaborating -- collaborative process of making music, is your job just to, quote, press record?

11:04:06 A. I don't think so, no.

11:04:08 Q. When you spent dozens of hours working on *Savage Love* over the course of two months, was your only job to, quote, press record?

11:04:17 A. Technically I'm hired to do that, but for -- personally, I like to add, which sets me apart from other engineers.

11:04:29 Q. So based on your recollection of events at the *Savage Love* recording sessions, was your job as the audio engineer only limited to pressing record?

11:04:41 A. No, I don't think so.

11:04:43 Q. Were you physically present during the entire time Matthew Spatola was at Jason Derulo's home recording studio working on *Savage Love*?

A. Yes, from what I can remember, yes.

MR. ROSENBERG: Your Honor, I would like to play a video from Matthew Spatola's deposition at page 159, line 10 to page 160, line 25, and removing the objection on page 159, line 24 if it's overruled.

THE COURT: All right. I have it here. All right.

You may. The objection is overruled.

(Thereupon, the video was played.)

Q. Mr. Hogarth, do you agree with plaintiff Matthew Spatola's description of your job, where you spent almost 60 hours as the audio engineer on *Savage Love*?

A. No, I don't agree.

Q. Why do you disagree?

A. There is more than what I do than just hit record. Mr. Derulo even asked me if I could mix the song. Unfortunately, he went with someone else, which happens in the music industry all the time.

But for me, I also put on a -- it's called a rough mix. It's before the actual mix is completed. And a lot of times the mix engineer goes off that rough mix as this is the final -- whatever, the final bounce before they receive the mix, and they go off that as a reference, because everyone is happy with the reference mix. And the mix engineer's job, in my opinion, is just make the reference mix a better mix overall.

11:08:35 Q. Thank you.
11:08:37 During the recording sessions for *Savage Love* at Jason Derulo's home studio, was that in Recording Studio A?
11:08:48 A. Yes.
11:08:48 Q. Where did you sit?
11:08:50 A. I sat at the middle of the console, at the helm of the computer, where the keyboard and mouse were.
11:08:58 Q. Do you feel more comfortable referring to it as "the console" or "the board"?
11:09:02 A. They are both the same to me. I'll go with "the console."
11:09:07 Q. Sounds good to me.
11:09:09 In Recording Studio A at Jason Derulo's house, Recording Studio A, is it a big, sprawling room like this courthouse -- or courtroom? Sorry.
11:09:24 A. It's not as big as this courtroom, as the studio is in his guest house and he converted it into a studio.
11:09:30 Q. Can you describe the size of Recording Studio A at Jason Derulo's house?
11:09:34 A. Probably -- probably just as big as this courtroom, honestly, without the door going outside. The console took up the main part of the studio, which then had a live room. If you went straight -- the console is this way. If you're facing that way, the live room is straight into a separate room that you can close off.

Q. So you are sitting at the console. Behind you is a couch, right?
A. Correct.
Q. And in front of you is, I guess, what you refer to as the booth with the sliding glass door; is that it?
A. Yeah, the live room or the booth, same thing.
Q. So is it fair to say when you were running the console in Jason Derulo's Recording Studio A on *Savage Love*, you pretty much saw everything that happened in the studio?
A. For the most part. I don't see what happens behind me, but I do have ears that I can listen to as well.
Q. So that -- including when Matthew Spatola was present?
A. Correct.
Q. Matthew Spatola has testified that while you were working on *Savage Love*, both Mr. Spatola and Jason Derulo stood over your shoulder as equals, with both Mr. Spatola and Mr. Derulo directing and supervising your work. Is that true?
A. No, that's not true.
Q. Based on your experience and everything you witnessed, is Matthew Spatola embellishing or exaggerating his role?
A. Can you repeat that question?
Q. Yeah. When Mr. Spatola -- assume he testified that he and Mr. Derulo stood over your shoulder as equals, directing you and supervising you. Is that a bit of an exaggeration of what Mr. Spatola did during the session?

A. I would say so, yes.
Q. And why do you say so?
A. From what I recall, mostly Jason sat on the couch next to me, behind -- to my right. And from what I remember is Mr. Spatola sat to the left of me.
I don't recall if we did -- which instrument we did first, but I do remember him recording bass to the left of me, and I was able to record where he was sitting. And the acoustic guitar we did in the live room, the booth, and I remember recording him there.
MR. ROSENBERG: Your Honor, I would like to publish Trial Exhibit 12, which has been stipulated into evidence, and I ask that it be moved into evidence.
THE COURT: All right. It has been moved into evidence, and again, because of that, you don't need my permission to publish it. You may use it as you wish.
MR. ROSENBERG: Thank you.
Q. Mr. Hogarth, do you recognize this document marked as Exhibit 12?
A. Yes.
Q. What is it?
A. This is a log sheet I created, and it tells the information of the session.
Q. Was this session log for the session that started on April 22, 2020?

A. Yes, I always put the date. Because sometimes the session will go through the night, so I always put the date on when the session started, which was April 22nd at 9:30 PM.
Q. So in this case, for this session, the session started at 9:30 PM on April 22nd?
A. Yes.
Q. And it lasted until 6:30 AM on April 23rd?
A. Yes.
Q. For a total of nine hours?
A. Yes.
Q. And was this the first session you worked on for *Savage Love*?
A. I believe so, yes.
Q. So to your knowledge, the best of your recollection, did the first recording session for *Savage Love* start on April 22, 2020, at 9:30 PM?
A. Yes.
Q. The recording log identifies the studio as Future History Studio. What is that?
A. I believe that is the name that Mr. Derulo named his studio. For every studio I go to, I try and put the name of the studio. And for the protection of Mr. Derulo, I didn't put his house as reference. I put the name that they called the studio as the studio name on my log sheet.
Q. The next artist, you identify Jason Derulo; is that

right?

A. Yes.

Q. And are there any other names on this recording log sheet?

A. No.

Q. For the song title, you identify *Savage Love*; is that correct?

A. Yes.

Q. During Mr. Werge's examination of you, he showed you a document stating that the first bounce was called *Somebody Else* (TikTok), but on this recording log marked as Exhibit 12, it says *Savage Love*. So did you create this recording log sheet sometime after April 22, 2020?

A. I believe I did, yes.

Q. When did you normally create these recording log sheets for *Savage Love*?

A. I tried to, best that I could, after every session, but obviously, this session ended at 6:30, and it takes me, usually, 20 or 30 minutes to get home. I believe I was too tired to create the log sheet that night, and I believe when I was -- I don't recall when I did this log sheet. If I had my computer, I could show you the date and time.

But I believe after the second session we did the song, that is when the song title became *Savage Love*, and I used that as the song title.

Q. Did you witness any interactions between Jason Derulo and Matthew Spatola during this first recording session on *Savage Love* that started on April 22, 2020, at 9:30 PM?

A. Yes.

Q. Did you witness Jason Derulo singing to Matthew Spatola the notes that Mr. Derulo wanted Mr. Spatola to play on guitar for *Savage Love*?

A. I don't recall specifically what happened. I believe what I recall is Mr. Derulo asked Mr. Spatola to record instruments over certain parts of the song. I don't remember specifically how he did it or how he asked Mr. Spatola.

MR. ROSENBERG: So I would like to read from Mr. Hogarth's deposition on page 63, starting at line 13 and going to line 25.

THE COURT: You may.

Q. "QUESTION: And did you witness Jason Derulo singing to Spatola the notes that Derulo wanted Spatola to play on guitar?

ANSWER: Yes.

QUESTION: Can you describe that process?

ANSWER: Matthew would try something himself, and Jason would tell him, 'Can you play the way he wanted it on the song,' Jason.

QUESTION: And how did he show to Matthew the way he wanted it played?

ANSWER: He was sitting next to him on the couch, and he would sing the melody that -- or the -- yeah, the melody of what Matthew should play."

Do you remember that testimony?

A. Yes.

Q. Does that refresh your memory about what you saw in terms of Jason Derulo singing to Matthew Spatola?

A. Yes.

Q. During this case, plaintiff and his counsel have questioned whether Jason Derulo had the ability to sing chords to Matthew Spatola during this *Savage Love* recording session.

Mr. Hogarth, based on your professional background in the music industry and what you witnessed, can a person sing a chord?

A. A chord consists of three notes, so technically, yes, you can sing the chord out, if you would like.

Q. Mr. Hogarth, is it correct that the root notes are how you find the chord?

A. Yes.

Q. Can you please explain to the jury what a root note is?

A. A root note is -- so, obviously, there is a scale. If you are in B-flat, you can sing all seven notes of that scale. The roots is the 1 of that scale. And as somebody who plays piano -- and I'm in sessions all the time -- that

11:18:51 is how I find the key of a song, is I use GarageBand on my phone, I pull up a piano, and I can play the root note for me to find the key of the song.

11:19:02 Q. So based on your professional background and what you witnessed, did Jason Derulo sing the root melody of what he wanted Matthew Spatola to play on guitar?

11:19:12 A. I don't recall specifically that -- that moment.

11:19:23 Q. Let's go to page 273 of your deposition, starting at line 5, going to line 20, and I'll omit the objection on lines 15 and 16.

11:19:56 THE COURT: All right. You may read that.

11:19:58 Q. Okay.

11:20:01 "QUESTION: So when you testified earlier, I think, under Mr. Rosenberg's questioning, you were testifying that Jason would sometimes sing things for Matty to play. Do you recall that testimony?

11:20:12 ANSWER: Yes. If he wanted it a certain way, he would kind of sing the melody or the rhythm of what he wanted.

11:20:21 QUESTION: Okay. But that's only -- you can't sing a chord, can you?

11:20:26 ANSWER: Obviously you can't sing a chord, but the root notes is how you find the chord. So if you are singing the root melody of what you want, you can figure out the chords from there.

QUESTION: Did Mr. Derulo tell you that?
ANSWER: That is from my personal musical background."
I'll stop there.
So I'll ask the question again.
Based on your professional background, what you witnessed, did Jason Derulo sing the root melody of what he wanted Matthew Spatola to play on guitar?
MR. WERGE: Objection, asked and answered.
THE COURT: Overruled.
THE WITNESS: Yes, I -- I don't -- again, I don't remember specifically what happened, but during -- during the first song, he was -- Mr. Derulo was telling Mr. Spatola what parts he wanted to lay down to what sections. I don't remember or recall if he was singing, you know, the exact melody during that time. I don't -- I don't recall. It was six years ago.
Q. Based on what you witnessed, did Jason Derulo ultimately decide what Matthew Spatola was going to play on guitar during the *Savage Love* recording session that started on April 22, 2020?
A. Can you repeat that question?
Q. Sure. Based on what you witnessed, did Jason Derulo ultimately decide what Matthew Spatola was going to play on guitar during the *Savage Love* recording session that started

11:22:08 on April 22nd?
11:22:09 A. Yes.
11:22:10 MR. WERGE: Objection, foundation.
11:22:11 THE COURT: Overruled. The answer will stand.
11:22:16 MR. ROSENBERG: Thank you.
11:22:16 Q. Did Jason Derulo ultimately decide what Matthew Spatola was going to play on guitar for all of Mr. Spatola's work on *Savage Love*?
11:22:23 A. He definitely led the direction of what Mr. Derulo wanted to have on his song -- can you repeat that question again?
11:22:38 Q. Yeah. No, did Mr. Derulo ultimately decide what Mr. Spatola was going to play on guitar for all of Mr. Spatola's work on *Savage Love*?
11:22:48 A. I think -- again, as a session musician, you are hired to come and play on the song. Whether that is the artist's direction of what everything he plays, I don't think that is correct. I think as a session musician, you come in, you play what you think would sound good here, and under the direction of the artist, he'll agree or not agree.
11:23:18 Q. Did Jason Derulo ultimately decide whether and to what extent Mr. Spatola's guitar parts would be incorporated into *Savage Love*?
11:23:27 A. Yes, he had the final say of what parts were to stay or not stay.
11:23:36 Q. Did you ever see Matthew Spatola overrule Jason Derulo on

what to play on guitar?

A. No.

Q. Did you ever see Matthew Spatola ever overrule Mr. Derulo on anything during any session Mr. Spatola attended on *Savage Love*?

A. No.

Q. So based on what you witnessed, did Matthew Spatola ever make any unilateral creative decisions on *Savage Love* without Jason Derulo's approval?

MR. WERGE: Objection, foundation.

THE COURT: Overruled.

THE WITNESS: No.

Q. Let's look back at Exhibit 12.

Matthew Spatola testified that he came to the *Savage Love* session at around 11:08 PM Pacific Time on April 22nd, and that he was at the session for three hours.

Mr. Hogarth, did this recording session that you have logged as Exhibit 12 finish when Mr. Spatola left at around 2:08 AM on April 23rd?

A. I don't believe so, no.

Q. How much longer did the recording session last?

A. It went through all the way until 6:30 AM that night.

Q. So about four hours?

A. Yes.

Q. So you and Jason Derulo continued working on the song for

four more hours after Mr. Spatola left the session?

A. Yes.

Q. Mr. Spatola claims that the song was done when he left the session. Is that true?

MR. WERGE: Objection, mischaracterization of the evidence.

THE COURT: All right. The jury will recall what it is that Mr. Spatola said.

But for now, I'll allow the question to be asked in that form.

THE WITNESS: I never know when a song is completely finished until the song is ready to get released. I also have no idea what we are working on when I arrive to the studio, and it's whatever the artist wants to work on. That is who I'm there for. So personally, I never know if a song is finished or not after one night.

Q. Mr. Spatola claims that for the three hours that he was present during this first recording session, he created *Savage Love*; is that true?

MR. WERGE: Objection, mischaracterization.

THE COURT: Again, ladies and gentlemen, that will be for you to recall what Mr. Spatola said.

There is a question there regardless of that preface, so Mr. Hogarth, you may answer the question.

THE WITNESS: Can you repeat the question?

Q. Mr. Spatola claims that for the three hours he was present during this first recording session, he created *Savage Love* during those three hours. Is that true?

MR. WERGE: Same objection.

THE COURT: Again, overruled.

Look, let's just do this. Mr. Rosenberg, just ask the question without reference to what he said. Just ask the witness whether that is what the plaintiff did or not.

So we don't need the -- we don't need the preface here on whether or not it was something that Mr. Spatola said. Just ask him whether he -- whether the plaintiff created the song during those three hours.

Q. Mr. Hogarth, did Matthew Spatola write and produce *Savage Love* during the three hours he was present on this first session?

A. No. And I assumed he was a session musician during that first session. And I'm going to say no, I don't think so.

Q. You were at every recording session for *Savage Love*; is that right?

A. Yes.

Q. You had about nine recording logs for *Savage Love*, like this one in Exhibit 12, right?

A. Yes.

MR. ROSENBERG: I would like to move to Trial Exhibit 17, which has been admitted into evidence by

11:27:27 stipulation.

11:27:32 Q. Do you see Trial Exhibit 17, Mr. Hogarth?

11:27:34 A. Yes.

11:27:34 Q. Is this your second recording log for *Savage Love*?

11:27:38 A. Yes, I believe so.

11:27:40 Q. So during your deposition, we were under the impression that there were nine recording sessions for *Savage Love*, but this, this April 23, 2020, recording log shows that there were technically two sessions on one day, one starting at 2:30 and then one starting at 8:00 PM.

11:27:58 So would you agree that there were two sessions rather than just one session with a two-hour break?

11:28:05 MR. WERGE: Object, the document speaks for itself.

11:28:07 THE COURT: Overruled.

11:28:08 THE WITNESS: Yes. I remember this night. Mr. Derulo had to leave, and he wanted to come back. He told me I could leave and get dinner that night and come back.

11:28:21 Q. So not to sound too technical here, there were really 10 recording sessions for *Savage Love*, not 9; is that correct?

11:28:29 A. Technically, I would say 9 still. From this log sheet, there is obviously two different songs. That means we worked on two songs that day. I don't remember when we worked on *Savage Love* during those times, but we did work on *Savage Love* during that time, on that date.

11:28:51 MR. ROSENBERG: Let's look at Trial Exhibit 20,

11:28:54 which has been admitted into evidence by stipulation.
11:29:01 Q. Do you recognize this document?
11:29:02 A. Yes.
11:29:02 Q. And what is it?
11:29:04 A. It's another log sheet that I produced.
11:29:07 Q. And is this the recording log for the third session of *Savage Love*?
11:29:13 A. Yes.
11:29:14 Q. And this session lasted six hours?
11:29:17 A. Yes.
11:29:18 MR. ROSENBERG: Okay. Trial Exhibit 26, please.
11:29:25 Q. Do you recognize this document --
11:29:26 MR. ROSENBERG: This is admitted into evidence by stipulation, Your Honor.
11:29:30 Q. Do you recognize this document, Mr. Hogarth?
11:29:32 A. Yes.
11:29:32 Q. What is it?
11:29:33 A. Another recording log sheet I produced.
11:29:37 Q. Is this your recording log for the fourth session for *Savage Love*?
11:29:40 A. Yes, I believe so.
11:29:42 Q. And this fourth recording session lasted eight hours?
11:29:45 A. Yes.
11:29:50 MR. ROSENBERG: Trial Exhibit 29, please.
11:29:57 Q. Do you recognize this document?

A. Yes.

MR. ROSENBERG: And this is admitted by stipulation, Exhibit 29.

Q. Is this your recording log for the fifth session of *Savage Love*?

A. Yes, I believe so.

Q. And this session lasted three hours?

A. Yes.

MR. ROSENBERG: Okay. Trial Exhibit 30. And this has been admitted into evidence by stipulation.

Q. Mr. Hogarth, is Exhibit 30 your recording log of the sixth session for *Savage Love*?

A. Yes, I believe so.

Q. And this sixth session lasted nine hours; is that correct?

A. Yes.

Q. Was Mr. Spatola there?

A. I don't recall which dates he was there.

MR. ROSENBERG: Okay. Let's do Trial Exhibit 34. This has been admitted into evidence by stipulation.

Q. Mr. Hogarth, what is Trial Exhibit 36 [sic]?

A. It's a log sheet I produced.

Q. Okay. Excuse me, this is Trial Exhibit 34. I misspoke.

And this is your seventh recording session for *Savage Love*?

A. Yes, I believe so.
Q. And this lasted seven hours?
A. Yes.
MR. ROSENBERG: Okay. Trial Exhibit 36. This has been admitted into evidence by stipulation.
Q. Trial Exhibit 36. Do you recognize this document, Mr. Hogarth?
A. Yes.
Q. What is it?
A. A log sheet I produced.
Q. And was this the eighth recording session for *Savage Love*?
A. Yes, I believe so.
Q. And it lasted two hours?
A. Yes.
MR. ROSENBERG: Trial Exhibit 37. This has been admitted into evidence by stipulation.
Q. Mr. Hogarth, do you recognize Trial Exhibit 37?
A. Yes.
Q. What is it?
A. A log sheet I produced.
Q. Is this for the -- is this the ninth recording session for *Savage Love*?
A. Yes, I believe so.
Q. And it lasted seven hours?

A. Yes.
Q. It came up earlier, but Jason Derulo -- you were at every single one of these sessions for *Savage Love*, right?
A. Yes.
Q. And Jason Derulo was also at every single one of these sessions, correct?
A. Yes, I believe so.
Q. At the end of each of these sessions, did you create what is called a bounce?
A. Yes.
Q. What is a bounce?
A. Either can be a WAV or an MP3 format. It's an audio file that is everything that was recorded, put together in the Pro Tools session. It's an MP3 file of that session that I'm able to send out to the artist, or anyone that is approved, of that bounce.
MR. ROSENBERG: If we can go back to -- I think it was Trial Exhibit 34? No, it's maybe 36. No, it's 30, I think. 30. Maybe it's 29. There we go.
Q. Looking at Trial Exhibit 29, this is for the session that occurred on April 29, 2020?
A. Yes.
Q. And do you see the name listed next to Producer?
A. Yes.
Q. What does it say?

A. Phil Greiss. I'm not sure how to pronounce his last name.
Q. Who is Phil Greiss?
A. He is a music producer.
Q. Is he a well-established music producer?
A. Yes.
MR. ROSENBERG: Now let's go to Trial Exhibit 16, which has been admitted into evidence by stipulation. Blow that up.
Q. What is this document, Mr. Hogarth?
A. That is an e-mail that I sent to Mr. Derulo and his manager, Frank Harris.
MR. ROSENBERG: Your Honor, Trial Exhibit 16 is a version of this e-mail without the audio attachment, so I would like to show Trial Exhibit 138, which I don't think has been stipulated to by the parties.
THE COURT: All right. And the -- to the extent that it is somewhat or completely duplicative, the purpose of admitting 138?
MR. ROSENBERG: It shows that there was an MP3 file attached.
THE COURT: I'm looking where it says Somebody Else, and there is the headphones there. All right. If you want it that much, go ahead.
MR. ROSENBERG: Okay. 138, please. And ask --

well, yeah. Blow that up.
Q. Mr. Hogarth, is this an e-mail that you sent on April 23, 2020, at 6:16 AM to Jason Derulo and Frank Harris?
A. Yes.
MR. ROSENBERG: I would ask that Trial Exhibit 138 be moved into evidence.
THE COURT: All right. I just did; otherwise, the jury wouldn't be looking at it. But I'll make it clear that it is in evidence.
MR. ROSENBERG: Thank you.
(Exhibit No. 371 received.)
Q. Mr. Hogarth, do you see that the e-mail attaches the bounce as an MP3 file?
A. Yes.
Q. And this is from the first session of *Savage Love*?
A. Yes.
Q. The working title of the bounce was *Somebody Else* (TikTok)?
A. Yes.
Q. Mr. Werge played the audio of this first bounce with the working title *Somebody Else* on Friday. Do you remember that?
A. Yes.
Q. Matthew Spatola's referred to this bounce as the "April 23rd session file," what you call a bounce.
Do you fix or lock this bounce at the end of the

first session?
A. Yes. It was at the end of the session.
Q. What is the right terminology you would use, "fix," "lock"?
A. Just say "bounced out."
Q. Bounced out?
A. Bounce out the song, yeah.
Q. Okay.
A. Yeah.
Q. And you bounced out this song at around 6:16 AM on April 23, 2020?
A. Yes.
Q. By the way, do you normally refer to a bounce as a "session file"?
A. I would refer that as an MP3. A session file, to me, is more of the Pro Tools, the DAW.
Q. So is what you sent to Frank Harris and Jason Derulo on April 23rd a session file or a bounce?
A. It was a bounce, not a session file.
Q. Okay. Was Matthew Spatola present in the studio when you bounced out this April 23rd -- what he's calling "April 23rd session file"?
A. No.
Q. Was Mr. Spatola -- Mr. Spatola had left the studio several hours earlier, right?

A. Yes.
Q. You and Jason Derulo continued to work on what became the April -- what he's called the April 23rd session file for several more hours after Mr. Spatola left, right?
A. Yes.
Q. So was this April 23rd session file bounced out under Matthew Spatola's authority?
A. No.
Q. Who had authority to bounce out this April 23rd -- what he's calling the April 23rd session file?
A. Mr. Derulo.
Q. Did anyone have authority besides Mr. Derulo?
A. No.
Q. And the second session for *Savage Love*, which was Exhibit 17 --
MR. ROSENBERG: If we could show that real fast.
Q. This second session for *Savage Love* started at 2:30 PM on April 23rd. So that is eight hours after you e-mailed the April 23rd session file, as the plaintiffs refer to it, to Jason Derulo and Frank Harris at 6:16 AM; is that right?
A. Yes.
Q. Jason Derulo was the person who told you to bounce out this file that Mr. Spatola calls the April 23rd session file; is that correct?
A. Yes.

11:38:48 Q. Did Jason Derulo tell you that he intended this, what's referred to as an April 23rd session file, to be the finalized song that was going to be commercially released to the world?
11:39:02 A. No.
11:39:02 Q. Did you ever send this, what's been referred to as the April 23rd session file, to Matthew Spatola for his input?
11:39:09 A. No.
11:39:09 Q. Why not?
11:39:11 A. Under the direction of whoever I'm working with, I always double-check of who is able to receive the files. And the -- what Mr. Derulo and I -- he had told me, and agreed upon, "Please send files or bounces to myself and my manager only."
11:39:34 Q. And that is Frank Harris?
11:39:35 A. Yes.
11:39:36 Q. Did Matthew Spatola ever ask you, Ben Hogarth, to send him this, what he calls the April 23rd session file?
11:39:44 A. No.
11:39:45 Q. Did Matthew Spatola ever ask you to send him any bounces or session files or any recordings from any of the *Savage Love* sessions?
11:39:57 A. No.
11:39:58 Q. Was it your understanding when you e-mailed this, what has been referred to as an April 23rd session file, to Jason Derulo and Frank Harris at 6:16 AM on April 23rd, that this

11:40:06 was the finalized version of the song that you had just
11:40:09 started working on that night?
11:40:10 A. No.
11:40:10 Q. Based on your professional background as an audio
11:40:14 engineer with 11 years of experience in the music industry,
11:40:18 was this bounce, which plaintiff has referred to as the
11:40:22 April 23rd session file, even a finished work?
11:40:25 A. No.
11:40:27 Q. It's just the draft?
11:40:28 A. Yes.
11:40:29 Q. You had nine -- excuse me. I know we disagreed on nine
11:40:35 versus ten. You had eight more recording sessions for *Savage*
11:40:40 *Love* after this first session that resulted in the April --
11:40:43 what he calls the April 23rd session file; is that correct?
11:40:45 A. Correct. Yes.
11:40:46 Q. And there were eight other versions of *Savage Love* after
11:40:51 this session that started on April 22nd, correct?
11:40:54 A. Correct. Yes.
11:40:55 Q. Each version was different, right?
11:40:57 A. To an extent, yes.
11:41:00 Q. So is it fair to say that the bounce that Mr. Spatola
11:41:06 refers to as the April 23rd session file was, like, a first
11:41:09 draft of the song?
11:41:10 A. I would say so. First -- first version of the song.
11:41:13 Q. So, like, a first draft of a novel or a screenplay or a

high school term paper?

A. Correct.

Q. Did Jason Derulo tell you that this bounce that Mr. Spatola calls the April 23rd session file needed more work?

A. I don't recall. Like I said before, I never know when the song is finished until it's -- until I'm told it's ready to be released. And most sessions I did with Mr. Derulo, I had no idea what we were going to work on. Every session I found out during the session. So, yeah.

Q. But you were back in the recording studio with Mr. Derulo just eight hours later, right?

A. Correct. Yes.

Q. So based on that, did you understand the song needed more work?

A. Yes.

Q. Okay. Did Matthew Spatola ever tell you that he intended the first session to result in a finalized song?

A. No.

Q. Did Matthew Spatola have any authority over what was included in any recordings or any versions of *Savage Love*?

A. No.

Q. And is that because Matthew Spatola was a session musician, not a writer or a producer?

A. I assumed -- from previous sessions when I saw

Mr. Spatola, I assumed he was a session musician that Jason wanted live instruments played on his songs.

Q. Did Mr. Spatola ever stick around for a playback of what he refers to as the April 23rd session file?

A. I don't recall.

Q. When you fix this bounce, which Mr. Spatola calls the April 23rd session file, was it a finalized song ready for commercial release?

A. No.

Q. Did Mr. Spatola claim -- excuse me.

You testified last Friday that you play instruments, like the drums, right?

A. Yes.

Q. So we've heard a lot in this trial that Jason Derulo does not play instruments. Mr. Hogarth, based on all that you have witnessed in your 11-year career, your professional experience, all the years that you have worked with Jason Derulo, is Jason Derulo's voice an instrument?

A. Yes.

Q. Based on what you have witnessed, is Jason Derulo's voice an important instrument on his songs?

A. Yes.

Q. For the Jason Derulo songs that you have worked on, do you consider his voice to be one of the more important instruments on the song?

11:43:58 A. Yes.

11:43:59 Q. And based on what you have witnessed and in your experience, is Jason Derulo's voice the driving force of his music?

11:44:13 A. Yes.

11:44:13 Q. Matthew Spatola is an excellent guitar player, do you agree?

11:44:16 A. I agree, yes.

11:44:17 Q. Is there a guitar solo by Matthew Spatola in *Savage Love*?

11:44:20 A. No, there is not.

11:44:21 Q. This past Friday when you started testifying, Mr. Werge had you admit that you are not a musicologist, but then there were some musicological questions based on your professional experience. Do you remember that?

11:44:35 A. Yes.

11:44:35 Q. Mr. Hogarth, based on your professional experience and what you personally witnessed, if you take Jason Derulo singing new lyrics for *Savage Love* and compare it to Matthew Spatola's playing guitar, which of the two added more value to the preexisting instrumental *Laxed (Siren Beat)* by Jawsh 685?

11:44:56 MR. WERGE: Objection, seeks expert opinion.

11:44:58 THE COURT: Yeah. Sustained. And it's an ultimate issue for the jury.

11:45:10 Q. Mr. Hogarth, for the musical composition of *Savage Love*,

11:45:16 it is your testimony that what Matthew Spatola played on guitar is almost completely identical to Jawsh 685's instrumental, *Laxed (Siren Beat)*, correct?

11:45:27 MR. WERGE: Objection, seeks expert --

11:45:28 THE COURT: As to this, overruled.

11:45:30 THE WITNESS: Technically, the song is four chords throughout the entire song -- can you repeat the question?

11:45:41 Q. Yeah. Let me -- so let's go to page 191 of your deposition.

11:45:47 MR. WERGE: Objection. The witness does not need his --

11:45:50 MR. ROSENBERG: I'll read it as I asked in deposition.

11:45:53 THE COURT: Let me take a look at it.

11:45:53 (Pause in proceedings.)

11:46:20 THE COURT: And what is it that you --

11:46:23 MR. ROSENBERG: I'm trying to get to the answer on line -- that starts on line 24 of page 191.

11:46:35 THE COURT: Again, this -- the jury -- this comes close to asking for his opinion as to who should win this lawsuit, and therefore, I think would be -- would not be appropriate. So no, you may not read that, but you may continue asking your questions.

11:46:55 Q. Have you ever received credits for working on songs with Jason Derulo?

A. Yes.
Q. What type of credits?
A. Engineer, engineered by, recorded by. I believe mixed by as well.
Q. When you worked with Jason Derulo, did you consider yourself the creator of the songs?
A. No.
Q. Would you consider yourself a collaborator on the songs?
A. I think so, as the engineer.
Q. Can you explain the difference -- based on your experience, the difference between a creator and a collaborator in the music industry?
A. A creator is someone that --
MR. WERGE: I'm going to object. Again, this seeks either expert testimony or something outside the scope.
THE COURT: Overruled. And it's not outside the scope.
Go ahead. You may answer the question, Mr. Hogarth.
THE WITNESS: I would say a creator is someone that creates the song, the melody, the rhythm, all of that. Collaborators, they can also be creatives if they together -- create the song together as collaboratives.
But collaboratives basically means you are working with someone else on the song, whether that is a producer or a writer, an artist, yeah.

Q. So would you agree that every creator is a collaborator, but not every collaborator is a creator?
A. Technically, it could be that way. It just depends on if the song was created while they were both in the room, if it was -- yeah, technicalities, I guess.
Q. Based on your experience and what you witnessed, did Jason Derulo have control over the people who worked on *Savage Love* at his home recording studio?
A. Yes.
Q. Did Jason Derulo have control over the work that you did during *Savage Love* during the recording sessions?
A. Yes.
Q. Based on your experience and what you witnessed, did Jason Derulo have control over the work that Matthew Spatola did during the *Savage Love* recording sessions?
A. Yes, I believe he would have the final say.
Q. Let's look at page 40 of your deposition transcript.
MR. ROSENBERG: Your Honor, this is page 40, lines 2 through 11.
THE COURT: We've just went over that, and I don't see the need to read this, so your request is denied.
MR. ROSENBERG: Okay.
Q. Mr. Hogarth, do you have experience working with music producers?
A. Yes.

Q. We've heard the term "session musician" during your testimony. Based on your knowledge and experience, what is a session musician?

A. To me, a session musician is a work-for-hire. They agree upon a certain rate, and they come in and provide services, whatever is needed.

Q. When you used the term "work-for-hire" in your testimony, do you mean a work made for hire as defined and interpreted under the United States Copyright Act?

A. I'm not sure what that Copyright Act is -- yeah.

Q. Have you had any formal legal education or training?

A. I went to college for music production. I'm not sure what your question is.

Q. Did you go to law school?

A. No.

Q. Okay. So do you know, like, 17 U.S. Code Sections 101 and 201 of the United States Copyright Act?

A. No.

Q. Thank you.

And have you worked with session musicians before?

A. Yes.

Q. Do you have experience with credits in the music industry?

A. Yes.

Q. Based on your experience, what is the difference between

a credit for producing a song versus a credit for playing guitar on a song?

A. Credit for producing is someone that kind of is in -- not in charge, but they are in charge of what is the production value overall of the instrumentation. They could put input on -- with the artist as well.

And then if I see a credit for someone that played an instrument, I assume that is all they did, was play the instrument on the song.

Q. Have you ever received credit for writing a song?

A. No.

Q. Based on your knowledge and experience, what is the difference between producing a song and writing a song?

A. Producing, again, more leans towards the instrumentation, but also the overall say of the song, and a writer -- or writing credit tends to lead towards lyrics, melodies, that are put on the song.

Q. Did you personally witness Matthew Spatola write or cowrite the song *Savage Love*?

MR. WERGE: Objection, ultimate issue.

THE COURT: Overruled.

THE WITNESS: No, I saw him play instruments on the song.

MR. ROSENBERG: Let's go to page -- and if Your Honor thinks it's not a clarification, page 43 of

Mr. Hogarth's testimony, lines 21 through 23.

THE COURT: I don't see the need for this in the way you phrase your questions.

MR. ROSENBERG: Okay. Thank you.

Q. Mr. Hogarth, based on your experience and what you witnessed, did Matthew Spatola write or cowrite the musical composition of *Savage Love*?

MR. WERGE: Objection. Ultimate issue and asked and answered.

THE COURT: Overruled.

THE WITNESS: No, the instrumental was already done before we began working on the song.

Q. What do you mean by that, "the instrumental was already done"?

A. What we used was an instrumental -- the music, it was already out in the public, and we used that -- what was out in the public to start the song.

Q. And is the thing you are referring to "out in public" *Laxed (Siren Beat)* by Jawsh 685?

A. Yes.

Q. Based on your experience and everything you witnessed, did Matthew Spatola produce or coproduce the song *Savage Love*?

A. No.

Q. Based on your experience and what you witnessed, did

Matthew Spatola produce or coproduce the musical composition of *Savage Love*?
A. No.
Q. Based on your experience and what you witnessed, did Matthew Spatola produce or coproduce the sound recording of *Savage Love*?
A. No.
Q. Mr. Hogarth, to your knowledge, and based on what you personally witnessed in the recording studio, what you witnessed, did Matthew Spatola work as a session musician on *Savage Love*?
A. Yes, that's what I assumed he was there for when he was there doing sessions.
Q. So I want to focus on what you witnessed, not just your assumptions. But I understand that is part of what you may have witnessed.
Based on what you witnessed, did Matthew Spatola work as a session musician on *Savage Love*?
A. Yes.
MR. WERGE: Objection, asked and answered.
THE COURT: Overruled.
THE WITNESS: Yes.
Q. Why is that your view?
A. I think that is just, like, a music industry thing, and that being a session musician is a music industry -- it's a

11:55:32 standard to it. There is a way that the business is done with that as well.

11:55:37 From other songs that Mr. Spatola has -- had came in to play instruments on, I assumed this was another song that Mr. Derulo had asked him to play instruments on.

11:55:49 Q. Mr. Hogarth, earlier, you talked about four chords. Do you remember that?

11:55:53 A. Yes.

11:55:54 Q. Can you explain that for the jury, please?

11:55:58 A. In pop music, modern music, a section, maybe a verse, another section, the chorus, can contain four chords. That is mainly pop music. And each bar depends on how long the chorus might be. It might be eight bars, which is four chords in one bar over eight times. Another section of the song could be different chords, four different chords. But for this song, it was only four chords throughout the entire song.

11:56:38 Q. So was anything originally done on *Savage Love (Laxed - Siren Beat)* with respect to those four chords or did they already exist in *Laxed (Siren Beat)*?

11:56:51 A. They already existed in the *Laxed (Siren Beat)*.

11:56:53 Q. Bear with me. Sorry.

11:56:53 (Pause in Proceedings.)

11:57:12 Q. Mr. Hogarth, based on what you witnessed -- what you witnessed, and your 11 years of professional experience, do

you believe that Matthew Spatola is entitled to receive producer credit on *Savage Love*?

A. As a work-for-hire, and business practices of the music industry, session musicians usually don't receive percentages of a song.

MR. ROSENBERG: Okay. Can we look at page 192, lines 10 through 14, please.

MR. WERGE: Your Honor, this is not inconsistent.

THE COURT: Yeah, I agree. Let's move on.

MR. ROSENBERG: Okay.

Q. So what you witnessed, and based on your experience, Matthew Spatola is not entitled to producer credit on *Savage Love*; is that correct?

MR. WERGE: Objection, ultimate issue, and asked and answered.

THE COURT: Overruled.

Again, it's the -- I won't allow an answer on something which is directly what the jury is going to decide, but when it's phrased in terms of what is customary in the music industry, which this witness and all the other -- and many other witnesses are in a position to testify to, then I'll allow that to be asked.

You may answer the question, Mr. Hogarth.

THE WITNESS: Can you repeat the question?

Q. Yeah. So Mr. Hogarth, is it correct that you believe

Mr. Spatola was not entitled to receive producer credit on *Savage Love*? Is that correct?

A. Correct.

Q. Why not, based on what you witnessed and your experience?

A. Like I said, it's not a normal thing for session musicians, a work-for-hire -- including myself as an engineer, it's not normal for a work-for-hire to receive percentages on a song because we are agreeing to be paid for -- in compensation for our time and our expertise.

So as a session musician, I don't think so, no.

Q. And again, when you use the term "work-for-hire," are you using that term as it is defined in the law?

A. I don't know the law specifically, but I believe so.

Q. Is "work-for-hire," in your experience, just a common parlance in the music industry?

A. Yes.

Q. That everyone, non-lawyers alike, use?

A. Work-for-hire -- work-for-hire --

MR. WERGE: Object, Your Honor. At this point we are getting into an issue for the jury.

THE COURT: Overruled.

Q. Mr. Hogarth, based on what you witnessed and your experience, do you believe that Matthew Spatola is entitled to receive songwriting credit on *Savage Love*?

MR. WERGE: Objection, ultimate question, and asked

and answered.

THE COURT: Overruled.

THE WITNESS: I'll say no, because songwriting is usually more towards the melody and the lyrics of the song.

Q. And the melody was preexisting, do you agree with that, from *Laxed (Siren Beat)*?

A. There is certain sections that Mr. Derulo followed the exact melody of the instrumental, but there is other sections that were other melodies.

Q. So based on your -- what you witnessed and your experience, why is it your view that Mr. Spatola is not entitled to receive songwriting credit on *Savage Love*?

MR. WERGE: Again, Your Honor, objection, ultimate question.

THE COURT: Overruled.

THE WITNESS: Again, I assumed he came in as a session musician, so... And again, a session musician, in my eyes, usually doesn't receive credit or percentages -- or not credit, percentage on the song.

Q. Mr. Hogarth, are you aware that Matthew Spatola was credited for additional guitar and bass on *Savage Love*?

A. I have not seen the credit page in a while. I'm not exactly sure what Mr. Spatola is credited on.

MR. ROSENBERG: Can we please turn to page 191, lines 10 through 13 of the deposition.

And may I read that, Your Honor?

THE COURT: You may.

MR. ROSENBERG: Thank you.

Q. "QUESTION: And are you aware that Matthew Spatola was credited for additional guitar and bass on *Savage Love*?

ANSWER: Yes."

That was your deposition testimony. Do you remember that?

A. Yes. Yeah.

Q. Okay. Based on what you witnessed and all your 11 years of professional experience in the music industry, does the additional guitar and bass credit that Mr. Spatola received on *Savage Love* properly credit him for the work he performed on the song?

A. Yes, I believe so.

Q. Why do you believe so?

A. Mr. Spatola was the one that played acoustic, electric guitar, and bass guitar, so he should be credited for those.

Q. Mr. Hogarth, do you have any financial interest in the outcome of this case?

A. No.

Q. Do you have a dog in the fight?

A. No.

MR. ROSENBERG: Thank you.

THE COURT: All right. Let's stand and stretch,

ladies and gentlemen, while Mr. Werge prepares his redirect.

You may be seated.

Members of the jury, I want to -- before -- I want to remind you of something before we have the redirect and the recross. And that is, as I mentioned to you last week, you will be asked, in the alternative, whether Mr. Spatola has proven that he is entitled to be viewed as a joint author of that recording which has been variously referred to here as the April 23rd session recording or the bounce.

So if -- again, this is all -- I don't mean to imply that I have any view as to what you should do at all, but if you should determine that he is not a joint author of the entire composition or the entire sound recording, then you would be asked whether, in the alternative, he has -- he is a joint author of that particular recording.

And so I'm just saying this right now to remind you that that is an issue in the case.

All right. Mr. Werge, you may proceed.

MR. WERGE: Thank you.

REDIRECT EXAMINATION

BY MR. WERGE:

Q. So Mr. Hogarth, when you testified on Friday, you identified that you didn't recall a lot about the various *Savage Love* sessions. Do you recall testifying about that?

A. Yes.

Q. And would it surprise you that during your deposition you said the words "I don't recall" 104 times?

MR. ROSENBERG: Objection, Your Honor, this is outside the scope.

THE COURT: No, it's not. Overruled.

THE WITNESS: Like, during the deposition, that was 2024, that was four years ago when the song happened, and now it's six years since the song has happened. And I've done many sessions in between those dates as well.

So a lot of -- a lot of my past work -- even looking at the recording log sheets, a lot of memories are being brought up because of the times -- I do remember this time, being there that afternoon. But it was six years ago, so, yeah.

Q. And you don't even remember how many of the sessions that Mr. Spatola was at, from your own recollection, right?

A. I want to say two or three. Definitely two sessions, but I don't recall the specific sessions he was at.

Q. Okay. Let's take a look at your deposition transcript, page 187, through -- 24, through 188, at 5.

You were asked the question:

"QUESTION: To your knowledge, of these nine different recording studios for *Savage Love* that you attended at Jason Derulo's home recording studio, how many sessions did Matthew Spatola attend?"

Your answer:

"ANSWER: I don't recall. I want to say three to four times."

You worked on over 500 songs with Mr. Derulo during your five years with him, didn't you?

A. Correct.

Q. And anything about specific sessions, fair to say, because of the volume, it's a blur?

A. There is some songs I look at and I don't remember what the song sounded like, because there has just been so many songs created. But that's why I -- I'm always able to go back and look at log sheets, look at the sessions, and remember from there.

Q. Well, it's a blur, and you don't remember, some of the things that you recounted under examination from Mr. Rosenberg, whether those were at any of the specific sessions for *Savage Love* or whether those were different times, right?

A. Correct.

Q. Now, you didn't list Matthew Spatola on the log sheets for the sessions that he was at, right?

A. Correct.

Q. And you acknowledge that you should have, right?

A. I probably should have, yes.

Q. And that was an oversight on your part, right?

12:08:01 A. Correct.
12:08:01 Q. Did Jason Derulo instruct you to keep him off of those log sheets?
12:08:06 A. No, never.
12:08:06 Q. And you talked about your creative contributions as an engineer earlier, right?
12:08:17 A. Correct.
12:08:17 Q. Those creative compositions, you talked about affecting -- putting effects on various tracks?
12:08:31 A. Correct.
12:08:32 Q. And you talked about mixing, right?
12:08:33 A. Correct.
12:08:34 Q. That's not compositional work for which you would generally get credit as part of the songwriting, right?
12:08:43 A. No. Usually those credits are recording, engineered, or mixing.
12:08:49 Q. Okay. And do you recall you testified about -- Mr. Derulo's lawyer asked you about the locations of the two individuals at the recording -- at the first recording session?
12:09:03 A. Yes.
12:09:04 Q. Where Mr. Derulo was and where Mr. Spatola was. Do you remember your testimony on that on redirect -- or, sorry, on cross-examination?
12:09:12 A. Yes.

Q. Okay. And do you recall at the beginning of that session that you put in the kick drum?

A. I don't recall.

Q. Do you recall that you got that from another of Jason Derulo's works called *Swalla*?

A. Yes. Yeah.

Q. And you added that kick drum in, right?

A. Yes, under the direction of Mr. Derulo.

Q. Right. And during that time, you just testified earlier that Mr. Spatola was to your left and Mr. Derulo was to your right?

A. Correct.

Q. And they were standing over your shoulders while you added that kick drum in, weren't they?

A. I don't recall.

Q. And you admit that Mr. Derulo was never completely in charge and that Mr. Spatola had some control over what was -- what occurred during the sessions, right?

MR. ROSENBERG: Objection, mischaracterizes the testimony.

THE COURT: That is for the jury to decide. Overruled.

THE WITNESS: I would say no. I would say most of the session was under the direction of Mr. Derulo.

Q. Mr. Derulo was not completely in charge. You admit that

Mr. Spatola was also in charge, correct?
A. No.
Q. Okay. Please turn to page 64 of your deposition, line 22, through 65, line 5.
The question --
THE COURT: You may go ahead and read it.
MR. WERGE: Thank you, Your Honor. My apologies.
MR. ROSENBERG: I'm sorry, which line on page 64?
MR. WERGE: 22.
Q. "QUESTION: Jason Derulo was completely in charge of what Spatola played on guitar during this recording session on *Savage Love* that started on April 22, 2020, to your knowledge, correct?"
Do you see that?
A. Yes.
Q. Okay. And that is what Mr. Derulo's lawyer asked you?
A. Yes.
Q. Okay. And then your response:
"ANSWER: Not 100 percent. It was what Matthew thought needed, and then Jason would tell him a certain way of how he would want Matthew to play on the song."
Right?
A. Correct.
MR. ROSENBERG: Your Honor, could he please read --
THE COURT: No, you may bring that up. The answer

is complete as the witness gave it. You may read the further section when you have your recross.

Go ahead, Mr. Werge.

MR. WERGE: Thank you, Your Honor.

Q. Can you describe generally the process by which Mr. Derulo records his vocals?

A. It depends on the song. If they need the right to it, if it's already -- have a reference track, already has something written to it, either Mr. Derulo will go in there -- into the vocal booth, try specific melody lines without any lyrics to try and create the melody, and from there, he'll piece together which melodies he likes for the section.

And then from there, he'll write the lyrics -- usually not in the live room, in the console room, and then once the lyrics are figured out, he'll go back into the live room and rerecord with the lyrics -- yeah, that is, for the most part, how he would do it.

Q. And for *Savage Love*, Mr. Derulo spent a lot of time on the vocals and the lyrics, right?

A. Correct.

Q. And he did things like ad-libs. What are ad-libs?

A. Ad-libs are like a lead vocal but something added on top of the lead vocal.

Q. And he added harmonies, right?

A. Correct.

Q. Fair to say that most of the session work that you did with Mr. Derulo was focused on his vocals for *Savage Love*?

A. Most of it, yes.

Q. Now, as to the instrumental portions of *Savage Love*, you will agree that after the first session, the format of the song had been created and was set, right?

MR. ROSENBERG: Objection. The ultimate issues objection has been made, so...

THE COURT: Overruled.

THE WITNESS: I think the idea of the structure was put together. Of course, I never know when it will be the final structure until I'm told, "This is ready to be released."

Q. You can't identify a single thing here, sitting on the stand, as to the structure that changed between that first session and the final work that was put out, right?

A. Yes.

Q. Yes, you can't identify anything?

A. No, I can.

Q. Okay. What can you identify? What was changed for the structure?

A. The song was the Jawsh 685 instrumental used. What was taken out from the instrumental was the prechorus, and the first four bars of the actual chorus of the instrumental was taken out. Also, the bridge of the song was, I believe,

taken out as well.
Q. And that was all done at that first session between April 22nd to 23rd, 2020, correct?
A. For the most part, yeah.
Q. Any of those things that you just identified, can you identify any of them that were done after that first session?
A. I -- I can't recall when the bridge was figured out, if it was the first session. But the prechorus and the first four bars of the chorus were done at that first session.
Q. Right. And as to the prechorus and the chorus, those are the sections that you just testified that the sample was completely removed, right?
A. Correct.
Q. And from an instrumental standpoint, what was put in in place of Jawsh 685's sample?
A. I believe it was acoustic guitar, electric guitar, and the bass guitar. And from what I remember on Friday, there was a snap -- or a clap put in there.
Q. And Mr. Spatola was the creative force behind putting all of that into those two sections of the song; isn't that right?
A. Yes, it was his instrumentation that he put down.
Q. And remember how you testified that a song can be created in 30 minutes and released the next day?
A. Yes, it is possible.

Q. So an instrumental for a song can certainly be created within three hours, right?

A. I believe so, yeah.

Q. Now, you testified under examination from Mr. Derulo's lawyer that Mr. Derulo was present at every -- every session?

A. Yes.

Q. But that's not true, is it? Because on April 24th, you were working, to the best of your knowledge, alone, right?

A. During that song, there was multiple hours I was left alone to continue working on the song, and I do remember being alone in the studio during those times.

Q. Okay. And to the best of your knowledge, you believe that you were alone for that session?

A. Not the entire session, no.

Q. You were alone except for when Jason came in to listen to the rough mix that you had created, right?

A. Correct.

Q. And that was a six-hour session?

A. I believe so. I don't remember which session specifically.

Q. You mentioned Phil Greiss briefly. How many sessions did Mr. Greiss attend?

A. I for sure remember one. It could be two. But I do remember him being at one of the sessions.

Q. Okay. And there was a lot of work done when Mr. Greiss

wasn't there, though, right?
A. Correct.
Q. And you would agree that, you know, whether someone should be designated as a producer, there is no relation to the number of sessions that they are at, right?
A. Correct. It's what they provide for the song, at the end of the day.
Q. And you can be a writer if you are not even there, right?
A. Technically, yeah.
Q. Like JKash, right? He wasn't at any of the sessions, right?
A. Correct. He wasn't at any of the sessions.
Q. He owns 20 percent of the composition?
A. I'm not aware of those splits.
Q. Now, you are not involved with crediting anyone involved in a studio session, right?
A. No.
Q. That's not part of your job. You don't decide who gets credit or not, right?
A. Correct. That's not my job.
Q. Who solely decides who gets credit?
A. If they are signed with a label, usually someone from the label will put together the credit list. I'm not 100 percent sure who is in charge of it, at the end of the day. I guess it's based on whoever is putting the credit list together,

and I'm assuming the artist and their team are in charge of giving the credits to whoever needs it to input them into the -- however they are listed with credits.

Q. And the artist here for *Savage Love* was Jason Derulo, right?

A. Correct.

Q. Right?

And he was not signed to any label at the time of those recording sessions, correct?

A. Correct. I believe so.

Q. All right. You -- I believe you testified that you have received some copyright ownership for some of the works that you have helped create, a point, half a point, somewhere?

A. Yes, I have received percentages. Yeah.

Q. And -- and those are given for your creative contributions, right?

A. Correct.

Q. Mr. Derulo never gave you a point or half a point for anything you worked on with him, right?

A. Correct. I never received a percentage.

Q. And the reason you get -- or that you have in other instances, you know, received a portion of the copyright ownership is because you are creating, right?

A. Correct.

Q. Right. You are a creator, right, in those instances?

A. In those instances, yeah.
Q. Back to Mr. Greiss.
Did Mr. Greiss tell Jason Derulo what to do on *Savage Love*?
A. No.
Q. He never would do that, would he?
A. It would come off as disrespectful if you are a producer telling the artist what to do. But that is built on the relationship you have with an artist if you are a producer -- yeah.
Q. Do you agree that the instrumental rhythms that Mr. Spatola created on his acoustic guitar in the prehook section did not exist in *Laxed (Siren Beat)* before he created them?
A. Correct.
Q. Do you believe that the syncopated rhythms that Mr. Spatola created in the first section did not exist before he created them on *Savage Love*?
A. The original instrumentation does have something playing on the ands of the bars, so I believe that was already there for the verses.
Q. You are talking about the offbeats (singing)?
A. Yes.
Q. What about the syncopated parts (singing), they weren't there, were they?

A. I don't believe so, no.

Q. And you know nothing about the business deal between Mr. Spatola and Mr. Derulo, and that is why on Friday, you admitted that you didn't know if he was a producer or a session musician or *Savage Love*, right?

A. Of course, I don't know. I'm not in charge or a part of who gets the splits. That is what they call it in the music industry, the percentages of the songs. And from -- during that time, during the sessions, I had assumed that Mr. Spatola was a session musician hired for the song itself, based on Mr. Spatola coming in and playing on various other songs for Mr. Derulo.

Q. So let me ask you that. So you have personal knowledge of Mr. Spatola playing prior to the *Savage Love* sessions on other sessions with Mr. Derulo?

A. I don't recall if it was prior to *Savage Love*, but he had played on multiple other songs for Mr. Derulo.

Q. Are you aware that Mr. Derulo is not claiming that Mr. Spatola is a session musician for those subsequent sessions?

A. I was --

MR. ROSENBERG: Objection.

THE COURT: Again, the objection is sustained. This witness would have no way of knowing that one way or the other, and it's getting into a legal position as well.

MR. WERGE: The Court's indulgence one moment?

THE COURT: You may.

(Pause in proceedings.)

Q. Mr. Hogarth, you are working from the assumption that Mr. Spatola was a session musician because you don't know whether he was or not?

A. Before the session, during and after, I never knew the -- what they decide on. I just assumed -- as someone who comes in and plays instruments on the song, I assumed they are a session musician.

Q. Just because he was playing guitar, you assumed he was a session musician?

A. Yes.

MR. WERGE: Okay.

THE COURT: All right. We are going to take our second break, members of the jury. Let's come back at 12:50. Remember what I told you. Don't discuss the case, and don't investigate the case.

Thank you.

(Thereupon, the jury retired from the courtroom.)

THE COURT: All right. Mr. Hogarth, you may step down. And if you would step outside for a moment, please.

Counsel, I'm trying to draw a consistent line here with these witnesses who, of course, are very sophisticated in the music industry, the plaintiff and the defendant,

obviously, and then Mr. Harris, Mr. Hogarth.

I won't let a witness testify to a legal conclusion. I won't let a witness testify to a formal musicological opinion. There is other -- I'll give the jury the law; you will be free to argue it. We are going to have three experts in regard to the musicology.

So the question, then, is where in between those is it just too much? And here, I did contradict myself in making the rulings in regard to Mr. Hogarth. But just so you understand what my thinking is, he, obviously, I think is free to testify as to what he was thinking at the time, and why. And that was brought out both on the cross and on the redirect, that it was ultimately based on his assumption that Mr. Spatola was a session musician. And I think that is appropriate.

So I will -- both sides have been eager to draw on, with the witnesses, their familiarity with the music industry. And part of it is inherent in the case, because the jury is going to be asked a specific legal question: Is Mr. Spatola a coauthor? But what he really wants is to be regarded as a producer, so...

And those are not necessarily the same things. It's just one is a creature of the music industry, and the other is a legal determination under the Copyright Act.

So I will do my best to be consistent in this. And

12:27:56 I would rather the jury get more information rather than less. But like I said, at some point if it strikes me, perhaps just on the wording of that particular question, that it's just gone too far or might mislead the jury, then I'll sustain an objection.

12:28:11 So you have the obligation to make objections if you believe that something is objectionable, and I'll do my best to be consistent on how I rule on those objections. Not just with Mr. Hogarth, but with the other witnesses as well.

12:28:27 Is there anything before we break?

12:28:32 MR. WERGE: No, Your Honor.

12:28:33 MR. ROSENBERG: Your Honor, I know I brought this up before, but the parties stipulate that there was no written agreement between Jason Derulo and Matthew Spatola, so I don't know why it keeps getting brought up.

12:28:47 THE COURT: Well, there is a number of reasons, which, frankly, I view as quite obvious as to why it's being brought up. So whether or not I include that language, which is in the model instruction, in the final jury instruction or not, both of you will have the chance to be heard on fully. But it certainly is something that he is entitled to bring up. Whether it helps or hurts with the jury, ultimately, I'm not sure, but it's indisputably something that he gets to -- that he gets to ask.

12:29:20 MR. ROSENBERG: Thank you.

12:29:21 (Thereupon, there was a brief recess.)

12:57:09 (Thereupon, the jury returned to the courtroom.)

12:57:12 THE COURT: Welcome back. All nine of you are here. 12:57:15 The witness is on the stand, still under oath.

12:57:18 Yes, Counsel?

12:57:23 MR. ROSENBERG: Is it my turn?

12:57:24 THE COURT: Mr. Werge, are you concluded or not?

12:57:26 MR. WERGE: Yeah, we concluded.

12:57:27 THE COURT: Yeah, that is what I thought.

12:57:29 Go ahead, Mr. Rosenberg.

12:57:30 MR. ROSENBERG: Thank you.

12:57:30 CROSS-EXAMINATION

12:57:36 BY MR. ROSENBERG:

12:57:36 Q. Hi, Mr. Hogarth.

12:57:38 A. Hi.

12:57:39 Q. Thank you again for taking all the time out. I know you 12:57:42 are a very busy person, so we all appreciate you being here.

12:57:45 A. No problem.

12:57:46 Q. Throughout your testimony, you've used the word "assumed" 12:57:53 a few times; is that fair?

12:57:54 A. Correct.

12:57:55 Q. But do you understand that the questions that I'm asking, 12:58:01 and what is critical, is what you have witnessed with your 12:58:06 eyes and your ears?

12:58:09 A. Yes.

Q. Okay. And you are testifying based on what you witnessed with your eyes and your ears; is that correct?

A. Yes.

Q. As well as your professional experience; is that correct?

A. Yes.

Q. Mr. Hogarth, when Mr. Werge was just up here, he was reading you a passage from your deposition, starting on page 64, line 22, and he stopped on page 65, line 5. There was a follow-up question and answer, and I would like to go through that with you.

A. Okay.

Q. But I'll start with the page and line that Mr. Werge started with.

A. Okay.

MR. WERGE: Your Honor, are we doing counterdesignations or is there a question?

THE COURT: I already told Mr. Rosenberg that he could raise this when it was his turn, and now he is.

MR. ROSENBERG: Thank you, Your Honor.

Q. So the question was:

"QUESTION: Jason Derulo was completely in charge of what Spatola played on guitar during this recording session on *Savage Love* that started on April 22, 2020, to your knowledge, correct?"

There was an objection. And then your answer was:

"ANSWER: Not 100 percent. It was what Matthew thought it needed, and then Jason would tell him a certain way of how he would want Matthew to play on the song."

And that is where Mr. Werge stopped. I would now like to read to you the follow-up question and answer.

"QUESTION: Okay. But ultimately Derulo controlled what Spatola played on guitar during this recording session on *Savage Love* that started on April 22, 2020, correct?"

There is an objection. And your answer:

"ANSWER: Yes."

Mr. Hogarth, by the way, do you stand by that testimony?

A. Yes.

Q. Mr. Hogarth, I believe you testified earlier that Mr. Spatola added snaps, when you were asked questions just now by Mr. Werge, but do you recall in your deposition you said it was Jason Derulo who added the snaps? Do you remember that?

A. Yes.

Q. Okay. So I'll just get a clean question and answer.

Mr. --

MR. WERGE: Your Honor, I did not -- I'm sorry to interrupt, but objection, I did not ask that question during my redirect.

THE COURT: That is -- the jury will -- as to that,

13:01:13 if it's -- your objection outside the scope, that is overruled. As to what was asked, and the answer, that is for the jury.

13:01:21 You can go ahead, Mr. Rosenberg.

13:01:22 MR. ROSENBERG: Thank you.

13:01:23 Q. I just want to clarify for you, Mr. Hogarth.

13:01:25 So Mr. Hogarth, who put the snaps into *Savage Love*?

13:01:31 A. I don't recall what happened six years ago. Most things that were added were under what Mr. Derulo wanted to add. I don't remember exactly where that snap came from. Yeah, I don't recall.

13:01:54 MR. ROSENBERG: Your Honor, may I read from page 280, lines 12 through 16?

13:02:13 THE COURT: You may.

13:02:14 MR. ROSENBERG: Thank you.

13:02:14 Q. "QUESTION: Who put the snaps in?"

13:02:18 This is from your deposition.

13:02:20 "ANSWER: I believe Jason. I don't recall what happened for that, but typically Jason would have me go to Splice and grab certain elements to add to songs."

13:02:31 Do you remember that testimony?

13:02:32 A. Yes.

13:02:32 Q. Do you stand by that testimony?

13:02:34 A. Yes.

13:02:34 Q. By the way, what is Splice?

13:02:36 A. It is a website that has sample -- free samples in there that if you pay a subscription to Splice, you are able to access those samples, and use however you want fit.

13:02:52 Q. Mr. Hogarth, when you were just questioned by Mr. Werge, I believe you testified that Mr. Spatola added the claps. So now we have moved on from snaps to claps.

13:03:04 MR. WERGE: Objection, outside the scope of the redirect.

13:03:06 THE COURT: Overruled.

13:03:08 Q. Mr. -- I believe you testified that Mr. Spatola added the claps, but do you recall that at your deposition you said that Jason Derulo was the one who added the claps?

13:03:18 A. Yes.

13:03:23 THE COURT: Yes, you remember saying that?

13:03:25 THE WITNESS: I do remember saying that, yes.

13:03:27 THE COURT: As you sit here, do you have a recollection as to who it was who added the claps?

13:03:32 THE WITNESS: I don't recall where the snap came from or -- but I do recall it was under the direction of Mr. Derulo, that he wanted the snaps to be added to the song.

13:03:45 MR. ROSENBERG: So, Your Honor, if I need to, you can tell me, but page 197 of Mr. Hogarth's deposition, starting from line 1 to line 10.

13:03:59 THE COURT: I don't see this as necessary.

13:04:01 MR. ROSENBERG: Okay.

13:04:02 Q. So I'll just ask. Mr. Hogarth, who was the one who added the claps to *Savage Love*?
13:04:09 A. I don't recall if it was Phil Greiss that added extra claps. I remember seeing from Friday that there were snaps added on the first session, and I don't recall where -- who I got those from during that session.
13:04:29 Q. So is it your testimony that Matthew Spatola was the one who added the claps?
13:04:34 A. I don't believe so.
13:04:36 Q. Okay. It was Jason Derulo?
13:04:39 A. Yes, more than likely.
13:04:44 Q. Mr. Hogarth, Mr. Werge asked you about adding the kick drum to *Savage Love*, right?
13:04:52 A. Correct.
13:04:52 Q. And you agreed it was pulled from Jason Derulo's prior song *Swalla*, right?
13:05:00 A. Correct.
13:05:00 Q. By the way, did you know -- are you aware that *Swalla* was cowritten with JKash?
13:05:07 A. I believe so, yes.
13:05:08 Q. So the kick drum, because it was from Mr. Derulo's song, would you agree that that was an element that Jason Derulo added?
13:05:20 A. Yes. It was under the direction of Mr. Derulo.
13:05:24 Q. So did Jason Derulo actually control adding the kick

drum?

A. Yes.

Q. Mr. Werge was asking you questions about master points. Do you remember that?

A. Yes.

Q. I know you are not a record -- you don't work at a record label and stuff like that, but you have some understanding about how master points work; is that --

A. Yes.

Q. -- correct? Okay.

And when you get a master point, is that just a right to a royalty payment?

A. If you get a percentage of the master, that is a percentage you contain your entire life. You receive that percentage. And there is a master side and there is a publishing side for every song released.

Q. Well, let me ask you: Is it your understanding that a master point equals ownership of a copyright to a sound recording?

A. I'm not an expert on that. I believe so, yes.

Q. Okay. We'll deal with that with someone else.

MR. WERGE: Objection to Counsel testifying.

THE COURT: That objection is sustained. The comment is stricken. The jury will disregard it.

Mr. Rosenberg, ask questions, get answers, ask more

questions.

MR. ROSENBERG: Okay.

Q. Mr. Hogarth, Matthew Spatola played guitar when you were present in the recording studio for *Savage Love*; is that correct?

A. Yes.

Q. And you were there -- you were present for all the work that Mr. Spatola put into *Savage Love*; is that correct?

A. Yes.

Q. And Jason Derulo was also present with you and Mr. Spatola during all the work that Mr. Spatola added to *Savage Love*; is that right?

A. I believe so, yes.

Q. So when Mr. Spatola performed his work on *Savage Love*, there were three people in the room; is that right?

A. Yes.

Q. Mr. Spatola?

A. Yes.

Q. Jason Derulo?

A. Yes.

Q. And Robert Benjamin Hogarth?

A. Yes, we were the only three during the first session.

Q. So there is Jason Derulo, there was Matthew Spatola, and then there was you; is that right?

A. Yes.

13:08:09 MR. ROSENBERG: Thank you.
13:08:12 MR. WERGE: No further questions from plaintiff.
13:08:14 THE COURT: All right. You are excused. Thank you.
13:08:16 THE WITNESS: Thank you.
13:08:17 THE COURT: All right. The plaintiff may call its next witness.
13:08:23 MR. BRANCOLINI: Our next witness, Your Honor, is our expert, Dr. Ethan Lustig. However, we need to set up some things for him.
13:08:30 THE COURT: Well, then do so. I'm not going to take a break so soon after we took our last break.
13:08:37 So you can stand up and stretch, ladies and gentlemen, while preparing for Dr. Lustig's testimony. You may chat quietly amongst yourselves.
13:08:43 THE COURT: Oh, right.
13:08:51 Excuse me. Actually, let's take a break. I think it will be more convenient for everyone. And I'll let you know when things are ready here.
13:09:00 Thank you, ladies and gentlemen.
13:09:03 (Thereupon, the jury retired from the courtroom.)
13:09:04 (Thereupon, there was a brief recess.)
13:14:19 THE COURT: You may get the jury.
13:14:20 Dr. Lustig, I'm very sorry about the inconvenience of getting you up there. There is supposed to be a working elevator for every courtroom here in this courthouse. I was

13:14:32 on the construction committee 10 years ago, and we asked GSA to make that -- one courtroom on each floor so we could make sure that the elevator was tested all the time, was always working, and all of this.

13:14:46 And GSA said, "No, no, no. You've got to have an elevator in every courtroom." And what that means is we've got ones that don't work for any courtroom. So I apologize.

13:14:57 THE WITNESS: That's all right, Your Honor. Thank you.

13:14:58 (Thereupon, the jury returned to the courtroom.)

13:15:29 THE CLERK: Please raise your right hand.

13:15:30 THEREUPON:

13:15:37 DR. ETHAN LUSTIG,

13:15:37 Called in these proceedings, and after having been first duly sworn, testifies as follows:THE CLERK: Thank you. Please state and spell your name for the record.

13:15:40 THE WITNESS: My name is Dr. Ethan Lustig; E-t-h-a-n, L-u-s-t-i-g.

13:15:46 THE CLERK: Thank you.

13:15:47 THE COURT: All right. Counsel, you may proceed.

13:15:47 DIRECT EXAMINATION

13:15:50 BY MR. BRANCOLINI:

13:15:50 Q. Good afternoon, Dr. Lustig. Could you please introduce yourself to the jury?

13:15:53 A. Yes. I'm Dr. Ethan Lustig. I am a music professor and

13:15:58 producer and composer. I also consult on music copyright cases.

13:16:04 Q. Great.

13:16:05 So what is it that you do professionally more specifically?

13:16:08 A. Well, I mostly spend my time teaching courses at the university involving music production, composition, songwriting, making music for film and TV, and also recording, mixing, and mastering, basically anything to do with popular music composition and theory.

13:16:31 Q. Great. Thank you.

13:16:33 And how, if at all, has your professional work involved recorded music, production, studio work, or audio engineering?

13:16:41 A. Well, I also do some freelance work. You know, I'm not a famous mix engineer or anything like that, but I've mixed and mastered many dozens of records. I worked as a producer for film and TV and a composer for film and TV, and I also used to do some managing -- in the recording studio in Los Angeles, I had some interns working for me, and I managed the day-to-day of the studio sessions.

13:17:05 Q. Great. Thank you, Dr. Lustig.

13:17:07 And could you tell us a little bit more about your teaching background.

13:17:11 A. Sure. So over the years, I have taught many college

courses from, like, hard-core classical music theory to ear training, making music for different audiovisual media. I teach a lot of private students as well, like, either in person or over Zoom, like how to improvise jazz, how to make beats, how to produce music in different digital audio work stations.

I have taught -- I teach -- currently teach a course on lyric writing as well. Like, we're making lyrics for pop songs and how to structure your melodies and your harmonies.

Q. Great.

And does your teaching include how music is created, performed, or analyzed?

A. Absolutely. Every single day, um-hum.

Q. And do you do scholarship in addition to your teaching?

A. I do, yes. I have published several articles in academic peer-reviewed journals involving the perception of groove. I did an article on groove perception in electronic dance music. I did an article, actually, on syncopation in rock and pop music, in taking kind of statistical systematic approaches.

Q. Great.

And so has that scholarship -- does your publication -- or scholarship include the creation, performance, or analyzation of music as well?

A. Yes, absolutely. And analyzing music is my main focus,

yeah.

Q. Okay. So stepping back a bit, can you give us a little more information about your educational background.

A. Sure. My background is in music theory, which is the systematic study of music, the analysis of music. I did my bachelor's at the University of British Columbia in music theory, and then I did my master's and Ph.D. at the Eastman School of Music, also in music theory.

Q. What subjects have you specifically taught over the course of your teaching career? I know you touched on this a little already.

A. Yeah, I have taught many, many semesters of music theory, like analysis of classical music, of popular music, hip-hop, electronic music, and I have taught -- well, as I mentioned, I'm teaching a course -- currently I'm teaching five different university courses, actually, across two universities, including songwriting and melodic structure, composition and production, recording, mixing and mastering, and lyric writing.

I've also taught ear training at the university level before, which is basically how do you take what you hear and convert it to, like, symbols so that you can turn sound to symbol and really understand what is in the signal.

Q. So is it safe to say that subjects that you've taught include things like melody, harmony, rhythm, groove, music

analysis, production, and related areas?
A. Every day, um-hum.
Q. Great.
So in your publication work, what sort of research is involved in terms of analyzing musical patterns, rhythm, groove, melody, or other features in popular music?
A. Well, for example, some of my articles have taken, like, a statistical approach. I have published a few articles on what is called corpus studies, which is a term that comes from linguistics. Basically you have, like, a big collection of many pieces, maybe hundreds or even thousands of different pieces, and then you can find patterns, you can find what is special in there, what is commonplace, and you can filter out and identify patterns over time.
Q. So do you also work as a forensic musicologist?
A. I do, yep.
Q. And so what is forensic musicology?
A. Forensic musicology is basically a music -- being a music expert, identifying similarities, differences, and looking at whether something in a musical passage, if it's something special, if it exists in prior art, and giving a systematic analysis.
Q. So practically speaking, what sorts of things does that work require you to do?
A. Well, the main thing is transcribing by ear so that you

have a music notation once you listen. You can have it in sheet music, and then from there, you can compare passages A and B for similarities and differences. Most forensic musicologists, including myself, I always do an assessment of the prior art to see if this pattern is something unique or if it's just something that already exists out there in previous composers.

Q. And when you analyze a piece of music as a forensic musicologist, what are the features that you typically consider?

A. The typical features are melody, harmony, rhythm, chord voicing, texture, formal structure.

Q. Great. Thank you.

And were you retained in this case by counsel for Mr. Spatola?

A. Yes.

THE COURT: Counsel, just a moment, please.

Ladies and gentlemen, you might have realized this already. You've heard references in the case to expert witnesses. More formally, and I think more appropriately, these witnesses are also called opinion witnesses. But the law allows both sides -- and both sides in fact are going to do this here. It's very typical in a music copyright case to bring in musicologists who don't have any knowledge apart from being retained about what happened here. You know, they

13:23:01 weren't there.

13:23:02 But in general, the law allows opinion witnesses to 13:23:07 testify to opinions that they have formed by viewing 13:23:13 materials in the case and based on their education and 13:23:16 experience.

13:23:17 And for that reason -- ordinarily, you know, 13:23:21 somebody just couldn't walk into a lawsuit and into a 13:23:24 courtroom and start talking about something happening in a 13:23:26 lawsuit that they had no personal knowledge of, but it is 13:23:30 allowed for those witnesses who because of their education, 13:23:33 their training, their experience, have a basis to offer you 13:23:38 an opinion.

13:23:39 You may treat, or should treat, that testimony the 13:23:43 way you would any other testimony: You can accept the 13:23:46 opinion, you can reject the opinion, you can accept it in 13:23:49 part if you wish, and you may do so for examining the -- by 13:24:01 examining the basis for the witness's opinion the same way 13:24:04 you would any other witness.

13:24:06 But also here, as to the opinion, you can examine 13:24:10 the basis that is being offered for the opinion: Does it 13:24:13 strike you as making sense? Do you believe that it's 13:24:16 supported by the evidence that you've heard in the case?

13:24:19 And again, I'm not picking on Dr. Lustig here. I'm 13:24:23 going to say the same thing for Dr. Ferrara and Dr. Rayner 13:24:27 when they testify for the defendants.

All right. Counsel, you may proceed.

MR. BRANCOLINI: Great. Thank you.

Q. So I believe my last question was: Were you retained in this case by counsel for Mr. Spatola?

A. Yes.

Q. And are you being compensated for your work in this case?

A. Yes.

Q. Does your compensation depend in any way on the opinions you give or the outcome of this case?

A. No.

Q. And what specifically were you asked to analyze by plaintiff?

A. I was asked by plaintiff to analyze the extent, if any, of Mr. Spatola's contributions in *Savage Love*. I was asked to consider the sound recording and the composition.

Q. And were you asked to give the jury a legal opinion about who owns the copyright or what legal result it should reach here today?

A. No.

Q. I guess I shouldn't say "today." Over the course of this trial.

Were you asked to calculate damages, royalties, or legal ownership percentages?

A. No.

Q. What were you asked, instead? You touched on this a

13:25:30 little already, but could you elaborate?
13:25:31 A. I was asked to consider the -- musicologically, so really the musical aspects of the extent of what Mr. Spatola contributed in *Savage Love*, the sound recording, the composition.
13:25:46 Q. Great. And I believe you stated this, but I just want to confirm. That analysis included the finished, recorded song; is that correct?
13:25:53 A. Yes.
13:25:53 Q. And also the underlying musical composition embodied in that song?
13:25:56 A. Yes, that's right.
13:25:57 Q. And so why is it important for a musicologist to consider both the finished recording and the musical composition?
13:26:06 A. Because they are two different things. So the physical recording is -- can be represented, like, in a sound file. For example, like a WAV file, MP3 file. That is what is actually the file that is heard and released.
13:26:22 And then the composition is kind of a more abstract thing. It's usually -- well, like, we refer to it as that is what you could represent in sheet music, in music notation.
13:26:32 And so they are two different things, the sound recording and the composition, and it was important to see what Spatola contributed on each side.
13:26:39 Q. Okay. So Dr. Lustig, how did you go about analyzing

Mr. Spatola's contributions to *Savage Love*?

A. Well, first I broke the piece into -- into the various formal sections. Like intro, verse, prechorus, chorus, bridge. So I identified the different sections because Spatola did different things in different sections. So I wanted to see what was the extent of his contributions in each section.

And then once I have that, I transcribe, by ear, his contributions, listening to his playing and determining from there what he did.

Q. And are these the kinds of methods musicologists ordinarily use in analyzing musical works?

A. Yeah, it's standard, yeah.

Q. So I would like to go to a demonstrative. This was an exhibit to your expert report. It is Table 1 from *Savage Love* with Spatola's contributions.

THE COURT: And Counsel, this is a demonstrative, as you just said, correct?

MR. BRANCOLINI: That is correct, Your Honor.

THE COURT: Members of the jury, I mentioned this to you last week. Occasionally you are going to see something here in court which is not evidence; rather, it is something that was created for purposes of this lawsuit to help you understand and follow along with the testimony of the witness.

13:28:14 So this won't be with you in the jury room, but it's helpful, or you may or may not find it helpful, but perhaps will find it helpful in following along with Dr. Lustig's testimony. And likewise, if Dr. Ferrara or Dr. Rayner wish to use a similar demonstrative, then they will be able to do that.

13:28:35 The other point I want to make is that you heard reference to a report. I don't think you will be surprised to learn that, you know, last night -- it would not be a very fair trial if suddenly last night Mr. Spatola could have let the defendants know that Dr. Lustig was going to be here and offer these opinions.

13:28:59 And likewise, it would hardly be a fair trial if the day before they testified, the same was true of Dr. Ferrara or Dr. Rayner.

13:29:07 Rather, pretrial, there is an elaborate procedure, so both sides know and have the chance to explore what the opinions are, and the basis for those various opinions. So -- and that includes reports that the opinion witnesses author, and perhaps a declaration that might have been used before the trial started, and, as well, a deposition of the witness.

13:29:41 So in that sense, it's somewhat similar to the depositions that you have seen used for the other witnesses.

13:29:48 What is important here is that these three

13:29:54 witnesses -- what is important about their testimony is in fact their testimony, what you see and hear in court.

13:30:05 However, the -- occasionally, each side will have the right to suggest to you that the -- this -- the witnesses are changing their opinions, or they are reacting to criticisms that were made of their opinions at their depositions. And for those reasons, occasionally you will hear about the reports that they authored or the depositions that were taken.

13:30:31 But those reports and depositions are not going to be in the jury room with you. To the extent there is something in them that would be helpful to you, then that will be explored here in court. I want to remind you that the -- these witnesses are like all the other witnesses, in that what really matters is the testimony that you are going to see and have the right to judge.

13:30:59 The other point I want to make in regard to that is obviously the -- these witnesses cannot offer you an opinion unless they have some basis for doing so. So it is permissible for them to review a lot of materials in the case, a lot of the exhibits that you have seen, the depositions that were taken.

13:31:24 But they are not expert witnesses in that sense. They have not sat here throughout the trial. They don't know, as well as you do already, let alone as well as you

will know at the end of the trial, exactly what happened here when you have seen all the witnesses and seen them cross-examined.

So don't think that these witnesses, just because they have looked at certain things, including certain things that won't be with you in the jury room, understand better than you do what happened or what the verdict should be. That is just simply not the case.

And again, I don't want to pick on Dr. Lustig here. I'll remind you of all of this when Dr. Ferrara and Dr. Rayner testify as well.

Go ahead, Counsel.

MR. BRANCOLINI: Thank you.

Q. So Dr. Lustig, I'm showing you this table that is titled Table 1 form of *Savage Love* with Mr. Spatola's contributions. Do you recognize it?

A. Yes.

Q. What is this?

A. So this is just a table I prepared in my -- in my original report. And it just shows which -- you have -- your column shows a different formal sections: intro, verse, and so forth. And we can see how many bars are in each section, what are the minutes and seconds for each section, and we can see what instruments Spatola played in each section.

Q. And so you said that this -- that you prepared this

chart. Can you confirm that it accurately reflects your analysis?

A. It does, yes.

Q. And so why did you break it down in this section-by-section way?

A. Well, so this is a pretty standard -- pretty standard for a step to kind of get the lay of the land when I'm -- when I'm asked to assess what Spatola played, what he contributed.

My first step was to make this chart. And what I found is that he plays in the entire record, every single section. 100 percent of the song sections, he's there. And you can see where everything except the intro, he's actually playing all three instruments. In the intro he just plays electric guitar and bass, but everywhere else it's all three instruments.

Q. And so why is this chart helpful in explaining your -- your analysis?

A. I think it's a helpful reference so that when we then talk about each section in turn, you know, it's a good reference to go back to and see, okay, so if we talk about -- if we say, for example, Spatola's work in verse 2, we know, okay, he played these three instruments in verse 2.

Q. Great.

And so I apologize to the members of the jury, because we are going to have to be going back to this a lot?

13:34:08 But can you, Dr. Lustig, just go through really quickly the formal sections?

13:34:13 A. Sure. Okay. So we have these different formal sections, fairly standard sections in a pop song: the intro, verse one, prechorus 1, chorus 1, verse 2, prechorus 2, chorus 2, bridge, and chorus 3.

13:34:31 Q. Great. So -- and I think you touched on this already, but could you just elaborate a little more why it's important to analyze a song in this way?

13:34:44 A. Well, it's good to break it into sections in this case because Spatola contributed different themes to different sections. For example, his -- in some sections he's playing more kind of verbatim, like, modeling *Laxed (Siren Beat)*, and then in other sections he's contributing really new compositional features.

13:35:06 And so breaking it down by section, it lets us see, okay, what did he do here, what did he do there?

13:35:11 Q. And I believe you mentioned earlier that you prepared your own musical transcriptions as part of the process. Did I hear that correctly?

13:35:17 A. That's right. Yup.

13:35:18 Q. And so -- and I believe you also said that you transcribed the relevant musical passages by ear; is that correct?

13:35:26 A. Yes.

Q. Is transcription one of the major tools musicologists use to identify and compare music material?
A. Yes, absolutely it's one of the major tools.
Q. So just in plain English, as somebody who is quite musically illiterate, can you please break it down, what you mean by "transcribe by ear"?
A. Transcribing is taking what you hear in the sound, like in the music file, in the audio, and writing it down into music notation. So music notation, you know, also called sheet music, it lets us see the pitches, the rhythms, the chords, and everything in a visual format. So then we can circle things and square things and compare things in a systematic way.
Q. Great. And so more generally, what materials did you review in forming your opinions?
A. I reviewed the recording of *Savage Love*, of course. And I was provided with the Pro Tools project files and the individual stems, like the individual stems of the instruments.
I reviewed the other side's experts' reports, Ferrara report and Rayner report. And then I reviewed the Ferrara rebuttal report of my report.
Oh, and I reviewed the depositions, the Derulo deposition, Hogarth deposition, and Spatola depositions.
Q. Thank you.

13:36:53 And just, again, humor my ignorance. What are stems?

13:36:59 A. So stems are basically -- they are bundles of -- so basically what you have in a project, for example, in any kind of digital audio workstation, also called a DAW, Pro Tools, Ableton, Logic, FL. These are all programs people use to record music, to make beats, to produce.

13:37:20 And you have what are called tracks. You have individual tracks. Which is very confusing, because when we talk, like, colloquially about music, we say, "Oh, that is a great track. That track is such a nice song." But in the industry, a track is actually the specific thing. So maybe the snare is one track, the kick is one track, the bass is one track. They are these individual rows in the program.

13:37:41 And so stems are like a more abstract -- they are like a grouping of that. So for example, if there was, like, you know, three different layers of snare tracks to make a complex snare sound, but then you group them all together and the stem just becomes snare. Or maybe the stem is percussion or maybe even, like, multiple guitar tracks. Individual takes are combined into a single guitar stem.

13:38:05 And that is just basically to manage the work flow. So then when you send it off to, like, the mixing engineer, the mastering engineer, instead of sending them, you know, 500 tracks, you send them 12 stems.

13:38:16 Q. Great. So I believe you mentioned the finished recording, source material, stems, and isolated tracks, deposition testimony, and Pro Tools and session materials. Is that correct?
13:38:31 A. That's right, the various Pro Tools project files.
13:38:34 Q. Great. And are those the kinds of things that a musicologist would ordinarily rely on in doing this kind of analysis?
13:38:40 A. Yes, absolutely. It depends. As well, there are some cases where it's really just about the final audio, but in this case the various, like, rounds of revisions were a factor that I was asked to assess.
13:38:54 Q. And again, as I believe you stated, you analyzed both the finished recorded song and the underlying composition, correct?
13:39:01 A. Yes.
13:39:01 Q. And for each of those -- well, why don't we take them one at a time.
13:39:07 What musical features were you focused on in reviewing the recorded song?
13:39:11 A. In reviewing the recorded song? So I was focused on the sound and feel because -- are you talking about the sound recording specifically or just in general?
13:39:24 Q. I was talking about the sound recording specifically, but if it's easier to discuss both together.

A. Okay.
Q. Whatever is easiest for you.
A. Sure. So I considered things that we usually consider as musicologists, like melody, harmony, rhythm, formal structure, texture, chord voicing. These are all kind of the things that we talk about every day in music theory in music schools, and they are just basically the different parameters of music, what is the way that music is structured.
Q. And so the list you just provided of musical features that you focused on, does that apply to both the finished recorded song and the underlying composition?
A. So the sound recording is a little bit of a different beast because the sound recording is usually approached as -- so the composition is the part that you could put in sheet music and really analyze for its compositional structure, and then the sound recording is more about listening to the file and what are the different instruments in there.
So my focus -- because I was asked to do both, to look at what did Spatola do for the sound recording side and what did he do for the composition side.
For the sound recording side, I was focused on well, what did he play, how does that change the feel, how does it change the genre of the record, and then the composition side is where I look at these kind of hard core, like melody, harmony, chord voicing, and all of these kind of music theory

13:40:53 concepts.

13:40:54 Q. And you mentioned for underlying compositions that there was -- that you could do notation -- that that was represented by musical notation. Is that always required for compositions?

13:41:05 A. It's usually a good standard practice to do, yeah.

13:41:09 Q. Okay. And you also used the term "voicing." What does that mean in plain English?

13:41:16 A. So voicing, which is also sometimes called spacing, it's about how you -- like, how you express your chord. So I can show you with the -- with the keyboard here.

13:41:32 Okay. So, for example, this is a chord (witness demonstrates). A chord is multiple notes, something made of more than one note, in this case C, E, and G (witness demonstrates). So this is a three-note -- three-note chord. And this particular -- every chord has an end. Just kind of like Pokémon, we all have a different name and a label. This is called C major, okay, with these three specific notes.

13:41:54 Now, this exact chord with the exact same notes can be played in so many ways (witness demonstrates), almost an infinite amount of ways, the exact same three notes. For example, (witness demonstrates).

13:42:03 And I could just go all day with presenting the various ways. All of those were just three notes, C, E, G. There are basically 12 notes total, at least in our modern --

what's called equal temperament tuning system. On a piano, for example, there is only 12 notes, but you can voice, or space, that same chord in many, many ways.

And so that is what chord voicing is.

Q. Great.

So using the same basic chord, changing order of placement of the notes can change the voicing; is that correct?

A. Absolutely.

Q. Can you just explain a little bit more in that demonstration what stayed the same and what changed between the chord progressions?

A. Sure. So what stayed the same was it was those same three notes, "C, E, G, (singing)" but some of them were played higher or lower, in different orders and different permutations, let's say.

And so there is different ways to present the spacing between them. You can put them all in close contact where they are just as close as possible (witness demonstrates), or you could really space them across the instrument (witness demonstrates), or you could even change the order. Instead of C, E, G, you could go E, and then you could two Cs in a row, and then one G (witness demonstrates).

So there is really many, many ways to voice it, and that in itself is a composition, a decision, because if you

hear -- actually, there is certain genres that -- for example, in Reggae, it's very common to do just this kind of thing (witness demonstrates), where you are just doing this -- the most simple possible position.

But then there are other styles, like in jazz, in these more complex kind of voicings, where you can play the same chord, but in classical or jazz, you might do it in more kind of elegant and spacious way (witness demonstrates), and so that tells a different musical story and even can affect the genre of it.

Q. Great. Thank you.

And so I believe that you stated that the instruments that Mr. Spatola played were guitar and bass; is that correct?

A. Acoustic guitar, electric guitar, and bass, yes.

Q. And why does analyzing voicing matter for guitar parts in a recording?

A. Well, basically the voicing is -- it's tracing a completely different path through the chords. So you could even -- as I was just playing, for example, you could play those same chords, but you actually create a different path, a different melodic implication for how you move through from chord to chord to chord.

You can choose to go jumping around like crazy (witness demonstrates), or you could take a really smooth

13:45:11 path and tell a completely different -- different compositional story (witness demonstrates).

13:45:22 Q. So in part, were these variations on voicing the sort of musical features you were analyzing when you looked at Mr. Spatola's guitar parts in *Savage Love*?

13:45:30 A. Yes, that was one of the first things that I noticed when I listened to Spatola's voicings, that he was using very distinct voicings and moving through a path that was totally different, for example, from *Laxed*, which is just moving around, jumping around, and Spatola was taking a smooth and unique path through the chords.

13:45:52 Q. And chord voicing is the kind of musical feature that a musicologist can isolate and analyze specifically; is that correct?

13:45:58 A. Yes.

13:45:58 Q. Okay. Did you find any significant voicing in Mr. Spatola's playing in the song?

13:46:03 A. Yes, I did, especially in -- well, in a lot of -- in most of the song, most of the sections I did, yes.

13:46:12 Q. And in musicological analysis, is it important to distinguish between commonplace musical features or more particular musical choices?

13:46:27 A. Yes, that's right. It's part of the process to identify is this something that is just kind of in the air that is part of the general -- you know, the common fund of musical

13:46:39 ideas or is this something unique. So we have to look at existing -- what we call prior art to see if it's something -- something that already exists out there.

13:46:48 Q. So in plain English, could you please elaborate on what "prior art" means in this context, Dr. Lustig?

13:46:56 A. So prior art is basically a fancy way to say, like, existing -- existing compositions, older compositions before the case came out. And so as musicologists, we always look at that because, you know, somebody could have a song where they present a melody or an idea, and you think, oh, that is a great idea and it sounds new to me, and then you realize that it already exists in some piece by the Beatles, you know.

13:47:24 And so we identify whether something is unique or whether it already exists in the prior art.

13:47:30 Q. What is the process for examining prior art?

13:47:34 A. So basically the process is you do what is called filtering. As musicologists, we filter out elements that are already existing in the prior art, and then you basically subtract them out in order to see, well, what is left, what are the new aspects that cannot be explained away by existing music.

13:47:56 Q. And what does the process of filtering look like in this context?

13:48:00 A. In this context, it's basically -- it's best represented

really in music notation. You could take the existing prior art and then the music that you are examining, and you could line them up, you can show where they align, where they don't align, and subtract out, okay, what is left, what is different about this compared to the older music.

Q. And so then as part of this evaluation, how do musicologists account for commonplace or preexisting musical material when performing this analysis?

A. Basically most good musicologists, we have a database of music, maybe, you know, a computer database of examples of different techniques. Most of us have kind of a mental Rolodex, too, just for different techniques. Oh, that happens in this piece, it happens in this piece.

And there's also various online databases for searching for patterns. Oh, I wonder if this pattern is new or maybe it already exists, and you can search through the scores and the existing songs to see if it pops up.

Q. And so as part of your analysis here, did you -- you considered prior art and filtering?

A. Yes. Absolutely.

Q. Do you know approximately sort of how many musical compositions there were in the filtering database that you were using?

A. It would be hard to count because I consulted multiple databases, and there's hundreds of thousands of notes in

those databases. So it's hard to quantify.

Q. Thank you.

So Dr. Lustig, without getting into every detail now, did that process affect the opinions you reached about whether the features you identified were merely commonplace or instead reflected particular musical choices?

A. It helped -- it helped to convince me that they are distinct choices because there are many aspects of Spatola's playing that I didn't find in any existing pieces.

MR. RAYGOR: Objection, Your Honor.

THE COURT: Yeah, please approach.

Ladies and gentlemen, you can stand and chat amongst yourselves quietly.

(At the bench:)

MR. RAYGOR: That was in ECF 137.

THE COURT: Counsel, I did -- when I granted the defendants' motion in limine, I pointed out that it wasn't necessarily getting the defendants very much because the witness would be free to criticize the filtration that was performed by Dr. Ferrara, and he would be able to specify to the jury those things which were changed from *Laxed (Siren Beat)*.

However, there were two rulings that I did make which were quite clear, or so I believed. The first was that this witness would not be allowed to testify to the

independent copyrightability because of -- in fact, as -- or at least as it appeared in the course of the reports and the deposition, there had not been an independent filtration analysis.

And then the second was that not to offer his own views of the credibility of the witnesses. So here, it seems that we are getting into precisely what it -- not perhaps quite as precisely as saying what Dr. -- what Mr. Spatola did is independently copyrightable, but very, very close to that because he's going into what he claims is his filtration analysis, and it was that -- that was the precise basis for the ruling, so I'm not sure why we are hearing this.

MR. BRANCOLINI: Your Honor, I apologize, it was our understanding that we could talk about the process, but couldn't sort of make the ultimate conclusion -- or have him make a conclusion. So I'm happy to move off this topic. And I apologize --

THE COURT: He's going to be here for a while. We can discuss it further. But that is -- I think that we are going to be -- end up getting very close to here.

Now, if I have forgotten this, then I apologize, but please remind me, is Dr. Lustig now going to anticipate Dr. Ferrara's testimony and criticize it, or is he going to be here in the courtroom listening to Dr. Ferrara and then take the stand again? I don't know if -- have we discussed

this?

MR. RAYGOR: We had agreed that each witness only appears one time.

THE COURT: Yeah. Right. So you intend to do that --

MR. RAYGOR: Your Honor, just one other thing --

THE COURT: Yes.

MR. RAYGOR: -- on the same point because I don't want to jump up and down like a jack-in-the-box.

In Your Honor's June 26, 2025, order about Dr. Lustig, you stated that "Lustig cannot testify that in prior art, he had not found significant similarities in terms specific --

THE COURT: Correct.

MR. RAYGOR: I think that is where --

THE COURT: This is why I think -- that is why I was -- I was waiting for your objection. I assumed it was going to come. So just move on from this. As I said when I issued the order, ultimately, it only gives the defendants so much, but still, it's -- I wrote what I wrote, so let's follow that.

MR. BRANCOLINI: Okay. Thank you, Your Honor.

(In open court:)

MR. BRANCOLINI: May I begin, Your Honor?

THE COURT: You may.

13:53:49 MR. BRANCOLINI: Oh, sorry.
13:53:50 Q. So at a -- moving on, at a high level, what is *Savage Love* in relation to *Laxed*?
13:53:59 A. Basically, *Savage Love* is a record that heavily samples *Laxed*. It uses the synth saxophone, and it uses the drums, some of the drums. But it's a record that goes much -- far beyond just *Laxed*.
13:54:20 Q. And I believe you said that *Savage Love* samples *Laxed.* What do you mean by "samples"?
13:54:25 A. Well, sampling, it's -- it's when you take the actual audio file -- so for example, the actual, literal audio file or clip of the synth saxophone from *Laxed*, you can bring it from one project and bring it into the other project. So it's taking the literal audio sample, the sound of it, into the *Savage Love* project file.
13:54:47 Q. And after identifying the source material for *Laxed*, what additional questions did you analyze?
13:54:55 A. Can you repeat the question, please?
13:54:59 Q. Yes. After -- actually, let me strike that. Let me move on.
13:55:03 Did you break *Savage Love* into musical sections as part of your analysis? I believe you've already said you did?
13:55:10 A. Yes.
13:55:10 Q. And remind us again what those sections were?

A. It was the, yeah, intro, verse 1, prechorus 1, chorus 1, and verse 2, prechorus 2, course 2, bridge, chorus 3.

Q. And remind us again, what instruments did Mr. Spatola perform throughout this song?

A. He performed acoustic guitar, electric guitar, and bass.

Q. And so let's make this a little easier, before we go section by section.

Dr. Lustig, I'm going to show you a series of arranged layer demonstrations and audio files. Do you --

MR. BRANCOLINI: These were submitted as Trial Exhibits 398 through 401. Could I -- Your Honor, could I have these published for demonstrative purposes?

THE COURT: Yes. 398 to 401, again, may be used with the jury for demonstrative purposes.

Q. Okay. So as I noted, we are going to see a series of these. So this is the first of four. But generally, could you explain what this is?

A. Sure. So this is an analysis that I created. And we can see at the top row, there is the different sections of the song: intro, verse, prechorus, chorus, and so forth. So from left to right, we can see the different sections. And then at the very bottom row, we have the time points, the minutes and seconds, showing where these sections occurred.

And what I've done here is broken *Savage Love* into four different arrangement layers. We have vocals, chords,

base, and percussion and effects.

Q. And did you prepare this, this visual?

A. Yes.

Q. And did you also review it for accuracy?

A. Yes.

Q. And what was the source material that you used in preparing this visual?

A. So this visual is -- it says in the title there, "Submix 1, No Matty." So this is what is called a submix. Basically it's like an alternative mix.

This, I created by taking *Savage Love* and just muting, literally muting Matty's contributions, or in other words, putting solo on everybody else. So this can show us what would *Savage Love* be like but without Matty in the picture.

Q. So could you explain with a little more detail what a submix is?

A. Sure. So it's basically a way to create an alternative version of something for -- for illustrative purposes in this case. This is not, you know, a commercially released piece, but it's created by muting all of Matty's tracks.

Q. And so you created -- is it accurate to say you created an audio file as well as this visual representation of the audio file?

A. That's right.

13:58:21 Q. And do -- does the submix, either visually or the audio, change your underlying opinions or help illustrate the opinions you have reached from reviewing the underlying musical materials?

13:58:38 A. I think it's a pretty nice kind of way to see visually, without even -- you know, without needing to read music notation.

13:58:45 When I created this, it was interesting to see how, like, if this was a building, like it's not very structurally sound. This is -- like, without Matty, we can see there is these big -- let me -- it does, okay. So we can see that there is these big gaps in the building.

13:59:01 Now, these are the parts where there is just absolutely no chords, no bass. And then I listened to the submix, and it sounds very awkward in many parts, especially the prechoruses and the first half of each chorus, because there is just Jason singing and then there is some snaps. And -- but there is just absolutely no chords and bass.

13:59:22 So that was a real moment for me when I realized, okay, Matty is -- Mr. Spatola is really carrying the record in these -- all of these sections where you just have these massive gaps in the chord and bass layers.

13:59:33 Q. So I'll ask you a little bit more specifically about this submix in a bit, but I want to speak more generally. I just want to make sure that I'm understanding correctly.

So this says "arrangement layer." So what are the actual layers of the arrangement layers?
A. So the layers are vocals, chords, bass, and percussion effects.
Q. Great. And so are these layers present in the same way in every section, or did you analyze them section by section?
A. I analyzed section by section.
Q. And that is what the list at the top is; is that correct?
A. That's right.
Q. With the time stamps at the bottom; is that correct?
A. Yes.
Q. And this is based off of the audio files that you reviewed in this case; is that correct?
A. Yes, this is based on the stems. And then I was able to make a bounce, an export of the submix, which has Matty's contributions muted.
Q. And so you've prepared these demonstratives, and reviewed and confirmed that they are an accurate representation as to the sections of the song with respect to these musical layers, correct?
A. Yes.
Q. And that said, you do not purport to assign legal ownership, legal credits, damages, or royalty percentages with this analysis; is that correct?
A. That's correct.

MR. RAYGOR: Objection, leading.

THE COURT: Sustained.

Q. So what is the limited purpose here?

A. Well, it's another way into the data. It's a visually, I think, immediate way to see, to ascertain what did Matty -- you know, what was Matty's role?

We can see that without Matty, we have these large gaps in the chord and bass structure. We can see that without Matty, we still have a full vocal layer, a fairly full percussion and effects layer, but the chords and bass were really -- are really lacking when we subtract out Mr. Spatola from the record.

Q. Okay. So we are already getting into this submix 1. And so as noted, it -- well, I guess not as noted. But it is titled "No Matty," and as you just noted, it has Matty's parts muted; is that correct?

A. Yes.

Q. And so we touched on this a little before, but you also would recognize corresponding audio for this visual; is that correct?

A. Yes.

MR. BRANCOLINI: And could we actually listen to that full audio for this?

And I apologize in advance. We are going to play all of it for all four of these, just so that there is

completeness, given some objections previously in this case. So bear with us. It's going to take a few minutes.

So this is submix 1.

A. I would like to erase my -- figure out how to erase my notations, so it's nice and clean. Okay. Ready.

(Thereupon, the audio was played.)

Q. So what did you think sonically was important to hear in that version?

A. Well, as I mentioned earlier, what stands out the most to me is how just kind of empty or unfinished it feels in those -- the PC1 and the first half of chorus 1 and then the PC2 and the first half of chorus 2.

You really hear Jason singing and some snaps, but it doesn't -- basically, like, in my expert opinion, the minimum necessary condition for a complete composition is you have a chord layer throughout, you have a bass layer throughout. And so in listening to this submix, it's quite clear that it's not really a full composition. Without Matty in here, it's not complete.

Q. And can I ask, how did you decide the proportions for this -- this visual aid?

A. So, yeah, so it's actually made to scale as well. I forget, you know, how many fractions of an inch it was, but it's all exactly made to scale proportionally, so that this is an actual representation of the -- the real seconds are

mapped correctly onto the inches.

Q. Great. Thank you.

And so this -- I believe you mentioned earlier that none of these submixes -- as I mentioned, we will be hearing four of them, but none of them were commercially released; is that correct?

A. That's right. They are not commercially released.

Q. And so just across the board, what is the musical effect for each of them, for isolating them like this?

A. So these are for illustrative purposes that I prepared them, to demonstrate in a way that is kind of immediately visual and auditory.

Q. Great. So let's move on to submix number 2.

THE COURT: Counsel, before you do that -- and again, Dr. Lustig, if you testified to this and I missed it, I apologize.

But is the recording to which you applied the muting, was that the commercial recording that was released in June 2022, or one of the session tapes, or something of your own creation? What was the -- what did you use as the source material, if you will, to then apply the muting?

THE WITNESS: I used the stems that were sent out for mastering.

THE COURT: And then here, when it says "chords and bass," does that correspond in this instance -- perhaps not

in other instances, but in this instance, to the acoustic guitar and electric guitar and then the bass, which were the instruments which Mr. Spatola played?

THE WITNESS: That's correct.

THE COURT: All right. Go ahead, Counsel.

Q. Do chords only include the bass and guitar, or are there other components of the chords?

A. So in terms of Mr. Spatola's contributions, chords is his -- his acoustic and electric guitar, and bass is his bass playing.

But there are -- and that is why the -- there is green and there is yellow, because there are, of course, during the verses -- for example, and there are chords played by the piano that comes from *Laxed (Siren Beat)* and then the bass that comes from *Laxed (Siren Beat)*.

Q. So chords -- not speaking specifically about Mr. Spatola's contributions, chords is broader, within your charts, than just the guitar and -- the two types of guitar and bass, correct?

A. That's right.

Q. Okay.

THE COURT: And Dr. Lustig, what is exactly missing where -- there is also a white space on percussion effects on the far left. What is it that was muted to create that white space, if in fact Mr. Spatola was playing the three

instruments that are reflected in the chords and the bass?

THE WITNESS: I would have to listen to it again. If I recall correctly, it's because there is no percussion or other effects at that part, irrespective of Mr. Spatola.

THE COURT: All right. So in that case -- look, I don't want to get involved here. It's up to the jury to determine whether there is a basis. But in any event, if it was -- you -- that was removed as well, regardless, as to the percussion effects, whether that was provided by Mr. Spatola or not?

THE WITNESS: That's correct.

THE COURT: Go ahead, Counsel.

MR. BRANCOLINI: Your Honor, the intro only has vocal and contributions from Mr. Spatola, so I think that is why -- what you are --

THE COURT: I see. So it just -- it was never there.

MR. BRANCOLINI: Exactly. That's correct, Your Honor.

THE COURT: It wasn't muted; it just wasn't there in the first place.

MR. BRANCOLINI: Yes, correct, Your Honor.

THE COURT: Thank you.

MR. BRANCOLINI: Thank you.

Q. So Dr. Lustig, let's now turn to submix 2, and this is

titled "Matty Only." So what is the jury seeing here?
A. Sure. So here, we have the result when you just press the solo button on Matty's tracks, or in other words, you just mute everyone who is not Matty. And we can see in a pretty clear way that 100 percent of the record, you have chords, you have bass without pause. We can see there is no vocals, there is no percussion or effects.
But, you know, it deems this kind of building metaphor, right? With the first one, it's got lots of holes and it's kind of structurally incomplete. Here, we can see that it's perfectly fine structurally. Listening to it, it's, you know, a stand-alone instrumental composition.
Q. And so we are going to listen to audio in a moment, and I would just like to, again, confirm that you recognize that the corresponding audio is for this specific demonstrative; is that correct?
A. Yes.
Q. And for this, what should the jury listen to as they hear the version with only Mr. Spatola's contributions?
A. I would recommend the jury listen for the feel of it, the sound of it, that -- you know, it's not going to hear vocals, it's going to sound more like an instrumental composition, and to compare it to *Laxed (Siren Beat)*, which to my ears, it's really a totally different composition than Laxed.
Q. Great. Thank you.

MR. BRANCOLINI: If we could play the audio for submix 2, please.

(Thereupon, the audio was played.)

Q. So now that we have heard the audio, I just want to confirm that that is the area that you understood to fairly correspond to the "Matty Only" arrangement layer slide, correct?

A. Yes.

Q. And from a musicological standpoint, what does this isolated version help you to explain?

A. Well, I think it demonstrates the feel of and the sound of an instrumental composition. It's complete in the sense that there is not -- there's no vocals, obviously, but there are chords, there's bass, and it's a perfectly freestanding composition.

Q. Great. Thank you.

Now, Dr. Lustig, let's turn to submix 3. And this is the -- this is titled "The Matty and Jason Arrangement Layer." So what does this slide now show?

A. So this is interesting. So this is really where the magic happens. We just have Matty and Jason together. There is no *Laxed (Siren Beat)* in the picture. So there is no Jawsh, there is no Phil. It's really just showing a really proper complete record with vocals, chords, and bass, fully occupied 100 percent of the structure.

And so this was created by just muting the elements from the *Laxed (Siren Beat)*, muting Phil's contributions, or in other words, soloing Matty and Jason.

Q. And why is it useful to look at Mr. Spatola's instrumental parts together with the vocal layer?

A. Well, I believe -- tend to believe that all data is good data, and it's just good to assess it in various ways. So I presented these in the different combinations that occurred to me, what would it be like without Matty, what would it be like with only Matty, in this case what would it be like without even *Laxed (Siren Beat)* in the picture.

Q. And so could you just elaborate a little bit why it's useful to examine the arrangement with the Jawsh and *Laxed* material removed?

A. Well, one of the questions of prior art is -- you know, is this record just based on *Laxed (Siren Beat)*. And so in order to answer that, I created this -- this analysis in order to have something to listen to and to visually assess what is the -- what is *Savage Love* like if we subtract out, you know, the record that kind of created the inspiration for it.

Q. So we are about to, again, listen to the audio for this submix. And before you -- I just want to know, to the best of your knowledge, is the audio that we are about to listen to, does it correspond to the arrangement layer slide that we

14:17:34 are currently looking at?
14:17:36 A. Yes.
14:17:36 Q. And on this one, what is it that you believe it is useful for the jury to listen to?
14:17:40 A. I would recommend the jury to listen and see if it -- does it feel like it's missing something, does it feel like a complete record, comparing it to *Laxed (Siren Beat)* (singing), with the sound of the saxophone and all these kind of sounds, and see if it sounds like that record, or if it's really its own distinct new record.
14:18:02 Q. Okay.
14:18:02 MR. BRANCOLINI: So with that, could we please play the audio for submix 3.
14:18:06 (Thereupon, the audio was played.)
14:20:59 MR. BRANCOLINI: Great. Thank you.
14:21:00 Q. And I apologize because I know this is a little bit tedious, but can you just confirm for us again that that was the correct audio that you were expecting?
14:21:07 A. Yes.
14:21:08 Q. Great. Thank you.
14:21:08 And just briefly, from a musicological standpoint, what does hearing those layers together help you evaluate in your analysis?
14:21:15 A. It basically helps me to evaluate the role of *Laxed (Siren Beat)* because this is subtracting out any of the

14:21:22 elements from Jawsh, from *Laxed (Siren Beat)*, and also subtracting out the percussion and the snaps and things that -- my understanding is that Phil Greiss added a few small elements.

14:21:34 Q. Thank you. So with that, let's turn to submix number 4, please. This is titled "No Jawsh." Who does the "Jawsh" there refer to?

14:21:46 A. That would be Jawsh 685, the producer of *Laxed (Siren Beat)*.

14:21:51 Q. Great.

14:21:52 And so you've sort of just previewed this for us, but what -- what layers were included or excluded from this?

14:21:59 A. So this is basically including now the percussion aspects, and so we still don't have -- we are still not going to have the synth saxophone and the kind of acoustic -- the acoustic piano sample from *Laxed (Siren Beat)*, but now we have really a full -- a full song with vocals, chords, bass, percussion, but none of the sampling from *Laxed (Siren Beat)*.

14:22:23 Q. So both the submix visual and the submix audio, they include everything except for the Jawsh and Laxed contributions; is that correct?

14:22:36 A. Yes.

14:22:37 Q. So again, I'll ask: To the best of your knowledge, the audio file we are about to listen to is the one that corresponds with this, correct?

A. Yes.

MR. BRANCOLINI: So with that, we can now listen to submix 4.

(Thereupon, the audio was played.)

Q. Great.

So now, Dr. Lustig, what stands out to you when listening to this submix 4 compared to submix 1, which, if you will recall, has no -- no -- no layering from Mr. Spatola?

A. Well, it's interesting. So this submix is "No Jawsh," and yet it still, to my ears, is a complete record. I mean, if a student submitted this in my pop production class, this would be a 10 out of 10. It's a great composition.

Now, is it even better with the kind of saxophone and these sounds from Jawsh? Absolutely. But this is already a great stand-alone record as it is without Jawsh.

By contrast, submix 1, the "No Matty," would be, you know, not a 10 out of 10 grade. It would be, you know, "Return with chords, return with bass," because as we saw with the one without Matty, there's serious holes in the structure.

And so it's kind of interesting depending on who you subtract out. If you take away Matty, you don't really have a complete piece, but if you take away Jawsh, you still have a complete record.

14:26:53 Q. Does this demonstrative mean that *Savage Love* was released without Jawsh's material included?
14:26:59 A. No, no, no. It's just an illustrative example.
14:27:03 Q. And so just, in summation, what do you believe these arrangement layer demonstratives help -- both the audio and visually help illustrate for the jury about Mr. Spatola's contributions?
14:27:19 A. I think it's a useful way to see all the musicians' role, their -- the kind of limits and extent of their contributions, and to break the data into various ways.
14:27:32 Q. And what do you believe that these arrangement layer demonstratives do to function with respect to Mr. Spatola's different functions across the different sections of the song?
14:27:43 A. I think it helps us to see that no matter how you slice it and dice it, Mr. Spatola played chords and bass in the entire record and is really indispensable to its structure.
14:27:58 Q. And just to be clear, your opinions were based on the underlying musical materials and not -- in your analysis of that and not these demonstratives themselves; is that correct?
14:28:06 A. That's right.
14:28:08 Q. So with that roadmap in mind, let's move on to the sound recording perspective.
14:28:15 What specifically are you analyzing when you are

looking at the sound recording?
A. So for the sound recording, I'm focused on the sound of it, right, the overall feel, the genre, what instruments Mr. Spatola played, and how that really changes the genre of the record.
Q. So are Mr. Spatola's performances limited to one isolated moment in the finished commercial release of the song or do they recur across the structures?
A. No, he plays all three instruments in all -- in 100 percent of the record, he's playing -- most of it all three instruments. Just in the intro, he plays two instruments, but the rest of it is all three.
Q. And again, specifically from a sound recording standpoint, what do his bass -- what do Mr. Spatola's bass and guitar sections contribute to what the listener hears?
A. Well, the first thing that struck me in listening to it is that -- so *Laxed (Siren Beat)* is basically what's called the Siren Kings genre. It's this, like, regional electronic genre from New Zealand. It's not going to use acoustic instruments, it's not going to have the same feel and sound.
And then Spatola adds acoustic guitar, which just, like, broadens the sound from just being a Siren Kings record to being something that is more of a kind of global pop appeal. And so it's kind of like the difference between, you know, a regional kind of sound and an Ed Sheeran-style global

pop record because of that feeling of that universal accessible acoustic guitar, electric guitar.

Q. So just sort of taking a step back a little, what genre is *Savage Love*?

A. I would consider it pop.

Q. And so you just touched on this, that *Savage Love* incorporates material from *Laxed.* How would you characterize the genre identity of *Laxed*?

A. I would consider *Laxed* a Siren Kings, a very specific regional, you know, genre.

Q. And you touched on this a bit in your two answers ago, but what is the Siren beats style generally? What are the hallmarks of a Siren beat genre style?

A. From my understanding, Siren Kings often uses these kind of, like, synthy sax kind of sounds like we hear with (witness demonstrates). So it often has these type of tinny sounds. And also, we can hear there is kind of a Reggae or Ska kind of influence with the offbeat piano chord (witness demonstrates).

And there is also an influence of a Reggae tone with kind of the drum programming in there as well (witness demonstrates).

MR. BRANCOLINI: Your Honor, I'm mindful of the time, and I have a few more question sections, so I wasn't sure if you would like me to stop now.

THE COURT: How many more questions in regard to this specific subject matter --

MR. BRANCOLINI: I think about three pretty brief questions.

THE COURT: All right. Then go ahead and ask those questions.

MR. BRANCOLINI: Thank you, Your Honor.

Q. So is the choice of musical instruments important in terms of genre?

A. Yes, it's pretty much the number one thing that kind of makes something a genre. You know, you could take the exact same music and, you know, do it on an acoustic piano and suddenly it's this classical song, and then you do it on a distorted electric guitar with screaming and now it's heavy metal.

So, obviously, there's many factors that go into genre. They all have different kind of harmonic structures, melodic formal patterns, but instrumentation is one of the main determinations of genre.

Q. Focusing specifically on Mr. Spatola's guitar and bass parts, what effect do those have on the sound of the finished recording?

A. So apart from his rhythmic and guitar voicing and harmonic contributions, it's more of a composition thing. But in terms of the sound recording, really changing the

genre, making it an accessible kind of global appeal by having that classic sound of the acoustic guitar, just very different from purely electronic artificial sounds.

Q. So are they -- so is Mr. Spatola's performance just duplicating the siren beat from *Laxed*?

A. No, it's adding -- it's adding distinct elements. It has different rhythmic properties. It gives a live feel to something that is otherwise just very rigid and electronic.

MR. BRANCOLINI: Great. Thank you.

That is a good place for us to stop, Your Honor.

THE COURT: Thank you.

In that case, that will be where we end today. Ladies and gentlemen, please be back here at 8:30. In the meantime, don't discuss the case with your family or friends or anyone else, and don't investigate the case.

Thank you.

(Thereupon, the jury retired from the courtroom.)

THE COURT: All right. Counsel, Dr. Lustig, would you like me to mention to the jury that Dr. Lustig isn't meaning any discourtesy by not standing? Or just let things be as they are?

MR. WERGE: That would be helpful, Your Honor.

THE COURT: All right. Then I'll be happy to -- I'll be happy to do that.

Anything else before we break?

MR. RAYGOR: No, Your Honor.

MR. WERGE: Yes, Your Honor. There was a concern raised from the defense about the order of witnesses here with regard to the deposition designations of TuneDaRula. I just wanted to make sure that the Court was aware that we are holding onto that to make sure that we use that to fill any time that might otherwise be empty.

THE COURT: Right. That seems reasonable. And then you have to also revise it based on their excising some of the designations. So I think it makes sense to let you play that when it -- when it makes the most sense.

MR. WERGE: Thank you, Your Honor. Appreciate that.

THE COURT: Anything else?

MR. ROSENBERG: No, Your Honor. Thank you.

THE COURT: And then Ms. Kajimura -- off the record.

(Thereupon, there was a brief off-the-record discussion.)

(Thereupon, the Court was in recess.)

***** ***** *****

I certify that the foregoing is a correct transcript from the record of proceedings in the above-titled matter.

---------------------------

Amy C. Diaz, RPR, CRR April 28, 2026

S/ Amy Diaz


FRANK HARRIS 882

DIRECT EXAMINATION 883

BY MR. FROST

CROSS-EXAMINATION 913

BY MR. ROSENBERG

REDIRECT EXAMINATION 930

BY MR. FROST

(CONTINUED) DIRECT EXAMINATION 940

BY MR. WERGE

CROSS-EXAMINATION 947

BY MR. ROSENBERG

(Exhibit No. 371 981

DIRECT EXAMINATION 1001

BY MR. WERGE

CROSS-EXAMINATION 1018

BY MR. ROSENBERG
DR. ETHAN LUSTIG 1027
DIRECT EXAMINATION 1027
BY MR. BRANCOLINI

## #

**#4455** [1] - 862:23

## '

**'Can** [1] - 967:22

## 1

**1** [24] - 865:8, 865:11, 865:20, 918:23, 918:24, 919:6, 922:13, 923:16, 925:16, 968:24, 1022:23, 1036:16, 1039:16, 1041:6, 1056:2, 1057:10, 1060:14, 1061:4, 1061:12, 1070:8, 1070:18
**10** [10] - 961:3, 975:18, 997:7, 999:25, 1022:23, 1027:2, 1070:14, 1070:19
**100** [7] - 1006:19, 1011:23, 1020:1, 1040:12, 1065:6, 1067:1, 1072:11
**1001** [1] - 1077:23
**101** [2] - 915:22, 992:16
**1018** [1] - 1077:25
**1027** [2] - 1078:2, 1078:3
**104** [1] - 1002:2
**10960** [1] - 863:9
**10:30** [1] - 939:8
**11** [10] - 914:3, 914:8, 914:16, 958:24, 959:18, 960:10, 985:5, 991:19, 996:25, 1000:10
**11-year** [1] - 987:16
**11:08** [1] - 972:15
**11:58** [2] - 909:3, 923:24
**11th** [1] - 914:8
**12** [11] - 957:16, 964:12, 964:19, 966:12, 972:13, 972:18, 974:22, 1021:13, 1044:1, 1047:1, 1047:3
**12:50** [1] - 1015:16
**13** [4] - 956:6, 956:12, 967:13, 999:25
**131** [1] - 959:17
**137** [1] - 1052:16
**138** [4] - 980:15, 980:19, 980:25, 981:5
**14** [2] - 884:21, 997:7
**14.69** [1] - 872:4
**15** [6] - 954:5, 956:2, 956:6, 956:12, 956:16, 969:10
**159** [2] - 961:3, 961:4
**16** [4] - 969:10, 980:7, 980:13, 1021:13
**160** [1] - 961:4
**1600** [1] - 863:17
**17** [8] - 942:15, 951:14, 956:23, 974:25, 975:2, 983:15, 992:16
**1736** [1] - 863:5
**18** [6] - 950:15, 950:18, 952:25, 953:15, 954:2, 956:23
**187** [1] - 1002:20
**188** [2] - 942:15, 1002:20
**19** [4] - 919:17, 919:18, 925:6, 940:24
**1901** [1] - 863:17
**191** [3] - 989:8, 989:18, 999:24
**192** [1] - 997:6
**197** [1] - 1022:22
**1:30** [1] - 919:8
**1L** [1] - 884:2
**1st** [1] - 862:23

## 2

**2** [19] - 881:3, 918:20, 918:23, 919:16, 922:12, 922:13, 991:18, 1040:22, 1040:23, 1041:6, 1056:3, 1061:13, 1062:14, 1065:1, 1066:3
**20** [8] - 954:5, 956:3, 956:6, 956:16, 966:19, 969:9, 975:25, 1011:13
**201** [2] - 915:22, 992:17
**2011** [1] - 958:23
**2015** [2] - 958:23, 958:24
**2020** [23] - 897:22, 899:17, 914:3, 914:8, 914:16, 917:21, 919:17, 919:18, 925:6, 945:25, 964:25, 965:16, 966:13, 967:3, 970:21, 975:8, 979:21, 981:3, 982:11, 1006:12, 1009:3, 1019:23, 1020:8
**2021** [12] - 909:3, 909:17, 911:23, 912:9, 917:21, 919:4, 919:7, 919:12, 923:23, 924:17, 925:13, 926:14
**2022** [3] - 876:21, 947:19, 1062:20
**2023** [4] - 876:21, 954:3, 954:12, 955:24
**2024** [10] - 950:15, 950:18, 952:25, 953:6, 953:15, 954:2, 954:3, 954:12, 955:24, 1002:7
**2025** [1] - 1054:11
**2026** [3] - 862:19, 947:12, 1077:8
**21** [2] - 959:18, 994:1
**2100** [1] - 863:9
**216** [2] - 874:11, 874:15
**22** [14] - 887:17, 889:3, 940:24, 964:25, 965:16, 966:13, 967:3, 970:21, 1006:4, 1006:9, 1006:12, 1019:8, 1019:23, 1020:8
**22nd** [6] - 965:3, 965:5, 971:1, 972:15, 985:17, 1009:3
**23** [6] - 862:19, 887:17, 975:8, 981:2, 982:11, 994:1
**23rd** [26] - 965:7, 972:19, 981:24, 982:18, 982:21, 983:3, 983:6, 983:9, 983:10, 983:18, 983:19, 983:23, 984:2, 984:7, 984:17, 984:24, 984:25, 985:7, 985:14, 985:22, 986:4, 987:4, 987:7, 1001:9, 1009:3
**24** [5] - 945:24, 947:12, 961:5, 989:18, 1002:20
**248** [1] - 871:21
**24th** [1] - 1010:7
**25** [3] - 883:22, 961:4, 967:14
**26** [4] - 883:20, 883:22, 976:11, 1054:11
**273** [1] - 969:8
**28** [1] - 1077:8
**280** [1] - 1021:13
**29** [5] - 976:24, 977:3, 979:19, 979:20, 979:21
**295** [1] - 940:24
**296-23** [1] - 945:1
**297-01** [1] - 945:1
**2:08** [1] - 972:19
**2:23-CV-6191-MWF** [1] - 862:8
**2:30** [2] - 975:10, 983:17

## 3

**3** [6] - 951:15, 1041:7, 1056:3, 1066:18, 1068:14
**30** [6] - 966:19, 977:9, 977:11, 979:18, 979:19, 1009:24
**34** [3] - 977:19, 977:23, 979:18
**350** [2] - 862:23, 863:15
**36** [4] - 977:21, 978:4, 978:6, 979:18
**360** [1] - 887:23
**365** [2] - 897:2, 897:4
**37** [2] - 978:16, 978:18
**371** [2] - 981:11, 1077:22
**398** [2] - 1056:12, 1056:14

## 4

**4** [14] - 909:3, 909:17, 911:23, 912:9, 919:4, 919:7, 919:12, 923:23, 924:17, 925:13, 926:14, 1069:6, 1070:4, 1070:8
**40** [2] - 991:17, 991:18
**401** [2] - 1056:12, 1056:14
**40th** [1] - 863:15
**43** [1] - 993:25
**4th** [1] - 922:23

## 5

**5** [4] - 969:9, 1002:20, 1006:4, 1019:8
**50** [4] - 942:25, 943:2, 943:6, 943:8
**500** [2] - 1003:4, 1044:1
**58.5** [2] - 942:21, 943:8

## 6

**60** [2] - 941:21, 961:11
**63** [1] - 967:13
**64** [3] - 1006:3, 1006:8, 1019:8
**65** [2] - 1006:4, 1019:8
**685** [18] - 879:15, 897:6, 897:7, 897:22, 898:1, 898:4, 898:15, 898:16, 899:9, 901:1, 914:9, 920:4, 941:7, 941:9, 988:21, 994:19, 1008:22, 1069:9
**685's** [6] - 897:12, 897:19, 935:19, 936:6, 989:2, 1009:15
**6:16** [4] - 981:3, 982:10, 983:20, 984:25
**6:30** [3] - 965:7, 966:18, 972:22

## 8

**8** [1] - 942:15
**80206** [1] - 863:6
**882** [1] - 1077:11
**883** [1] - 1077:12
**8:00** [1] - 975:10
**8:30** [1] - 1075:14

## 9

**9** [3] - 878:18, 975:19, 975:20
**90012** [1] - 862:23
**90024** [1] - 863:9
**90067** [1] - 863:18
**90071** [1] - 863:15
**913** [1] - 1077:14
**930** [1] - 1077:16
**940** [1] - 1077:18
**947** [1] - 1077:20
**96** [1] - 908:6
**97** [12] - 907:20, 908:4,

908:8, 918:14, 918:17, 922:7, 923:17, 924:14, 925:16, 926:15, 929:19, 931:5
**981** [1] - 1077:22
**9:30** [4] - 965:3, 965:5, 965:16, 967:3

## A

**A&R** [3] - 922:21, 923:2, 927:18
**A&Rs** [1] - 928:7
**ability** [1] - 968:10
**able** [12] - 876:16, 894:1, 922:23, 960:3, 964:8, 979:15, 984:11, 1003:11, 1022:2, 1037:6, 1052:21, 1059:15
**Ableton** [1] - 1043:7
**above-titled** [1] - 1077:2
**absolutely** [15] - 871:4, 921:4, 921:10, 921:13, 937:8, 955:17, 1029:14, 1030:1, 1042:4, 1044:10, 1047:10, 1051:21, 1058:15, 1058:19, 1070:16
**abstract** [2] - 1035:20, 1043:16
**academic** [2] - 867:18, 1029:16
**academy** [1] - 895:2
**accept** [2] - 1033:15, 1033:16
**access** [4] - 948:6, 953:7, 958:16, 1022:3
**accessible** [2] - 1073:3, 1075:2
**account** [1] - 1051:8
**accuracy** [4] - 928:16, 928:18, 928:19, 1057:5
**accurate** [14] - 887:24, 887:25, 895:20, 909:24, 911:8, 911:12, 911:21, 923:25, 928:14, 931:17, 949:11, 952:11, 1057:23, 1059:19
**accurately** [1] - 1040:2
**accusatory** [1] - 954:24
**acknowledge** [1] - 1003:23
**acknowledged** [1] - 881:5
**acoustic** [15] - 964:9, 1000:17, 1009:16, 1013:12, 1048:16, 1056:6, 1063:2, 1063:10, 1069:16, 1069:17, 1072:20, 1072:22, 1073:3, 1074:13, 1075:3
**acquired** [1] - 936:15
**Act** [5] - 915:22, 992:9, 992:10, 992:17, 1016:24
**acting** [1] - 900:11
**actions** [1] - 881:11
**actual** [9] - 885:8, 891:18, 903:8, 961:19, 1008:24, 1055:11, 1055:12, 1059:3, 1062:1
**ad** [3] - 1007:21, 1007:22
**ad-libs** [3] - 1007:21, 1007:22
**add** [7] - 959:5, 959:11, 960:3, 960:6, 960:18, 1021:9, 1021:20
**added** [21] - 959:13, 988:19, 1005:7, 1005:14, 1007:22, 1007:24, 1020:15, 1020:17, 1021:9, 1022:5, 1022:10, 1022:12, 1022:17, 1022:20, 1023:1, 1023:3, 1023:5, 1023:8, 1023:23, 1025:11, 1069:4
**adding** [5] - 922:21, 1023:12, 1023:25, 1075:7
**addition** [3] - 888:3, 920:19, 1029:15
**additional** [30] - 876:2, 920:22, 925:8, 925:9, 925:18, 926:3, 926:19, 927:1, 927:11, 927:15, 927:16, 928:10, 929:5, 929:9, 929:13, 931:11, 931:12, 933:2, 933:11, 933:15, 933:16, 934:17, 999:21, 1000:5, 1000:12, 1055:18
**additionally** [1] - 903:16
**address** [3] - 908:20, 919:4, 922:23
**addressing** [1] - 866:10
**adds** [1] - 1072:22
**admissibility** [1] - 874:12
**admit** [4] - 874:23, 988:12, 1005:16, 1005:25
**admitted** [18] - 874:10, 874:16, 874:18, 874:21, 875:13, 875:23, 918:15, 918:16, 974:25, 976:1, 976:13, 977:2, 977:10, 977:20, 978:5, 978:17, 980:8, 1014:4
**admitting** [1] - 980:19
**advance** [1] - 1060:25
**adverse** [2] - 866:9, 876:17
**advice** [3] - 888:17, 888:21, 899:22
**advisable** [1] - 937:2
**advise** [5] - 898:14, 899:6, 900:15, 904:20, 936:22
**advised** [3] - 901:3, 901:14, 913:24
**advising** [1] - 864:21
**affect** [2] - 1048:10, 1052:5
**affecting** [1] - 1004:9
**affiliation** [1] - 920:23
**AFM** [2] - 920:6, 920:14
**afternoon** [5] - 942:10, 942:13, 947:11, 1002:13, 1027:24
**age** [2] - 884:21, 928:15
**agents** [1] - 917:11
**ago** [14] - 876:13, 879:3, 883:20, 883:22, 908:25, 912:4, 913:12, 913:14, 970:17, 1002:7, 1002:13, 1021:8, 1027:2, 1073:12
**agree** [25] - 867:12, 868:25, 875:22, 892:19, 901:5, 901:8, 928:13, 933:7, 941:7, 944:19, 961:9, 961:12, 971:19, 975:11, 988:7, 988:8, 991:1, 992:4, 997:9, 999:5, 1008:5, 1011:3, 1013:11, 1023:22
**agreed** [5] - 874:25, 875:9, 984:12, 1023:15, 1054:3
**agreeing** [1] - 998:8
**agreement** [12] - 873:22, 881:6, 896:15, 898:10, 901:9, 935:18, 936:23, 937:11, 938:3, 945:10, 945:12, 1017:14
**agreements** [1] - 945:9
**ahead** [18] - 872:11, 900:3, 900:8, 907:24, 936:14, 949:6, 951:25, 956:11, 980:24, 990:18, 1006:6, 1007:3, 1018:10, 1021:4, 1039:13, 1063:6, 1064:13, 1074:6
**aid** [1] - 1061:22
**air** [1] - 1049:25
**Akinwande** [1] - 871:1
**al** [1] - 862:8
**album** [3] - 890:8, 892:22, 907:5
**albums** [1] - 893:9
**alert** [1] - 875:19
**align** [2] - 1051:4, 1051:5
**alike** [1] - 998:17
**Allison** [1] - 863:14
**allow** [6] - 864:10, 882:7, 954:23, 973:9, 997:17, 997:22
**allowed** [3] - 948:16, 1033:11, 1053:1
**allows** [2] - 1032:23, 1033:3
**almost** [6] - 867:1, 868:3, 958:24, 961:10, 989:2, 1046:21
**alone** [11] - 911:25, 942:12, 946:4, 1010:8, 1010:10, 1010:11, 1010:13, 1010:15, 1039:1, 1065:13, 1070:17
**alternative** [5] - 874:16, 1001:6, 1001:14, 1057:11, 1057:19
**AM** [9] - 909:3, 923:24, 965:7, 972:19, 972:22, 981:3, 982:10, 983:20, 984:25
**American** [4] - 955:1, 955:5, 955:8, 955:22
**amount** [3] - 941:24, 956:10, 1046:22
**amounts** [1] - 948:14
**Amy** [2] - 1077:8, 1077:9
**AMY** [1] - 862:22
**analysis** [19] - 1030:6, 1030:14, 1031:2, 1031:23, 1035:8, 1040:3, 1040:18, 1044:9, 1049:21, 1051:9, 1051:19, 1053:5, 1053:12, 1055:23, 1056:19, 1059:25, 1067:18, 1068:24, 1071:20
**analyzation** [1] - 1029:25
**analyze** [8] - 1032:9, 1034:12, 1034:14, 1041:10, 1045:16, 1049:14, 1055:18, 1059:7
**analyzed** [3] - 1029:13, 1044:14, 1059:8
**analyzing** [7] - 1030:1, 1031:6, 1036:1, 1036:13, 1048:17, 1049:5, 1072:1
**ands** [1] - 1013:20
**Angeles** [7] - 862:18, 862:23, 863:9, 863:15, 863:18, 958:23, 1028:21
**annotated** [1] - 874:22
**ANSWER** [25] - 895:15, 942:20, 942:25, 943:2, 947:18, 947:22, 956:16, 957:2, 957:10, 957:19, 957:21, 958:1, 960:1, 967:19, 967:21, 968:1,

969:17, 969:22, 970:2, 1000:6, 1003:2, 1006:19, 1020:1, 1020:10, 1021:18
**answer** [29] - 880:5, 901:13, 907:10, 914:20, 937:5, 942:24, 943:14, 944:8, 944:16, 946:20, 952:11, 957:6, 957:7, 957:14, 971:4, 973:24, 989:17, 990:18, 997:17, 997:23, 1003:1, 1006:25, 1019:9, 1019:25, 1020:5, 1020:9, 1020:20, 1021:2, 1067:18
**answered** [6] - 958:7, 970:9, 994:9, 995:20, 997:15, 999:1
**answers** [4] - 948:15, 948:16, 1024:25, 1073:12
**anticipate** [2] - 871:10, 1053:23
**anytime** [1] - 938:11
**anyway** [2] - 865:7, 914:21
**apart** [3] - 960:18, 1032:25, 1074:24
**apologies** [4] - 878:11, 878:15, 943:17, 1006:7
**apologize** [11] - 864:16, 921:13, 921:19, 1027:8, 1040:25, 1053:14, 1053:18, 1053:22, 1060:25, 1062:17, 1068:17
**appeal** [3] - 881:15, 1072:25, 1075:2
**appear** [3] - 866:15, 943:6, 949:14
**APPEARANCES** [1] - 863:1
**appeared** [1] - 1053:3
**appearing** [1] - 864:11
**applied** [2] - 892:8, 1062:18
**applies** [1] - 957:9
**apply** [2] - 1045:11, 1062:22
**appraised** [1] - 881:17
**appreciate** [4] - 870:1, 873:13, 1018:17, 1076:13
**approach** [4] - 947:3, 950:20, 1031:9, 1052:12
**approached** [1] - 1045:14
**approaches** [1] - 1029:21
**appropriate** [2] - 989:22, 1016:15
**appropriately** [1] - 1032:21
**approval** [3] - 926:18, 926:25, 972:9
**approved** [1] - 979:15
**April** [51] - 862:19, 897:22, 945:24, 947:12, 964:25, 965:3, 965:5, 965:7, 965:16, 966:13, 967:3, 970:21, 971:1, 972:15, 972:19, 975:8, 979:21, 981:2, 981:24, 982:11, 982:18, 982:21, 983:3, 983:6, 983:9, 983:10, 983:18, 983:19, 983:23, 984:2, 984:7, 984:17, 984:24, 984:25, 985:7, 985:13, 985:14, 985:17, 985:22, 986:4, 987:4, 987:7, 1001:9, 1006:12, 1009:3, 1010:7, 1019:23, 1020:8, 1077:8
**area** [3] - 865:23, 879:7, 1066:6
**areas** [2] - 883:15, 1031:2
**arguably** [1] - 873:9
**argue** [1] - 1016:5
**argument** [4] - 875:15, 875:16, 875:19, 875:24
**arrange** [1] - 905:3
**arranged** [1] - 1056:10
**Arrangement** [1] - 1066:19
**arrangement** [8] - 1057:1, 1059:2, 1059:3, 1066:7, 1067:14, 1068:1, 1071:6, 1071:12
**arrive** [1] - 973:13
**arrived** [2] - 939:16, 953:8
**art** [13] - 893:5, 1031:22, 1032:6, 1050:3, 1050:6, 1050:7, 1050:16, 1050:17, 1050:20, 1051:3, 1051:20, 1054:13, 1067:16
**article** [2] - 1029:18, 1029:19
**articles** [3] - 1029:16, 1031:8, 1031:9
**artificial** [1] - 1075:4
**artist** [25] - 883:23, 885:14, 886:18, 891:7, 891:10, 899:4, 906:3, 917:7, 917:13, 920:4, 923:8, 923:9, 936:21, 936:22, 960:7, 965:25, 971:19, 973:14, 979:15, 990:25, 993:6, 1012:1, 1012:4, 1013:8, 1013:9
**artist's** [4] - 893:24, 917:6, 917:19, 971:15
**artistic** [1] - 879:8
**artists** [12] - 887:13, 888:23, 889:2, 889:7, 889:8, 889:16, 889:20, 905:9, 915:14, 923:3, 923:4, 923:7
**ascertain** [1] - 1060:6
**aside** [1] - 916:22
**aspects** [4] - 1035:4, 1050:22, 1052:9, 1069:15
**assess** [4] - 1040:9, 1044:13, 1067:8, 1067:19
**assessment** [1] - 1032:5
**assign** [1] - 1059:23
**assigned** [2] - 890:14, 892:20
**assist** [3] - 921:5, 922:22, 931:6
**assume** [8] - 885:1, 891:3, 904:13, 908:25, 932:14, 963:22, 993:8
**assumed** [12] - 974:16, 986:25, 987:1, 995:12, 996:4, 999:16, 1014:9, 1015:8, 1015:9, 1015:11, 1018:19, 1054:18
**assuming** [3] - 884:17, 912:4, 1012:1
**assumption** [3] - 936:9, 1015:4, 1016:13
**assumptions** [2] - 932:19, 995:15
**attached** [2] - 921:6, 980:21
**attaches** [1] - 981:12
**attachment** [1] - 980:14
**attend** [2] - 1002:25, 1010:22
**attended** [3] - 942:19, 972:4, 1002:23
**attention** [1] - 943:16
**Attorney** [8] - 863:4, 863:5, 863:7, 863:8, 863:8, 863:14, 863:14, 863:17
**attorney** [9] - 899:11, 899:13, 900:6, 900:11, 947:11, 950:4, 954:18, 955:24, 956:2
**attorney-client** [1] - 899:11
**attorneys** [1] - 953:17
**audience** [1] - 881:15
**audio** [44] - 926:10, 940:13, 949:24, 958:22, 959:3, 959:5, 959:13, 960:10, 960:20, 961:11, 979:12, 980:14, 981:20, 985:4, 1028:14, 1029:6, 1042:9, 1043:6, 1044:11, 1055:12, 1055:15, 1056:10, 1057:24, 1057:25, 1058:2, 1059:13, 1060:20, 1060:24, 1061:7, 1065:14, 1065:16, 1066:2, 1066:4, 1066:5, 1067:23, 1067:25, 1068:14, 1068:15, 1068:19, 1069:20, 1069:25, 1070:5, 1071:6
**audiovisual** [1] - 1029:3
**auditory** [1] - 1062:13
**August** [1] - 920:6
**author** [13] - 879:22, 880:1, 880:5, 880:8, 880:12, 880:18, 880:20, 880:23, 881:1, 1001:7, 1001:12, 1001:15, 1037:21
**author's** [1] - 881:19
**authored** [1] - 1038:9
**authority** [4] - 983:7, 983:9, 983:12, 986:20
**authorization** [1] - 901:19
**authors** [2] - 879:6, 880:15
**autonomy** [1] - 891:12
**availability** [1] - 953:20
**Avenue** [2] - 863:15, 863:17
**award** [1] - 895:2
**aware** [12] - 864:22, 889:14, 897:8, 937:10, 937:14, 938:18, 999:20, 1000:4, 1011:14, 1014:18, 1023:18, 1076:6
**awkward** [1] - 1058:16

**B**

**B-flat** [1] - 968:23
**bachelor's** [1] - 1030:7
**background** [8] - 968:13, 969:4, 970:3, 970:6, 985:4, 1028:25, 1030:4, 1030:5
**balance** [1] - 870:22
**bar** [4] - 899:16, 899:18, 996:12, 996:14
**bars** [5] - 996:13, 1008:24, 1009:9, 1013:20, 1039:23
**base** [1] - 1057:2
**based** [54] - 868:2, 874:11, 875:7, 880:1, 896:13, 915:1, 915:18, 928:20, 929:3, 929:8, 952:12, 960:19, 963:19, 968:13, 969:4, 970:6, 970:18, 970:23, 972:7, 985:4, 986:14, 987:15, 987:20, 988:2, 988:13,

988:16, 990:10, 991:6, 991:13, 992:2, 992:25, 993:12, 994:5, 994:21, 994:25, 995:4, 995:8, 995:17, 996:24, 997:11, 998:4, 998:22, 999:10, 1000:10, 1011:25, 1014:11, 1016:13, 1019:1, 1033:5, 1059:13, 1059:15, 1067:17, 1071:19, 1076:10
**basic** [1] - 1047:7
**basis** [11] - 876:24, 877:3, 951:10, 954:11, 1033:12, 1033:18, 1033:21, 1037:19, 1038:20, 1053:12, 1064:8
**basketball** [1] - 884:3
**bass** [50] - 920:22, 925:9, 925:19, 926:4, 926:19, 927:1, 927:12, 927:16, 929:5, 929:10, 929:13, 931:12, 933:2, 933:11, 933:15, 964:7, 999:21, 1000:5, 1000:12, 1000:18, 1009:17, 1040:15, 1043:14, 1048:14, 1048:16, 1056:6, 1058:15, 1058:19, 1058:23, 1059:4, 1060:9, 1060:11, 1061:17, 1063:1, 1063:3, 1063:7, 1063:10, 1063:16, 1063:20, 1064:2, 1065:7, 1066:15, 1066:25, 1069:18, 1070:20, 1071:17, 1072:15, 1074:21
**bear** [3] - 947:2, 996:22, 1061:3
**beast** [1] - 1045:14
**beat** [7] - 897:19, 898:16, 899:8, 935:19, 936:6, 1073:14, 1075:6
**Beat** [25] - 879:15, 891:15, 896:23, 897:1, 897:9, 897:13, 898:6, 900:16, 988:20, 989:3, 994:19, 996:19, 996:20, 999:6, 1013:13, 1041:14, 1063:15, 1065:24, 1066:23, 1067:3, 1067:12, 1069:1, 1069:2, 1069:17, 1072:18
**Beat)** [7] - 879:11, 996:21, 1052:23, 1063:16, 1067:17, 1069:10, 1069:19
**Beat)(singing** [1] - 1068:8
**Beatles** [1] - 1050:13
**beats** [3] - 1029:6, 1043:8, 1073:13
**became** [6] - 891:1, 899:15, 903:3, 966:24, 983:2
**become** [3] - 883:18, 884:7, 917:11
**becomes** [1] - 1043:20
**began** [3] - 883:25, 884:13, 994:12
**begets** [2] - 894:13, 894:14
**begin** [2] - 912:25, 1054:25
**beginning** [5] - 868:12, 868:18, 884:18, 897:13, 1005:1
**behalf** [4] - 886:3, 917:25, 918:5, 925:12
**behind** [4] - 963:1, 963:10, 964:4, 1009:19
**belatedly** [1] - 875:23
**below** [4] - 909:6, 909:19, 909:24, 923:25
**Ben** [28] - 882:1, 909:17, 909:22, 910:14, 911:7, 911:18, 916:15, 919:6, 919:10, 919:12, 922:10, 922:21, 923:24, 924:5, 924:10, 924:16, 924:17, 925:12, 925:15, 926:13, 929:20, 934:22, 934:25, 935:1, 935:9, 984:16
**Ben's** [1] - 909:13
**bench** [1] - 1052:15
**beneath** [1] - 918:25
**benefit** [1] - 948:23
**benefits** [3] - 920:5, 920:7, 920:10
**Benjamin** [1] - 1025:21
**benmaddahi@ sonymusic** [1] - 909:3
**berated** [1] - 944:22
**best** [22] - 872:5, 883:6, 899:1, 917:5, 932:3, 932:9, 932:23, 933:23, 935:3, 938:1, 942:18, 945:12, 945:16, 965:14, 966:17, 1010:8, 1010:12, 1016:25, 1017:7, 1051:1, 1067:24, 1069:24
**Betsy** [8] - 909:14, 909:20, 910:7, 919:24, 922:8, 922:18
**Betsy's** [1] - 909:12
**betsywhitney@ columbiarecords** [1] - 909:7
**better** [6] - 888:13, 894:10, 894:22, 961:24, 1039:7, 1070:15
**between** [29] - 865:22, 866:1, 866:11, 866:14, 867:11, 867:22, 881:6, 898:4, 899:23, 933:11, 934:10, 943:24, 944:3, 944:13, 955:2, 967:1, 990:11, 992:25, 993:13, 1002:9, 1008:15, 1009:2, 1014:2, 1016:7, 1017:14, 1047:12, 1047:19, 1049:22, 1072:25
**beyond** [3] - 873:14, 959:21, 1055:8
**big** [10] - 868:18, 875:24, 892:17, 948:12, 962:14, 962:16, 962:20, 1031:11, 1058:12, 1058:13
**bigger** [3] - 894:16, 894:22
**biggest** [1] - 955:2
**binder** [1] - 942:15
**bit** [12] - 877:14, 908:2, 963:24, 1028:24, 1030:3, 1045:13, 1047:11, 1058:24, 1058:25, 1067:13, 1068:17, 1073:12
**Blank** [1] - 913:19
**blankety** [1] - 904:14
**blow** [3] - 923:20, 980:8, 981:1
**bluntly** [1] - 948:13
**blur** [2] - 1003:8, 1003:14
**board** [2] - 962:9, 1062:9
**body** [8] - 894:13, 894:17, 931:14, 932:25, 933:8, 933:12, 933:19, 934:4
**booth** [4] - 963:5, 963:6, 964:9, 1007:10
**bottom** [4] - 908:11, 918:20, 1056:23, 1059:11
**Boulevard** [1] - 863:9
**bounce** [24] - 916:17, 961:21, 966:10, 979:9, 979:11, 979:16, 981:13, 981:17, 981:20, 981:23, 981:24, 981:25, 982:7, 982:13, 982:18, 982:19, 983:9, 983:22, 985:6, 985:21, 986:3, 987:6, 1001:9, 1059:16
**bounced** [5] - 982:5, 982:6, 982:10, 982:21, 983:6
**bounces** [7] - 916:16, 929:21, 934:22, 935:1, 935:10, 984:13, 984:19
**box** [1] - 1054:10
**Brancolini** [4] - 863:8, 872:13, 873:22
**BRANCOLINI** [24] - 1026:7, 1027:23, 1034:3, 1036:20, 1039:14, 1053:14, 1054:23, 1054:25, 1055:2, 1056:11, 1060:23, 1064:14, 1064:19, 1064:23, 1064:25, 1066:2, 1068:13, 1068:16, 1070:3, 1073:24, 1074:4, 1074:8, 1075:10, 1078:4
**breadth** [1] - 930:20
**break** [17] - 877:15, 904:18, 930:17, 939:7, 939:19, 975:12, 1015:16, 1017:10, 1026:11, 1026:17, 1040:5, 1041:11, 1042:6, 1055:22, 1071:11, 1076:1
**breaking** [2] - 907:9, 1041:17
**breakup** [1] - 876:24
**brevity** [1] - 931:3
**bridge** [5] - 1008:25, 1009:7, 1036:5, 1041:7, 1056:3
**brief** [7] - 877:19, 879:1, 939:22, 1018:1, 1026:22, 1074:4, 1076:17
**briefly** [4] - 876:10, 902:8, 1010:21, 1068:22
**bring** [6] - 918:13, 1006:25, 1017:21, 1032:25, 1055:13, 1055:14
**British** [1] - 1030:7
**Brittany** [2] - 920:15, 922:13
**broad** [1] - 867:7
**broadens** [1] - 1072:23
**broader** [1] - 1063:18
**broadly** [1] - 880:11
**broke** [3] - 864:1, 882:3, 1036:3
**broken** [1] - 1056:25
**Bros** [2] - 886:7, 886:8
**brought** [6] - 959:9, 1002:12, 1016:12, 1017:12, 1017:15, 1017:18
**build** [1] - 894:9
**building** [3] - 1058:10, 1058:13, 1065:9
**built** [1] - 1013:8
**bunch** [1] - 954:4
**bundles** [1] - 1043:4
**burden** [1] - 880:16
**business** [12] - 879:20, 917:3, 917:6, 917:10, 917:14, 917:20, 918:5, 945:8, 996:1, 997:3, 1014:2
**busy** [1] - 1018:17

**button** [1] - 1065:4
**BY** [17] - 883:2, 913:3, 930:3, 940:4, 947:7, 952:23, 1001:21, 1018:13, 1027:23, 1077:13, 1077:15, 1077:17, 1077:19, 1077:21, 1077:24, 1078:1, 1078:4

## C

**CA** [1] - 862:23
**calculate** [1] - 1034:23
**CALIFORNIA** [1] - 862:2
**California** [4] - 862:18, 863:9, 863:15, 863:18
**cannot** [5] - 868:25, 881:17, 1038:19, 1050:22, 1054:12
**capacity** [5] - 886:13, 906:10, 906:19, 907:16, 913:21
**care** [5] - 917:17, 940:12, 952:15, 952:16
**career** [5] - 890:17, 890:22, 918:10, 987:16, 1030:11
**careful** [1] - 894:20
**carrying** [1] - 1058:21
**case** [53] - 866:7, 870:12, 875:25, 880:10, 899:4, 905:7, 911:2, 913:16, 921:7, 939:10, 939:13, 947:12, 948:3, 949:15, 949:18, 950:2, 950:5, 950:7, 950:10, 950:13, 950:15, 952:5, 953:24, 956:20, 965:4, 968:9, 1000:20, 1001:17, 1015:17, 1015:18, 1016:18, 1032:15, 1032:20, 1032:24, 1033:5, 1033:23, 1034:5, 1034:7, 1034:10, 1038:22, 1039:9, 1041:11, 1044:12, 1046:15, 1050:9, 1057:21, 1059:14, 1061:2, 1064:6, 1067:11, 1075:13, 1075:15, 1075:16
**cases** [3] - 873:3, 1028:3, 1044:11
**casual** [1] - 903:2
**caused** [3] - 926:12, 936:8, 943:23
**caution** [1] - 899:11
**CC'd** [1] - 921:6
**CDs** [1] - 928:14
**CENTRAL** [1] - 862:2
**CEO** [1] - 917:6
**certain** [17] - 874:25, 875:6, 879:15, 880:1, 880:5, 946:2, 960:6, 967:10, 969:17, 992:5, 999:7, 1006:20, 1020:2, 1021:20, 1039:6, 1048:2
**certainly** [6] - 866:19, 868:3, 869:8, 912:21, 1010:1, 1017:21
**certify** [1] - 1077:1
**cetera** [9] - 885:25, 886:23, 890:19, 890:24, 891:23, 898:23, 927:20, 935:12
**chain** [1] - 924:13
**chance** [2] - 1017:20, 1037:18
**chances** [2] - 894:10, 895:4
**change** [6] - 871:3, 1045:23, 1045:24, 1047:8, 1047:22, 1058:3
**changed** [4] - 1008:15, 1008:20, 1047:12, 1052:22
**changes** [2] - 928:18, 1072:5
**changing** [3] - 1038:6, 1047:7, 1075:1
**characterization** [1] - 954:21
**characterize** [1] - 1073:8
**charge** [15] - 923:6, 923:10, 940:17, 945:23, 946:10, 993:4, 1005:17, 1005:25, 1006:1, 1006:10, 1011:24, 1012:1, 1014:6, 1019:21
**charitably** [1] - 869:2
**chart** [3] - 1040:2, 1040:10, 1040:17
**charts** [1] - 1063:19
**chat** [2] - 1026:14, 1052:13
**check** [2] - 939:17, 984:11
**choice** [1] - 1074:9
**choices** [3] - 1049:23, 1052:7, 1052:9
**choose** [1] - 1048:25
**chord** [29] - 968:15, 968:16, 968:17, 968:19, 969:21, 969:22, 969:23, 1032:12, 1045:6, 1046:1, 1046:11, 1046:13, 1046:14, 1046:16, 1046:17, 1046:20, 1047:4, 1047:5, 1047:7, 1047:13, 1048:8, 1048:24, 1049:13, 1058:23, 1060:9, 1061:17, 1073:19
**chords** [33] - 968:11, 969:25, 989:6, 996:6, 996:11, 996:14, 996:15, 996:16, 996:19, 1042:12, 1048:20, 1048:22, 1049:12, 1057:1, 1058:15, 1058:19, 1059:4, 1060:11, 1062:25, 1063:7, 1063:8, 1063:9, 1063:14, 1063:17, 1063:18, 1064:2, 1065:7, 1066:15, 1066:25, 1069:18, 1070:20, 1071:17
**chorus** [15] - 996:11, 996:13, 1008:24, 1009:9, 1009:10, 1036:4, 1041:6, 1041:7, 1056:2, 1056:3, 1056:21, 1058:17, 1061:12, 1061:13
**chosen** [2] - 879:4, 901:12
**Christopher** [1] - 863:7
**chronologically** [1] - 873:21
**circle** [1] - 1042:13
**circumlocution** [1] - 875:2
**circumstance** [1] - 932:13
**civil** [1] - 879:4
**claim** [1] - 987:10
**claiming** [1] - 1014:18
**claims** [6] - 879:25, 880:7, 973:3, 973:17, 974:1, 1053:11
**clap** [1] - 1009:18
**claps** [8] - 1022:5, 1022:6, 1022:11, 1022:12, 1022:17, 1023:2, 1023:4, 1023:8
**clarification** [1] - 993:25
**clarified** [1] - 932:20
**clarify** [7] - 887:21, 889:5, 889:18, 892:3, 911:17, 938:16, 1021:6
**clarifying** [1] - 907:14
**clarity** [2] - 919:3, 938:15
**class** [1] - 1070:13
**classic** [1] - 1075:3
**classical** [4] - 1029:2, 1030:14, 1048:8, 1074:14
**clean** [3] - 873:11, 1020:20, 1061:6
**clear** [18] - 867:7, 891:8, 894:21, 899:7, 900:5, 900:15, 904:9, 904:21, 911:4, 916:11, 921:18, 933:7, 934:2, 981:8, 1052:25, 1061:18, 1065:6, 1071:19
**cleared** [1] - 936:6
**clearing** [2] - 901:1, 901:6
**CLERK** [7] - 877:16, 882:14, 882:20, 882:23, 1027:12, 1027:16, 1027:20
**client** [5] - 899:1, 899:3, 899:11, 955:11, 955:21
**client's** [2] - 903:20, 903:25
**clients** [2] - 955:5, 959:11
**clip** [3] - 940:23, 945:1, 1055:13
**close** [7] - 888:8, 962:25, 989:20, 1047:19, 1047:20, 1053:10, 1053:21
**closed** [1] - 922:22
**closing** [4] - 875:15, 875:16, 875:19, 875:24
**coauthor** [1] - 1016:20
**coauthors** [1] - 881:12
**cocounsel** [1] - 876:5
**Code** [1] - 992:16
**code** [1] - 915:25
**collaborate** [1] - 886:20
**collaborating** [1] - 960:11
**collaboration** [5] - 889:15, 889:17, 889:18, 892:7, 903:21
**collaborations** [2] - 889:20, 889:24
**collaborative** [2] - 923:11, 960:11
**collaboratives** [2] - 990:22, 990:23
**collaborator** [4] - 990:8, 990:12, 991:1, 991:2
**collaborators** [2] - 904:17, 990:21
**collection** [1] - 1031:11
**college** [3] - 958:23, 992:12, 1029:1
**colloquially** [1] - 1043:11
**Colorado** [1] - 863:6
**Columbia** [16] - 879:20, 886:10, 887:1, 887:5, 911:3, 920:15, 922:8, 922:22, 935:17, 935:20, 936:3, 936:11, 936:15, 936:16, 936:17, 1030:7
**column** [1] - 1039:22
**combinations** [1] - 1067:9
**combined** [1] - 1043:22
**comfortable** [2] - 878:21, 962:8
**coming** [2] - 871:1, 1014:11
**comment** [1] - 1024:24
**commercial** [3] - 987:8, 1062:19, 1072:8
**commercially** [6] - 896:3, 914:7, 984:3, 1057:21, 1062:6, 1062:8
**commission** [1] -

917:15
**commissioned** [1] - 888:9
**committee** [1] - 1027:2
**common** [5] - 905:13, 916:3, 998:14, 1048:3, 1050:1
**commonly** [1] - 889:15
**commonplace** [4] - 1031:14, 1049:22, 1051:8, 1052:6
**communicate** [5] - 890:12, 950:17, 952:24, 953:3, 953:5
**communicated** [3] - 932:1, 951:14, 953:2
**communicating** [3] - 886:3, 892:11, 917:25
**communication** [2] - 920:20, 926:2
**communications** [3] - 899:12, 953:13, 957:17
**companies** [2] - 893:11, 903:19
**company** [1] - 920:11
**compare** [5] - 988:18, 1032:3, 1042:3, 1042:13, 1065:24
**compared** [2] - 1051:6, 1070:8
**comparing** [1] - 1068:8
**compensated** [3] - 893:4, 915:19, 1034:7
**compensation** [7] - 893:13, 894:3, 894:4, 894:12, 903:14, 998:9, 1034:9
**competitions** [1] - 884:23
**complete** [13] - 864:17, 869:15, 957:5, 957:7, 1007:1, 1061:16, 1061:20, 1066:13, 1066:25, 1068:8, 1070:12, 1070:25, 1071:1
**completed** [2] - 882:10, 961:19
**completely** [12] - 869:10, 890:16, 973:11, 980:18, 989:2, 1005:16, 1005:25, 1006:10, 1009:12, 1019:21, 1048:20, 1049:2
**completeness** [1] - 1061:2
**complex** [2] - 1043:19, 1048:7
**components** [1] - 1063:8
**composer** [2] - 1028:2, 1028:19
**composers** [1] - 1032:8
**composition** [32] - 879:14, 879:24, 915:3, 988:25, 994:7, 995:1, 1001:13, 1011:13, 1028:8, 1028:11, 1030:19, 1034:16, 1035:6, 1035:11, 1035:15, 1035:20, 1035:24, 1044:15, 1045:12, 1045:15, 1045:21, 1045:24, 1048:1, 1061:16, 1061:19, 1065:13, 1065:23, 1065:25, 1066:13, 1066:16, 1070:14, 1074:25
**compositional** [4] - 1004:13, 1041:16, 1045:16, 1049:3
**compositions** [7] - 879:9, 1004:8, 1046:3, 1046:6, 1050:8, 1051:23
**compound** [4] - 930:16, 931:21, 953:12, 954:10
**computer** [4] - 948:4, 962:7, 966:22, 1051:11
**computerized** [1] - 948:10
**concepts** [2] - 883:16, 1046:2
**concern** [5] - 864:2, 875:5, 936:8, 936:10, 1076:3
**concerned** [1] - 868:7
**concerning** [2] - 892:12, 930:5
**concluded** [3] - 882:4, 1018:7, 1018:8
**conclusion** [4] - 936:25, 1016:2, 1053:16, 1053:17
**condition** [2] - 908:23, 1061:16
**confer** [1] - 876:5
**conference** [1] - 864:16
**conferral** [1] - 868:14
**confidant** [3] - 888:11, 888:13, 888:14
**confirm** [6] - 864:23, 1035:8, 1040:2, 1065:15, 1066:6, 1068:18
**confirmation** [1] - 920:17
**confirmed** [1] - 1059:19
**confirming** [1] - 925:11
**confusing** [1] - 1043:10
**connection** [3] - 908:17, 913:16, 914:2
**consequence** [2] - 893:14, 893:24
**consequences** [1] - 893:17
**consider** [14] - 881:4, 881:8, 927:8, 938:5, 987:24, 990:5, 990:8, 1032:11, 1034:16, 1035:3, 1035:14, 1045:4, 1073:6, 1073:10
**consideration** [1] - 872:18
**considered** [2] - 1045:4, 1051:20
**consistent** [3] - 1015:23, 1016:25, 1017:8
**consistently** [1] - 886:23
**consists** [1] - 968:16
**console** [8] - 962:6, 962:9, 962:11, 962:21, 962:23, 963:1, 963:7, 1007:14
**construction** [1] - 1027:2
**consult** [2] - 864:5, 1028:2
**consulted** [1] - 1051:25
**consummate** [1] - 938:13
**contact** [5] - 886:24, 886:25, 920:2, 920:14, 1047:19
**contacted** [2] - 957:2, 957:21
**contain** [2] - 996:11, 1024:14
**contemporaneous** [1] - 902:22
**contention** [1] - 880:2
**context** [4] - 865:9, 1050:6, 1050:25, 1051:1
**continue** [3] - 872:19, 989:23, 1010:10
**CONTINUED** [2] - 940:3, 1077:18
**continued** [4] - 891:12, 946:4, 972:25, 983:2
**continuous** [1] - 871:14
**contradict** [1] - 1016:8
**contrast** [1] - 1070:18
**contribute** [1] - 1072:16
**contributed** [8] - 880:23, 893:2, 904:2, 905:21, 1035:5, 1035:25, 1040:9, 1041:12
**contributing** [2] - 904:13, 1041:15
**contribution** [10] - 880:19, 880:21, 881:4, 881:16, 881:17, 881:18, 881:19, 903:15, 903:25, 905:23
**contributions** [25] - 880:1, 903:5, 928:12, 929:22, 930:5, 930:7, 1004:5, 1012:16, 1034:15, 1036:2, 1036:7, 1036:10, 1036:17, 1039:16, 1057:13, 1059:17, 1063:9, 1063:18, 1064:15, 1065:20, 1067:3, 1069:22, 1071:8, 1071:11, 1074:25
**contributor's** [2] - 893:23, 893:25
**contributors** [2] - 903:18, 928:4
**control** [11] - 881:9, 930:11, 930:24, 945:20, 946:15, 991:7, 991:10, 991:14, 1005:17, 1023:25
**controlled** [1] - 1020:6
**convenience** [1] - 882:7
**convenient** [1] - 1026:18
**conversation** [9] - 899:18, 900:18, 903:3, 933:4, 934:21, 937:8, 956:4, 956:13, 958:18
**conversations** [6] - 890:24, 891:11, 903:16, 903:17, 906:6, 907:3
**convert** [1] - 1030:23
**converted** [1] - 962:17
**convince** [1] - 1052:8
**cooperate** [1] - 871:20
**coordinate** [1] - 953:16
**copacetic** [2] - 866:16, 867:10
**copied** [1] - 922:14
**coproduce** [3] - 994:22, 995:1, 995:5
**copy** [5] - 865:4, 868:13, 896:8, 922:10, 949:17
**copying** [3] - 919:12, 922:9, 924:17
**Copyright** [5] - 915:22, 992:9, 992:10, 992:17, 1016:24
**copyright** [18] - 879:7, 879:10, 879:23, 895:6, 895:8, 895:14, 895:16, 896:4, 896:7, 915:3, 916:4, 916:6, 1012:12, 1012:22, 1024:18, 1028:2, 1032:24, 1034:18
**copyrightability** [1] - 1053:2
**copyrightable** [1] - 1053:10
**copyrighted** [1] - 880:25
**core** [2] - 1029:2, 1045:25
**corporate** [1] - 879:22
**corpus** [1] - 1031:10
**correct** [182] - 870:17, 885:11, 886:4, 886:5, 889:16, 891:15, 891:16, 892:10, 892:22, 892:25, 895:5, 896:17, 897:4, 897:17, 898:12,

899:5, 901:23, 902:14, 902:16, 902:17, 905:5, 905:25, 906:5, 907:7, 907:17, 907:18, 908:10, 908:15, 910:17, 910:22, 910:23, 911:9, 911:21, 911:22, 913:20, 914:4, 914:6, 916:17, 916:21, 917:23, 918:8, 918:11, 918:12, 918:24, 919:2, 924:11, 924:20, 925:2, 925:3, 925:5, 925:11, 926:4, 926:5, 926:7, 926:9, 926:15, 926:16, 926:20, 927:2, 927:3, 930:8, 930:23, 931:1, 931:7, 931:13, 932:24, 933:1, 933:10, 933:15, 933:25, 934:5, 934:6, 934:16, 934:20, 935:16, 938:17, 938:20, 940:9, 940:15, 940:21, 941:8, 941:15, 941:18, 943:20, 946:8, 946:11, 953:20, 953:21, 953:25, 954:1, 954:19, 957:18, 958:20, 963:3, 963:13, 966:7, 968:18, 971:17, 975:19, 977:15, 979:6, 983:24, 985:14, 985:15, 985:17, 985:18, 986:2, 986:13, 989:3, 997:13, 997:25, 998:2, 998:3, 1003:6, 1003:19, 1003:22, 1004:1, 1004:7, 1004:10, 1004:12, 1005:12, 1006:1, 1006:13, 1006:23, 1007:20, 1007:25, 1009:3, 1009:13, 1010:17, 1011:2, 1011:6, 1011:12, 1011:20, 1012:6, 1012:9, 1012:10, 1012:17, 1012:20, 1012:24, 1013:15, 1018:21, 1019:2, 1019:4, 1019:24, 1020:8, 1023:14, 1023:17, 1024:10, 1025:5, 1025:8, 1035:9, 1036:19, 1036:20, 1041:25, 1044:5, 1044:16, 1047:9, 1048:15, 1049:15, 1054:15, 1059:9, 1059:11, 1059:14, 1059:21, 1059:25, 1060:1, 1060:17, 1060:21, 1062:7, 1063:5, 1063:20, 1064:12, 1064:19, 1064:23, 1065:17, 1066:8, 1068:19, 1069:22, 1070:1, 1071:22, 1077:1

**correctly** [5] - 903:6, 1041:21, 1059:1, 1062:2, 1064:4

**correspond** [3] - 1063:1, 1066:7, 1068:1

**corresponding** [2] - 1060:20, 1065:16

**corresponds** [1] - 1070:1

**couch** [3] - 963:2, 964:3, 968:1

**counsel** [22] - 864:1, 877:12, 877:18, 878:18, 882:24, 904:22, 913:17, 930:16, 937:17, 942:2, 942:5, 943:6, 968:9, 1015:23, 1027:21, 1032:15, 1032:18, 1034:2, 1034:5, 1052:17, 1062:15, 1075:19

**COUNSEL** [1] - 863:1

**Counsel** [11] - 867:13, 900:3, 907:23, 957:1, 959:16, 1018:5, 1024:22, 1036:18, 1039:13, 1063:6, 1064:13

**count** [1] - 1051:25

**counted** [1] - 872:7

**counterdesignations** [5] - 870:21, 871:3, 871:6, 871:12, 1019:16

**couple** [2] - 941:2, 946:7

**course** [23] - 870:21, 879:2, 892:15, 897:8, 899:20, 907:2, 918:3, 948:18, 951:9, 955:12, 959:17, 960:15, 1008:11, 1014:6, 1015:24, 1029:8, 1030:11, 1030:16, 1034:21, 1042:17, 1053:3, 1056:3, 1063:13

**courses** [3] - 1028:7, 1029:2, 1030:17

**Court** [7] - 864:10, 864:19, 872:21, 877:21, 918:15, 1076:6, 1076:19

**COURT** [179] - 862:1, 864:1, 864:13, 865:1, 865:14, 865:25, 866:18, 867:12, 867:25, 868:5, 868:25, 869:18, 870:2, 870:12, 870:18, 871:7, 871:13, 872:8, 872:11, 872:25, 874:1, 874:13, 874:19, 876:7, 876:11, 876:14, 876:19, 876:22, 877:14, 877:17, 877:25, 878:13, 878:16, 878:18, 878:24, 882:24, 899:14, 900:2, 900:22, 903:11, 907:23, 912:13, 912:17, 912:24, 921:12, 921:25, 926:22, 930:1, 930:16, 931:22, 932:7, 932:20, 935:5, 937:1, 937:17, 937:19, 937:22, 938:9, 939:1, 939:3, 939:6, 939:15, 939:18, 939:24, 942:5, 943:6, 944:1, 944:8, 944:16, 944:24, 945:3, 946:19, 946:23, 946:25, 947:5, 947:25, 950:21, 951:4, 951:19, 954:10, 954:22, 956:11, 957:1, 957:7, 957:13, 957:25, 958:8, 959:16, 959:19, 959:23, 961:6, 964:14, 967:15, 969:11, 970:10, 971:4, 972:11, 973:7, 973:21, 974:5, 975:14, 980:17, 980:22, 981:7, 988:23, 989:5, 989:14, 989:16, 989:19, 990:16, 991:20, 993:21, 994:2, 994:10, 995:21, 997:9, 997:16, 998:21, 999:2, 999:15, 1000:2, 1000:25, 1002:5, 1005:21, 1006:6, 1006:25, 1008:9, 1014:23, 1015:2, 1015:15, 1015:21, 1017:16, 1018:3, 1018:7, 1018:9, 1019:17, 1020:25, 1021:14, 1022:9, 1022:14, 1022:16, 1022:24, 1024:23, 1026:3, 1026:5, 1026:10, 1026:16, 1026:23, 1027:21, 1032:18, 1036:18, 1036:21, 1052:12, 1052:17, 1053:19, 1054:5, 1054:8, 1054:15, 1054:17, 1055:1, 1056:14, 1060:3, 1062:15, 1062:25, 1063:6, 1063:23, 1064:6, 1064:13, 1064:17, 1064:21, 1064:24, 1074:2, 1074:6, 1075:12, 1075:19, 1075:24, 1076:9, 1076:14, 1076:16

**court** [8] - 862:25, 878:20, 881:22, 884:3, 1036:23, 1038:3, 1038:14, 1054:24

**Court's** [1] - 1015:1

**courthouse** [2] - 962:15, 1027:1

**courtroom** [20] - 877:22, 877:23, 878:23, 939:14, 939:23, 954:18, 962:15, 962:16, 962:20, 1015:20, 1018:2, 1026:21, 1027:1, 1027:3, 1027:7, 1027:8, 1027:11, 1033:9, 1053:25, 1075:18

**covered** [2] - 916:11, 931:15

**cowrite** [2] - 993:19, 994:6

**cowritten** [1] - 1023:19

**crazy** [1] - 1048:25

**create** [15] - 894:18, 895:1, 896:6, 897:10, 923:9, 966:12, 966:15, 966:20, 979:8, 990:22, 1007:11, 1012:13, 1048:22, 1057:19, 1063:25

**created** [29] - 896:16, 896:25, 898:16, 899:9, 964:22, 973:18, 974:2, 974:12, 991:4, 1003:11, 1008:6, 1009:23, 1010:1, 1010:16, 1013:12, 1013:13, 1013:17, 1013:18, 1029:12, 1036:24, 1056:19, 1057:12, 1057:22, 1057:23, 1058:9, 1067:2, 1067:18, 1067:21

**creates** [2] - 895:15, 990:20

**creating** [3] - 881:13, 917:15, 1012:23

**creation** [2] - 1029:24, 1062:21

**creative** [15] - 918:6, 923:12, 923:14, 959:3, 959:6, 959:8, 959:14, 960:5, 960:11, 972:8, 1004:5, 1004:8, 1009:19, 1012:15

**creatives** [1] - 990:21

**creator** [7] - 990:6, 990:11, 990:13, 990:19, 991:1, 991:2, 1012:25

**creature** [1] - 1016:23

**credibility** [1] - 1053:7

**credit** [60] - 890:1, 890:13, 892:12, 892:21, 893:8, 893:12, 893:15, 893:16, 893:20, 894:2, 901:21, 903:8, 910:11,

911:8, 915:2, 915:6, 921:23, 925:3, 925:4, 925:11, 926:3, 926:19, 927:1, 927:11, 927:14, 927:15, 927:17, 927:21, 929:5, 929:9, 929:10, 929:12, 929:14, 929:16, 931:12, 934:11, 993:1, 993:3, 993:7, 993:10, 993:16, 997:2, 997:12, 998:1, 998:24, 999:12, 999:18, 999:19, 999:22, 1000:12, 1000:13, 1004:14, 1011:19, 1011:21, 1011:23, 1011:25
**credited** [7] - 879:5, 893:19, 903:7, 999:21, 999:23, 1000:5, 1000:18
**crediting** [4] - 909:25, 923:14, 924:1, 1011:15
**credits** [19] - 914:23, 919:13, 920:21, 922:17, 923:12, 924:19, 925:8, 927:9, 927:18, 928:13, 928:16, 929:4, 989:24, 990:2, 992:22, 1004:15, 1012:2, 1012:3, 1059:24
**critical** [1] - 1018:23
**criticisms** [1] - 1038:7
**criticize** [2] - 1052:20, 1053:24
**CROSS** [6] - 913:2, 947:6, 1018:12, 1077:14, 1077:20, 1077:25
**cross** [12] - 866:13, 874:8, 874:18, 912:19, 926:22, 938:8, 938:12, 946:25, 952:5, 1004:24, 1016:12, 1039:4
**cross-examination** [5] - 874:8, 874:18, 926:22, 946:25, 1004:24
**CROSS-EXAMINATION** [6] - 913:2, 947:6, 1018:12, 1077:14, 1077:20, 1077:25
**cross-examine** [2] - 912:19, 952:5
**cross-examined** [1] - 1039:4
**CRR** [2] - 862:22, 1077:8
**Cruz** [3] - 920:13, 921:6, 922:10
**Cs** [1] - 1047:24
**current** [1] - 865:25
**customary** [1] - 997:19
**cut** [2] - 865:17, 867:2

## D

**damages** [2] - 1034:23, 1059:24
**dance** [1] - 1029:18
**data** [4] - 1060:5, 1067:7, 1067:8, 1071:11
**database** [3] - 1051:10, 1051:11, 1051:23
**databases** [3] - 1051:15, 1052:1, 1052:2
**date** [8] - 875:16, 885:5, 885:6, 885:8, 965:1, 965:2, 966:22, 975:24
**dates** [2] - 977:18, 1002:9
**David** [1] - 878:8
**DAW** [2] - 982:16, 1043:6
**day-to-day** [1] - 1028:22
**days** [1] - 928:13
**deal** [14] - 868:18, 884:19, 885:2, 885:22, 898:4, 900:9, 935:17, 935:20, 936:3, 936:11, 936:16, 936:17, 1014:2, 1024:21
**dealing** [1] - 867:25
**deals** [3] - 891:23, 937:9, 938:12
**December** [3] - 919:17, 919:18, 925:6
**decide** [13] - 880:4, 952:21, 955:20, 970:19, 970:24, 971:6, 971:11, 971:20, 997:18, 1005:21, 1011:18, 1015:8, 1061:21
**decides** [2] - 876:1, 1011:21
**decision** [3] - 901:5, 944:19, 1048:1
**decisions** [1] - 972:8
**declaration** [1] - 1037:21
**deems** [1] - 1065:9
**defendant** [2] - 879:23, 1015:25
**Defendants** [2] - 862:9, 863:12
**defendants** [13] - 868:12, 868:17, 869:15, 870:1, 870:25, 879:19, 880:3, 941:20, 942:2, 1034:1, 1037:12, 1052:19, 1054:20
**defendants'** [2] - 870:6, 1052:18
**defense** [10] - 864:2, 866:24, 869:20, 870:15, 870:19, 870:23, 876:13, 877:23, 912:19, 1076:4
**defined** [2] - 992:8, 998:12
**defines** [1] - 879:8
**definitely** [3] - 894:21, 971:9, 1002:17
**degree** [2] - 884:10, 955:5
**delay** [1] - 959:12
**deliberations** [1] - 948:7
**delving** [1] - 866:17
**demonstrate** [1] - 1062:12
**demonstrates** [7] - 1046:21, 1047:21, 1047:22, 1048:4, 1048:9, 1049:1, 1066:12
**demonstrates)** [8] - 1046:14, 1046:16, 1046:23, 1047:24, 1049:3, 1073:17, 1073:20, 1073:23
**demonstration** [1] - 1047:12
**demonstrations** [1] - 1056:10
**demonstrative** [7] - 1036:15, 1036:18, 1037:6, 1056:13, 1056:15, 1065:16, 1071:2
**demonstratives** [4] - 1059:18, 1071:6, 1071:13, 1071:21
**denied** [5] - 869:3, 880:2, 932:21, 945:6, 991:21
**Denver** [1] - 863:6
**departing** [1] - 944:21
**department** [1] - 922:21
**departments** [1] - 885:23
**departure** [1] - 943:21
**depose** [1] - 955:19
**deposition** [74] - 868:8, 869:24, 870:4, 871:18, 871:24, 872:6, 878:6, 886:1, 887:22, 895:13, 895:25, 908:7, 940:23, 941:23, 942:14, 945:1, 945:7, 945:19, 947:4, 949:14, 949:17, 950:2, 950:5, 950:7, 950:9, 950:13, 950:15, 950:18, 951:7, 951:14, 951:15, 951:20, 951:23, 952:3, 952:4, 952:8, 952:14, 952:15, 952:16, 952:19, 952:25, 953:2, 953:6, 953:9, 954:2, 955:25, 956:6, 956:8, 958:19, 959:15, 961:3, 967:13, 969:8, 975:6, 989:9, 989:13, 991:17, 999:25, 1000:7, 1002:1, 1002:6, 1002:19, 1006:3, 1019:7, 1020:16, 1021:17, 1022:11, 1022:22, 1037:22, 1042:25, 1044:4, 1053:4, 1076:5
**depositions** [7] - 1037:25, 1038:8, 1038:9, 1038:11, 1038:23, 1042:24, 1042:25
**derived** [1] - 879:14
**derulo** [1] - 941:1
**Derulo** [196] - 865:22, 866:1, 867:2, 867:9, 867:20, 869:6, 876:20, 876:25, 877:1, 879:19, 879:21, 880:3, 881:7, 883:24, 884:1, 884:13, 884:16, 885:14, 886:11, 887:6, 887:9, 887:15, 888:16, 888:20, 888:24, 889:4, 889:14, 889:19, 889:24, 891:1, 891:25, 892:9, 892:13, 893:9, 897:9, 897:16, 897:17, 897:18, 897:25, 898:5, 898:8, 899:4, 899:6, 900:6, 900:11, 900:25, 901:8, 902:6, 902:18, 903:9, 904:6, 904:20, 905:9, 905:24, 906:6, 906:18, 907:4, 910:23, 911:12, 911:19, 911:24, 912:8, 913:11, 913:24, 914:2, 914:8, 914:11, 914:17, 917:21, 917:25, 920:4, 925:12, 925:17, 926:3, 926:12, 930:12, 930:22, 930:24, 931:16, 932:3, 932:24, 935:14, 940:20, 941:1, 942:3, 942:8, 942:19, 942:23, 943:14, 943:18, 943:24, 944:13, 944:22, 945:20, 945:23, 946:14, 947:16, 947:19, 950:9, 956:20, 959:25, 961:15, 963:15, 963:16, 963:23, 965:20, 965:22, 965:25, 967:1, 967:5, 967:6, 967:9, 967:16, 967:17, 968:7, 968:10, 969:5, 970:1, 970:7, 970:13, 970:18, 970:23, 971:6, 971:9, 971:11,

971:20, 971:25, 972:3, 972:25, 975:16, 979:2, 979:5, 980:11, 981:3, 982:17, 983:2, 983:11, 983:12, 983:20, 983:22, 984:1, 984:12, 984:25, 986:3, 986:8, 986:11, 987:14, 987:18, 987:23, 988:17, 989:25, 990:5, 991:7, 991:10, 991:14, 996:5, 999:7, 1003:4, 1004:2, 1004:22, 1005:8, 1005:10, 1005:16, 1005:24, 1005:25, 1006:10, 1007:6, 1007:9, 1007:18, 1008:2, 1010:5, 1012:4, 1012:18, 1013:3, 1014:3, 1014:12, 1014:15, 1014:17, 1014:18, 1017:14, 1019:21, 1020:6, 1020:17, 1021:9, 1022:12, 1022:20, 1023:10, 1023:22, 1023:24, 1023:25, 1025:10, 1025:19, 1025:23, 1042:24
**Derulo's** [36] - 877:10, 886:3, 899:13, 901:5, 918:4, 918:10, 920:3, 926:17, 926:24, 930:6, 940:7, 940:23, 941:20, 942:22, 943:21, 945:1, 945:7, 946:9, 950:12, 952:3, 960:24, 962:3, 962:13, 962:19, 963:8, 972:9, 987:18, 987:20, 988:3, 1002:24, 1004:18, 1005:5, 1006:16, 1010:4, 1023:15, 1023:21
**descending** [1] - 918:25
**describe** [7] - 888:13, 901:17, 917:5, 959:8, 962:18, 967:20, 1007:5
**described** [1] - 895:13
**description** [1] - 961:10
**deserves** [2] - 877:1, 945:5
**designated** [5] - 870:8, 870:9, 870:14, 871:16, 1011:4
**designation** [2] - 868:9, 908:7
**designations** [4] - 869:24, 871:10, 1076:5, 1076:11
**desires** [1] - 887:10
**despite** [2] - 868:14, 948:1
**DESROULEAUX** [1] - 862:8
**Dessources** [5] - 920:2, 920:21, 921:2, 922:2, 922:4
**detail** [2] - 1052:4, 1057:17
**details** [1] - 933:25
**determination** [1] - 1016:24
**determinations** [1] - 1074:20
**determine** [3] - 895:16, 1001:12, 1064:8
**determining** [1] - 1036:10
**developing** [1] - 884:20
**development** [2] - 884:20, 884:22
**DIAZ** [1] - 862:22
**Diaz** [4] - 877:14, 948:10, 1077:8, 1077:9
**Diaz's** [3] - 948:4, 948:22, 949:9
**dice** [1] - 1071:17
**difference** [6] - 934:10, 990:10, 990:11, 992:25, 993:13, 1072:25
**differences** [2] - 1031:20, 1032:4
**different** [56] - 866:16, 867:23, 885:22, 915:14, 920:14, 928:17, 959:12, 960:3, 975:21, 985:19, 996:15, 1002:23, 1003:17, 1029:3, 1029:6, 1030:17, 1031:12, 1035:16, 1035:23, 1036:5, 1036:6, 1039:22, 1041:4, 1041:12, 1043:18, 1045:8, 1045:13, 1045:18, 1046:18, 1047:16, 1047:18, 1048:10, 1048:20, 1048:22, 1048:23, 1049:2, 1049:10, 1051:6, 1051:12, 1051:13, 1056:20, 1056:22, 1057:1, 1065:25, 1067:9, 1071:14, 1074:18, 1075:4, 1075:8
**differentiate** [1] - 933:10
**differentiation** [1] - 887:20
**difficult** [1] - 877:6
**digital** [3] - 928:15, 1029:6, 1043:6
**dinner** [1] - 975:17
**direct** [1] - 946:21
**DIRECT** [7] - 883:1, 940:3, 1027:22, 1077:12, 1077:18, 1077:23, 1078:3
**directing** [2] - 963:17, 963:23
**direction** [9] - 960:2, 971:9, 971:16, 971:19, 984:10, 1005:8, 1005:24, 1022:19, 1023:24
**directly** [8] - 891:18, 897:21, 905:10, 943:11, 949:8, 951:6, 952:10, 997:18
**disagree** [2] - 933:8, 961:13
**disagreed** [1] - 985:11
**disclose** [1] - 899:11
**disclosed** [1] - 868:24
**disconnect** [1] - 939:7
**discourtesy** [1] - 1075:21
**discredit** [1] - 914:12
**discuss** [8] - 866:16, 899:20, 939:10, 939:11, 1015:17, 1045:1, 1053:20, 1075:15
**discussed** [6] - 868:2, 898:8, 898:11, 901:20, 936:9, 1054:1
**discussing** [1] - 900:10
**discussion** [2] - 866:17, 1076:18
**dispute** [8] - 866:11, 879:4, 879:5, 879:7, 879:10, 879:13, 879:21, 879:25
**disputes** [1] - 865:22
**disregard** [1] - 1024:24
**disrespectful** [1] - 1013:7
**disseminated** [1] - 895:17
**distinct** [4] - 1049:9, 1052:9, 1068:11, 1075:7
**distinction** [1] - 899:25
**distinctions** [1] - 955:2
**distinguish** [1] - 1049:22
**distorted** [1] - 1074:15
**DISTRICT** [3] - 862:1, 862:2, 862:3
**DIVISION** [1] - 862:2
**Docket** [1] - 871:21
**document** [12] - 871:21, 872:24, 945:10, 964:18, 966:10, 975:13, 976:2, 976:12, 976:15, 976:25, 978:6, 980:10
**documents** [5] - 949:23, 953:7, 955:10, 958:12, 958:16
**Dodgers** [1] - 939:11
**dog** [1] - 1000:22
**done** [17] - 870:13, 894:2, 901:18, 946:13, 955:3, 955:13, 973:3, 994:11, 994:14, 996:1, 996:18, 1002:8, 1009:2, 1009:6, 1009:9, 1010:25, 1056:25
**door** [3] - 865:10, 962:21, 963:5
**dot** [1] - 938:12
**double** [1] - 984:11
**double-check** [1] - 984:11
**doubt** [1] - 869:11
**down** [11] - 867:18, 904:18, 910:3, 970:14, 1009:22, 1015:22, 1040:5, 1041:17, 1042:6, 1042:9, 1054:10
**dozens** [2] - 960:14, 1028:18
**DR** [2] - 1027:14, 1078:2
**Dr** [43] - 868:10, 868:11, 869:1, 869:4, 869:8, 1026:8, 1026:13, 1026:24, 1027:18, 1027:24, 1028:1, 1028:23, 1033:24, 1033:25, 1036:1, 1037:4, 1037:5, 1037:12, 1037:15, 1037:16, 1039:10, 1039:11, 1039:12, 1039:15, 1041:2, 1050:6, 1052:4, 1052:21, 1053:9, 1053:23, 1053:24, 1053:25, 1054:12, 1056:9, 1062:16, 1063:23, 1065:1, 1066:18, 1070:7, 1075:19, 1075:20
**draft** [3] - 985:9, 985:23, 985:25
**draw** [3] - 943:15, 1015:23, 1016:16
**driving** [1] - 988:3
**drum** [7] - 1005:2, 1005:7, 1005:14, 1023:13, 1023:21, 1024:1, 1073:22
**drums** [3] - 987:12, 1055:6, 1055:7
**Duboff** [1] - 863:8
**due** [3] - 892:21, 893:8, 901:22
**duly** [2] - 882:18, 1027:15
**duper** [1] - 866:25
**duplicating** [1] - 1075:6
**duplicative** [1] - 980:18
**during** [72] - 874:17, 879:12, 886:10, 887:5, 887:8, 887:14, 887:18, 888:23, 889:3, 891:3, 891:14, 891:17, 891:25, 900:8, 900:14, 916:23, 934:21, 934:25, 941:6, 944:18, 945:7, 946:5, 946:13,

946:15, 950:13, 954:6, 960:23, 962:2, 963:25, 966:9, 967:2, 968:9, 968:11, 970:12, 970:16, 970:20, 970:25, 972:4, 973:18, 974:2, 974:3, 974:12, 974:14, 974:16, 975:6, 975:23, 975:24, 986:10, 991:11, 991:15, 992:1, 1002:1, 1002:6, 1003:4, 1005:9, 1005:18, 1006:11, 1010:9, 1010:11, 1014:8, 1014:9, 1015:7, 1019:22, 1020:7, 1020:23, 1023:6, 1025:11, 1025:22, 1063:14
**duties** [2] - 867:8, 885:13

## E

**e-mail** [64] - 872:16, 908:18, 908:20, 909:2, 909:6, 909:12, 909:14, 909:16, 909:19, 910:6, 910:14, 911:2, 911:7, 911:11, 911:18, 911:23, 916:15, 918:19, 918:20, 918:24, 919:3, 919:6, 919:10, 919:11, 919:17, 919:19, 919:22, 921:22, 922:8, 922:9, 923:22, 924:3, 924:10, 924:16, 924:17, 924:24, 925:4, 925:6, 925:12, 925:15, 925:21, 926:13, 929:19, 931:5, 931:15, 931:19, 931:23, 931:25, 932:2, 932:4, 932:10, 932:12, 932:25, 933:5, 933:8, 933:12, 933:19, 934:5, 958:12, 980:11, 980:14, 981:2, 981:12
**e-mailed** [4] - 953:19, 958:13, 983:18, 984:23
**e-mails** [5] - 868:14, 918:25, 924:13, 929:20, 953:22
**eager** [1] - 1016:16
**ear** [6] - 1029:2, 1030:21, 1032:1, 1036:9, 1041:24, 1042:7
**early** [10] - 890:17, 890:22, 891:6, 891:7, 891:10, 900:7, 900:9, 954:3, 954:12, 955:24
**ears** [5] - 963:11, 1018:24, 1019:2, 1065:24, 1070:12
**easier** [2] - 1045:1, 1056:7
**easiest** [1] - 1045:3
**easily** [1] - 878:22
**Eastman** [1] - 1030:8
**ECF** [3] - 874:11, 874:15, 1052:16
**economic** [1] - 917:17
**economics** [1] - 917:15
**ecosystem** [1] - 917:19
**Ed** [1] - 1073:1
**education** [3] - 992:11, 1033:5, 1033:11
**educational** [1] - 1030:4
**effect** [3] - 925:17, 1062:9, 1074:22
**effects** [10] - 960:3, 960:6, 1004:9, 1057:2, 1059:5, 1060:11, 1063:24, 1064:5, 1064:10, 1065:8
**eight** [7] - 976:22, 983:18, 985:12, 985:16, 986:12, 996:13, 996:14
**eighth** [1] - 978:11
**either** [13] - 866:19, 873:10, 873:14, 874:15, 879:13, 892:8, 894:12, 935:15, 979:12, 990:15, 1007:9, 1029:4, 1058:2
**elaborate** [5] - 1035:2, 1037:17, 1041:9, 1050:5, 1067:13
**electric** [9] - 1000:17, 1009:16, 1040:15, 1048:16, 1056:6, 1063:3, 1063:10, 1073:3, 1074:15
**electronic** [5] - 1029:18, 1030:15, 1072:19, 1075:4, 1075:9
**elegant** [1] - 1048:9
**Element** [1] - 881:3
**element** [4] - 881:7, 917:7, 923:13, 1023:22
**elements** [9] - 880:16, 880:17, 917:19, 1021:20, 1050:19, 1067:2, 1069:2, 1069:5, 1075:7
**elevate** [1] - 873:8
**elevator** [3] - 1027:1, 1027:4, 1027:7
**embellishing** [1] - 963:20
**embodied** [1] - 1035:11
**emphasize** [1] - 867:15
**employment** [1] - 943:22
**empty** [2] - 1061:11, 1076:8
**end** [13] - 873:24, 880:10, 900:25, 960:5, 979:8, 981:25, 982:2, 1011:6, 1011:24, 1039:2, 1046:17, 1053:21, 1075:13
**ended** [1] - 966:18
**enemy** [1] - 877:10
**engineer** [19] - 882:1, 935:11, 940:7, 958:22, 959:3, 959:5, 960:2, 960:10, 960:20, 961:11, 961:20, 985:5, 990:3, 990:9, 998:7, 1004:6, 1028:17, 1043:24, 1043:25
**engineer's** [1] - 961:23
**engineered** [3] - 923:13, 990:3, 1004:15
**engineering** [3] - 940:14, 940:16, 1028:15
**engineers** [3] - 940:10, 940:13, 960:18
**England** [1] - 955:3
**English** [3] - 1042:5, 1046:9, 1050:5
**enjoyed** [1] - 878:25
**enlarge** [1] - 908:2
**ensure** [1] - 893:8
**entering** [1] - 936:10
**entertainment** [3] - 883:11, 884:25, 917:2
**Entertainment** [1] - 879:19
**entire** [13] - 885:21, 932:4, 932:10, 957:13, 960:23, 989:7, 996:16, 1001:13, 1010:14, 1024:14, 1040:11, 1071:18
**entitled** [8] - 934:15, 997:1, 997:12, 998:1, 998:23, 999:12, 1001:7, 1017:21
**entitlement** [1] - 915:7
**equal** [2] - 881:20, 1047:2
**equals** [3] - 963:16, 963:23, 1024:18
**equate** [2] - 915:2, 915:6
**era** [1] - 928:3
**erase** [2] - 1061:5
**Erick** [3] - 920:13, 921:6, 922:10
**especially** [3] - 903:3, 1049:19, 1058:16
**essence** [1] - 917:11
**established** [2] - 891:1, 980:5
**estimate** [3] - 942:22, 943:13
**et** [10] - 862:8, 885:25, 886:23, 890:19, 890:24, 891:23, 898:23, 927:20, 935:12
**Ethan** [3] - 1026:8, 1027:18, 1028:1
**ETHAN** [3] - 1027:14, 1027:19, 1078:2
**evaluate** [2] - 1068:23, 1068:25
**evaluation** [1] - 1051:7
**event** [2] - 865:16, 1064:8
**events** [6] - 899:17, 951:10, 953:24, 954:14, 958:6, 960:19
**eventually** [1] - 884:3
**everywhere** [1] - 1040:15
**evidence** [30] - 873:8, 874:10, 874:12, 874:15, 874:16, 874:18, 874:21, 874:22, 875:1, 907:21, 907:24, 918:16, 935:4, 964:12, 964:13, 964:15, 973:6, 974:25, 976:1, 976:13, 977:10, 977:20, 978:5, 978:17, 980:8, 981:6, 981:9, 1033:23, 1036:23
**evolved** [1] - 884:4
**ex** [1] - 881:25
**ex-wife** [1] - 881:25
**exact** [8] - 913:14, 916:8, 970:15, 999:8, 1046:20, 1046:22, 1074:12
**exactly** [10] - 870:21, 925:24, 933:21, 933:22, 999:23, 1021:10, 1039:2, 1061:25, 1063:23, 1064:19
**exaggerating** [1] - 963:20
**exaggeration** [1] - 963:24
**EXAMINATION** [16] - 883:1, 913:2, 930:2, 940:3, 947:6, 1001:20, 1018:12, 1027:22, 1077:12, 1077:14, 1077:16, 1077:18, 1077:20, 1077:23, 1077:25, 1078:3
**examination** [13] - 864:3, 864:17, 864:25, 865:15, 871:17, 874:8, 874:18, 926:22, 946:25, 966:9, 1003:15, 1004:24, 1010:4
**examine** [4] - 912:19, 952:5, 1033:20, 1067:14
**examined** [1] - 1039:4
**examiner** [1] - 877:8
**examining** [4] -

1033:17, 1033:18, 1050:17, 1051:3
**example** [16] - 954:4, 1031:8, 1035:18, 1040:22, 1041:13, 1043:5, 1043:17, 1046:13, 1046:23, 1047:3, 1048:3, 1048:21, 1049:10, 1055:12, 1063:14, 1071:4
**examples** [1] - 1051:11
**exceeds** [1] - 938:8
**excellent** [1] - 988:6
**except** [3] - 1010:15, 1040:13, 1069:21
**exchange** [2] - 918:19, 934:7
**exchanged** [1] - 953:23
**exchanging** [1] - 868:14
**excising** [1] - 1076:10
**excluded** [2] - 864:4, 1069:13
**excluding** [1] - 865:21
**exclusive** [1] - 934:14
**excuse** [6] - 903:15, 920:1, 977:23, 985:11, 987:10, 1026:17
**excused** [2] - 939:3, 1026:3
**executive** [1] - 928:4
**exercised** [1] - 881:9
**Exhibit** [43] - 907:20, 908:3, 908:4, 908:6, 918:14, 918:17, 922:7, 923:17, 924:14, 925:16, 926:15, 929:19, 931:5, 964:12, 964:19, 966:12, 972:13, 972:18, 974:22, 974:25, 975:2, 975:25, 976:11, 976:24, 977:3, 977:9, 977:11, 977:19, 977:21, 977:23, 978:4, 978:6, 978:16, 978:18, 979:18, 979:20, 980:7, 980:13, 980:15, 981:5, 981:11, 983:15, 1077:22
**exhibit** [7] - 872:16, 872:21, 873:15, 875:3, 908:9, 951:1, 1036:16
**exhibited** [1] - 875:7
**Exhibits** [1] - 1056:12
**exhibits** [7] - 874:16, 874:17, 875:6, 875:21, 876:2, 881:22, 1038:22
**exist** [3] - 996:20, 1013:13, 1013:17
**existed** [1] - 996:21
**existing** [9] - 871:22, 1050:3, 1050:8, 1050:20, 1050:22, 1051:2, 1051:18, 1052:10
**exists** [7] - 949:7, 1031:22, 1032:7, 1050:4, 1050:13, 1050:16, 1051:17
**expect** [1] - 867:23
**expected** [1] - 955:3
**expecting** [1] - 1068:19
**experience** [39] - 895:22, 896:14, 915:1, 915:18, 927:5, 928:20, 929:3, 929:8, 958:21, 959:1, 960:10, 963:19, 985:5, 987:17, 988:3, 988:14, 988:16, 990:11, 991:6, 991:13, 991:23, 992:2, 992:22, 992:25, 993:12, 994:5, 994:21, 994:25, 995:4, 996:25, 997:11, 998:4, 998:14, 998:23, 999:11, 1000:11, 1019:4, 1033:6, 1033:12
**expert** [10] - 988:22, 989:4, 990:15, 1024:20, 1026:8, 1031:20, 1032:20, 1036:16, 1038:24, 1061:15
**expertise** [1] - 998:9
**experts** [1] - 1016:5
**experts'** [1] - 1042:21
**expired** [1] - 891:23
**explain** [10] - 917:1, 927:24, 959:13, 968:21, 990:10, 996:9, 1047:11, 1056:18, 1057:17, 1066:11
**explained** [1] - 1050:22
**explaining** [1] - 1040:17
**explicitly** [3] - 864:4, 864:18, 865:8
**exploits** [1] - 896:1
**explore** [1] - 1037:18
**explored** [3] - 945:4, 945:5, 1038:14
**export** [1] - 1059:16
**express** [2] - 900:19, 1046:11
**expressed** [1] - 900:18
**extend** [1] - 952:7
**extent** [14] - 871:3, 871:16, 899:17, 899:18, 899:21, 945:5, 971:21, 980:17, 985:20, 1034:14, 1035:4, 1036:7, 1038:12, 1071:10
**extra** [2] - 959:11, 1023:3
**extremely** [6] - 892:23, 892:24, 893:1, 893:6, 893:15, 949:8
**eyes** [3] - 999:18, 1018:24, 1019:2

## F

**facing** [1] - 962:24
**fact** [9] - 866:20, 867:19, 889:15, 907:15, 909:23, 1032:23, 1038:3, 1053:2, 1064:1
**factor** [1] - 1044:13
**factors** [3] - 881:5, 881:8, 1074:17
**facts** [9] - 872:16, 872:19, 872:20, 872:22, 872:24, 873:4, 873:8, 881:21, 937:16
**fair** [16] - 885:9, 887:10, 890:14, 908:22, 916:19, 916:21, 936:9, 941:14, 958:25, 963:7, 985:21, 1003:7, 1008:1, 1018:20, 1037:11, 1037:14
**fairly** [4] - 893:4, 1041:5, 1060:10, 1066:6
**familiar** [4] - 883:14, 896:20, 896:22, 915:10
**familiarity** [1] - 1016:17
**family** [3] - 888:3, 922:6, 1075:15
**famous** [1] - 1028:17
**fancy** [1] - 1050:7
**far** [7] - 868:22, 895:21, 950:25, 1017:4, 1055:7, 1063:25
**fast** [1] - 983:16
**FCRR** [1] - 862:22
**feature** [1] - 1049:13
**features** [10] - 959:11, 1031:7, 1032:10, 1032:12, 1041:16, 1044:20, 1045:10, 1049:5, 1049:22, 1052:6
**Federal** [1] - 862:22
**fee** [1] - 915:24
**feed** [1] - 926:10
**felt** [6] - 875:6, 893:19, 901:14, 901:16, 901:17, 903:14
**Ferrara** [8] - 1033:25, 1037:5, 1037:15, 1039:11, 1042:22, 1042:23, 1052:21, 1053:25
**Ferrara's** [1] - 1053:24
**few** [9] - 876:13, 902:12, 913:13, 955:18, 1018:20, 1031:9, 1061:3, 1069:4, 1073:25
**fifth** [1] - 977:4
**fight** [1] - 1000:22
**figure** [5] - 874:3, 886:21, 903:3, 969:24, 1061:5
**figured** [2] - 1007:15, 1009:7
**figuring** [1] - 923:12
**file** [38] - 979:12, 979:14, 980:20, 981:13, 981:24, 982:14, 982:15, 982:18, 982:19, 982:22, 983:3, 983:6, 983:10, 983:19, 983:23, 984:2, 984:7, 984:17, 984:24, 985:7, 985:14, 985:22, 986:4, 987:4, 987:7, 1035:17, 1035:18, 1035:19, 1042:9, 1045:17, 1055:12, 1055:16, 1057:24, 1057:25, 1069:25
**filed** [2] - 868:12, 956:20
**files** [8] - 949:24, 984:11, 984:13, 984:20, 1042:18, 1044:6, 1056:10, 1059:13
**fill** [1] - 1076:7
**film** [3] - 1028:9, 1028:19
**filter** [2] - 1031:14, 1050:19
**filtering** [4] - 1050:19, 1050:24, 1051:20, 1051:23
**filtration** [3] - 1052:20, 1053:4, 1053:11
**final** [8] - 961:21, 971:23, 991:16, 1008:12, 1008:16, 1017:19, 1044:11
**finalized** [4] - 984:3, 985:1, 986:18, 987:7
**finally** [1] - 876:15
**finances** [1] - 917:15
**financial** [1] - 1000:19
**financially** [1] - 903:7
**fine** [5] - 866:25, 871:5, 874:2, 912:23, 1065:12
**finish** [1] - 972:18
**finished** [11] - 973:12, 973:16, 985:7, 986:7, 1035:8, 1035:15, 1044:2, 1044:15, 1045:11, 1072:8, 1074:22
**finishing** [1] - 942:10
**firm** [1] - 913:19
**first** [70] - 864:10, 865:19, 872:19, 872:25, 880:18, 882:18, 883:18, 883:23, 884:7, 885:4, 895:17, 895:19, 895:24, 896:1, 896:3, 902:13, 904:1, 905:24, 908:3, 910:15, 926:14, 930:11, 930:20, 939:7, 946:6, 948:13, 953:11,

964:7, 965:11, 965:15, 966:10, 967:2, 970:13, 973:18, 974:2, 974:14, 974:17, 981:15, 981:20, 982:1, 985:13, 985:22, 985:24, 985:25, 986:18, 1004:19, 1008:5, 1008:15, 1008:24, 1009:2, 1009:6, 1009:8, 1009:9, 1013:17, 1023:5, 1025:22, 1027:15, 1036:3, 1040:10, 1049:7, 1052:25, 1056:17, 1058:17, 1061:12, 1061:13, 1064:22, 1065:10, 1072:17
**first-use** [1] - 895:17
**fit** [1] - 1022:3
**FITZGERALD** [1] - 862:3
**five** [6] - 885:7, 940:7, 940:22, 941:3, 1003:5, 1030:16
**fix** [3] - 981:25, 982:3, 987:6
**FL** [1] - 1043:7
**flat** [1] - 968:23
**Floor** [1] - 863:15
**floor** [1] - 1027:3
**flow** [2] - 930:25, 1043:23
**focus** [9] - 906:14, 918:6, 923:17, 933:9, 951:9, 952:10, 995:14, 1030:1, 1045:19
**focused** [8] - 931:11, 948:22, 1008:2, 1044:20, 1044:22, 1045:11, 1045:22, 1072:3
**focusing** [1] - 1074:21
**follow** [11] - 871:11, 878:21, 903:17, 906:1, 906:2, 906:3, 921:5, 1019:9, 1020:5, 1036:25, 1054:22
**follow-up** [4] - 903:17, 906:1, 1019:9, 1020:5
**followed** [1] - 999:7
**following** [5] - 880:15, 881:5, 923:22, 947:10, 1037:4
**follows** [1] - 882:19
**follows:THE** [1] - 1027:16
**fondly** [1] - 876:25
**forbid** [1] - 955:14
**force** [2] - 988:3, 1009:19
**forcing** [1] - 945:14
**foregoing** [1] - 1077:1
**forensic** [5] - 1031:16, 1031:18, 1031:19, 1032:4, 1032:9
**forget** [3] - 866:5, 952:10, 1061:24
**forgive** [2] - 883:4, 883:6
**forgotten** [1] - 1053:22
**form** [6] - 873:4, 926:2, 954:24, 958:10, 973:10, 1039:16
**formal** [11] - 898:4, 898:10, 992:11, 1016:3, 1032:13, 1036:4, 1039:22, 1041:3, 1041:4, 1045:5, 1074:19
**formally** [1] - 1032:21
**format** [3] - 979:12, 1008:5, 1042:12
**formats** [1] - 940:17
**formed** [1] - 1033:4
**forming** [1] - 1042:16
**forth** [3] - 871:15, 1039:23, 1056:21
**fortunately** [1] - 886:19
**forward** [3] - 931:19, 931:23, 949:11
**forwarded** [7] - 910:6, 925:5, 931:25, 932:2, 932:9, 932:12, 933:19
**forwarding** [1] - 909:19
**forwards** [1] - 925:16
**foundation** [3] - 932:5, 971:3, 972:10
**four** [24] - 880:16, 885:7, 885:9, 885:11, 885:12, 972:23, 973:1, 989:6, 996:6, 996:11, 996:13, 996:15, 996:16, 996:19, 1002:7, 1003:3, 1008:24, 1009:9, 1056:17, 1057:1, 1061:1, 1062:6
**fourth** [3] - 881:1, 976:19, 976:22
**fractions** [1] - 1061:24
**Frank** [15] - 864:11, 865:19, 865:22, 882:13, 882:22, 909:23, 919:11, 923:25, 929:20, 980:12, 981:3, 982:17, 983:20, 984:14, 984:25
**FRANK** [3] - 882:17, 882:22, 1077:11
**frank@23-management.com** [1] - 919:4
**frankly** [5] - 865:13, 874:21, 882:7, 955:20, 1017:17
**free** [7] - 899:23, 912:21, 939:11, 1016:5, 1016:11, 1022:1, 1052:20
**freelance** [1] - 1028:16
**freestanding** [1] - 1066:15
**friction** [2] - 943:23, 944:13
**Friday** [14] - 864:1, 868:7, 882:3, 940:8, 941:4, 945:20, 947:11, 981:21, 987:11, 988:11, 1001:22, 1009:17, 1014:3, 1023:4
**friend** [2] - 888:11, 888:14
**friendly** [1] - 866:13
**friends** [1] - 1075:15
**front** [3] - 918:17, 949:18, 963:4
**frost** [8] - 867:7, 913:23, 914:23, 916:10, 918:14, 927:4, 930:1, 932:17
**FROST** [24] - 863:7, 866:8, 867:14, 868:4, 876:15, 882:12, 882:25, 883:2, 900:4, 907:20, 908:1, 909:5, 910:3, 910:15, 912:12, 912:15, 921:9, 921:24, 926:21, 930:3, 930:18, 938:25, 1077:13, 1077:17
**Frost** [1] - 863:7
**full** [10] - 879:11, 940:7, 940:10, 941:24, 1060:10, 1060:11, 1060:24, 1061:19, 1069:18
**full-time** [2] - 940:7, 940:10
**fully** [3] - 868:24, 1017:20, 1066:25
**function** [1] - 1071:13
**functions** [1] - 1071:14
**fund** [1] - 1050:1
**future** [2] - 894:18, 949:6
**Future** [1] - 965:18

**G**

**gain** [1] - 914:17
**gaps** [3] - 1058:13, 1058:23, 1060:9
**GarageBand** [1] - 969:1
**general** [8] - 883:12, 888:4, 889:10, 893:5, 902:1, 1033:3, 1044:24, 1050:1
**generally** [13] - 887:3, 887:6, 893:7, 894:19, 894:20, 894:21, 936:18, 1004:14, 1007:5, 1042:15, 1056:17, 1058:25, 1073:13
**genre** [15] - 1045:24, 1048:11, 1072:4, 1072:5, 1072:19, 1072:20, 1073:4, 1073:9, 1073:11, 1073:14, 1074:10, 1074:12, 1074:18, 1074:20, 1075:2
**genres** [1] - 1048:2
**gentlemen** [10] - 912:17, 948:1, 955:1, 973:21, 1001:1, 1026:13, 1026:20, 1032:19, 1052:13, 1075:14
**germane** [1] - 866:6
**Ghena** [12] - 881:24, 910:6, 910:7, 910:9, 918:21, 919:17, 919:25, 921:20, 921:22, 922:9, 922:19, 925:7
**given** [8] - 869:11, 872:21, 893:6, 899:22, 932:13, 933:23, 1012:15, 1061:2
**glass** [1] - 963:5
**glasses** [2] - 878:12, 878:13
**global** [3] - 1072:24, 1073:1, 1075:2
**God** [1] - 955:14
**gotcha** [1] - 878:10
**grab** [1] - 1021:20
**grade** [1] - 1070:19
**graduate** [1] - 884:9
**graduated** [1] - 899:15
**Grand** [1] - 863:15
**granted** [1] - 1052:17
**great** [32] - 876:14, 913:9, 1028:4, 1028:12, 1028:23, 1029:11, 1029:22, 1031:4, 1032:14, 1034:3, 1035:7, 1040:24, 1041:8, 1042:15, 1043:12, 1044:2, 1044:7, 1047:6, 1048:12, 1050:12, 1059:6, 1062:3, 1062:14, 1066:1, 1066:17, 1068:16, 1068:21, 1069:11, 1070:6, 1070:14, 1070:17, 1075:10
**green** [1] - 1063:13
**Greiss** [9] - 980:1, 980:3, 1010:21, 1010:22, 1010:25, 1013:2, 1013:3, 1023:3, 1069:4
**groove** [4] - 1029:17, 1029:18, 1031:1, 1031:7
**GROUP** [1] - 863:4
**group** [1] - 1043:19
**grouping** [1] - 1043:17
**GSA** [2] - 1027:2, 1027:6
**guaranteed** [2] - 894:19, 894:21
**guess** [12] - 902:9, 906:13, 917:4, 928:1, 931:24, 932:12, 935:13, 963:4, 991:5, 1011:24, 1034:21, 1060:15
**guesses** [1] - 932:19
**guest** [1] - 962:17

**guided** [1] - 871:23
**guitar** [69] - 915:16, 920:22, 925:8, 925:19, 926:4, 926:19, 927:1, 927:12, 929:5, 929:9, 929:13, 931:11, 933:2, 933:11, 933:16, 964:9, 967:7, 967:18, 969:6, 970:8, 970:19, 970:25, 971:7, 971:12, 971:21, 972:1, 988:6, 988:9, 988:19, 989:2, 993:2, 999:21, 1000:5, 1000:12, 1000:18, 1006:11, 1009:16, 1009:17, 1013:12, 1015:11, 1019:22, 1020:7, 1025:3, 1040:15, 1043:21, 1043:22, 1048:14, 1048:16, 1048:17, 1049:6, 1056:6, 1063:3, 1063:7, 1063:10, 1063:19, 1072:16, 1072:22, 1073:3, 1074:15, 1074:21, 1074:24, 1075:3
**guitarist** [1] - 927:16
**guy** [1] - 915:15

## H

**H-a-r-r-i-s** [1] - 882:22
**half** [10] - 870:11, 883:5, 910:19, 911:14, 943:4, 1012:13, 1012:18, 1058:17, 1061:12, 1061:13
**hallmarks** [1] - 1073:14
**HAMPTON** [2] - 863:13, 863:16
**hand** [4] - 873:7, 882:15, 949:3, 1027:12
**handling** [1] - 918:5
**happy** [5] - 924:19, 961:23, 1053:17, 1075:24, 1075:25
**Happy** [2] - 909:23, 923:24
**hard** [5] - 949:17, 1029:2, 1045:25, 1051:25, 1052:2
**hard-core** [1] - 1029:2
**hardly** [1] - 1037:14
**harmful** [1] - 955:21
**harmonic** [2] - 1074:18, 1074:25
**harmonies** [2] - 1007:24, 1029:10
**harmony** [4] - 1031:1, 1032:12, 1045:5, 1046:1
**Harris** [41] - 864:11, 865:19, 865:23, 866:1, 867:8, 876:17, 882:13, 882:14, 882:22, 883:3, 899:12, 899:14, 900:5, 912:20, 913:4, 913:16, 914:11, 914:15, 916:10, 917:24, 918:17, 919:11, 919:19, 920:8, 921:20, 923:15, 923:22, 927:4, 929:3, 929:8, 929:20, 930:4, 937:5, 939:3, 980:12, 981:3, 982:17, 983:20, 984:14, 984:25, 1016:1
**HARRIS** [2] - 882:17, 1077:11
**HARRIS-0001** [1] - 908:12
**hats** [1] - 934:18
**head** [3] - 878:8, 883:5, 943:23
**headphones** [1] - 980:23
**hear** [20] - 868:10, 868:11, 870:19, 913:4, 924:7, 948:21, 952:13, 952:18, 1030:23, 1038:3, 1038:9, 1041:21, 1042:8, 1048:2, 1061:8, 1061:14, 1065:19, 1065:22, 1073:16, 1073:18
**heard** [13] - 881:21, 881:24, 882:2, 891:14, 901:24, 987:14, 992:1, 1017:20, 1032:20, 1033:23, 1035:19, 1037:8, 1066:5
**hearing** [5] - 876:24, 903:21, 1053:13, 1062:5, 1068:23
**hears** [1] - 1072:16
**heartburn** [3] - 901:11, 901:14, 901:16
**heavily** [1] - 1055:5
**heavy** [1] - 1074:15
**helm** [1] - 962:6
**help** [9] - 878:21, 897:10, 940:16, 1036:24, 1058:3, 1066:11, 1068:23, 1071:6, 1071:7
**helped** [3] - 1012:13, 1052:8
**helpful** [9] - 938:15, 955:21, 1037:3, 1037:4, 1038:13, 1040:17, 1040:19, 1075:23
**helps** [3] - 1017:22, 1068:25, 1071:16
**hence** [1] - 933:20
**Henry** [3] - 920:2, 922:2, 922:4
**Hi** [1] - 919:24
**hi** [3] - 922:19, 1018:14, 1018:15
**high** [2] - 986:1, 1055:3
**higher** [1] - 1047:16
**himself** [1] - 967:21
**hip** [1] - 1030:14
**hip-hop** [1] - 1030:14
**hire** [18] - 915:20, 915:21, 916:2, 936:21, 936:23, 937:9, 937:11, 938:2, 992:4, 992:7, 992:8, 997:3, 998:6, 998:7, 998:11, 998:14, 998:18
**hired** [3] - 960:17, 971:14, 1014:10
**hires** [1] - 936:20
**historical** [1] - 951:10
**History** [1] - 965:18
**hit** [1] - 961:14
**Hogarth** [79] - 864:3, 864:8, 864:11, 864:17, 864:20, 865:10, 882:1, 882:5, 916:15, 929:21, 934:22, 934:25, 935:1, 939:15, 939:25, 940:5, 944:6, 946:24, 947:2, 947:8, 947:15, 949:14, 950:22, 951:10, 951:13, 952:24, 954:12, 956:12, 958:21, 961:9, 964:18, 968:13, 968:18, 972:17, 973:24, 974:13, 975:2, 976:15, 977:11, 977:21, 978:7, 978:18, 980:10, 981:2, 981:12, 984:16, 987:15, 988:16, 988:25, 990:18, 991:23, 994:5, 995:8, 996:6, 996:24, 997:23, 997:25, 998:22, 999:20, 1000:19, 1001:22, 1015:4, 1015:21, 1016:1, 1016:9, 1017:9, 1018:14, 1019:6, 1020:11, 1020:14, 1021:6, 1021:7, 1022:4, 1023:1, 1023:12, 1025:3, 1025:21, 1042:25
**Hogarth's** [7] - 865:6, 882:3, 882:9, 951:8, 967:13, 994:1, 1022:22
**holding** [1] - 1076:7
**holes** [2] - 1065:10, 1070:21
**holiday** [1] - 922:24
**holidays** [1] - 924:19
**home** [6] - 942:22, 960:24, 962:3, 966:19, 991:8, 1002:24
**honestly** [1] - 962:21
**Honor** [96] - 864:9, 864:16, 864:25, 865:3, 865:18, 866:9, 867:6, 868:11, 869:22, 869:23, 870:5, 870:17, 871:2, 871:9, 872:1, 872:2, 872:9, 872:12, 872:15, 873:20, 873:21, 874:7, 874:9, 876:4, 876:9, 876:15, 877:13, 877:20, 878:11, 878:15, 882:12, 882:25, 899:10, 900:1, 912:12, 912:22, 913:1, 918:16, 921:9, 932:17, 932:18, 937:15, 939:2, 939:20, 939:21, 940:2, 943:17, 944:25, 946:22, 947:2, 947:3, 949:13, 950:20, 951:12, 956:9, 961:2, 964:11, 976:14, 980:13, 991:18, 993:25, 997:8, 998:19, 999:13, 1000:1, 1002:3, 1006:7, 1006:24, 1007:4, 1017:11, 1017:12, 1019:15, 1019:19, 1020:22, 1021:12, 1022:21, 1026:7, 1027:9, 1036:20, 1052:11, 1053:14, 1054:7, 1054:23, 1054:25, 1056:12, 1064:14, 1064:20, 1064:23, 1073:24, 1074:8, 1075:11, 1075:23, 1076:2, 1076:3, 1076:13, 1076:15
**Honor's** [1] - 1054:11
**HONORABLE** [1] - 862:3
**hook** [1] - 923:9
**hop** [1] - 1030:14
**hope** [2] - 878:25, 895:1
**hoping** [1] - 922:22
**horn** [1] - 915:16
**hostile** [2] - 866:3, 877:3
**hour** [6] - 910:19, 911:14, 943:3, 945:24, 975:12, 1010:18
**hours** [36] - 872:4, 941:21, 941:24, 942:1, 942:3, 942:7, 942:9, 942:21, 942:22, 943:8, 943:12, 943:13, 960:14, 961:11, 965:9, 972:16, 972:23, 973:1, 973:17, 974:1, 974:3, 974:12, 974:14, 976:9, 976:22, 977:7, 977:14, 978:2, 978:14, 978:25, 982:25, 983:4,

983:18, 986:12, 1010:2, 1010:9
**house** [5] - 945:14, 962:13, 962:17, 962:19, 965:23
**housekeeping** [1] - 872:10
**hum** [8] - 889:22, 904:25, 923:18, 926:11, 931:18, 936:5, 1029:14, 1031:3
**humor** [1] - 1043:2
**hundreds** [2] - 1031:12, 1052:1
**hurts** [1] - 1017:22

**I**

**I's** [1] - 938:12
**idea** [7] - 897:12, 938:24, 973:13, 986:9, 1008:10, 1050:11, 1050:12
**ideas** [2] - 959:24, 1050:2
**identical** [1] - 989:2
**identified** [7] - 874:17, 904:8, 945:7, 1001:23, 1009:5, 1036:5, 1052:6
**identifies** [1] - 965:18
**identify** [11] - 875:8, 965:25, 966:6, 1008:14, 1008:18, 1008:20, 1009:6, 1031:15, 1042:3, 1049:24, 1050:15
**identifying** [2] - 1031:20, 1055:17
**identity** [1] - 1073:9
**ignorance** [1] - 1043:2
**ignore** [1] - 908:6
**illiterate** [1] - 1042:6
**illustrate** [2] - 1058:3, 1071:7
**illustrative** [3] - 1057:20, 1062:11, 1071:4
**imagine** [1] - 939:16
**immediate** [1] - 1060:6
**immediately** [1] - 1062:12
**implication** [1] - 1048:23
**imply** [2] - 867:10, 1001:10
**important** [19] - 892:20, 892:23, 892:24, 893:1, 893:6, 893:16, 894:1, 898:25, 948:8, 987:21, 987:24, 1035:14, 1035:24, 1038:1, 1038:2, 1041:9, 1049:21, 1061:8, 1074:9
**impression** [1] - 975:6
**improper** [2] - 868:23, 955:15
**improperly** [1] - 893:19
**improvise** [1] - 1029:5
**inadvertently** [1] - 928:21
**inch** [1] - 1061:24
**inches** [1] - 1062:2
**include** [9] - 873:15, 945:2, 957:11, 1017:18, 1029:12, 1029:24, 1031:1, 1063:7, 1069:21
**included** [6] - 873:4, 873:9, 986:21, 1035:8, 1069:13, 1071:3
**includes** [1] - 1037:20
**including** [11] - 866:11, 872:20, 879:8, 917:22, 945:9, 963:12, 998:6, 1030:18, 1032:5, 1039:6, 1069:14
**incomplete** [1] - 1065:11
**inconsistent** [5] - 943:15, 951:20, 952:9, 952:21, 997:8
**inconsistently** [1] - 951:25
**inconvenience** [1] - 1026:24
**incorporated** [1] - 971:21
**incorporates** [1] - 1073:8
**incorrectly** [2] - 909:25, 924:1
**increase** [1] - 895:4
**independent** [3] - 938:21, 1053:2, 1053:4
**independently** [2] - 880:24, 1053:10
**indicate** [2] - 888:16, 928:25
**indicated** [1] - 951:4
**Indiscernible** [1] - 1026:15
**indispensable** [1] - 1071:18
**indisputably** [1] - 1017:23
**individual** [5] - 1042:19, 1043:10, 1043:15, 1043:21
**individuals** [1] - 1004:19
**indulgence** [1] - 1015:1
**industry** [32] - 883:14, 883:19, 888:18, 888:21, 892:20, 896:13, 915:2, 916:4, 917:2, 927:5, 927:9, 929:4, 929:9, 958:22, 959:1, 961:17, 968:14, 985:5, 990:12, 992:23, 995:24, 995:25, 997:4, 997:20, 998:15, 1000:11, 1014:8, 1015:25, 1016:18, 1016:23, 1043:13
**infer** [1] - 867:21
**inference** [1] - 866:24
**inferring** [1] - 867:21
**infinite** [1] - 1046:22
**influence** [3] - 947:20, 1073:19, 1073:21
**inform** [2] - 899:1, 910:23
**information** [9] - 877:7, 920:2, 928:21, 930:5, 930:10, 930:25, 964:23, 1017:1, 1030:4
**informed** [6] - 872:15, 910:16, 910:21, 921:2, 924:20, 925:1
**informing** [2] - 926:17, 926:24
**inherent** [1] - 1016:18
**inherently** [1] - 875:7
**initial** [2] - 907:3, 919:17
**input** [3] - 984:7, 993:5, 1012:2
**inquiring** [1] - 869:19
**inseparable** [1] - 880:21
**insinuation** [1] - 955:12
**inspiration** [1] - 1067:21
**instance** [8] - 867:17, 881:13, 904:1, 905:24, 930:11, 930:20, 1063:1, 1063:2
**instances** [4] - 1012:22, 1012:25, 1013:1, 1063:2
**instead** [5] - 885:20, 1035:1, 1043:25, 1047:23, 1052:7
**institutional** [1] - 877:4
**instruct** [1] - 1004:2
**instructed** [1] - 872:23
**instructing** [2] - 874:1, 874:5
**instruction** [2] - 1017:19
**instructions** [3] - 872:14, 873:6, 880:9
**instrument** [6] - 964:6, 987:18, 987:21, 993:8, 993:9, 1047:22
**instrumental** [19] - 929:18, 941:10, 988:20, 989:3, 994:11, 994:13, 994:15, 999:8, 1008:4, 1008:22, 1008:23, 1008:24, 1009:14, 1010:1, 1013:11, 1065:13, 1065:23, 1066:13, 1067:6
**instrumentalist** [4] - 929:14, 929:16, 934:10, 934:18
**instrumentalists** [2] - 915:17, 927:19
**instrumentation** [5] - 993:5, 993:14, 1009:22, 1013:19, 1074:19
**instruments** [26] - 915:15, 967:10, 987:2, 987:11, 987:15, 987:25, 993:22, 996:4, 996:5, 1015:9, 1039:25, 1040:14, 1040:16, 1040:23, 1042:20, 1045:18, 1048:14, 1056:4, 1063:4, 1064:2, 1072:4, 1072:10, 1072:12, 1072:13, 1072:21, 1074:9
**insurances** [1] - 917:16
**intend** [3] - 868:20, 869:16, 1054:5
**intended** [4] - 873:21, 880:20, 984:1, 986:17
**intent** [1] - 881:12
**intention** [3] - 866:2, 866:10, 881:3
**interact** [3] - 886:9, 886:16, 890:3
**interacted** [1] - 886:14
**interacting** [2] - 885:19, 886:23
**interaction** [1] - 885:16
**interactions** [1] - 967:1
**interdependent** [1] - 880:21
**interest** [1] - 1000:19
**interested** [1] - 948:15
**interesting** [4] - 1058:9, 1066:21, 1070:11, 1070:23
**interests** [1] - 879:23
**interface** [6] - 887:9, 893:10, 917:7, 917:9, 917:10
**interfacing** [1] - 917:20
**interject** [1] - 876:9
**interns** [1] - 1028:21
**interpret** [2] - 896:7, 920:12
**interpreted** [1] - 992:8
**interrupt** [3] - 867:14, 872:9, 1020:23
**intro** [9] - 1036:4, 1039:22, 1040:13, 1040:14, 1041:5, 1056:2, 1056:21, 1064:14, 1072:12
**introduce** [1] - 1027:24
**investigate** [3] - 939:12, 1015:18, 1075:16
**invite** [1] - 882:10
**involved** [11] - 890:18, 891:10, 891:17, 911:20, 917:18, 928:7, 1011:15, 1028:14, 1031:6, 1064:7
**involvement** [2] - 890:23, 930:21
**involves** [2] - 879:4, 879:13
**involving** [3] - 918:19,

1028:8, 1029:17
**irrelevant** [1] - 868:1
**irrespective** [1] - 1064:5
**isolate** [1] - 1049:14
**isolated** [3] - 1044:3, 1066:11, 1072:7
**isolating** [1] - 1062:10
**issue** [16] - 864:3, 864:22, 866:14, 866:16, 867:23, 868:9, 868:16, 880:4, 904:24, 910:10, 988:24, 993:20, 994:8, 997:14, 998:20, 1001:17
**issued** [1] - 1054:20
**issues** [6] - 866:10, 868:6, 890:4, 922:20, 936:19, 1008:7
**items** [1] - 872:10
**itself** [8] - 896:8, 896:10, 915:6, 955:7, 975:13, 1014:10, 1048:1

## J

**jack** [1] - 1054:10
**jack-in-the-box** [1] - 1054:10
**jacket** [3] - 927:21, 927:24, 928:2
**JACOBY** [1] - 878:8
**Jacoby** [3] - 878:8, 878:15, 878:16
**January** [12] - 909:3, 909:17, 911:23, 912:9, 919:4, 919:7, 919:12, 922:23, 923:23, 924:17, 925:13, 926:14
**JASON** [1] - 862:8
**Jason** [129] - 865:22, 879:19, 880:3, 883:24, 884:20, 885:20, 886:20, 888:1, 892:6, 892:13, 893:9, 897:16, 897:17, 898:4, 902:6, 903:2, 903:14, 903:22, 904:4, 904:5, 904:16, 905:5, 910:16, 910:21, 913:11, 914:8, 914:11, 914:17, 917:21, 917:25, 918:4, 920:3, 924:20, 925:1, 925:12, 925:17, 925:18, 926:2, 926:17, 926:24, 940:7, 940:19, 943:24, 945:20, 945:23, 946:14, 950:9, 956:20, 959:25, 960:1, 960:2, 960:4, 960:24, 962:3, 962:13, 962:18, 963:8, 963:15, 964:3, 965:25, 967:1, 967:5, 967:16, 967:22, 967:23, 968:7, 968:10, 969:5, 969:15, 970:7, 970:18, 970:23, 971:6, 971:20, 971:25, 972:9, 972:25, 979:2, 979:5, 981:3, 982:17, 983:2, 983:20, 983:22, 984:1, 984:24, 986:3, 987:1, 987:14, 987:17, 987:18, 987:20, 987:23, 988:3, 988:17, 989:25, 990:5, 991:7, 991:10, 991:14, 1002:24, 1004:2, 1005:4, 1006:10, 1006:20, 1010:15, 1012:4, 1013:3, 1017:14, 1019:21, 1020:2, 1020:17, 1021:18, 1021:19, 1022:12, 1023:10, 1023:15, 1023:22, 1023:25, 1025:10, 1025:19, 1025:23, 1058:18, 1061:14, 1066:19, 1066:22, 1067:4
**Jason's** [4] - 884:25, 890:17, 897:15, 922:5
**Jawsh** [35] - 879:15, 897:2, 897:4, 897:6, 897:12, 897:19, 897:22, 898:1, 898:4, 898:15, 898:16, 899:8, 901:1, 914:9, 920:4, 935:19, 936:6, 941:7, 941:9, 988:20, 989:2, 994:19, 1008:22, 1009:15, 1066:24, 1067:14, 1069:2, 1069:7, 1069:9, 1069:21, 1070:11, 1070:16, 1070:17, 1070:25
**Jawsh's** [1] - 1071:3
**jazz** [3] - 1029:5, 1048:6, 1048:8
**JKash** [2] - 1011:10, 1023:19
**job** [11] - 888:5, 898:25, 918:4, 959:10, 960:12, 960:15, 960:20, 961:10, 961:23, 1011:18, 1011:20
**joining** [1] - 939:4
**joint** [14] - 874:11, 874:23, 880:1, 880:5, 880:8, 880:12, 880:13, 880:14, 880:24, 881:19, 1001:7, 1001:12, 1001:15
**jointly** [1] - 872:15
**Joshua** [1] - 863:14
**journals** [1] - 1029:17
**Juba** [4] - 919:12, 922:10, 922:21, 924:18
**JUDGE** [1] - 862:3
**judge** [1] - 1038:17
**judges** [1] - 881:21
**jump** [1] - 1054:10
**jumping** [2] - 1048:25, 1049:11
**June** [12] - 914:8, 950:15, 950:17, 950:18, 952:25, 953:6, 953:15, 954:2, 958:24, 1054:11, 1062:20
**juror** [1] - 877:16
**Juror** [1] - 878:18
**jurors** [1] - 877:15
**jury** [70] - 866:24, 867:21, 870:16, 871:14, 871:18, 871:25, 872:14, 872:22, 873:4, 874:5, 874:24, 875:14, 876:18, 878:23, 878:24, 917:1, 939:9, 939:14, 939:23, 944:2, 948:5, 952:1, 952:15, 952:17, 952:20, 959:8, 968:21, 973:7, 981:8, 988:24, 989:19, 996:9, 997:18, 998:20, 1001:3, 1005:21, 1015:16, 1015:20, 1016:4, 1016:19, 1017:1, 1017:4, 1017:19, 1017:22, 1018:2, 1020:25, 1021:3, 1024:24, 1026:21, 1026:23, 1027:11, 1027:25, 1034:17, 1036:21, 1037:2, 1038:12, 1039:7, 1040:25, 1052:22, 1056:15, 1064:7, 1065:2, 1065:19, 1065:21, 1068:5, 1068:6, 1071:7, 1075:18, 1075:20
**JURY** [1] - 862:15
**jury's** [1] - 943:15
**juxtaposed** [1] - 903:23

## K

**Kajimura** [5] - 872:14, 872:15, 873:23, 1076:16
**keep** [3] - 896:11, 960:7, 1004:2
**keeps** [1] - 1017:15
**Kent** [1] - 863:17
**key** [3] - 917:12, 969:1, 969:3
**keyboard** [2] - 962:7, 1046:12
**keyboardist** [1] - 928:10
**keys** [1] - 915:15
**kick** [7] - 1005:2, 1005:7, 1005:14, 1023:12, 1023:21, 1023:25, 1043:14
**kind** [49] - 865:21, 873:12, 875:21, 877:4, 885:21, 887:23, 917:5, 917:6, 928:11, 969:18, 993:3, 1029:20, 1035:20, 1040:8, 1041:14, 1043:6, 1044:8, 1045:6, 1045:25, 1046:1, 1046:17, 1048:3, 1048:7, 1048:9, 1049:13, 1049:25, 1051:12, 1058:6, 1061:11, 1062:12, 1065:9, 1065:11, 1067:21, 1068:9, 1069:16, 1070:15, 1070:23, 1071:10, 1072:24, 1072:25, 1073:1, 1073:15, 1073:16, 1073:18, 1073:19, 1073:22, 1074:11, 1074:18, 1075:2
**kinds** [2] - 1036:12, 1044:7
**Kings** [4] - 1072:19, 1072:23, 1073:10, 1073:15
**Kinsella** [2] - 920:15, 922:14
**knowing** [2] - 904:7, 1014:24
**knowledge** [28] - 914:15, 915:1, 916:23, 927:14, 929:8, 929:12, 929:22, 936:19, 938:1, 938:4, 938:22, 942:18, 945:12, 945:16, 965:14, 992:2, 993:12, 995:8, 1002:22, 1006:13, 1010:8, 1010:12, 1014:13, 1019:24, 1032:25, 1033:10, 1067:25, 1069:24
**knowledgeable** [6] - 916:4, 916:6, 916:8, 916:9, 927:8
**known** [4] - 879:18, 914:12, 930:20, 943:2
**knows** [2] - 872:12, 894:25

## L

**L-u-s-t-i-g** [1] - 1027:19
**label** [38] - 883:12, 885:15, 885:17, 885:18, 885:21, 886:3, 886:6, 886:21, 889:7, 889:12, 890:3, 890:6, 890:9, 890:12, 890:19, 890:23, 891:2, 891:4, 891:10,

891:18, 891:20, 891:21, 891:23, 891:24, 892:12, 896:2, 917:9, 920:11, 920:18, 921:8, 923:5, 928:5, 928:22, 1011:22, 1011:23, 1012:8, 1024:7, 1046:18
**labels** [4] - 886:20, 886:23, 891:3, 923:7
**lacking** [1] - 1060:12
**lacks** [1] - 932:5
**ladies** [10] - 912:17, 948:1, 955:1, 973:21, 1001:1, 1026:12, 1026:20, 1032:19, 1052:13, 1075:14
**land** [1] - 1040:8
**language** [1] - 1017:18
**large** [3] - 948:13, 955:4, 1060:8
**last** [15] - 868:14, 908:14, 913:10, 921:2, 947:16, 947:18, 972:21, 980:1, 987:11, 1001:5, 1026:11, 1034:4, 1036:22, 1037:10, 1037:11
**lasted** [8] - 965:7, 976:9, 976:22, 977:7, 977:14, 978:2, 978:14, 978:25
**lastly** [1] - 874:8
**late** [4] - 943:3, 954:2, 954:12, 955:24
**law** [20] - 879:7, 880:11, 880:14, 884:2, 884:9, 884:12, 899:15, 913:19, 916:5, 916:6, 948:9, 948:13, 992:14, 998:12, 998:13, 1016:4, 1032:23, 1033:3
**LAW** [1] - 863:4
**Law** [8] - 863:4, 863:5, 863:7, 863:8, 863:8, 863:14, 863:14, 863:17
**lawsuit** [10] - 877:2, 879:4, 956:19, 957:2, 957:21, 958:13, 989:21, 1033:8, 1033:10, 1036:24
**lawyer** [7] - 899:16, 899:19, 955:8, 955:17, 1004:18, 1006:16, 1010:5
**lawyer's** [1] - 955:10
**lawyers** [8] - 941:20, 942:6, 948:3, 955:1, 955:3, 955:5, 955:22, 998:17
**Laxed** [47] - 879:11, 879:15, 891:15, 896:23, 897:1, 897:9, 897:12, 898:5, 900:16, 988:20, 989:3, 994:19, 996:18, 996:20, 996:21, 999:6, 1013:13, 1041:14, 1049:10, 1052:22, 1055:4, 1055:6, 1055:8, 1055:9, 1055:13, 1055:17, 1063:15, 1063:16, 1065:24, 1065:25, 1066:23, 1067:3, 1067:12, 1067:14, 1067:17, 1068:8, 1068:25, 1069:2, 1069:9, 1069:17, 1069:19, 1069:21, 1072:18, 1073:8, 1073:9, 1073:10, 1075:6
**lay** [2] - 970:14, 1040:8
**layer** [11] - 1056:10, 1059:2, 1060:10, 1060:11, 1061:17, 1066:7, 1067:6, 1068:1, 1071:6, 1071:12
**Layer** [1] - 1066:20
**layering** [1] - 1070:9
**layers** [10] - 1043:18, 1057:1, 1058:23, 1059:3, 1059:4, 1059:6, 1059:21, 1068:23, 1069:13
**layperson** [1] - 916:3
**lead** [3] - 993:16, 1007:22, 1007:23
**leading** [5] - 877:8, 900:21, 903:10, 926:21, 1060:2
**leak** [2] - 878:1, 878:14
**Leak** [4] - 878:1, 878:3, 878:4, 878:6
**Leak's** [1] - 878:5
**leans** [1] - 993:14
**learn** [3] - 890:6, 904:2, 1037:10
**learned** [1] - 930:22
**least** [5] - 870:5, 883:5, 905:24, 1047:1, 1053:3
**leave** [4] - 873:14, 909:5, 975:16, 975:17
**led** [2] - 944:19, 971:9
**Lee** [4] - 919:12, 922:10, 922:21, 924:18
**leeway** [1] - 952:3
**left** [16] - 864:20, 942:12, 946:3, 964:5, 964:7, 972:18, 973:1, 973:3, 982:24, 983:4, 1005:10, 1010:9, 1050:21, 1051:5, 1056:22, 1063:25
**legal** [14] - 865:22, 904:22, 936:24, 937:3, 992:11, 1014:25, 1016:2, 1016:19, 1016:24, 1034:17, 1034:18, 1034:24, 1059:23, 1059:24
**less** [3] - 870:11, 954:23, 1017:2
**level** [3] - 872:5, 1030:22, 1055:3
**libs** [3] - 1007:21, 1007:22
**lie** [1] - 955:15
**life** [2] - 889:3, 1024:14
**light** [1] - 872:18
**likely** [2] - 880:5, 1023:11
**likewise** [2] - 1037:5, 1037:14
**limine** [5] - 864:4, 866:7, 866:11, 869:3, 1052:18
**Limine** [3] - 865:7, 865:11, 865:20
**limitations** [1] - 869:7
**limited** [6] - 870:7, 933:2, 944:2, 960:21, 1060:4, 1072:7
**limiting** [1] - 871:1
**limits** [1] - 1071:10
**Lindy** [2] - 920:15, 922:11
**line** [29] - 919:13, 922:16, 924:18, 951:15, 957:16, 959:16, 959:18, 961:3, 961:4, 961:5, 967:13, 967:14, 969:9, 989:18, 1006:3, 1006:4, 1006:8, 1015:23, 1019:8, 1019:12, 1022:23, 1051:4
**lines** [12] - 940:24, 942:15, 956:6, 956:12, 956:23, 969:10, 991:18, 994:1, 997:7, 999:25, 1007:10, 1021:13
**linguistics** [1] - 1031:11
**link** [2] - 958:14
**list** [8] - 868:20, 869:15, 928:4, 1003:20, 1011:23, 1011:25, 1045:10, 1059:9
**listed** [3] - 874:15, 979:23, 1012:3
**listen** [15] - 963:11, 1010:15, 1032:2, 1060:23, 1064:3, 1065:14, 1065:19, 1065:21, 1067:19, 1067:23, 1067:25, 1068:5, 1068:6, 1069:25, 1070:3
**listened** [2] - 1049:8, 1058:15
**listener** [1] - 1072:16
**listening** [7] - 1036:10, 1045:17, 1053:25, 1061:18, 1065:12, 1070:8, 1072:17
**listing** [1] - 872:20
**lists** [1] - 928:6
**literal** [2] - 1055:12, 1055:15
**literally** [1] - 1057:13
**litigation** [3] - 869:11, 878:9, 908:17
**live** [12] - 928:2, 940:13, 940:14, 952:17, 962:22, 962:24, 963:6, 964:9, 987:2, 1007:14, 1007:15, 1075:8
**livelihood** [1] - 893:3
**living** [1] - 883:8
**LLP** [3] - 863:7, 863:13, 863:16
**locations** [1] - 1004:18
**lock** [2] - 981:25, 982:4
**log** [27] - 941:25, 964:22, 964:24, 965:18, 965:24, 966:3, 966:11, 966:13, 966:15, 966:20, 966:21, 975:4, 975:8, 975:20, 976:5, 976:6, 976:18, 976:19, 977:4, 977:11, 977:22, 978:10, 978:21, 1002:11, 1003:12, 1003:20, 1004:3
**logged** [1] - 972:18
**Logic** [1] - 1043:7
**logistical** [4] - 953:7, 953:13, 953:23, 958:15
**logs** [1] - 974:21
**look** [23] - 910:10, 919:6, 921:22, 945:3, 951:14, 951:23, 972:13, 974:6, 975:25, 989:14, 991:17, 997:6, 1002:19, 1003:9, 1003:12, 1045:20, 1045:25, 1050:2, 1050:9, 1050:24, 1064:6, 1067:5
**looked** [3] - 931:2, 1039:6, 1049:5
**looking** [11] - 910:20, 918:23, 922:7, 931:20, 979:20, 980:22, 981:8, 1002:10, 1031:20, 1068:2, 1072:2
**looks** [1] - 885:24
**Los** [7] - 862:18, 862:23, 863:9, 863:15, 863:18, 958:23, 1028:20
**Love** [169] - 879:11, 879:13, 879:14, 880:1, 880:13, 882:2, 891:15, 891:24, 896:20, 897:10, 897:14, 898:3, 898:9, 900:10, 900:14, 900:25, 902:16,

904:3, 904:20, 904:24, 905:15, 905:21, 906:7, 910:11, 911:25, 913:24, 914:7, 916:10, 916:13, 916:23, 917:22, 917:24, 918:9, 919:13, 920:4, 920:22, 922:16, 924:18, 925:19, 926:19, 927:1, 929:23, 930:21, 937:13, 938:23, 941:6, 941:8, 941:10, 941:12, 941:22, 953:25, 954:6, 958:6, 959:5, 959:9, 959:25, 960:14, 960:20, 960:25, 961:11, 962:2, 963:8, 963:15, 965:12, 965:15, 966:6, 966:12, 966:16, 966:24, 967:3, 967:7, 968:11, 970:20, 970:25, 971:8, 971:13, 971:22, 972:5, 972:8, 972:15, 973:19, 974:3, 974:14, 974:18, 974:21, 975:4, 975:7, 975:19, 975:23, 975:24, 976:7, 976:20, 977:5, 977:12, 977:25, 978:12, 978:23, 979:3, 981:15, 983:14, 983:17, 984:21, 985:13, 985:16, 986:21, 988:9, 988:18, 988:25, 991:8, 991:11, 991:15, 993:19, 994:7, 994:23, 995:2, 995:6, 995:11, 995:18, 996:18, 997:2, 997:13, 998:2, 998:24, 999:12, 999:21, 1000:5, 1000:13, 1001:24, 1002:23, 1003:17, 1006:12, 1007:18, 1008:2, 1008:4, 1012:4, 1013:4, 1013:18, 1014:5, 1014:14, 1014:16, 1019:23, 1020:8, 1021:7, 1023:2, 1023:13, 1025:4, 1025:8, 1025:12, 1025:14, 1034:15, 1035:5, 1036:2, 1036:17, 1039:16, 1042:17, 1049:6, 1055:4, 1055:5, 1055:9, 1055:16, 1055:22, 1056:25, 1057:12, 1057:15, 1067:20, 1071:2, 1073:5, 1073:7

**Love-specific** [1] - 904:24

**lower** [1] - 1047:16

**Lustig** [28] - 868:10, 868:11, 869:1, 1026:8, 1026:24, 1027:18, 1027:24, 1028:1, 1028:23, 1033:24, 1036:1, 1037:12, 1039:10, 1039:15, 1041:2, 1050:6, 1052:4, 1053:23, 1054:12, 1056:9, 1062:16, 1063:23, 1065:1, 1066:18, 1070:7, 1075:19, 1075:20

**LUSTIG** [2] - 1027:14, 1078:2

**Lustig's** [4] - 869:4, 869:8, 1026:13, 1037:4

**lying** [1] - 875:21

**lyric** [2] - 1029:9, 1030:20

**lyrics** [10] - 960:1, 988:18, 993:16, 999:4, 1007:10, 1007:13, 1007:15, 1007:16, 1007:19, 1029:9

## M

**Maddahi** [18] - 909:17, 909:19, 909:22, 910:14, 911:7, 911:19, 919:7, 919:10, 919:12, 922:10, 922:21, 923:24, 924:5, 924:10, 924:17, 925:13, 925:15, 926:13

**Maddahi's** [2] - 911:18, 924:16

**magic** [1] - 1066:22

**mail** [64] - 872:16, 908:18, 908:20, 909:2, 909:6, 909:12, 909:14, 909:16, 909:19, 910:6, 910:14, 911:2, 911:7, 911:11, 911:18, 911:23, 916:15, 918:19, 918:20, 918:24, 919:3, 919:6, 919:10, 919:11, 919:17, 919:19, 919:22, 921:22, 922:8, 922:9, 923:22, 924:3, 924:10, 924:16, 924:17, 924:24, 925:4, 925:6, 925:12, 925:15, 925:21, 926:13, 929:19, 931:5, 931:15, 931:19, 931:23, 931:25, 932:2, 932:4, 932:10, 932:12, 932:25, 933:5, 933:8, 933:12, 933:19, 934:5, 958:12, 980:11, 980:14, 981:2, 981:12

**mailed** [4] - 953:19, 958:13, 983:18, 984:23

**mails** [5] - 868:14, 918:25, 924:13, 929:20, 953:22

**main** [5] - 872:3, 962:22, 1030:1, 1032:1, 1074:20

**major** [4] - 889:12, 1042:2, 1042:4, 1046:19

**man** [1] - 897:4

**manage** [3] - 885:21, 886:18, 1043:23

**managed** [2] - 883:23, 1028:21

**management** [3] - 869:19, 883:15, 920:3

**manager** [38] - 883:12, 883:18, 884:5, 884:7, 884:16, 887:16, 887:19, 887:25, 888:11, 888:14, 889:7, 889:9, 889:11, 892:19, 898:24, 898:25, 899:19, 899:22, 900:12, 900:13, 906:4, 917:2, 917:3, 917:4, 917:5, 917:10, 917:14, 917:18, 917:20, 918:5, 918:10, 922:5, 928:7, 937:2, 938:6, 980:12, 984:13

**managers** [2] - 893:10, 903:17

**managing** [6] - 883:25, 884:13, 885:10, 886:11, 892:1, 1028:20

**manner** [1] - 904:2

**mapped** [1] - 1062:2

**mark** [1] - 875:10

**marked** [5] - 870:4, 871:24, 929:19, 964:18, 966:11

**massive** [1] - 1058:23

**master** [11] - 896:5, 896:6, 896:8, 915:8, 1024:3, 1024:8, 1024:11, 1024:13, 1024:15, 1024:18

**master's** [1] - 1030:8

**mastered** [1] - 1028:18

**mastering** [4] - 1028:10, 1030:19, 1043:25, 1062:24

**material** [10] - 880:23, 1042:3, 1044:3, 1051:9, 1055:17, 1057:7, 1062:22, 1067:15, 1071:3, 1073:8

**materials** [6] - 1033:5, 1038:21, 1042:15, 1044:4, 1058:5, 1071:20

**Matt** [1] - 902:10

**matter** [6] - 864:18, 868:23, 1048:17, 1071:16, 1074:3, 1077:2

**matters** [5] - 918:5, 921:5, 931:7, 953:6, 1038:16

**MATTHEW** [1] - 862:5

**Matthew** [85] - 874:8, 879:17, 881:24, 901:24, 906:24, 911:24, 912:8, 919:13, 920:1, 920:3, 920:6, 920:23, 921:3, 922:16, 924:18, 925:18, 926:18, 926:25, 929:23, 935:1, 935:15, 947:10, 950:1, 954:6, 956:19, 960:24, 961:3, 961:9, 963:12, 963:14, 963:20, 967:2, 967:5, 967:21, 967:24, 968:3, 968:7, 968:11, 969:6, 970:8, 970:19, 970:24, 971:6, 971:25, 972:3, 972:7, 972:14, 974:13, 981:23, 982:20, 983:7, 984:7, 984:16, 984:19, 986:17, 986:20, 986:23, 988:6, 988:9, 988:18, 989:1, 991:14, 993:18, 994:6, 994:22, 995:1, 995:5, 995:10, 995:17, 997:1, 997:12, 998:23, 999:20, 1000:4, 1002:25, 1003:20, 1006:19, 1006:21, 1017:14, 1020:1, 1020:3, 1023:7, 1025:3, 1025:23

**Matthew's** [2] - 920:21, 925:7

**Matty** [23] - 879:18, 911:24, 969:15, 1057:10, 1057:15, 1058:11, 1058:21, 1060:6, 1060:8, 1060:10, 1060:16, 1061:19, 1065:2, 1065:5, 1066:7, 1066:19, 1066:22, 1067:4, 1067:10, 1067:11, 1070:18, 1070:21, 1070:24

**Matty's** [6] - 1057:13, 1057:22, 1059:16, 1060:7, 1060:16, 1065:4

**mean** [58] - 864:13, 867:14, 868:23, 870:20, 876:25, 883:9, 885:17, 886:14, 887:25, 889:5, 889:18,

893:18, 893:20, 894:6, 894:7, 894:11, 894:14, 894:23, 895:3, 895:25, 896:11, 898:23, 900:17, 901:13, 902:1, 902:20, 905:8, 906:22, 908:19, 910:24, 911:15, 912:3, 915:21, 915:23, 918:2, 923:2, 925:23, 925:24, 927:17, 927:24, 928:1, 928:17, 928:18, 931:9, 931:24, 932:11, 935:8, 948:14, 992:8, 994:13, 1001:10, 1042:7, 1046:9, 1055:10, 1070:12, 1071:2
**mean..** [1] - 933:17
**meaning** [1] - 1075:21
**means** [6] - 865:9, 927:11, 975:21, 990:23, 1027:7, 1050:6
**meantime** [1] - 1075:15
**media** [1] - 1029:3
**medical** [1] - 878:18
**meeting** [2] - 872:14, 873:22
**melodic** [3] - 1030:18, 1048:23, 1074:19
**melodies** [4] - 993:16, 999:9, 1007:12, 1029:10
**melody** [20] - 960:1, 968:2, 968:3, 969:5, 969:18, 969:24, 970:7, 970:16, 990:20, 999:4, 999:5, 999:8, 1007:10, 1007:11, 1031:1, 1031:7, 1032:12, 1045:5, 1045:25, 1050:11
**member** [4] - 899:16, 899:17, 899:18, 922:6
**members** [7] - 878:24, 939:9, 950:12, 1001:3, 1015:16, 1036:21, 1040:25
**memories** [1] - 1002:11
**memory** [3] - 956:17, 958:3, 968:6
**mental** [1] - 1051:12
**mention** [2] - 935:1, 1075:20
**mentioned** [13] - 934:21, 935:8, 938:18, 1001:5, 1010:21, 1030:15, 1036:21, 1041:19, 1044:2, 1046:3, 1061:10, 1062:4, 1062:5
**mentioning** [1] - 935:7
**merely** [2] - 938:23, 1052:6
**merge** [1] - 871:24
**merged** [2] - 880:21, 881:4
**mess** [2] - 873:12, 935:25
**message** [5] - 864:20, 911:3, 922:25, 944:22, 953:3
**messages** [2] - 953:15, 953:22
**met** [3] - 883:25, 884:2, 884:8
**metal** [1] - 1074:16
**metaphor** [1] - 1065:10
**methods** [1] - 1036:12
**Miami** [1] - 884:2
**MICHAEL** [1] - 862:3
**mid** [1] - 920:6
**mid-August** [1] - 920:6
**middle** [2] - 957:11, 962:6
**might** [12] - 864:3, 869:19, 876:9, 948:1, 948:15, 996:13, 1017:4, 1032:19, 1037:21, 1048:8, 1076:8
**mind** [3] - 946:14, 952:1, 1071:24
**mindful** [1] - 1073:24
**minimize** [1] - 872:5
**minimum** [2] - 875:15, 1061:15
**minute** [1] - 870:11
**minutes** [11] - 876:13, 902:13, 954:5, 955:18, 956:3, 956:16, 966:19, 1009:24, 1039:24, 1056:24, 1061:3
**mischaracterization** [2] - 973:5, 973:20
**mischaracterizes** [1] - 1005:19
**mislead** [1] - 1017:4
**misread** [1] - 921:14
**misrecollect** [1] - 955:14
**missed** [1] - 1062:16
**missing** [4] - 877:16, 877:17, 1063:23, 1068:7
**misspoke** [1] - 977:23
**misstated** [1] - 919:23
**mistaken** [1] - 909:13
**mistakenly** [1] - 949:2
**mix** [15] - 942:12, 946:6, 961:15, 961:19, 961:20, 961:22, 961:23, 961:24, 1010:16, 1028:17, 1057:11
**mixed** [2] - 990:3, 1028:17
**mixing** [7] - 945:24, 946:2, 1004:11, 1004:16, 1028:10, 1030:19, 1043:24
**model** [2] - 873:6, 1017:19
**modeling** [1] - 1041:14
**modern** [2] - 996:10, 1047:1
**moment** [14] - 887:3, 912:12, 912:21, 933:3, 933:6, 947:2, 947:25, 969:7, 1015:1, 1015:22, 1032:18, 1058:20, 1065:14, 1072:8
**moments** [1] - 946:3
**Monday** [2] - 919:11, 924:17
**monetary** [1] - 914:17
**money** [1] - 914:19
**months** [1] - 960:15
**moral** [1] - 901:21
**morally** [1] - 893:21
**morning** [8] - 864:9, 868:13, 913:6, 913:7, 940:5, 940:6, 947:8, 947:9
**most** [21] - 874:20, 918:24, 942:9, 943:19, 963:10, 986:8, 1005:23, 1007:17, 1008:1, 1008:3, 1009:4, 1021:8, 1032:4, 1048:5, 1049:19, 1049:20, 1051:10, 1051:12, 1061:10, 1072:11, 1076:12
**mostly** [2] - 964:3, 1028:7
**Motion** [3] - 865:7, 865:11, 865:20
**motion** [7] - 864:4, 866:7, 868:12, 868:22, 869:3, 932:20, 1052:18
**motions** [1] - 866:11
**mouse** [1] - 962:7
**mouth** [1] - 887:22
**move** [10] - 868:2, 932:18, 974:24, 997:9, 1048:23, 1053:17, 1054:19, 1055:20, 1062:14, 1071:24
**moved** [5] - 958:23, 964:13, 964:14, 981:6, 1022:6
**movie** [1] - 895:3
**moving** [3] - 1049:9, 1049:10, 1055:3
**MP3** [6] - 979:12, 979:14, 980:20, 981:13, 982:15, 1035:18
**MR** [249] - 864:9, 864:15, 865:3, 865:6, 865:7, 865:18, 866:4, 866:8, 867:6, 867:14, 868:4, 868:11, 869:14, 869:22, 869:23, 870:5, 870:17, 871:2, 871:9, 872:1, 872:2, 872:9, 872:12, 873:20, 874:7, 874:14, 876:4, 876:9, 876:12, 876:15, 876:21, 877:13, 877:20, 878:1, 878:2, 878:4, 878:5, 878:7, 878:8, 878:10, 878:14, 882:12, 882:25, 883:2, 899:10, 900:4, 900:21, 903:10, 907:20, 908:1, 909:5, 910:3, 910:15, 912:12, 912:15, 913:1, 913:3, 918:13, 921:9, 921:11, 921:13, 921:17, 921:19, 921:24, 923:16, 923:20, 926:21, 929:25, 930:3, 930:18, 931:21, 932:5, 932:8, 932:17, 932:22, 935:3, 935:6, 936:24, 937:15, 937:18, 937:21, 937:23, 938:7, 938:25, 939:2, 939:16, 939:20, 939:21, 940:2, 940:4, 943:5, 943:17, 943:25, 944:15, 944:23, 944:25, 946:17, 946:21, 946:24, 947:1, 947:7, 949:13, 950:20, 950:25, 951:2, 951:12, 951:17, 952:23, 953:12, 954:9, 954:20, 956:7, 956:9, 957:5, 957:11, 957:15, 958:1, 958:7, 959:17, 959:20, 961:2, 964:11, 964:17, 967:12, 970:9, 971:3, 971:5, 972:10, 973:5, 973:20, 974:4, 974:24, 975:13, 975:25, 976:11, 976:13, 976:24, 977:2, 977:9, 977:19, 978:4, 978:16, 979:17, 980:7, 980:13, 980:20, 980:25, 981:5, 981:10, 983:16, 988:22, 989:4, 989:10, 989:12, 989:17, 990:14, 991:18, 991:22, 993:20, 993:24, 994:4, 994:8, 995:20, 997:6, 997:8, 997:10, 997:14, 998:19, 998:25, 999:13, 999:24, 1000:3, 1000:24, 1001:19, 1001:21, 1002:3, 1005:19, 1006:7, 1006:8, 1006:9, 1006:24, 1007:4, 1008:7, 1014:22, 1015:1, 1015:14, 1017:11, 1017:12, 1017:25, 1018:6, 1018:8,

1018:11, 1018:13, 1019:15, 1019:19, 1020:22, 1021:5, 1021:12, 1021:15, 1022:7, 1022:21, 1022:25, 1024:22, 1025:2, 1026:1, 1026:2, 1026:7, 1027:23, 1034:3, 1036:20, 1039:14, 1052:11, 1052:16, 1053:14, 1054:3, 1054:7, 1054:9, 1054:16, 1054:23, 1054:25, 1055:2, 1056:11, 1060:2, 1060:23, 1064:14, 1064:19, 1064:23, 1064:25, 1066:2, 1068:13, 1068:16, 1070:3, 1073:24, 1074:4, 1074:8, 1075:10, 1075:23, 1076:2, 1076:3, 1076:13, 1076:15, 1077:13, 1077:15, 1077:17, 1077:19, 1077:21, 1077:24, 1078:1, 1078:4
**MULLIN** [2] - 863:13, 863:16
**multiple** [6] - 886:15, 1010:9, 1014:17, 1043:21, 1046:14, 1051:25
**muscle** [1] - 884:25
**Music** [13] - 879:19, 879:22, 880:3, 886:10, 914:9, 918:19, 920:16, 923:24, 926:13, 926:17, 926:24, 956:21, 1030:9
**music** [95] - 883:13, 883:18, 884:4, 888:17, 888:21, 892:19, 896:13, 915:2, 916:3, 917:1, 927:5, 927:9, 929:4, 929:9, 958:22, 959:1, 959:10, 960:12, 961:17, 968:14, 980:4, 980:5, 985:5, 988:4, 990:12, 991:23, 992:12, 992:22, 994:15, 995:24, 995:25, 996:10, 996:12, 997:3, 997:20, 998:15, 1000:11, 1014:7, 1015:25, 1016:17, 1016:23, 1028:1, 1028:2, 1028:8, 1028:9, 1028:11, 1028:14, 1029:2, 1029:3, 1029:6, 1029:12, 1029:19, 1029:20, 1029:25, 1030:1, 1030:5, 1030:6, 1030:7, 1030:9, 1030:13, 1030:14, 1030:15, 1031:1, 1031:7, 1031:19, 1032:2, 1032:3, 1032:9, 1032:24, 1035:22, 1042:3, 1042:9, 1042:10, 1042:11, 1043:8, 1043:11, 1045:7, 1045:9, 1045:16, 1046:1, 1050:23, 1051:2, 1051:3, 1051:6, 1051:11, 1058:7, 1074:13
**musical** [33] - 879:5, 879:8, 879:14, 970:2, 988:25, 994:6, 995:1, 1031:6, 1031:21, 1035:4, 1035:11, 1035:15, 1036:13, 1041:20, 1041:24, 1044:20, 1045:10, 1046:5, 1048:10, 1049:5, 1049:13, 1049:22, 1049:23, 1050:1, 1051:8, 1051:22, 1052:7, 1055:22, 1058:5, 1059:20, 1062:9, 1071:20, 1074:9
**musically** [1] - 1042:6
**musician** [27] - 879:17, 915:10, 915:13, 919:25, 938:19, 938:23, 971:14, 971:17, 974:16, 986:24, 987:1, 992:1, 992:3, 992:4, 995:10, 995:18, 995:25, 998:10, 999:17, 1014:5, 1014:10, 1014:19, 1015:5, 1015:10, 1015:12, 1016:14
**musicians** [9] - 905:10, 915:14, 915:18, 928:20, 929:17, 936:19, 992:20, 997:4, 998:6
**musicians'** [1] - 1071:9
**musicological** [5] - 988:13, 1016:3, 1049:21, 1066:10, 1068:22
**musicologically** [1] - 1035:3
**musicologist** [6] - 988:12, 1031:16, 1032:10, 1035:14, 1044:8, 1049:14
**musicologists** [9] - 1032:5, 1032:25, 1036:12, 1042:2, 1045:5, 1050:9, 1050:19, 1051:8, 1051:10
**musicology** [3] - 1016:6, 1031:18, 1031:19
**must** [5] - 880:15, 880:18, 880:20, 880:23, 881:1
**mute** [1] - 1065:5
**muted** [4] - 1059:17, 1060:17, 1063:25, 1064:21
**muting** [7] - 1057:13, 1057:22, 1062:19, 1062:22, 1067:2, 1067:3
**mutually** [1] - 934:14

## N

**name** [25] - 882:20, 897:2, 897:3, 901:24, 902:5, 902:13, 904:6, 907:7, 908:14, 911:24, 912:8, 919:25, 920:21, 925:8, 935:1, 935:14, 965:20, 965:21, 965:23, 965:24, 979:23, 980:2, 1027:17, 1027:18, 1046:18
**named** [2] - 925:18, 965:20
**names** [2] - 889:1, 966:3
**narrow** [1] - 944:5
**Nasser** [10] - 881:25, 910:7, 910:10, 918:21, 919:17, 919:24, 919:25, 921:20, 921:22, 925:7
**Nasser's** [1] - 922:9
**national** [1] - 884:23
**NDA** [1] - 945:14
**necessarily** [5] - 873:7, 876:23, 888:5, 1016:22, 1052:19
**necessary** [4] - 870:22, 920:23, 1022:24, 1061:16
**need** [20] - 881:19, 890:12, 890:13, 900:15, 906:1, 907:23, 949:18, 949:22, 951:4, 951:7, 951:17, 964:15, 974:9, 989:10, 991:21, 994:2, 1007:7, 1022:21, 1026:8
**needed** [12] - 889:25, 890:1, 898:14, 899:7, 903:7, 904:20, 920:24, 986:4, 986:14, 992:6, 1006:20, 1020:2
**needing** [1] - 1058:7
**needs** [3] - 887:9, 946:12, 1012:2
**nefarious** [1] - 929:1
**neutral** [1] - 866:19
**never** [16] - 867:22, 904:15, 906:18, 921:7, 930:6, 973:11, 973:15, 986:6, 1004:4, 1005:16, 1008:11, 1012:18, 1012:20, 1013:6, 1015:7, 1064:17
**New** [4] - 897:4, 909:23, 923:24, 1072:20
**new** [7] - 928:2, 988:18, 1041:15, 1050:12, 1050:22, 1051:16, 1068:11
**next** [9] - 895:3, 910:3, 964:3, 965:25, 968:1, 979:23, 1009:24, 1026:6, 1026:7
**nice** [4] - 922:24, 1043:12, 1058:6, 1061:6
**Nicholas** [1] - 863:8
**night** [10] - 868:15, 965:2, 966:20, 972:22, 973:16, 975:15, 975:17, 985:2, 1037:10, 1037:11
**nine** [12] - 878:25, 939:24, 942:17, 942:19, 965:9, 974:21, 975:7, 977:14, 985:11, 1002:22, 1018:3
**ninth** [1] - 978:22
**nobody** [2] - 930:12, 935:14
**non** [1] - 998:17
**non-lawyers** [1] - 998:17
**nondisclosure** [2] - 945:10, 945:11
**none** [5] - 916:14, 929:24, 1062:5, 1062:6, 1069:19
**noon** [1] - 875:16
**normal** [2] - 998:5, 998:7
**normally** [8] - 891:4, 915:20, 923:5, 923:6, 928:8, 935:9, 966:15, 982:13
**notation** [8] - 1032:2, 1035:22, 1042:10, 1046:4, 1046:5, 1051:2, 1058:8
**notations** [1] - 1061:6
**note** [6] - 968:21, 968:22, 969:2, 1046:15, 1046:16
**noted** [6] - 874:9, 918:15, 1056:16, 1060:15, 1060:16
**notes** [19] - 948:11, 948:22, 949:9, 967:6, 967:17, 968:16, 968:18, 968:23, 969:23, 1046:14, 1046:19, 1046:20, 1046:22, 1046:25, 1047:1, 1047:3, 1047:8, 1047:15, 1052:1
**nothing** [3] - 955:7, 955:17, 1014:2
**notice** [2] - 868:8, 875:25
**noticed** [1] - 1049:7
**notifying** [1] - 953:8
**novel** [1] - 985:25
**Number** [6] - 865:8, 865:11, 865:20, 871:21, 878:18,

881:3
**number** [9] - 880:9, 908:11, 941:5, 943:12, 1011:5, 1017:16, 1062:14, 1069:6, 1074:11
**numbers** [1] - 897:3
**numerous** [1] - 900:20

**O**

**oath** [4] - 939:25, 942:16, 952:5, 1018:4
**object** [12] - 868:1, 872:20, 872:23, 935:3, 937:16, 950:25, 954:20, 956:7, 959:20, 975:13, 990:14, 998:19
**objecting** [1] - 867:3
**objection** [64] - 867:3, 873:2, 899:10, 900:21, 903:10, 921:9, 921:15, 921:24, 926:21, 931:21, 932:5, 936:24, 937:4, 937:19, 937:21, 938:7, 943:5, 943:25, 944:15, 944:23, 946:17, 946:19, 951:17, 953:12, 954:9, 954:11, 954:22, 957:5, 958:7, 961:4, 961:7, 969:9, 970:9, 971:3, 972:10, 973:5, 973:20, 974:4, 988:22, 989:4, 989:10, 993:20, 994:8, 995:20, 997:14, 998:25, 999:13, 1002:3, 1005:19, 1008:7, 1008:8, 1014:22, 1014:23, 1017:5, 1019:25, 1020:9, 1020:23, 1021:1, 1022:7, 1024:22, 1024:23, 1052:11, 1054:18, 1060:2
**objectionable** [1] - 1017:7
**objections** [4] - 945:2, 1017:6, 1017:8, 1061:2
**objective** [1] - 877:4
**obligation** [1] - 1017:6
**obligations** [1] - 887:10
**obvious** [1] - 1017:17
**obviously** [17] - 865:9, 867:8, 885:17, 893:18, 894:9, 894:22, 903:22, 959:10, 966:18, 968:22, 969:22, 975:21, 1016:1, 1016:10, 1038:19, 1066:14, 1074:17
**occasion** [1] - 952:22
**occasionally** [3] - 1036:22, 1038:4, 1038:8
**occasions** [3] - 886:15, 904:19, 920:14
**occupied** [1] - 1067:1
**occur** [2] - 884:6, 950:15
**occurred** [5] - 916:23, 979:21, 1005:18, 1056:24, 1067:9
**OF** [3] - 862:2, 862:15, 863:1
**off-the-record** [1] - 1076:17
**offbeat** [1] - 1073:19
**offbeats** [1] - 1013:22
**offer** [4] - 1033:12, 1037:13, 1038:19, 1053:6
**offered** [3] - 867:9, 937:10, 1033:21
**offers** [1] - 869:9
**official** [2] - 920:21, 925:8
**Official** [1] - 862:22
**often** [9] - 869:6, 879:23, 892:1, 915:14, 925:23, 928:6, 929:16, 1073:15, 1073:17
**old** [1] - 884:21
**older** [2] - 1050:8, 1051:6
**omit** [1] - 969:9
**omitted** [1] - 928:21
**once** [5] - 882:6, 885:13, 1007:15, 1032:2, 1036:9
**one** [74] - 866:18, 867:2, 867:25, 869:23, 871:14, 873:9, 874:14, 877:16, 877:17, 889:12, 890:3, 892:8, 893:18, 894:13, 894:14, 896:19, 900:23, 900:24, 902:9, 912:12, 923:23, 930:24, 937:11, 937:19, 942:12, 942:19, 944:1, 945:13, 948:19, 955:2, 973:16, 974:22, 975:9, 975:10, 975:12, 979:3, 979:5, 987:24, 996:14, 1000:17, 1010:23, 1010:24, 1014:24, 1015:1, 1016:23, 1022:12, 1023:1, 1023:7, 1027:3, 1041:6, 1042:2, 1042:4, 1043:14, 1043:15, 1044:18, 1046:15, 1047:24, 1049:7, 1054:4, 1054:7, 1055:14, 1062:20, 1065:10, 1067:16, 1068:4, 1069:25, 1070:21, 1072:7, 1074:11, 1074:19
**one's** [1] - 955:21
**ones** [1] - 1027:8
**online** [1] - 1051:15
**open** [3] - 865:9, 873:14, 1054:24
**opening** [1] - 866:17
**operating** [1] - 887:18
**opinion** [18] - 869:10, 937:3, 961:24, 988:22, 989:20, 1016:4, 1032:22, 1033:3, 1033:13, 1033:16, 1033:18, 1033:20, 1033:21, 1034:17, 1037:20, 1038:19, 1061:15
**opinions** [13] - 888:17, 1033:4, 1034:9, 1037:13, 1037:19, 1038:6, 1038:7, 1042:16, 1052:5, 1058:3, 1058:4, 1071:19
**opportunities** [3] - 894:10, 894:18, 894:23
**opportunity** [5] - 869:6, 886:9, 887:4, 894:17, 895:1
**opposed** [2] - 916:4, 917:3
**order** [19] - 862:25, 868:17, 869:14, 869:16, 876:12, 877:21, 903:6, 919:1, 920:6, 921:4, 930:15, 1047:7, 1047:23, 1050:21, 1054:11, 1054:20, 1067:18, 1067:19, 1076:4
**ordered** [1] - 868:21
**orders** [1] - 1047:16
**ordinarily** [3] - 1033:7, 1036:13, 1044:8
**ordinary** [1] - 877:7
**original** [3] - 941:9, 1013:19, 1039:21
**originally** [1] - 996:18
**origins** [1] - 881:2
**otherwise** [6] - 900:16, 949:7, 952:10, 981:7, 1075:9, 1076:8
**outcome** [2] - 1000:20, 1034:10
**outlines** [1] - 928:11
**outset** [1] - 877:20
**outside** [10] - 893:22, 935:13, 958:18, 962:21, 990:15, 990:16, 1002:4, 1015:22, 1021:1, 1022:7
**overall** [5] - 942:11, 961:25, 993:5, 993:15, 1072:4
**overrule** [2] - 971:25, 972:3
**overruled** [33] - 900:22, 903:11, 921:25, 926:22, 935:5, 937:4, 937:22, 938:9, 944:2, 946:19, 958:8, 959:23, 961:5, 961:7, 970:10, 971:4, 972:11, 974:5, 975:14, 989:5, 990:16, 993:21, 994:10, 995:21, 997:16, 998:21, 999:2, 999:15, 1002:5, 1005:22, 1008:9, 1021:2, 1022:9
**overseeing** [1] - 889:23
**oversight** [2] - 922:20, 1003:25
**owes** [1] - 881:2
**own** [10] - 905:5, 952:1, 955:4, 955:5, 955:10, 1002:16, 1041:20, 1053:6, 1062:21, 1068:11
**owner** [2] - 883:12, 896:16
**ownership** [6] - 915:2, 1012:12, 1012:23, 1024:18, 1034:24, 1059:24
**owns** [2] - 1011:13, 1034:18

**P**

**Pacific** [2] - 919:8, 972:15
**page** [43] - 910:3, 910:15, 918:20, 918:23, 918:24, 919:6, 919:16, 922:12, 922:13, 923:16, 925:16, 926:14, 940:23, 942:15, 951:14, 956:6, 956:23, 959:16, 959:17, 961:3, 961:4, 967:13, 969:8, 989:8, 989:18, 991:17, 991:18, 993:24, 993:25, 997:6, 999:22, 999:24, 1002:20, 1006:3, 1006:8, 1019:7, 1019:8, 1019:12, 1021:12, 1022:22
**paid** [3] - 946:5, 946:11, 998:8
**paper** [1] - 986:1
**paragraph** [3] - 920:13, 920:19, 921:2
**parameters** [1] - 1045:8
**paraphrase** [1] - 931:20
**parlance** [2] - 916:3, 998:15
**part** [26] - 875:24, 890:16, 918:4, 920:2, 953:11, 960:5, 962:22, 963:10, 995:15, 1003:25, 1004:14, 1007:17, 1009:4,

1011:18, 1014:6, 1016:18, 1033:17, 1041:20, 1045:15, 1049:4, 1049:24, 1050:1, 1051:7, 1051:19, 1055:23, 1064:5
**parted** [1] - 866:5
**partial** [1] - 868:19
**participated** [2] - 893:12, 893:20
**participation** [2] - 893:4, 903:20
**particular** [8] - 879:6, 886:21, 895:11, 1001:15, 1017:3, 1046:17, 1049:23, 1052:7
**parties** [4] - 881:9, 952:4, 980:16, 1017:13
**parties'** [1] - 881:11
**parting** [1] - 866:6
**partner** [1] - 891:24
**parts** [17] - 870:8, 870:9, 870:10, 880:22, 959:6, 967:10, 970:14, 971:21, 971:23, 1013:24, 1048:17, 1049:6, 1058:14, 1058:16, 1060:17, 1067:6, 1074:22
**party** [2] - 881:16, 944:4
**party's** [1] - 881:16
**passage** [2] - 1019:7, 1031:21
**passages** [2] - 1032:3, 1041:24
**password** [1] - 958:14
**past** [5] - 869:8, 875:6, 875:11, 988:11, 1002:10
**path** [5] - 1048:20, 1048:22, 1049:2, 1049:9, 1049:12
**pattern** [2] - 1032:6, 1051:16
**patterns** [5] - 1031:6, 1031:13, 1031:15, 1051:16, 1074:19
**pause** [2] - 920:8, 1065:7
**Pause** [6] - 876:8, 878:17, 912:14, 989:15, 996:23, 1015:3
**pay** [3] - 915:23, 916:1, 1022:2
**paying** [1] - 917:16
**payment** [1] - 1024:12
**payments** [2] - 915:7, 920:10
**PC1** [1] - 1061:12
**PC2** [1] - 1061:13
**peer** [1] - 1029:17
**peer-reviewed** [1] - 1029:17
**people** [21] - 885:18, 889:20, 890:18, 892:20, 893:8, 894:25, 903:15, 903:24, 904:12, 905:16, 905:17, 905:19, 905:21, 907:5, 917:16, 923:7, 928:9, 928:11, 991:7, 1025:15, 1043:7
**people's** [1] - 938:15
**per** [1] - 873:21
**percent** [11] - 942:25, 943:8, 1006:19, 1011:13, 1011:23, 1020:1, 1040:12, 1065:6, 1067:1, 1072:11
**percentage** [6] - 888:6, 999:19, 1012:20, 1024:13, 1024:14, 1024:15
**percentages** [7] - 997:4, 998:8, 999:18, 1012:14, 1014:8, 1034:24, 1059:24
**perception** [2] - 1029:17, 1029:18
**percussion** [11] - 1043:20, 1057:2, 1059:4, 1060:11, 1063:24, 1064:4, 1064:10, 1065:8, 1069:3, 1069:14, 1069:19
**perfectly** [2] - 1065:12, 1066:15
**perform** [1] - 1056:5
**performance** [2] - 1029:24, 1075:5
**performances** [1] - 1072:7
**performed** [5] - 1000:13, 1025:14, 1029:13, 1052:21, 1056:6
**performing** [1] - 1051:9
**perhaps** [6] - 870:23, 1017:3, 1037:3, 1037:21, 1053:8, 1063:1
**period** [5] - 884:6, 891:3, 891:17, 902:21, 917:22
**periods** [1] - 891:22
**permissible** [1] - 1038:21
**permission** [7] - 898:5, 898:15, 898:20, 907:22, 907:24, 914:8, 964:16
**permutations** [1] - 1047:17
**persist** [1] - 873:1
**person** [17] - 881:1, 886:2, 893:18, 896:16, 904:8, 905:6, 915:15, 915:16, 917:4, 917:11, 917:12, 923:5, 968:14, 983:22, 1018:17, 1029:5
**personal** [15] - 887:19, 887:24, 916:22, 917:2, 917:4, 917:5, 917:18, 918:4, 918:10, 929:22, 944:9, 960:3, 970:2, 1014:13, 1033:10
**personally** [10] - 921:10, 921:14, 921:19, 944:11, 960:17, 973:15, 988:17, 993:18, 995:9
**perspective** [7] - 891:13, 893:23, 893:24, 893:25, 902:8, 914:20, 1071:25
**pertain** [1] - 959:21
**pertaining** [1] - 917:24
**Ph.D** [1] - 1030:8
**phase** [1] - 890:17
**Phifer** [1] - 863:5
**Phil** [6] - 980:1, 980:3, 1010:21, 1023:3, 1066:24, 1069:4
**Phil's** [1] - 1067:3
**phone** [5] - 925:21, 954:4, 956:5, 958:9, 969:2
**phrase** [3] - 916:2, 949:10, 994:3
**phrased** [1] - 997:19
**physical** [1] - 1035:16
**physically** [5] - 902:15, 916:12, 916:18, 950:1, 960:23
**piano** [7] - 968:25, 969:2, 1047:2, 1063:15, 1069:17, 1073:19, 1074:13
**pick** [2] - 875:15, 1039:10
**picking** [1] - 1033:24
**picture** [4] - 892:17, 1057:16, 1066:23, 1067:12
**piece** [8] - 1007:11, 1032:9, 1036:3, 1050:13, 1051:14, 1057:21, 1070:25
**pieces** [3] - 1031:12, 1031:13, 1052:10
**pitches** [1] - 1042:11
**place** [10] - 871:18, 885:15, 896:15, 898:4, 898:10, 901:9, 937:9, 1009:15, 1064:22, 1075:11
**placement** [1] - 1047:8
**plain** [3] - 1042:5, 1046:9, 1050:5
**plaintiff** [21] - 870:20, 870:24, 870:25, 872:19, 873:1, 873:17, 879:17, 881:24, 882:11, 882:13, 961:9, 968:9, 974:8, 974:11, 985:6, 1015:25, 1026:2, 1026:5, 1034:13, 1034:14
**Plaintiff** [5] - 862:6, 863:2, 950:1, 950:4, 953:16
**plaintiffs** [3] - 870:24, 872:5, 983:19
**plan** [2] - 864:10, 864:17
**play** [42] - 871:25, 872:5, 915:14, 915:15, 915:16, 916:1, 925:18, 940:23, 944:25, 945:6, 961:2, 967:6, 967:17, 967:22, 968:3, 969:2, 969:6, 969:15, 970:8, 970:19, 970:24, 971:7, 971:12, 971:15, 971:18, 972:1, 987:11, 987:15, 993:8, 993:22, 996:4, 996:5, 1006:21, 1020:3, 1045:23, 1048:7, 1048:21, 1060:25, 1066:2, 1068:13, 1076:11
**playback** [2] - 940:16, 987:3
**played** [32] - 870:15, 871:17, 871:22, 928:9, 938:22, 940:25, 961:8, 967:25, 981:20, 987:2, 989:1, 993:7, 1000:17, 1006:11, 1014:17, 1019:22, 1020:7, 1025:3, 1039:25, 1040:9, 1040:23, 1046:21, 1047:16, 1048:14, 1061:7, 1063:4, 1063:14, 1066:4, 1068:15, 1070:5, 1071:17, 1072:5
**player** [2] - 927:16, 988:6
**playing** [19] - 871:10, 871:15, 871:23, 940:17, 988:19, 993:1, 1013:19, 1014:11, 1014:14, 1015:11, 1036:10, 1040:14, 1041:13, 1048:21, 1049:18, 1052:10, 1063:11, 1064:1, 1072:11
**plays** [7] - 968:25, 971:16, 1015:9, 1040:11, 1040:14, 1072:10, 1072:12
**PM** [8] - 919:8, 965:3, 965:5, 965:16, 967:3, 972:15, 975:10, 983:17
**point** [34] - 867:6, 867:15, 869:6, 869:9, 871:13, 872:2, 876:16, 885:1, 894:5, 902:8, 902:20, 906:13, 906:23, 911:1, 935:13, 936:15, 937:6, 937:8, 937:12, 938:1, 951:21, 952:12, 955:16, 998:19, 1012:13, 1012:18,

1017:2, 1024:11, 1024:18, 1037:8, 1038:18, 1054:9
**pointed** [1] - 1052:18
**points** [3] - 1024:3, 1024:8, 1056:23
**Pokémon** [1] - 1046:18
**pop** [9] - 996:10, 996:12, 1029:9, 1029:20, 1041:5, 1070:13, 1072:24, 1073:2, 1073:6
**pops** [1] - 1051:18
**popular** [3] - 1028:11, 1030:14, 1031:7
**portion** [2] - 903:13, 1012:22
**portions** [3] - 870:14, 935:2, 1008:4
**position** [5] - 871:2, 873:17, 997:21, 1014:25, 1048:5
**possible** [4] - 865:5, 1009:25, 1047:20, 1048:5
**potential** [2] - 894:18, 955:18
**potentially** [2] - 893:18, 928:7
**practicality** [1] - 938:10
**practically** [1] - 1031:24
**practice** [1] - 1046:7
**practices** [1] - 997:3
**prechorus** [9] - 1008:23, 1009:8, 1009:10, 1036:4, 1041:6, 1056:2, 1056:3, 1056:21
**prechoruses** [1] - 1058:17
**precise** [2] - 932:23, 1053:12
**precisely** [3] - 948:8, 1053:8, 1053:9
**precluded** [1] - 866:10
**preexisting** [3] - 988:20, 999:5, 1051:8
**preface** [2] - 973:24, 974:9
**prehook** [1] - 1013:12
**prepare** [2] - 955:8, 1057:3
**prepared** [5] - 1039:20, 1040:1, 1041:19, 1059:18, 1062:11
**prepares** [1] - 1001:1
**preparing** [2] - 1026:13, 1057:8
**prescription** [1] - 878:19
**presence** [1] - 951:8
**present** [27] - 882:6, 902:15, 916:12, 920:23, 938:2, 942:3, 942:7, 942:8, 942:23, 943:14, 943:18, 950:1, 950:9, 950:12, 960:23, 963:12, 973:18, 974:2, 974:14, 982:20, 1010:5, 1025:4, 1025:7, 1025:10, 1047:18, 1050:11, 1059:6
**presented** [2] - 937:11, 1067:9
**presenting** [1] - 1046:24
**preserve** [1] - 873:1
**press** [3] - 960:12, 960:16, 1065:3
**pressing** [1] - 960:21
**pretending** [1] - 949:7
**pretrial** [1] - 1037:17
**pretty** [11] - 866:23, 867:7, 905:13, 963:8, 1040:7, 1058:6, 1065:6, 1074:4, 1074:11
**prevail** [1] - 877:1
**previewed** [1] - 1069:12
**previous** [5] - 872:18, 925:4, 936:13, 986:25, 1032:8
**previously** [3] - 870:9, 948:21, 1061:2
**primarily** [2] - 886:2, 903:8
**primary** [1] - 887:8
**printed** [1] - 928:17
**priorly** [1] - 921:7
**private** [1] - 1029:4
**privilege** [1] - 899:12
**Pro** [6] - 979:13, 982:16, 1042:18, 1043:6, 1044:4, 1044:6
**pro** [1] - 916:1
**problem** [6] - 864:6, 870:18, 873:2, 873:17, 926:11, 1018:18
**problems** [2] - 867:22, 948:12
**procedure** [1] - 1037:17
**proceed** [6] - 882:24, 940:1, 955:23, 1001:18, 1027:21, 1034:2
**proceedings** [8] - 876:8, 878:17, 882:18, 912:14, 989:15, 1015:3, 1027:15, 1077:2
**Proceedings** [1] - 996:23
**process** [14] - 883:25, 920:5, 937:7, 937:12, 960:11, 967:20, 1007:5, 1041:20, 1049:24, 1050:17, 1050:18, 1050:24, 1052:5, 1053:15
**processed** [1] - 920:17
**produce** [6] - 974:13, 994:22, 995:1, 995:5, 1029:6, 1043:8
**produced** [10] - 908:18, 908:24, 928:8, 953:7, 958:16, 976:5, 976:18, 977:22, 978:10, 978:21
**Producer** [1] - 979:23
**producer** [26] - 905:6, 919:25, 921:23, 927:19, 928:5, 934:11, 934:17, 941:7, 941:9, 941:11, 941:14, 980:4, 980:5, 986:24, 990:24, 997:2, 997:12, 998:1, 1011:4, 1013:7, 1013:9, 1014:4, 1016:21, 1028:2, 1028:18, 1069:9
**producer/musician** [1] - 920:1
**producers** [6] - 889:6, 892:5, 892:7, 914:13, 923:10, 991:24
**producing** [5] - 929:10, 993:1, 993:3, 993:13, 993:14
**production** [8] - 908:14, 992:12, 993:4, 1028:8, 1028:14, 1030:19, 1031:2, 1070:13
**professional** [16] - 887:19, 887:23, 888:4, 888:14, 958:25, 968:13, 969:4, 970:6, 985:4, 987:16, 988:13, 988:16, 996:25, 1000:11, 1019:4, 1028:13
**professionally** [2] - 879:18, 1028:5
**professor** [1] - 1028:1
**proffer** [1] - 870:1
**program** [1] - 1043:15
**programming** [1] - 1073:22
**programs** [1] - 1043:7
**progressions** [1] - 1047:13
**project** [7] - 881:14, 1042:18, 1043:5, 1044:6, 1055:14, 1055:16
**projects** [3] - 889:16, 889:17, 918:7
**pronounce** [1] - 980:1
**proof** [1] - 920:23
**proper** [7] - 893:8, 893:12, 893:15, 893:16, 894:1, 901:18, 1066:25
**properly** [1] - 1000:13
**properties** [1] - 1075:8
**proportionally** [1] - 1061:25
**proportions** [1] - 1061:21
**protection** [1] - 965:22
**prove** [1] - 880:16
**proved** [1] - 877:6
**proven** [1] - 1001:7
**provide** [8] - 865:4, 868:17, 868:21, 869:15, 871:5, 914:16, 992:5, 1011:6
**provided** [7] - 876:12, 877:23, 930:9, 941:25, 1042:18, 1045:10, 1064:10
**providing** [1] - 872:23
**prudence** [1] - 938:11
**prudent** [2] - 898:24, 938:5
**public** [3] - 994:16, 994:17, 994:18
**publication** [2] - 1029:23, 1031:5
**publicly** [1] - 881:13
**publish** [4] - 907:22, 907:24, 964:11, 964:16
**published** [3] - 1029:16, 1031:9, 1056:13
**publisher** [1] - 883:12
**publishing** [9] - 883:15, 893:11, 895:6, 895:8, 895:10, 903:18, 915:8, 920:11, 1024:16
**pull** [1] - 969:2
**pulled** [1] - 1023:15
**pulling** [1] - 931:4
**purely** [4] - 953:7, 953:13, 953:23, 1075:4
**purport** [1] - 1059:23
**purpose** [4] - 869:25, 956:7, 980:18, 1060:4
**purposefully** [1] - 914:12
**purposes** [8] - 869:18, 895:17, 931:3, 1036:24, 1056:13, 1056:15, 1057:20, 1062:11
**pursuant** [2] - 953:8, 958:16
**put** [24] - 877:21, 887:21, 896:1, 961:18, 965:1, 965:2, 965:21, 965:23, 979:13, 993:5, 993:17, 1005:2, 1008:11, 1008:16, 1009:14, 1009:18, 1009:22, 1011:23, 1021:7, 1021:16, 1025:8, 1045:15, 1047:19
**putting** [4] - 1004:9, 1009:19, 1011:25, 1057:14

## Q

**quantify** [1] - 1052:2
**QUESTION** [18] - 942:17, 947:15, 947:20, 956:13, 957:20, 959:24, 967:16, 967:20,

967:24, 969:13, 969:20, 970:1, 1000:4, 1002:22, 1006:10, 1019:21, 1020:6, 1021:16
**questioned** [2] - 968:10, 1022:4
**questioning** [2] - 877:7, 969:14
**questions** [36] - 865:21, 877:8, 880:5, 912:15, 913:23, 913:25, 914:23, 914:24, 927:5, 931:11, 938:25, 939:2, 946:22, 947:10, 947:23, 948:15, 948:16, 949:19, 949:23, 951:7, 952:14, 954:5, 988:13, 989:23, 994:3, 1018:22, 1020:15, 1024:3, 1024:25, 1025:1, 1026:2, 1055:18, 1067:16, 1074:2, 1074:5, 1074:7
**quickly** [1] - 1041:3
**quid** [1] - 916:1
**quietly** [2] - 1026:14, 1052:14
**quite** [8] - 915:14, 928:6, 930:16, 1017:17, 1042:5, 1052:25, 1053:9, 1061:18
**quo** [1] - 916:1
**quote** [3] - 949:8, 960:12, 960:15

**R**

**rabbit** [1] - 867:18
**Race** [1] - 863:5
**Rachel** [1] - 863:8
**raise** [5] - 866:13, 876:6, 882:14, 1019:18, 1027:12
**raised** [2] - 864:2, 1076:4
**ramifications** [3] - 896:14, 898:19, 898:20
**rate** [1] - 992:5
**rather** [6] - 948:21, 975:12, 1017:1, 1036:23, 1037:17
**Raygor** [1] - 863:17
**RAYGOR** [10] - 876:9, 876:12, 1052:11, 1052:16, 1054:3, 1054:7, 1054:9, 1054:16, 1060:2, 1076:2
**Rayner** [5] - 1033:25, 1037:5, 1037:16, 1039:12, 1042:22
**re** [1] - 926:23
**re-read** [1] - 926:23
**reach** [7] - 905:16, 905:17, 905:19, 921:4, 921:15, 925:16, 1034:18
**reached** [4] - 897:21, 920:14, 1052:5, 1058:4
**reacting** [1] - 1038:6
**reaction** [1] - 870:25
**read** [31] - 870:3, 872:21, 873:10, 873:16, 874:4, 919:22, 920:9, 924:22, 926:23, 948:10, 948:14, 948:17, 949:1, 951:25, 956:12, 957:1, 957:7, 957:13, 959:15, 967:12, 969:11, 989:12, 989:22, 991:21, 1000:1, 1006:6, 1006:24, 1007:1, 1020:5, 1021:12, 1058:7
**reading** [3] - 873:12, 956:8, 1019:7
**reads** [1] - 920:13
**ready** [8] - 912:25, 939:15, 973:12, 986:7, 987:7, 1008:12, 1026:19, 1061:6
**real** [3] - 983:16, 1058:20, 1062:1
**realize** [1] - 1050:12
**realized** [3] - 873:12, 1032:19, 1058:20
**really** [31] - 935:10, 935:11, 955:4, 975:18, 1016:20, 1030:24, 1035:3, 1038:16, 1041:2, 1041:15, 1044:11, 1045:16, 1047:21, 1047:25, 1049:1, 1051:2, 1058:21, 1060:12, 1061:14, 1061:19, 1065:25, 1066:21, 1066:24, 1068:10, 1069:18, 1070:24, 1071:18, 1072:5, 1075:1
**realm** [1] - 883:11
**reason** [11] - 866:6, 872:3, 907:15, 930:4, 938:14, 949:1, 952:19, 954:7, 957:22, 1012:21, 1033:7
**reasonable** [2] - 875:22, 1076:9
**reasons** [8] - 866:22, 878:19, 901:20, 936:8, 944:9, 948:19, 1017:16, 1038:8
**rebuttal** [1] - 1042:23
**receive** [16] - 911:7, 916:15, 920:7, 924:3, 926:18, 926:25, 961:21, 984:11, 997:1, 997:4, 998:1, 998:7, 998:24, 999:12, 999:18, 1024:14
**received** [19] - 864:23, 869:3, 872:16, 893:8, 910:5, 911:11, 911:18, 920:16, 921:7, 924:10, 950:19, 981:11, 989:24, 993:10, 1000:12, 1012:12, 1012:14, 1012:20, 1012:22
**receiving** [5] - 910:14, 911:23, 915:7, 916:19, 956:5
**recent** [1] - 918:25
**recently** [1] - 939:16
**recess** [5] - 877:19, 939:22, 1018:1, 1026:22, 1076:19
**recognize** [12] - 908:4, 908:9, 964:18, 976:2, 976:12, 976:15, 976:25, 978:6, 978:18, 1039:17, 1060:20, 1065:15
**recollection** [25] - 881:23, 896:25, 912:7, 912:10, 932:9, 932:11, 932:24, 933:14, 933:24, 934:3, 942:18, 949:18, 949:23, 951:3, 951:5, 951:16, 951:18, 953:24, 954:5, 954:13, 958:6, 960:19, 965:14, 1002:16, 1022:17
**recollection-wise** [1] - 934:3
**recommend** [2] - 1065:21, 1068:6
**record** [78] - 882:21, 884:19, 885:2, 885:17, 885:21, 886:3, 886:16, 886:17, 886:21, 889:7, 889:12, 891:20, 892:12, 893:3, 893:12, 893:21, 894:8, 895:10, 896:1, 896:2, 896:5, 896:6, 896:8, 896:10, 898:19, 900:9, 906:24, 917:9, 919:3, 920:4, 920:10, 921:10, 921:17, 923:5, 923:7, 928:3, 928:6, 928:12, 928:21, 935:10, 935:25, 959:10, 959:13, 960:12, 960:16, 960:21, 961:14, 964:8, 967:9, 1024:6, 1027:17, 1040:11, 1043:8, 1045:24, 1055:5, 1055:7, 1058:21, 1060:13, 1065:6, 1066:25, 1067:17, 1067:21, 1068:8, 1068:10, 1068:11, 1070:12, 1070:17, 1071:1, 1071:18, 1072:6, 1072:11, 1072:23, 1073:2, 1076:16, 1076:17, 1077:2
**recorded** [11] - 892:9, 905:8, 906:7, 979:13, 990:3, 1028:14, 1035:8, 1044:15, 1044:21, 1044:22, 1045:12
**Recording** [5] - 962:3, 962:13, 962:14, 962:18, 963:8
**recording** [105] - 879:24, 882:1, 890:9, 891:2, 891:5, 891:18, 896:4, 902:16, 902:19, 902:22, 902:25, 915:3, 916:12, 916:16, 916:24, 918:6, 929:21, 940:12, 940:14, 942:17, 954:6, 954:14, 960:20, 960:24, 962:2, 964:7, 964:10, 965:15, 965:18, 966:3, 966:11, 966:13, 966:15, 967:2, 968:11, 970:20, 970:25, 972:17, 972:21, 973:18, 974:2, 974:18, 974:21, 975:4, 975:7, 975:8, 975:19, 976:6, 976:18, 976:19, 976:22, 977:4, 977:11, 977:24, 978:11, 978:22, 985:12, 986:11, 991:8, 991:11, 991:15, 995:5, 995:9, 1001:8, 1001:9, 1001:13, 1001:15, 1002:11, 1002:23, 1002:24, 1004:15, 1004:19, 1006:11, 1012:9, 1019:22, 1020:7, 1024:19, 1025:4, 1028:10, 1028:20, 1030:19, 1034:16, 1035:5, 1035:15, 1035:17, 1035:24, 1042:17, 1044:3, 1044:24, 1044:25, 1045:13, 1045:14, 1045:17, 1045:20, 1045:22, 1048:18, 1062:18, 1062:19, 1071:25, 1072:2, 1072:3, 1072:14, 1074:23, 1075:1
**recordings** [6] - 879:9, 879:16, 916:19, 916:22, 984:20, 986:21
**records** [10] - 884:22, 885:17, 885:24, 894:25, 895:9, 923:13, 928:14, 1007:6, 1028:18
**Records** [7] - 879:20, 886:10, 920:15, 922:9, 922:22, 935:18, 936:4

**recounted** [1] - 1003:15
**recross** [2] - 1001:5, 1007:2
**recur** [1] - 1072:9
**redirect** [8] - 912:16, 930:1, 1001:1, 1001:4, 1004:23, 1016:13, 1020:24, 1022:8
**REDIRECT** [3] - 930:2, 1001:20, 1077:16
**reduce** [1] - 938:16
**refer** [7] - 875:18, 963:4, 982:13, 982:15, 983:19, 1035:21, 1069:8
**reference** [10] - 943:7, 961:22, 961:23, 961:24, 965:23, 974:7, 1007:8, 1037:9, 1040:19, 1040:21
**referenced** [2] - 875:14, 875:18
**references** [1] - 1032:20
**referred** [8] - 879:23, 929:13, 981:23, 984:2, 984:6, 984:24, 985:6, 1001:8
**referring** [6] - 879:12, 899:3, 925:6, 943:7, 962:8, 994:18
**refers** [3] - 924:13, 985:22, 987:4
**reflected** [2] - 1052:7, 1064:2
**reflects** [1] - 1040:2
**refresh** [8] - 881:23, 949:18, 949:22, 951:2, 951:16, 956:17, 958:3, 968:6
**refreshed** [2] - 951:5, 951:18
**refresher** [1] - 879:2
**refused** [1] - 877:6
**regard** [9] - 869:12, 880:8, 881:3, 943:12, 1016:6, 1016:9, 1038:18, 1074:2, 1076:5
**regarded** [1] - 1016:21
**regarding** [5] - 865:11, 869:14, 872:24, 881:7, 953:24
**regardless** [2] - 973:23, 1064:9
**regards** [1] - 921:3
**Reggae** [3] - 1048:3, 1073:18, 1073:21
**regional** [3] - 1072:19, 1073:1, 1073:11
**reject** [1] - 1033:16
**relate** [1] - 917:12
**related** [10] - 868:16, 870:1, 880:6, 889:24, 890:18, 903:24, 934:4, 941:22, 943:10, 1031:2
**relates** [4] - 885:16, 886:24, 893:5, 895:10
**relating** [8] - 887:9, 890:13, 900:14, 900:16, 901:1, 904:20, 910:11, 937:12
**relation** [2] - 1011:4, 1055:4
**relationship** [11] - 866:1, 866:5, 866:14, 867:10, 867:20, 884:4, 885:22, 888:2, 938:13, 944:3, 1013:9
**relationships** [1] - 905:5
**relatively** [3] - 905:14, 914:5, 916:9
**relayed** [1] - 911:3
**release** [9] - 889:19, 896:2, 898:15, 898:19, 898:20, 901:5, 916:15, 987:8, 1072:8
**released** [16] - 885:23, 898:3, 904:21, 914:7, 973:12, 984:3, 986:8, 1008:13, 1009:24, 1024:16, 1035:19, 1057:21, 1062:6, 1062:8, 1062:19, 1071:3
**releases** [1] - 896:3
**releasing** [10] - 885:16, 896:15, 898:9, 899:7, 900:25, 901:8, 913:24, 914:2, 914:15, 914:19
**relevance** [2] - 937:21, 946:17
**relevant** [1] - 1041:24
**rely** [2] - 870:24, 1044:8
**relying** [1] - 903:8
**remember** [72] - 885:5, 885:6, 885:8, 895:18, 897:23, 908:19, 912:3, 912:5, 913:13, 913:25, 914:5, 914:24, 925:21, 925:24, 925:25, 927:6, 931:25, 933:13, 933:17, 933:21, 933:22, 934:1, 934:3, 934:7, 934:11, 934:23, 935:7, 937:25, 939:9, 941:4, 942:9, 942:10, 947:10, 947:23, 956:5, 958:11, 961:1, 964:4, 964:7, 964:10, 967:10, 968:4, 970:12, 970:15, 975:15, 975:22, 981:21, 988:14, 996:7, 1000:7, 1002:12, 1002:15, 1003:9, 1003:13, 1003:14, 1004:23, 1009:17, 1009:23, 1010:10, 1010:19, 1010:23, 1010:24, 1015:17, 1020:18, 1021:10, 1021:21, 1022:14, 1022:15, 1023:4, 1024:4
**remind** [9] - 875:12, 953:15, 1001:4, 1001:16, 1038:14, 1039:11, 1053:23, 1056:1, 1056:4
**removed** [3] - 1009:12, 1064:9, 1067:15
**removing** [1] - 961:4
**repeat** [10] - 907:10, 937:24, 953:11, 963:21, 970:22, 971:10, 973:25, 989:7, 997:24, 1055:19
**repertoire** [2] - 923:3, 923:4
**report** [7] - 1036:16, 1037:9, 1039:21, 1042:22, 1042:23
**Reporter** [1] - 862:22
**REPORTER'S** [1] - 862:15
**reports** [15] - 868:24, 868:25, 869:4, 919:14, 920:5, 920:17, 920:20, 921:7, 922:17, 924:19, 1037:20, 1038:9, 1038:11, 1042:21, 1053:3
**represent** [4] - 900:6, 908:8, 919:25, 1035:22
**representation** [3] - 1057:24, 1059:19, 1062:1
**represented** [6] - 903:18, 913:17, 936:22, 1035:17, 1046:5, 1051:1
**representing** [3] - 867:9, 886:11, 913:21
**reputation** [1] - 867:1
**request** [14] - 866:8, 874:15, 876:18, 910:9, 911:8, 919:18, 919:19, 925:7, 926:18, 926:25, 931:6, 945:5, 949:1, 991:21
**requested** [1] - 926:3
**requesting** [3] - 921:23, 951:22, 958:12
**require** [1] - 1031:25
**required** [1] - 1046:5
**requires** [2] - 948:9, 948:13
**rerecord** [1] - 1007:16
**research** [1] - 1031:5
**residuals** [2] - 920:7, 920:9
**resolved** [1] - 868:6
**resort** [1] - 877:8
**respect** [8] - 890:4, 905:15, 936:21, 938:23, 951:13, 996:19, 1059:20, 1071:13
**responded** [7] - 910:18, 911:2, 911:18, 926:12, 933:20, 934:4, 957:23
**responding** [2] - 919:20, 933:5
**response** [15] - 909:14, 910:13, 910:16, 910:21, 912:4, 919:10, 922:9, 922:25, 924:16, 933:20, 933:22, 949:19, 949:23, 957:12, 1006:18
**responsibilities** [1] - 885:13
**responsibility** [2] - 887:23, 923:9
**responsible** [3] - 886:2, 889:23, 892:11
**rest** [2] - 931:14, 1072:13
**result** [3] - 986:18, 1034:18, 1065:3
**resulted** [1] - 985:13
**resume** [8] - 894:3, 894:4, 894:6, 894:9, 894:12, 894:16, 894:22
**retained** [3] - 1032:15, 1033:1, 1034:4
**retired** [4] - 939:14, 1015:20, 1026:21, 1075:18
**Return** [1] - 1070:20
**return** [1] - 1070:20
**returned** [4] - 878:23, 939:23, 1018:2, 1027:11
**review** [3] - 1038:21, 1042:16, 1057:5
**reviewed** [7] - 1029:17, 1042:17, 1042:21, 1042:22, 1042:24, 1059:14, 1059:18
**reviewing** [3] - 1044:21, 1044:22, 1058:4
**revise** [1] - 1076:10
**revised** [2] - 868:8, 869:24
**revisions** [1] - 1044:12
**rhythm** [6] - 969:18, 990:20, 1031:1, 1031:6, 1032:12, 1045:5
**rhythmic** [2] - 1074:24, 1075:8
**rhythms** [3] - 1013:11, 1013:16, 1042:11
**RICHTER** [2] - 863:13, 863:16
**rights** [12] - 879:8, 889:25, 890:13, 899:7, 900:15, 901:1, 901:6, 904:21, 936:6,

936:7, 936:16, 936:17
**rigid** [1] - 1075:9
**rise** [1] - 891:12
**risk** [2] - 901:20, 938:16
**road** [3] - 944:10, 944:12, 944:20
**roadmap** [1] - 1071:24
**Robert** [1] - 1025:21
**rock** [1] - 1029:19
**role** [10] - 899:19, 917:2, 917:21, 937:1, 938:22, 963:20, 1060:7, 1068:25, 1071:9
**roles** [2] - 917:3, 938:15
**Rolodex** [1] - 1051:13
**Rome** [1] - 913:19
**room** [22] - 891:4, 894:24, 903:4, 903:16, 903:18, 906:3, 946:4, 948:5, 962:14, 962:22, 962:24, 962:25, 963:6, 964:9, 991:4, 1007:14, 1007:16, 1025:15, 1037:2, 1038:12, 1039:7
**root** [8] - 968:18, 968:21, 968:22, 969:2, 969:5, 969:23, 969:24, 970:7
**roots** [1] - 968:24
**ROSENBERG** [120] - 865:3, 865:7, 865:18, 866:4, 867:6, 869:22, 870:5, 870:17, 872:2, 872:9, 872:12, 873:20, 874:7, 874:14, 876:4, 876:21, 877:13, 878:2, 878:5, 899:10, 900:21, 903:10, 913:1, 913:3, 918:13, 921:11, 921:13, 921:19, 923:16, 923:20, 929:25, 931:21, 932:5, 932:8, 932:17, 932:22, 935:3, 935:6, 936:24, 937:15, 937:18, 937:21, 937:23, 938:7, 939:2, 939:21, 943:5, 943:25, 944:15, 944:23, 944:25, 946:17, 947:1, 947:7, 949:13, 950:20, 951:2, 951:12, 952:23, 956:9, 957:15, 958:1, 959:17, 961:2, 964:11, 964:17, 967:12, 971:5, 974:24, 975:25, 976:11, 976:13, 976:24, 977:2, 977:9, 977:19, 978:4, 978:16, 979:17, 980:7, 980:13, 980:20, 980:25, 981:5, 981:10, 983:16, 989:12, 989:17, 991:18, 991:22, 993:24, 994:4, 997:6, 997:10, 999:24, 1000:3, 1000:24, 1002:3, 1005:19, 1006:8, 1006:24, 1008:7, 1014:22, 1017:12, 1017:25, 1018:6, 1018:11, 1018:13, 1019:19, 1021:5, 1021:12, 1021:15, 1022:21, 1022:25, 1025:2, 1026:1, 1076:15, 1077:15, 1077:21, 1078:1
**Rosenberg** [20] - 863:14, 865:2, 912:25, 931:10, 934:10, 934:22, 947:25, 949:6, 951:6, 954:24, 955:23, 956:11, 957:8, 957:13, 974:6, 1003:16, 1018:10, 1019:17, 1021:4, 1024:25
**Rosenberg's** [1] - 969:14
**rough** [6] - 946:6, 948:3, 949:8, 961:18, 961:20, 1010:16
**roughly** [1] - 885:9
**rounds** [1] - 1044:12
**row** [3] - 1047:24, 1056:20, 1056:23
**rows** [1] - 1043:15
**royalties** [1] - 1034:23
**royalty** [5] - 914:19, 915:7, 920:10, 1024:12, 1059:24
**RPR** [2] - 862:22, 1077:8
**rule** [3] - 935:4, 937:20, 1017:8
**ruled** [1] - 864:19
**ruling** [4] - 864:21, 865:21, 877:11, 1053:13
**rulings** [5] - 866:11, 871:23, 875:7, 1016:9, 1052:24
**run** [1] - 867:18
**running** [1] - 963:7

## S

**safe** [1] - 1030:25
**sample** [6] - 892:13, 1009:11, 1009:15, 1022:1, 1055:15, 1069:17
**samples** [11] - 892:2, 892:4, 892:5, 892:6, 892:7, 892:8, 1022:1, 1022:3, 1055:5, 1055:9, 1055:10
**sampling** [2] - 1055:11, 1069:19
**Sanchez** [2] - 874:21, 875:9
**sat** [4] - 962:6, 964:3, 964:5, 1038:25
**Savage** [171] - 879:11, 879:13, 879:14, 880:1, 880:12, 882:2, 891:14, 891:24, 896:19, 896:20, 897:9, 897:10, 897:12, 897:14, 898:3, 898:9, 900:10, 900:14, 900:25, 902:16, 904:3, 904:20, 904:24, 905:15, 905:21, 906:7, 910:11, 911:25, 913:24, 914:7, 916:10, 916:13, 916:23, 917:22, 917:24, 918:9, 919:13, 920:4, 920:22, 922:16, 924:18, 925:19, 926:19, 927:1, 929:23, 930:21, 937:12, 938:23, 941:6, 941:8, 941:10, 941:12, 941:22, 953:25, 954:6, 958:6, 959:5, 959:9, 959:25, 960:14, 960:19, 960:25, 961:11, 962:2, 963:8, 963:15, 965:11, 965:15, 966:6, 966:12, 966:16, 966:24, 967:2, 967:7, 968:11, 970:20, 970:25, 971:8, 971:13, 971:22, 972:4, 972:8, 972:14, 973:19, 974:3, 974:13, 974:18, 974:21, 975:4, 975:7, 975:19, 975:23, 976:7, 976:20, 977:5, 977:12, 977:25, 978:11, 978:23, 979:3, 981:15, 983:14, 983:17, 984:20, 985:12, 985:16, 986:21, 988:9, 988:18, 988:25, 991:8, 991:11, 991:15, 993:19, 994:7, 994:22, 995:2, 995:6, 995:11, 995:18, 996:18, 997:2, 997:12, 998:2, 998:24, 999:12, 999:21, 1000:5, 1000:13, 1001:24, 1002:23, 1003:17, 1006:12, 1007:18, 1008:2, 1008:4, 1012:4, 1013:4, 1013:18, 1014:5, 1014:14, 1014:16, 1019:23, 1020:8, 1021:7, 1023:2, 1023:13, 1025:4, 1025:8, 1025:12, 1025:14, 1034:15, 1035:5, 1036:2, 1036:16, 1039:16, 1042:17, 1049:6, 1055:3, 1055:5, 1055:9, 1055:16, 1055:22, 1056:25, 1057:12, 1057:15, 1067:20, 1071:2, 1073:5, 1073:7
**saw** [7] - 920:9, 932:3, 963:9, 968:6, 986:25, 993:22, 1070:20
**sax** [1] - 1073:16
**saxophone** [5] - 1055:6, 1055:13, 1068:9, 1069:16, 1070:15
**scale** [5] - 968:22, 968:24, 1061:23, 1061:25
**scheduling** [3] - 864:10, 953:9, 953:17
**scholarship** [3] - 1029:15, 1029:23, 1029:24
**school** [5] - 884:9, 884:12, 899:15, 986:1, 992:14
**School** [1] - 1030:9
**schools** [1] - 1045:8
**scope** [9] - 930:20, 938:8, 958:18, 959:21, 990:15, 990:17, 1002:4, 1021:1, 1022:7
**scores** [1] - 1051:18
**screaming** [1] - 1074:15
**screen** [1] - 908:4
**screenplay** [1] - 985:25
**scroll** [2] - 909:12, 910:3
**search** [1] - 1051:17
**searched** [1] - 908:17
**searching** [1] - 1051:16
**seated** [2] - 912:24, 1001:2
**second** [11] - 880:20, 892:17, 909:5, 920:13, 948:18, 966:23, 975:4, 983:14, 983:17, 1015:16, 1053:6
**secondly** [2] - 865:13, 865:19
**seconds** [4] - 876:5, 1039:24, 1056:24, 1062:1
**section** [23] - 996:10, 996:11, 996:14, 1007:2, 1007:12, 1013:13, 1013:17, 1036:8, 1039:23, 1039:24, 1039:25, 1040:6, 1040:12,

1040:20, 1041:17, 1056:8, 1059:7, 1059:8
**section-by-section** [1] - 1040:6
**sections** [28] - 970:14, 999:7, 999:8, 1009:11, 1009:20, 1036:4, 1036:5, 1036:6, 1039:22, 1040:12, 1041:3, 1041:4, 1041:5, 1041:11, 1041:13, 1041:15, 1049:20, 1055:22, 1056:1, 1056:20, 1056:22, 1056:24, 1058:22, 1059:20, 1071:14, 1072:16, 1073:25
**Sections** [2] - 915:22, 992:16
**see** [75] - 864:6, 872:13, 878:20, 883:5, 908:3, 908:11, 909:2, 909:6, 909:12, 909:13, 909:14, 909:16, 909:23, 910:1, 910:5, 919:8, 920:25, 922:8, 922:13, 922:18, 922:25, 923:19, 923:22, 923:25, 931:3, 937:25, 948:21, 952:18, 956:23, 959:14, 963:10, 971:25, 972:3, 975:2, 979:23, 981:12, 991:21, 993:7, 994:2, 1006:14, 1022:24, 1032:6, 1035:24, 1036:7, 1036:22, 1038:3, 1038:17, 1039:23, 1039:25, 1040:13, 1040:21, 1041:17, 1042:11, 1050:3, 1050:21, 1051:18, 1056:16, 1056:20, 1056:22, 1058:6, 1058:9, 1058:11, 1058:12, 1060:6, 1060:8, 1060:9, 1064:17, 1065:5, 1065:7, 1065:11, 1068:6, 1068:10, 1071:9, 1071:16
**seeing** [4] - 875:1, 948:19, 1023:4, 1065:2
**seeks** [3] - 988:22, 989:4, 990:14
**semesters** [1] - 1030:13
**send** [11] - 924:16, 924:24, 926:13, 935:10, 979:15, 984:6, 984:13, 984:16, 984:19, 1043:24, 1044:1
**sending** [3] - 928:21, 934:25, 1043:25
**sense** [12] - 870:21, 874:20, 896:3, 917:12, 948:3, 955:19, 1033:22, 1037:24, 1038:24, 1066:13, 1076:11, 1076:12
**sent** [11] - 898:1, 908:24, 919:11, 925:12, 926:14, 929:21, 934:22, 980:11, 981:2, 982:17, 1062:23
**separate** [2] - 896:22, 962:24
**separately** [1] - 889:8
**sequestration** [1] - 877:21
**series** [2] - 1056:9, 1056:16
**serious** [1] - 1070:21
**served** [1] - 918:10
**service** [1] - 946:12
**services** [1] - 992:5
**session** [160] - 904:10, 904:11, 904:12, 905:3, 905:7, 906:22, 910:25, 915:10, 915:12, 915:18, 916:16, 916:17, 916:19, 919:14, 920:5, 920:17, 920:20, 921:6, 922:17, 924:19, 928:20, 929:17, 929:21, 936:19, 938:19, 938:23, 941:7, 941:11, 941:14, 941:21, 943:3, 945:24, 946:13, 963:25, 964:23, 964:24, 965:2, 965:3, 965:4, 965:11, 965:15, 966:17, 966:18, 966:23, 967:2, 968:12, 970:20, 970:25, 971:14, 971:17, 972:4, 972:15, 972:16, 972:17, 972:21, 973:1, 973:4, 973:18, 974:2, 974:15, 974:16, 974:17, 974:18, 975:12, 976:6, 976:9, 976:19, 976:22, 977:4, 977:7, 977:12, 977:14, 977:24, 978:11, 978:22, 979:14, 979:20, 981:15, 981:24, 982:1, 982:2, 982:14, 982:15, 982:18, 982:19, 982:22, 983:3, 983:6, 983:10, 983:14, 983:17, 983:19, 983:23, 984:2, 984:7, 984:17, 984:20, 984:24, 985:7, 985:13, 985:14, 985:17, 985:22, 986:4, 986:9, 986:10, 986:18, 986:23, 987:1, 987:4, 987:7, 992:1, 992:3, 992:4, 992:20, 995:10, 995:18, 995:25, 997:4, 998:5, 998:10, 999:17, 1001:9, 1004:20, 1005:1, 1005:24, 1006:11, 1008:1, 1008:5, 1008:16, 1009:2, 1009:6, 1009:8, 1009:9, 1010:5, 1010:13, 1010:14, 1010:18, 1010:19, 1011:16, 1014:5, 1014:10, 1014:19, 1015:5, 1015:7, 1015:10, 1015:12, 1016:14, 1019:22, 1020:7, 1023:5, 1023:6, 1025:22, 1044:4, 1062:20
**sessions** [70] - 882:2, 884:19, 890:9, 891:18, 902:22, 902:25, 904:16, 904:17, 906:10, 906:12, 916:12, 916:24, 923:6, 923:9, 923:11, 923:12, 934:23, 935:12, 935:14, 941:5, 941:6, 941:8, 941:12, 941:13, 942:18, 942:19, 946:2, 946:7, 946:15, 954:7, 954:14, 960:20, 962:2, 968:25, 975:7, 975:9, 975:11, 975:19, 979:3, 979:6, 979:8, 984:21, 985:12, 986:8, 986:25, 991:11, 991:15, 995:13, 1001:24, 1002:9, 1002:15, 1002:17, 1002:18, 1002:24, 1003:7, 1003:12, 1003:17, 1003:21, 1005:18, 1010:21, 1010:24, 1011:5, 1011:10, 1011:12, 1012:9, 1014:9, 1014:14, 1014:15, 1014:20, 1028:22
**set** [8] - 871:4, 872:19, 872:20, 882:8, 904:10, 904:15, 1008:6, 1026:8
**sets** [1] - 960:18
**setting** [2] - 884:19, 923:6
**seven** [3] - 968:23, 978:2, 978:25
**seventh** [1] - 977:24
**several** [3] - 982:25, 983:4, 1029:16
**Sevier** [2] - 920:15, 922:11
**shape** [1] - 955:13
**share** [4] - 881:16, 895:9, 903:19, 954:25
**shared** [2] - 881:12, 881:14
**Sheeran** [1] - 1073:1
**Sheeran-style** [1] - 1073:1
**sheet** [16] - 964:22, 965:24, 966:4, 966:13, 966:20, 966:21, 975:20, 976:5, 976:18, 977:22, 978:10, 978:21, 1032:3, 1035:22, 1042:11, 1045:15
**sheets** [7] - 917:16, 941:25, 966:15, 1002:11, 1003:12, 1003:20, 1004:3
**SHEPPARD** [2] - 863:13, 863:16
**shift** [1] - 885:13
**shifted** [1] - 885:1
**short** [1] - 870:10
**shorten** [1] - 870:6
**shortly** [1] - 887:2
**shoulder** [2] - 963:16, 963:23
**shoulders** [1] - 1005:13
**show** [12] - 945:13, 945:15, 955:9, 966:22, 967:24, 980:15, 983:16, 1046:12, 1051:4, 1056:9, 1057:14, 1066:20
**showed** [2] - 881:11, 966:9
**showing** [3] - 1039:15, 1056:24, 1066:24
**shows** [7] - 884:23, 940:13, 940:18, 975:8, 980:20, 1039:21, 1039:22
**sic** [3] - 897:2, 897:9, 977:21
**side** [15] - 868:19, 870:6, 870:10, 875:19, 876:1, 876:13, 955:16, 1024:15, 1024:16, 1035:25, 1038:4, 1045:20, 1045:21, 1045:22, 1045:24
**side's** [1] - 1042:21
**sides** [7] - 867:5, 875:22, 952:2, 1016:16, 1032:23, 1037:18
**sign** [5] - 923:7, 923:8, 937:12, 945:11, 945:14
**signal** [1] - 1030:24
**signed** [13] - 885:2, 885:14, 889:2, 889:7, 889:12, 891:2, 891:7, 891:10, 891:22, 901:9, 945:10, 1011:22, 1012:8
**significant** [4] - 885:18, 958:25,

1049:17, 1054:13
**signing** [1] - 945:9
**similar** [3] - 908:23, 1037:6, 1037:24
**similarities** [3] - 1031:20, 1032:4, 1054:13
**simple** [1] - 1048:5
**simply** [1] - 1039:9
**sing** [11] - 968:2, 968:10, 968:15, 968:17, 968:23, 969:5, 969:15, 969:18, 969:20, 969:22, 970:7
**singing** [11] - 967:5, 967:16, 968:7, 969:23, 970:15, 988:18, 1013:22, 1013:24, 1047:15, 1058:18, 1061:14
**single** [6] - 979:3, 979:5, 1008:14, 1029:14, 1040:11, 1043:22
**Siren** [37] - 879:11, 879:15, 891:15, 896:23, 897:1, 898:6, 900:16, 988:20, 989:3, 994:19, 996:19, 996:20, 996:21, 999:6, 1013:13, 1041:14, 1052:22, 1063:15, 1063:16, 1065:24, 1066:23, 1067:3, 1067:12, 1067:17, 1068:8, 1069:1, 1069:2, 1069:9, 1069:17, 1069:19, 1072:18, 1072:19, 1072:23, 1073:10, 1073:13, 1073:14, 1073:15
**siren** [1] - 1075:6
**sit** [4] - 912:7, 938:21, 962:5, 1022:16
**sitting** [4] - 963:1, 964:8, 968:1, 1008:14
**situation** [2] - 864:7, 899:2
**situations** [1] - 934:15
**six** [8] - 908:25, 945:24, 970:17, 976:9, 1002:8, 1002:13, 1010:18, 1021:8
**six-hour** [2] - 945:24, 1010:18
**sixth** [2] - 977:12, 977:14
**size** [1] - 962:18
**Ska** [1] - 1073:19
**sleeve** [3] - 927:22, 927:25, 928:2
**slice** [1] - 1071:16
**slide** [3] - 1066:7, 1066:20, 1068:1
**sliding** [1] - 963:5
**small** [1] - 1069:5
**smaller** [1] - 871:4
**smooth** [3] - 876:23, 1049:1, 1049:11
**snap** [3] - 1009:18, 1021:10, 1022:18
**snaps** [10] - 1020:15, 1020:17, 1021:7, 1021:16, 1022:6, 1022:20, 1023:4, 1058:18, 1061:14, 1069:3
**snare** [4] - 1043:14, 1043:18, 1043:19, 1043:20
**snippet** [3] - 914:3, 914:16, 952:1
**so..** [6] - 865:17, 866:3, 866:22, 999:17, 1008:8, 1016:21
**solely** [1] - 1011:21
**solo** [3] - 988:9, 1057:14, 1065:4
**soloing** [1] - 1067:4
**someone** [18] - 893:20, 895:15, 898:23, 915:25, 916:4, 916:6, 921:23, 927:8, 961:16, 990:13, 990:19, 990:24, 993:3, 993:7, 1011:3, 1011:22, 1015:8, 1024:21
**sometime** [3] - 912:4, 954:2, 966:13
**sometimes** [8] - 904:10, 905:2, 905:6, 923:6, 928:20, 965:1, 969:15, 1046:10
**somewhat** [3] - 873:6, 980:18, 1037:24
**somewhere** [1] - 1012:13
**song** [143] - 879:6, 879:10, 879:12, 879:13, 879:22, 880:2, 886:25, 887:2, 891:14, 895:11, 896:6, 896:7, 896:8, 896:10, 896:20, 897:10, 897:13, 904:10, 914:3, 915:4, 919:13, 920:21, 921:23, 922:16, 924:18, 925:8, 927:15, 927:18, 927:19, 927:22, 929:6, 929:10, 929:17, 941:25, 942:11, 942:12, 943:12, 946:4, 959:6, 959:13, 960:2, 960:6, 961:15, 966:6, 966:24, 966:25, 967:10, 967:23, 969:1, 969:3, 970:13, 971:10, 971:15, 972:25, 973:3, 973:11, 973:12, 973:15, 974:12, 982:7, 982:10, 984:3, 985:1, 985:23, 985:24, 986:7, 986:14, 986:18, 987:7, 987:25, 989:6, 989:7, 990:20, 990:22, 990:24, 991:4, 993:1, 993:2, 993:9, 993:10, 993:13, 993:15, 993:17, 993:19, 993:23, 994:12, 994:17, 994:22, 996:4, 996:15, 996:16, 996:17, 997:5, 998:8, 999:4, 999:19, 1000:14, 1002:7, 1002:8, 1003:10, 1006:21, 1007:7, 1008:6, 1008:22, 1008:25, 1009:20, 1009:23, 1010:1, 1010:9, 1010:10, 1011:6, 1014:10, 1015:9, 1020:3, 1022:20, 1023:16, 1023:21, 1024:16, 1035:8, 1035:12, 1040:12, 1041:5, 1041:10, 1043:12, 1044:15, 1044:21, 1044:22, 1045:12, 1049:18, 1049:20, 1050:10, 1056:5, 1056:21, 1059:20, 1069:18, 1071:15, 1072:8, 1074:14
**songs** [20] - 914:19, 940:17, 975:21, 975:22, 987:2, 987:21, 987:23, 989:24, 990:6, 990:8, 996:3, 1003:4, 1003:9, 1003:11, 1014:8, 1014:12, 1014:17, 1021:20, 1029:10, 1051:18
**songwriting** [6] - 998:24, 999:3, 999:12, 1004:14, 1028:9, 1030:18
**sonically** [1] - 1061:8
**Sony** [18] - 869:5, 878:9, 879:19, 879:22, 880:3, 881:7, 886:10, 886:25, 887:4, 914:9, 918:19, 919:10, 920:16, 923:24, 926:13, 926:17, 926:24, 956:20
**soon** [1] - 1026:11
**sophisticated** [1] - 1015:24
**sorry** [27] - 864:15, 867:15, 872:9, 878:7, 896:10, 896:11, 897:7, 900:8, 907:9, 907:14, 921:15, 924:7, 926:6, 926:10, 930:13, 931:9, 932:17, 937:15, 937:18, 962:15, 996:22, 1004:23, 1006:8, 1020:22, 1026:24, 1055:2
**sort** [14] - 866:15, 867:1, 867:10, 867:15, 867:18, 868:1, 887:3, 901:9, 1031:5, 1049:4, 1051:22, 1053:16, 1069:12, 1073:4
**sorts** [5] - 883:15, 884:15, 890:1, 890:14, 1031:24
**sound** [44] - 879:9, 879:15, 882:1, 887:24, 896:4, 896:8, 915:3, 971:18, 975:18, 995:5, 1001:13, 1024:18, 1030:24, 1034:16, 1035:5, 1035:17, 1035:23, 1042:8, 1043:19, 1044:23, 1044:25, 1045:13, 1045:14, 1045:17, 1045:20, 1045:22, 1055:15, 1058:11, 1065:22, 1065:23, 1066:12, 1068:9, 1071:24, 1072:2, 1072:3, 1072:14, 1072:21, 1072:23, 1073:1, 1074:22, 1075:1, 1075:3
**sounded** [1] - 1003:10
**sounds** [13] - 868:6, 876:22, 876:23, 914:5, 962:12, 1050:12, 1058:16, 1068:9, 1068:10, 1070:16, 1073:16, 1073:18, 1075:4
**source** [4] - 1044:3, 1055:17, 1057:7, 1062:22
**sources** [1] - 907:17
**South** [1] - 863:15
**space** [6] - 883:13, 887:24, 1047:4, 1047:21, 1063:24, 1064:1
**spacing** [2] - 1046:10, 1047:19
**spacious** [1] - 1048:9
**Spatola** [176] - 874:8, 879:17, 879:18, 879:25, 880:4, 880:6, 880:16, 881:6, 881:24, 881:25, 901:24, 902:11, 906:7, 906:14, 906:18, 906:24, 907:16, 910:6, 911:20, 911:24, 911:25, 912:8, 919:13, 920:1, 922:16, 924:18, 925:18, 929:23, 930:6, 935:2, 935:15, 937:11, 938:2, 938:22, 950:1, 954:6, 956:20, 960:24, 963:12, 963:14, 963:15,

963:16, 963:20, 963:22, 963:25, 964:5, 967:2, 967:5, 967:6, 967:9, 967:11, 967:17, 968:7, 968:11, 969:6, 970:8, 970:13, 970:19, 970:24, 971:6, 971:12, 971:25, 972:3, 972:4, 972:7, 972:14, 972:18, 973:1, 973:3, 973:8, 973:17, 973:22, 974:1, 974:10, 974:13, 977:17, 982:20, 982:24, 983:4, 983:23, 984:7, 984:16, 984:19, 985:21, 986:4, 986:17, 986:20, 986:23, 987:1, 987:3, 987:6, 987:10, 988:6, 988:9, 989:1, 991:14, 993:18, 994:6, 994:22, 995:1, 995:5, 995:10, 995:17, 996:3, 997:1, 997:12, 998:1, 998:23, 999:11, 999:20, 999:23, 1000:4, 1000:12, 1000:17, 1001:6, 1002:16, 1002:25, 1003:20, 1004:22, 1005:10, 1005:17, 1006:1, 1006:11, 1009:19, 1013:12, 1013:17, 1014:3, 1014:10, 1014:11, 1014:14, 1014:19, 1015:5, 1016:14, 1016:20, 1017:14, 1019:22, 1020:7, 1020:15, 1022:5, 1022:10, 1023:7, 1025:3, 1025:8, 1025:11, 1025:14, 1025:17, 1025:23, 1032:16, 1034:5, 1035:4, 1035:25, 1036:6, 1037:11, 1039:25, 1040:9, 1041:12, 1042:25, 1045:20, 1048:14, 1049:11, 1053:9, 1056:4, 1058:21, 1060:13, 1063:4, 1064:1, 1064:5, 1064:10, 1064:15, 1070:10, 1071:17, 1072:5, 1072:22

**SPATOLA** [1] - 862:5

**Spatola's** [40] - 874:18, 881:25, 907:7, 910:10, 911:8, 926:3, 926:18, 926:25, 930:21, 947:11, 950:4, 952:3, 953:16, 961:3, 961:10, 971:7, 971:13, 971:21, 981:23, 983:7, 988:19, 1034:15, 1036:2, 1036:17, 1039:16, 1040:22, 1049:6, 1049:8, 1049:18, 1052:9, 1063:9, 1063:18, 1065:20, 1067:5, 1071:7, 1071:13, 1072:7, 1072:15, 1074:21, 1075:5

**Spats** [1] - 879:18

**SPEAKER** [1] - 1026:15

**speaking** [11] - 865:10, 886:15, 887:6, 889:9, 890:10, 893:7, 894:20, 894:22, 937:17, 1031:24, 1063:17

**speaks** [2] - 917:14, 975:13

**special** [2] - 1031:14, 1031:22

**specific** [19] - 864:22, 887:2, 892:18, 904:24, 915:25, 918:2, 926:18, 926:25, 1002:18, 1003:7, 1003:16, 1007:10, 1016:19, 1043:13, 1046:19, 1054:14, 1065:16, 1073:10, 1074:3

**specifically** [24] - 866:2, 886:15, 905:15, 906:14, 917:14, 933:1, 947:14, 967:8, 967:11, 969:7, 970:12, 998:13, 1010:20, 1028:6, 1030:10, 1034:12, 1044:24, 1044:25, 1049:14, 1058:24, 1063:17, 1072:1, 1072:14, 1074:21

**specify** [1] - 1052:21

**speculation** [2] - 921:24, 932:6

**spell** [2] - 882:20, 1027:17

**spend** [2] - 955:9, 1028:7

**spent** [5] - 869:1, 942:21, 960:14, 961:10, 1007:18

**Splice** [3] - 1021:20, 1021:25, 1022:2

**splits** [4] - 895:10, 903:4, 1011:14, 1014:7

**spoken** [1] - 947:18

**sprawling** [1] - 962:14

**square** [1] - 1042:13

**stamps** [1] - 1059:11

**stand** [18] - 869:9, 912:17, 912:20, 939:25, 941:20, 946:20, 952:17, 971:4, 1000:25, 1008:15, 1018:4, 1020:11, 1021:23, 1026:12, 1052:13, 1054:1, 1065:13, 1070:17

**stand-alone** [2] - 1065:13, 1070:17

**standard** [6] - 996:1, 1036:14, 1040:7, 1041:5, 1046:7

**standing** [2] - 1005:13, 1075:21

**standpoint** [4] - 1009:14, 1066:10, 1068:22, 1072:15

**stands** [2] - 1061:10, 1070:7

**Stars** [1] - 863:17

**start** [10] - 879:1, 882:5, 891:11, 919:16, 939:8, 959:18, 965:15, 994:17, 1019:12, 1033:9

**started** [18] - 885:10, 888:1, 947:12, 964:24, 965:3, 965:4, 967:3, 970:20, 970:25, 983:17, 985:2, 985:17, 988:11, 1006:12, 1019:13, 1019:23, 1020:8, 1037:22

**starting** [10] - 879:3, 881:22, 951:15, 957:15, 967:13, 969:8, 975:9, 975:10, 1019:7, 1022:23

**starts** [3] - 865:10, 922:12, 989:18

**state** [2] - 882:20, 1027:17

**statement** [6] - 887:11, 890:15, 895:20, 916:20, 916:21, 952:9

**States** [3] - 915:22, 992:9, 992:17

**STATES** [1] - 862:1

**stating** [2] - 881:13, 966:10

**stations** [1] - 1029:7

**statistical** [2] - 1029:20, 1031:9

**statutes** [1] - 916:8

**stay** [2] - 971:23, 971:24

**stayed** [2] - 1047:12, 1047:14

**stem** [3] - 1043:20, 1043:22

**stems** [10] - 898:1, 1042:19, 1043:3, 1043:4, 1043:16, 1044:1, 1044:3, 1059:15, 1062:23

**step** [7] - 887:14, 890:7, 1015:21, 1015:22, 1040:8, 1040:10, 1073:4

**stepping** [2] - 896:11, 1030:3

**steps** [1] - 893:7

**stick** [1] - 987:3

**still** [20] - 870:23, 877:10, 884:12, 894:23, 894:24, 920:16, 928:19, 939:25, 945:3, 945:16, 946:15, 975:20, 1018:4, 1054:21, 1060:10, 1069:15, 1070:12, 1070:25

**stipulate** [1] - 1017:13

**stipulated** [8] - 872:16, 872:19, 872:22, 872:24, 873:4, 937:16, 964:12, 980:16

**stipulation** [11] - 874:12, 874:23, 975:1, 976:1, 976:14, 977:2, 977:10, 977:20, 978:5, 978:17, 980:8

**stood** [2] - 963:15, 963:23

**stop** [5] - 866:21, 970:4, 1074:1, 1075:11

**stopped** [3] - 876:19, 1019:8, 1020:4

**story** [2] - 1048:10, 1049:3

**straight** [2] - 962:23, 962:24

**Street** [2] - 862:23, 863:5

**stretch** [4] - 912:18, 912:20, 1000:25, 1026:12

**stricken** [1] - 1024:24

**strike** [5] - 868:2, 889:13, 932:18, 1033:22, 1055:20

**strikes** [1] - 1017:2

**strong** [1] - 866:23

**strongly** [1] - 948:25

**struck** [1] - 1072:17

**structurally** [3] - 1058:10, 1065:11, 1065:12

**structure** [13] - 1008:10, 1008:12, 1008:15, 1008:21, 1029:10, 1030:18, 1032:13, 1045:6, 1045:16, 1060:9, 1067:1, 1070:22, 1071:18

**structured** [1] - 1045:9

**structures** [2] - 1072:9, 1074:18

**student** [2] - 884:2, 1070:13

**students** [1] - 1029:4

**studies** [1] - 1031:10

**studio** [34] - 890:24, 902:15, 902:19, 905:10, 940:19, 942:8, 942:22, 943:12, 944:11, 960:24, 962:3, 962:16, 962:17, 962:22, 963:9, 965:18, 965:21, 965:22, 965:24, 973:14, 982:20, 982:24, 986:11, 991:8, 995:9,

1002:24, 1010:11, 1011:16, 1025:4, 1028:14, 1028:20, 1028:22
**Studio** [6] - 962:3, 962:13, 962:14, 962:18, 963:8, 965:19
**studios** [1] - 1002:23
**study** [1] - 1030:6
**stuff** [3] - 864:18, 888:4, 1024:7
**style** [3] - 1073:1, 1073:13, 1073:14
**styles** [1] - 1048:6
**Subject** [3] - 919:13, 922:16, 924:18
**subject** [8] - 864:18, 864:24, 868:23, 912:16, 945:4, 945:16, 952:5, 1074:3
**subjects** [2] - 1030:10, 1030:25
**submit** [1] - 873:20
**submitted** [2] - 1056:11, 1070:13
**Submix** [1] - 1057:10
**submix** [23] - 1057:10, 1057:18, 1058:2, 1058:16, 1058:25, 1059:16, 1060:14, 1061:4, 1061:18, 1062:14, 1065:1, 1066:3, 1066:18, 1067:24, 1068:14, 1069:6, 1069:20, 1070:4, 1070:8, 1070:11, 1070:18
**submixes** [1] - 1062:5
**subpoena** [3] - 953:8, 958:16, 958:19
**subpoenaed** [2] - 954:8, 957:23
**subpoenas** [1] - 950:19
**subscription** [1] - 1022:2
**subsequent** [1] - 1014:19
**substance** [2] - 953:23, 954:13
**substantial** [2] - 880:18, 881:18
**subtract** [5] - 1050:21, 1051:5, 1060:12, 1067:20, 1070:24
**subtracting** [2] - 1069:1, 1069:3
**success** [5] - 881:17, 886:19, 890:20, 890:25, 891:6
**successfully** [1] - 869:7
**suddenly** [3] - 875:23, 1037:11, 1074:14
**sue** [1] - 893:18
**sued** [2] - 893:22, 898:23
**sufficiently** [1] - 872:23
**suggest** [1] - 1038:5
**suggested** [5] - 873:6, 941:21, 942:2, 943:8, 948:2
**suggesting** [1] - 942:6
**suing** [3] - 879:18, 902:6, 902:7
**Suite** [2] - 863:9, 863:17
**summarizing** [1] - 903:11
**summation** [1] - 1071:5
**sunglasses** [1] - 878:19
**super** [1] - 866:25
**super-duper** [1] - 866:25
**superintended** [1] - 881:2
**supervising** [2] - 963:17, 963:24
**supported** [1] - 1033:23
**supposed** [1] - 1026:25
**surprise** [2] - 868:12, 1002:1
**surprised** [3] - 869:2, 878:20, 1037:9
**suspect** [1] - 955:7
**sustain** [2] - 867:3, 1017:5
**sustained** [9] - 931:22, 932:7, 944:24, 954:11, 954:22, 988:23, 1014:23, 1024:23, 1060:3
**Swalla** [3] - 1005:5, 1023:16, 1023:18
**sworn** [3] - 877:10, 882:19, 1027:16
**symbol** [1] - 1030:24
**symbols** [1] - 1030:23
**syncopated** [2] - 1013:16, 1013:24
**syncopation** [1] - 1029:19
**synth** [3] - 1055:6, 1055:13, 1069:16
**synthy** [1] - 1073:16
**system** [1] - 1047:2
**systematic** [4] - 1029:20, 1030:6, 1031:22, 1042:14

## T

**T's** [1] - 938:12
**Table** [2] - 1036:16, 1039:16
**table** [3] - 933:4, 1039:15, 1039:20
**talent** [1] - 884:23
**talks** [2] - 928:5, 928:6
**tapes** [1] - 1062:20
**taste** [1] - 960:3
**taught** [7] - 1029:1, 1029:8, 1030:10, 1030:13, 1030:15, 1030:21, 1030:25
**taxes** [1] - 917:15
**teach** [3] - 1029:4, 1029:8
**teaching** [7] - 1028:7, 1028:25, 1029:12, 1029:15, 1030:11, 1030:16
**team** [8] - 885:18, 911:3, 920:3, 930:6, 945:11, 947:17, 950:12, 1012:1
**technical** [2] - 874:20, 975:18
**technicalities** [1] - 991:5
**technically** [7] - 960:17, 968:16, 975:9, 975:20, 989:6, 991:3, 1011:9
**techniques** [2] - 1051:12, 1051:13
**technology** [2] - 883:7, 896:11
**tedious** [1] - 1068:18
**teeters** [1] - 866:7
**temperament** [1] - 1047:2
**ten** [1] - 985:12
**tend** [1] - 1067:7
**tends** [1] - 993:16
**term** [11] - 865:8, 915:10, 915:12, 938:18, 986:1, 992:1, 992:7, 998:11, 998:12, 1031:10, 1046:8
**terminology** [1] - 982:3
**terms** [14] - 883:15, 886:22, 897:13, 903:8, 906:20, 906:25, 933:4, 968:6, 997:19, 1031:6, 1054:13, 1063:9, 1074:10, 1075:1
**test** [1] - 880:11
**tested** [1] - 1027:4
**testified** [28] - 881:25, 886:1, 887:22, 927:4, 940:8, 941:4, 943:19, 945:19, 945:23, 951:24, 952:5, 963:14, 963:22, 969:13, 972:14, 987:11, 1001:22, 1004:17, 1005:9, 1009:11, 1009:23, 1010:4, 1012:11, 1020:14, 1022:5, 1022:10, 1037:15, 1062:16
**testifies** [3] - 877:24, 882:19, 1027:16
**testify** [14] - 899:24, 948:19, 948:22, 953:20, 955:9, 997:21, 1016:2, 1016:3, 1016:11, 1033:4, 1034:1, 1039:12, 1053:1, 1054:12
**testifying** [5] - 969:14, 988:11, 1001:24, 1019:1, 1024:22
**testimony** [49] - 865:15, 865:21, 869:5, 869:8, 871:1, 877:24, 881:21, 882:3, 882:10, 895:18, 903:12, 934:23, 943:10, 947:12, 947:21, 948:14, 949:1, 952:12, 953:9, 953:17, 955:13, 955:20, 957:4, 960:8, 968:4, 969:16, 989:1, 990:15, 992:2, 992:7, 994:1, 1000:7, 1004:23, 1005:20, 1018:19, 1020:12, 1021:21, 1021:23, 1023:7, 1026:13, 1033:14, 1033:15, 1036:25, 1037:5, 1038:2, 1038:3, 1038:16, 1044:4, 1053:24
**text** [6] - 925:22, 944:22, 953:3, 953:15, 953:22, 958:11
**texted** [2] - 958:13, 958:14
**texture** [2] - 1032:13, 1045:6
**THE** [224] - 864:1, 864:13, 865:1, 865:14, 865:25, 866:18, 867:12, 867:25, 868:5, 868:25, 869:18, 870:2, 870:12, 870:18, 871:7, 871:13, 872:8, 872:11, 872:25, 874:1, 874:13, 874:19, 876:7, 876:11, 876:14, 876:19, 876:22, 877:14, 877:16, 877:17, 877:25, 878:13, 878:16, 878:18, 878:24, 882:14, 882:20, 882:22, 882:23, 882:24, 899:14, 900:1, 900:2, 900:22, 903:11, 903:13, 907:23, 912:13, 912:17, 912:22, 912:24, 921:12, 921:25, 922:1, 926:22, 930:1, 930:16, 931:22, 932:7, 932:20, 935:5, 935:7, 937:1, 937:6, 937:17, 937:19, 937:22, 937:24, 938:9, 938:10, 939:1, 939:3, 939:5, 939:6, 939:15, 939:18, 939:24, 942:5, 943:6, 944:1, 944:7, 944:8, 944:9, 944:16, 944:18, 944:24, 945:3, 946:18, 946:19, 946:23, 946:25, 947:5, 947:25, 950:21, 951:4, 951:19, 954:10, 954:22, 956:11, 957:1, 957:7, 957:13, 957:25,

958:8, 958:9, 959:16, 959:19, 959:23, 961:6, 964:14, 967:15, 969:11, 970:10, 970:11, 971:4, 972:11, 972:12, 973:7, 973:11, 973:21, 973:25, 974:5, 975:14, 975:15, 980:17, 980:22, 981:7, 988:23, 989:5, 989:6, 989:14, 989:16, 989:19, 990:16, 990:19, 991:20, 993:21, 993:22, 994:2, 994:10, 994:11, 995:21, 995:22, 997:9, 997:16, 997:24, 998:21, 999:2, 999:3, 999:15, 999:16, 1000:2, 1000:25, 1002:5, 1002:6, 1005:21, 1005:23, 1006:6, 1006:25, 1008:9, 1008:10, 1014:23, 1015:2, 1015:15, 1015:21, 1017:16, 1018:3, 1018:7, 1018:9, 1019:17, 1020:25, 1021:14, 1022:9, 1022:14, 1022:15, 1022:16, 1022:18, 1022:24, 1024:23, 1026:3, 1026:4, 1026:5, 1026:10, 1026:16, 1026:23, 1027:9, 1027:12, 1027:18, 1027:20, 1027:21, 1032:18, 1036:18, 1036:21, 1052:12, 1052:17, 1053:19, 1054:5, 1054:8, 1054:15, 1054:17, 1055:1, 1056:14, 1060:3, 1062:15, 1062:23, 1062:25, 1063:5, 1063:6, 1063:23, 1064:3, 1064:6, 1064:12, 1064:13, 1064:17, 1064:21, 1064:24, 1074:2, 1074:6, 1075:12, 1075:19, 1075:24, 1076:9, 1076:14, 1076:16

**themes** [1] - 1041:12
**themselves** [2] - 877:2, 1071:21
**theory** [8] - 1028:11, 1029:2, 1030:5, 1030:8, 1030:9, 1030:13, 1045:7, 1046:1
**therefore** [4] - 875:10, 879:6, 948:24, 989:21
**THEREUPON** [2] - 882:16, 1027:13
**Thereupon** [20] - 877:19, 878:23, 939:14, 939:22, 939:23, 940:25, 961:8, 1015:20, 1018:1, 1018:2, 1026:21, 1026:22, 1027:11, 1061:7, 1066:4, 1068:15, 1070:5, 1075:18, 1076:17, 1076:19
**thinking** [3] - 873:5, 1016:10, 1016:11
**thinks** [2] - 937:2, 993:25
**third** [3] - 880:23, 920:19, 976:6
**Thomas** [2] - 863:4, 957:19
**thoughts** [1] - 877:2
**thousands** [2] - 1031:12, 1052:1
**three** [41] - 881:8, 885:7, 885:9, 885:11, 885:12, 913:12, 913:14, 948:15, 948:16, 968:16, 972:16, 973:17, 974:1, 974:3, 974:12, 974:14, 977:7, 1002:17, 1003:2, 1010:2, 1016:5, 1025:15, 1025:22, 1038:1, 1040:14, 1040:15, 1040:23, 1043:18, 1046:16, 1046:19, 1046:22, 1046:25, 1047:15, 1064:1, 1072:10, 1072:12, 1072:13, 1074:4
**three-note** [2] - 1046:16
**throughout** [7] - 989:7, 996:16, 1018:19, 1038:25, 1056:5, 1061:17
**throws** [1] - 959:12
**Thursday** [2] - 862:19, 874:5
**TikTok** [7] - 898:3, 898:9, 914:3, 914:16, 914:19, 966:11, 981:18
**timeframe** [2] - 906:20, 907:1
**timeline** [1] - 911:5
**timeliness** [1] - 880:6
**timing** [4] - 910:20, 911:15, 914:5, 937:7
**tinny** [1] - 1073:17
**tired** [1] - 966:20
**title** [6] - 966:6, 966:24, 966:25, 981:17, 981:21, 1057:9
**titled** [6] - 1039:15, 1060:16, 1065:2, 1066:19, 1069:7, 1077:2
**today** [18] - 864:25, 868:12, 873:24, 883:7, 902:3, 912:7, 913:7, 928:14, 933:23, 934:6, 938:21, 945:17, 946:16, 947:21, 951:9, 1034:19, 1034:21, 1075:13
**together** [15] - 888:7, 888:10, 903:23, 979:13, 990:21, 990:22, 1007:12, 1008:11, 1011:23, 1011:25, 1043:19, 1045:1, 1066:22, 1067:6, 1068:23
**Tom** [11] - 865:4, 947:11, 950:4, 953:19, 956:13, 956:19, 957:10, 957:18, 957:24, 958:2
**tomorrow** [1] - 874:2
**tone** [1] - 1073:21
**took** [6] - 871:18, 878:5, 940:12, 954:7, 962:21, 1026:11
**tools** [2] - 1042:2, 1042:4
**Tools** [6] - 979:14, 982:16, 1042:18, 1043:7, 1044:4, 1044:6
**top** [6] - 908:3, 918:24, 919:6, 1007:22, 1056:20, 1059:9
**topic** [1] - 1053:17
**total** [4] - 943:11, 956:16, 965:9, 1047:1
**totally** [2] - 1049:9, 1065:25
**touch** [1] - 921:3
**touched** [6] - 1030:11, 1035:1, 1041:8, 1060:19, 1073:7, 1073:12
**tour** [2] - 922:5, 940:19
**touring** [3] - 864:3, 865:11, 918:6
**towards** [4] - 872:7, 993:14, 993:16, 999:4
**tracing** [1] - 1048:19
**track** [35] - 890:8, 892:9, 892:13, 892:22, 896:15, 896:16, 896:19, 896:22, 897:1, 897:9, 898:1, 898:6, 898:15, 899:8, 900:10, 901:6, 901:8, 903:1, 904:7, 904:21, 905:23, 906:7, 906:19, 907:16, 910:11, 915:17, 935:19, 1007:8, 1043:12, 1043:13, 1043:14, 1043:15
**tracks** [15] - 889:19, 889:21, 891:2, 892:2, 893:9, 935:2, 1004:9, 1043:9, 1043:10, 1043:18, 1043:21, 1044:1, 1044:3, 1057:22, 1065:4
**trails** [1] - 867:18
**training** [4] - 992:11, 1029:3, 1030:21, 1033:12
**transcribe** [2] - 1036:9, 1042:7
**transcribed** [1] - 1041:24
**transcribing** [2] - 1032:1, 1042:8
**transcript** [7] - 943:9, 948:2, 949:3, 949:17, 991:17, 1002:19, 1077:1
**TRANSCRIPT** [1] - 862:15
**transcription** [1] - 1042:2
**transcriptions** [1] - 1041:20
**transcripts** [2] - 862:25, 947:4
**treat** [5] - 866:2, 866:9, 876:16, 1033:14
**trial** [21] - 868:18, 869:19, 874:12, 875:14, 875:18, 877:21, 879:12, 953:10, 955:3, 976:11, 977:9, 978:4, 978:6, 978:16, 987:14, 1034:22, 1037:11, 1037:14, 1037:22, 1038:25, 1039:2
**TRIAL** [1] - 862:15
**Trial** [19] - 918:14, 926:14, 929:19, 964:12, 974:24, 975:2, 975:25, 976:24, 977:19, 977:21, 977:23, 978:18, 979:18, 979:20, 980:7, 980:13, 980:15, 981:5, 1056:11
**trials** [2] - 948:20, 949:4
**tricky** [1] - 914:18
**tried** [3] - 873:21, 947:20, 966:17
**trouble** [1] - 901:12
**true** [14] - 865:16, 877:5, 877:8, 930:4, 930:19, 944:21, 945:25, 963:17, 963:18, 973:4, 973:19, 974:3, 1010:7, 1037:15
**trusted** [4] - 888:3, 888:16, 888:20, 946:3
**trusting** [1] - 903:22
**try** [10] - 922:18, 931:23, 935:25, 936:2, 957:23, 965:21, 967:21, 1007:10, 1007:11
**trying** [10] - 866:24, 870:6, 875:22, 887:21, 911:17, 920:5, 931:14, 933:9, 989:17,

1015:23
**Tuesday** [1] - 873:24
**TuneDaRula** [1] - 1076:5
**tuning** [1] - 1047:2
**turn** [10] - 942:14, 999:24, 1006:3, 1018:6, 1019:18, 1030:23, 1040:20, 1065:1, 1066:18, 1069:6
**turns** [1] - 865:16
**TV** [3] - 1028:9, 1028:19
**twist** [1] - 917:17
**two** [37] - 866:14, 871:19, 871:25, 872:10, 873:10, 873:11, 874:14, 876:4, 880:15, 894:4, 899:23, 920:5, 921:6, 943:3, 948:12, 960:15, 975:9, 975:11, 975:12, 975:21, 975:22, 978:14, 988:19, 1002:17, 1004:18, 1009:20, 1010:23, 1030:17, 1035:16, 1035:23, 1047:24, 1052:24, 1063:19, 1072:12, 1073:12
**two-hour** [1] - 975:12
**type** [2] - 990:2, 1073:17
**types** [2] - 959:12, 1063:19
**typical** [2] - 1032:12, 1032:24
**typically** [4] - 879:12, 890:9, 1021:19, 1032:10

## U

**U.S** [2] - 862:3, 992:16
**ultimate** [8] - 988:23, 993:20, 994:8, 997:14, 998:25, 999:13, 1008:7, 1053:16
**ultimately** [10] - 919:19, 970:18, 970:24, 971:6, 971:11, 971:20, 1016:13, 1017:22, 1020:6, 1054:20
**um-hum** [8] - 889:22, 904:25, 923:18, 926:11, 931:18, 936:5, 1029:14, 1031:3
**unanticipated** [1] - 869:10
**unbelievably** [1] - 877:6
**under** [24] - 877:7, 879:7, 915:21, 935:3, 937:16, 939:25, 942:16, 952:5, 960:5, 969:14, 971:18, 975:6, 983:6, 984:10, 992:9, 1003:15, 1005:8, 1005:24, 1010:4, 1016:24, 1018:4, 1021:9, 1022:19, 1023:24
**underlying** [8] - 951:8, 1035:11, 1044:15, 1045:12, 1046:3, 1058:3, 1058:4, 1071:20
**understood** [8] - 872:1, 875:9, 891:9, 895:12, 899:23, 931:6, 935:13, 1066:6
**unexpected** [1] - 869:10
**unfair** [1] - 875:20
**unfinished** [1] - 1061:11
**unfortunately** [3] - 874:4, 922:20, 961:16
**UNIDENTIFIED** [1] - 1026:15
**unilateral** [1] - 972:8
**union** [1] - 920:16
**unique** [4] - 1032:6, 1049:12, 1050:2, 1050:15
**unitary** [1] - 880:22
**United** [3] - 915:22, 992:9, 992:17
**UNITED** [1] - 862:1
**universal** [1] - 1073:2
**universe** [1] - 933:24
**universities** [1] - 1030:18
**university** [3] - 1028:8, 1030:17, 1030:21
**University** [1] - 1030:7
**unless** [2] - 869:9, 1038:20
**unlikely** [1] - 865:16
**untimely** [1] - 869:25
**unusual** [1] - 905:9
**up** [56] - 867:17, 867:19, 870:4, 871:24, 873:11, 877:6, 882:8, 884:19, 887:14, 900:5, 900:25, 902:13, 903:17, 904:10, 904:15, 906:1, 906:2, 906:3, 907:7, 907:9, 909:12, 918:13, 921:5, 923:6, 923:10, 923:20, 930:17, 931:4, 937:8, 942:15, 952:1, 955:18, 959:24, 960:6, 962:22, 969:2, 979:2, 980:9, 981:1, 1002:12, 1006:25, 1017:12, 1017:15, 1017:18, 1017:22, 1019:6, 1019:9, 1020:5, 1026:8, 1026:12, 1026:25, 1051:4, 1051:18, 1053:21, 1054:10, 1064:7
**urge** [1] - 948:25
**useful** [6] - 877:7, 880:10, 1067:5, 1067:14, 1068:4, 1071:9
**uses** [3] - 1055:6, 1073:15

## V

**valuable** [2] - 880:19, 881:18
**value** [3] - 959:8, 988:19, 993:5
**variations** [1] - 1049:4
**various** [13] - 886:23, 893:10, 1001:23, 1004:9, 1014:11, 1036:3, 1037:19, 1044:6, 1044:12, 1046:25, 1051:15, 1067:8, 1071:11
**variously** [1] - 1001:8
**verbatim** [1] - 1041:14
**verdict** [1] - 1039:8
**Veronica** [1] - 863:5
**verse** [10] - 996:10, 1036:4, 1039:22, 1040:22, 1040:23, 1041:5, 1041:6, 1056:2, 1056:3, 1056:21
**verses** [2] - 1013:21, 1063:14
**version** [9] - 949:8, 980:14, 985:1, 985:19, 985:24, 1057:20, 1061:9, 1065:20, 1066:11
**versions** [2] - 985:16, 986:21
**versus** [3] - 938:10, 985:12, 993:1
**via** [1] - 864:11
**video** [8] - 864:11, 864:14, 864:15, 871:25, 940:17, 940:25, 961:3, 961:8
**view** [6] - 883:5, 959:3, 995:23, 999:11, 1001:11, 1017:17
**viewed** [1] - 1001:7
**viewing** [1] - 1033:4
**views** [3] - 880:11, 880:14, 1053:7
**vinyl** [1] - 928:14
**visual** [9] - 1042:12, 1057:3, 1057:8, 1057:9, 1057:24, 1060:20, 1061:22, 1062:13, 1069:20
**visually** [5] - 1058:2, 1058:6, 1060:5, 1067:19, 1071:7
**vocal** [6] - 1007:10, 1007:22, 1007:23, 1060:10, 1064:15, 1067:6
**vocals** [10] - 1007:6, 1007:19, 1008:2, 1057:1, 1059:4, 1065:8, 1065:22, 1066:14, 1066:25, 1069:18
**voice** [6] - 987:18, 987:20, 987:24, 988:3, 1047:3, 1047:25
**voicemail** [3] - 864:20, 864:23, 865:5
**voicing** [13] - 1032:13, 1045:6, 1046:1, 1046:8, 1046:10, 1047:5, 1047:8, 1048:17, 1048:19, 1049:4, 1049:13, 1049:17, 1074:24
**voicings** [3] - 1048:7, 1049:8, 1049:9
**VOLUME** [1] - 862:16
**volume** [1] - 1003:8
**vs** [1] - 862:7

## W

**Wade** [5] - 878:1, 878:3, 878:4, 878:5, 878:6
**wait** [1] - 892:14
**waiting** [1] - 1054:18
**walk** [1] - 1033:8
**wants** [4] - 876:1, 887:9, 973:14, 1016:20
**Warner** [2] - 886:7, 886:8
**Warners** [1] - 886:7
**WAV** [2] - 979:12, 1035:18
**ways** [10] - 866:5, 866:6, 1046:21, 1046:22, 1046:25, 1047:4, 1047:18, 1047:25, 1067:8, 1071:11
**wear** [1] - 934:18
**wearing** [1] - 878:19
**website** [1] - 1022:1
**Wednesday** [2] - 874:5, 881:22
**week** [3] - 879:3, 1001:5, 1036:22
**weekend** [2] - 878:25, 939:12
**welcome** [4] - 878:16, 878:24, 939:24, 1018:3
**well-established** [1] - 980:5
**WERGE** [72] - 863:4, 864:9, 864:15, 865:6, 868:11, 869:14, 869:23, 871:2, 871:9, 872:1, 877:20, 878:1, 878:4, 878:7, 878:10, 878:14, 921:17, 939:16, 939:20, 940:2, 940:4, 943:17, 946:21, 946:24, 950:25, 951:17, 953:12, 954:9, 954:20, 956:7, 957:5, 957:11, 958:7, 959:20, 970:9, 971:3, 972:10, 973:5, 973:20, 974:4,

975:13, 988:22, 989:4, 989:10, 990:14, 993:20, 994:8, 995:20, 997:8, 997:14, 998:19, 998:25, 999:13, 1001:19, 1001:21, 1006:7, 1006:9, 1007:4, 1015:1, 1015:14, 1017:11, 1018:8, 1019:15, 1020:22, 1022:7, 1024:22, 1026:2, 1075:23, 1076:3, 1076:13, 1077:19, 1077:24
**Werge** [28] - 863:4, 865:9, 872:17, 873:18, 876:13, 939:15, 940:1, 947:11, 947:14, 950:4, 953:19, 956:14, 956:19, 957:18, 957:19, 981:20, 988:11, 1001:1, 1001:18, 1007:3, 1018:7, 1019:6, 1019:12, 1020:4, 1020:16, 1022:4, 1023:12, 1024:3
**Werge's** [1] - 966:9
**West** [1] - 862:23
**WESTERN** [1] - 862:2
**whereas** [2] - 917:14, 917:18
**white** [2] - 1063:24, 1063:25
**Whitney** [6] - 909:20, 910:7, 919:24, 922:8, 922:18
**whole** [2] - 880:22, 881:2
**wife** [2] - 881:25, 911:8
**Wilshire** [1] - 863:9
**win** [2] - 895:2, 989:20
**window** [2] - 911:14, 911:19
**wise** [1] - 934:3
**wish** [4] - 949:9, 964:16, 1033:17, 1037:5
**withdrawal** [1] - 872:18
**witness** [76] - 865:19, 866:3, 866:9, 866:13, 867:1, 876:17, 877:3, 877:5, 877:22, 877:23, 877:25, 882:6, 882:7, 882:11, 899:11, 923:21, 932:20, 942:5, 943:11, 944:3, 946:20, 947:3, 948:8, 948:14, 948:19, 948:21, 951:4, 951:11, 951:17, 951:22, 955:8, 955:9, 955:13, 955:14, 955:15, 955:18, 955:19, 955:20, 955:21, 967:1, 967:5, 967:16, 974:8, 989:10, 993:18, 997:20, 1007:1, 1014:24, 1016:2, 1016:3, 1018:4, 1026:6, 1026:7, 1033:19, 1037:1, 1037:23, 1046:13, 1046:15, 1046:21, 1046:23, 1047:20, 1047:22, 1047:24, 1048:4, 1048:9, 1049:1, 1049:3, 1052:20, 1053:1, 1054:3, 1073:17, 1073:19, 1073:22
**WITNESS** [40] - 882:22, 900:1, 903:13, 912:22, 922:1, 935:7, 937:6, 937:24, 938:10, 939:5, 944:7, 944:9, 944:18, 946:18, 958:9, 970:11, 972:12, 973:11, 973:25, 975:15, 989:6, 990:19, 993:22, 994:11, 995:22, 997:24, 999:3, 999:16, 1002:6, 1005:23, 1008:10, 1022:15, 1022:18, 1026:4, 1027:9, 1027:18, 1062:23, 1063:5, 1064:3, 1064:12
**witness's** [2] - 951:2, 1033:18
**witnessed** [31] - 963:19, 968:14, 969:5, 970:7, 970:18, 970:23, 972:7, 987:16, 987:20, 988:2, 988:17, 991:6, 991:13, 994:6, 994:21, 994:25, 995:4, 995:9, 995:10, 995:14, 995:16, 995:17, 996:24, 996:25, 997:11, 998:4, 998:22, 999:10, 1000:10, 1018:23, 1019:1
**witnesses** [32] - 868:17, 868:20, 869:14, 869:16, 870:7, 876:12, 877:9, 881:23, 952:7, 955:1, 955:4, 997:21, 1015:24, 1016:17, 1017:9, 1032:21, 1032:22, 1033:3, 1033:11, 1037:20, 1037:25, 1038:2, 1038:5, 1038:15, 1038:19, 1038:24, 1039:3, 1039:5, 1053:7, 1076:4
**wonder** [1] - 1051:16
**Wong** [1] - 863:14
**word** [3] - 895:24, 937:19, 1018:19
**wording** [1] - 1017:3
**words** [9] - 887:21, 896:12, 920:9, 922:19, 933:9, 1002:2, 1057:14, 1065:4, 1067:4
**work's** [1] - 881:17
**work-for-hire** [17] - 915:20, 915:21, 916:2, 936:21, 936:23, 937:9, 937:11, 938:2, 992:4, 992:7, 997:3, 998:6, 998:7, 998:11, 998:14, 998:18
**work-for-hires** [1] - 936:20
**works** [4] - 879:8, 1005:5, 1012:12, 1036:13
**workstation** [1] - 1043:6
**world** [1] - 984:4
**worry** [1] - 874:6
**worth** [1] - 878:12
**write** [4] - 974:13, 993:18, 994:6, 1007:13
**writer** [7] - 905:7, 934:11, 934:17, 986:24, 990:25, 993:15, 1011:8
**writers** [5] - 889:6, 895:9, 895:11, 914:12, 923:10
**writes** [2] - 919:24, 922:18
**writing** [11] - 873:9, 880:9, 918:6, 929:6, 942:11, 993:10, 993:13, 993:16, 1029:9, 1030:20, 1042:9
**written** [8] - 881:6, 898:9, 901:9, 935:18, 936:22, 938:2, 1007:9, 1017:13
**wrote** [6] - 895:9, 923:12, 923:24, 925:1, 1054:21
**www.amydiazfedreporter.com** [1] - 862:25

## Y

**year** [4] - 866:5, 884:8, 913:10
**Year** [2] - 909:23, 923:25
**years** [36] - 883:20, 883:22, 884:21, 885:7, 885:9, 885:11, 885:12, 887:17, 888:7, 889:3, 903:23, 908:25, 913:12, 913:13, 913:14, 929:3, 940:8, 940:22, 941:2, 941:3, 958:21, 958:24, 960:10, 970:17, 985:5, 987:17, 996:25, 1000:10, 1002:7, 1002:8, 1002:13, 1003:5, 1021:8, 1027:2, 1029:1
**yellow** [1] - 1063:13
**yesterday** [2] - 864:21, 872:17
**young** [2] - 888:2, 897:4
**yourself** [6] - 918:20, 927:8, 945:24, 990:6, 990:8, 1027:25
**yourselves** [3] - 939:10, 1026:14, 1052:14
**yup** [4] - 895:19, 897:24, 1041:22

## Z

**Zealand** [2] - 897:5, 1072:20
**zoom** [8] - 864:13, 864:15, 881:25, 882:6, 882:8, 882:11, 939:7, 1029:5